No. 90,044

STATE OF KANSAS, *Appellee,* v. REGINALD DEXTER CARR, JR., *Appellant.*

(331 P.3d 544)

12

Opinion filed July 25, 2014.

*Debra J. Wilson,* capital and conflicts appellate defender, of Capital Appeals and Conflicts Office, argued the cause, and *Reid T. Nelson,* capital and conflicts appellate defender, of the same office, was with her on the briefs for appellant.

*Kim T. Parker,* deputy district attorney, argued the cause, and *Debra S. Peterson,* special prosecutor, *David Lowden,* chief attorney, *Lesley A. Isherwood,* assistant district attorney, *Nola Tedesco Foulston,* former district attorney, *Marc Bennett,* district attorney, and *Derek Schmidt,* attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

*Per Curiam:* Defendant Reginald Dexter Carr, Jr., and his brother, Jonathan D. Carr, were jointly charged, tried, convicted, and sentenced for crimes committed in a series of three incidents in December 2000 in Wichita. This is R. Carr's direct appeal from his 50 convictions and 4 death sentences.

In the first incident on December 7 and 8, Andrew Schreiber was the victim. The State charged R. Carr and J. Carr with one count of kidnapping, one count of aggravated robbery, one count of aggravated battery, and one count of criminal damage to property. The jury convicted R. Carr on all counts and acquitted J. Carr on all counts.

In the second incident on December 11, Linda Ann Walenta was the victim. The State charged R. Carr and J. Carr with one count of first-degree felony murder. The jury convicted both men.

In the third incident on December 14 and 15, Heather M., Aaron S., Brad H., Jason B., and Holly G. were the victims of an invasion at the men's Birchwood Drive home that led to sex crimes, kidnappings, robberies, and, eventually, murder and attempted murder. The State charged R. Carr and J. Carr with eight alternative counts of capital murder, four based on a related sex crime under K.S.A. 21-3439(a)(4) and four based on multiple first-degree premeditated murders under K.S.A. 21-3439(a)(6); one count of

attempted first-degree murder; five counts of aggravated kidnapping; nine counts of aggravated robbery, eight of which were alternatives, four based on use of a dangerous weapon and four based on infliction of bodily harm; one count of aggravated burglary; 13 counts of rape, eight of which were based on coerced victim-on-victim sexual intercourse and one of which was based on a victim's coerced self-penetration; three counts of aggravated criminal sodomy, two of which were based on coerced victim-on-victim oral sex; seven counts of attempted rape, six of which were based on coerced victim-on-victim overt acts toward the perpetration of sexual intercourse; one count of burglary; and one count of theft. The State also charged R. Carr and J. Carr with one count of cruelty to animals because of the killing of Holly G.'s dog. The jury convicted R. Carr and J. Carr on all of the charges arising out of the Birchwood incident.

In connection with the three incidents, the State also charged R. Carr alone with three counts of unlawful possession of a firearm. The jury convicted him on these three counts as well.

In the separate capital penalty proceeding that followed, R. Carr and J. Carr were sentenced to death for each of the four capital murders committed on December 15. They each received a hard 20 life sentence for the Walenta felony murder. J. Carr received a controlling total of 492 months' imprisonment consecutive to the hard 20 life sentence, and R. Carr received a controlling total of 570 months' imprisonment consecutive to the hard 20 life sentence for the remaining nondeath-eligible crimes.

In his briefs, R. Carr raises 21 issues tied to the guilt phase of his prosecution and 19 issues tied to the death penalty phase of his prosecution. In addition, because this is a death penalty case, this court is empowered to notice and discuss unassigned potential errors under K.S.A. 2013 Supp. 21-6619(b), which we do. R. Carr does not challenge the sentences he received for the Schreiber crimes; for the Walenta felony murder; for the crimes in which Heather M., Aaron S., Brad H., Jason B., and Holly G. were the victims that were not eligible for the death penalty; or for the cruelty to animals conviction.

Both sides sought many extensions of time to file briefs in this appeal and in J. Carr's separate appeal. In R. Carr's case, all of these extension requests were unopposed by the other side of the case. After completion of briefing, this court heard oral argument on December 17, 2013.

After searching review of the record, careful examination of the parties' arguments, extensive independent legal research, and lengthy deliberations, we affirm 32 of R. Carr's 50 convictions, including those for one count of capital murder of Heather M., Aaron S., Brad H., and Jason B. under K.S.A. 21-3439(a)(6); for the felony murder of Walenta; and for all of the crimes against Schreiber. We reverse the three remaining convictions for capital murder because of charging and multiplicity errors. We also reverse his convictions on Counts 25, 26, 29 through 40, and 42 for coerced sex acts for similar reasons. We affirm the convictions based on Counts 2, 9 through 24, 27, 28, 41, and 43 through 58.

We vacate R. Carr's death sentence for the remaining capital murder conviction, because the district judge refused to sever the defendants' penalty phase trials. We remand to the district court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND FOR GUILT PHASE ISSUES

Resolution of R. Carr's claims on this appeal demands a comprehensive review of the disturbing facts underlying his convictions and sentences. It also requires discussion of the actions now attributed to J. Carr, as the defendants' cases were joined at the hip until appeal and their challenges to their convictions and death sentences are necessarily intertwined.

### The Schreiber Incident and Investigation

The first incident began when Schreiber went to a convenience store at 21st and Woodlawn at 10:45 p.m. on December 7, 2000. He parked his 1998 Ford Expedition on the side of the building and went inside to make a purchase. Just after he returned to his car and sat down in the driver's seat, a man holding a small, black, semi-automatic handgun palm down approached and placed the

gun's barrel against the glass of the window in the driver's door. The man ordered Schreiber to move over to the front passenger seat.

As Schreiber followed the order and the man climbed into the driver's seat, the man hit Schreiber in the back of the head with the gun and told him to hurry up. Once both were situated, the man backed the Expedition out of the parking lot and drove away. As he was driving, he asked Schreiber if he had any money. Schreiber said yes and handed over his wallet.

The man pulled into a nearby alley, and a second man came up to the front passenger window and pointed another gun at Schreiber. The driver ordered Schreiber to let the other man into the front passenger seat and then get into a middle seat behind the front seat of the Expedition. As the second man got into the car, he hit Schreiber in the head with his gun and told Schreiber not to look at him.

The two men asked Schreiber if he had an ATM card, remarking that someone who drove a car like the Expedition must have money. When Schreiber said he had an ATM card, the driver gave Schreiber his wallet and had him get his ATM card out. Schreiber then handed the wallet back to the driver.

The driver went to a nearby ATM, pulling up beside it so that Schreiber could access the machine through the rear passenger window. Schreiber told the men that he could withdraw only $300 at a time. They instructed him to withdraw $300, and, as the machine dispensed the money, the men told Schreiber to hand it over his shoulder without looking at them, which he did. The passenger grabbed the money. The two men then told Schreiber to hand them the receipt, which he did in the same way. When the passenger determined from the receipt that Schreiber still had money, he said they were not done yet.

The driver went to a second ATM, where Schreiber again withdrew the maximum of $300. Again, the men asked for the receipt, and, after determining that Schreiber still had money in his account, they again said they were not done.

At a third ATM, Schreiber tried to withdraw $300, but there were insufficient funds to cover that amount. The men told Schrei-

ber to try to get $200, and the transaction processed successfully. Schreiber handed the passenger the money and the receipt in the same way that he did at the first and second ATMs. When the passenger looked at the third receipt, he said they were going to leave Schreiber with 8 dollars and some change, which the two men appeared to find funny.

During the entire time the two men took Schreiber from ATM to ATM, the second man held a gun to Schreiber's head. Schreiber described the passenger's gun as a dark semi-automatic handgun. During the episode, including a stretch of driving when the Expedition moved north of the convenience store and then west on Kansas Highway 96, the men demanded that Schreiber remove any jewelry and give it to them. Schreiber handed over a silver Guess watch with a blue face. While he was removing the watch, he turned his head and was again hit on the head and told not to look at the two men.

The men also discussed what they were going to do with Schreiber, including the possibility of dropping him off on a dirt road. After driving on several dirt roads bordered by open fields, however, the men determined that the locations were not remote enough for their purposes. The men also discussed the Expedition, the driver commenting on how much he liked it and wanted one. The passenger said at one point that he planned to take Schreiber's pants and shoes when they dropped him off, because it was so cold outside. The passenger appeared to be amused by his own remark.

Eventually, the men took Schreiber back into town and stopped at a car wash near Windsor at Woodgate Apartments on East 21st Street. There, after two switches between the positions of the passenger and Schreiber, they told Schreiber to lie face down on the floor in front of the middle seat. They also discussed dropping the second man off at their car.

After leaving the car wash, the driver stopped the Expedition again and the passenger got out of the car. As he left, he reminded the driver to be sure to wipe down the Expedition. The driver told the passenger to follow him. Schreiber heard another vehicle. Both cars were driven for several more minutes and then stopped. The

driver told the other man that they had not arrived at the right spot and that the second man should continue to follow.

The two cars were driven for another 5 to .10 minutes before they were stopped again. Schreiber could tell that this time the cars had left the paved road. Schreiber heard the driver turn off the ignition and then wipe the surfaces in the Expedition.

The driver then got out of the Expedition and had a discussion with the second man about whether they were going to leave Schreiber's keys behind. The second man then told Schreiber that the two men were going to put the keys in the street. The driver asked Schreiber if he had a spare tire and Schreiber said that he did. The driver said he was going to slash the tires. Schreiber then heard someone fire three shots.

The driver instructed Schreiber to wait 20 minutes before leaving the scene. Schreiber heard the men get into the other car and drive away. As they did so, he peeked out of a window of the Expedition and saw the receding square taillights of the other car.

Schreiber found his keys. One of the Expedition's tires had three holes in it, but he was able to maneuver the car back onto the paved road near 43rd Street and Webb Road and drive home, where he called 911.

When law enforcement responded to Schreiber's call, he told police that the driver who accosted him was a black male in his 20s, approximately 5 feet 9 inches or 5 feet 10 inches tall and with a medium build. Schreiber said the driver was wearing a beanie or stocking cap of some type, blue jeans, and a long-sleeved dark t-shirt or sweatshirt. The driver had some facial hair but not a full mustache or a full beard. Schreiber described the second man as a black male who was taller than the driver, and who was wearing a winter jacket or parka.

## The Walenta Incident and Investigation

The second incident, at about 9:40 p.m. on December 11, 2000, took place in the driveway of Walenta's home on Dublin Court in east Wichita.

Walenta, who was a cellist with the Wichita Symphony, was arriving home from practice in her 2000 GMC Yukon. As she turned

into one of the side streets near her home, she noticed a newer, light-colored, four-door Honda-type vehicle turn behind her.

The car continued to follow Walenta's Yukon as she turned into her street, a dead end with a cul-de-sac. As Walenta approached her house, she noticed that the car had stopped in front of the residence directly south of hers. And, when she pulled into her driveway, she saw a black male get out of the front passenger side of the car and begin walking toward the driver's side of her Yukon.

As the man approached, he said he needed help. Walenta rolled her window down a few inches, and the man immediately pointed a handgun through the window, palm down and at her head. Walenta tried to start her Yukon, which ground the starter gear because the car was already running. The man then told Walenta not to move the Yukon, but Walenta shifted into reverse. When she did, the man shot her.

The gunman began to run away, and, as he did, the other car appeared to be leaving. Walenta was not sure whether the gunman may have been left behind by whoever was driving the car that had followed her.

After Walenta had been shot, her across-the-street neighbor, Anna Kelley, heard a car horn honking. When Kelley looked outside, she realized that the honking was coming from Walenta's Yukon, and that the Yukon's lights were flashing. When Kelley opened her front door, Walenta began calling to her for help. Kelley's husband called police as Kelley ran to Walenta's car. The Yukon was still running; its driver's window had shattered; and Walenta was slumped backward in the driver's seat.

While waiting for police to arrive, Walenta told Kelley she had been shot by a black man with wiry hair. She also said that a light-colored car had followed her into her street.

Once transported to the hospital, Walenta provided somewhat more detailed descriptions of the gunman, although they varied in certain respects from one another. She described the gunman as a black male in his 30s with a medium build. She said his hair was long, straight, and wiry, and described it as shoulder-length with corkscrews. At different points, she estimated his height at between 5 feet 7 inches and 6 feet; as between 5 feet 9 inches and more

than 6 feet; and as approximately 6 feet. The only description she was able to give of the gunman's clothing was that he might have been wearing a beige trench coat.

Walenta suffered three gunshot wounds, and one of the bullets severed her spinal cord, rendering her paraplegic. But she began recovering during her stay in the hospital and was scheduled to be transferred to a rehabilitation facility on January 2, 2001. That day, however, Walenta suffered a pulmonary embolus—a complication of her paralysis—and died.

*The Quadruple Homicide and Crimes Leading to It*

The third incident began on December 14, 2000, at a home shared by Aaron S., Brad H., and Jason B. at 12727 Birchwood, the middle unit of a triplex at the intersection of 127th and Birchwood.

Holly G., who was the girlfriend of Jason B., was with Jason B. at the home. Holly G. had her dog with her as well. Aaron S. and his friend, Heather M., also were at the home, as was Brad H.

As Holly G. and Jason B. began getting ready for bed at about 10:30 p.m., Holly G. pulled her hair back and fastened it with a plastic clip. Jason B. turned off the front porch light, made sure the front door was locked, and then came to bed. Holly G.'s dog was in Jason B.'s bedroom with Holly G. and Jason B.

A few minutes later, the porch light came on again. Holly G. heard Aaron S. talking to someone whose voice she did not recognize. Then Jason B.'s bedroom door burst open, and a tall black man with a gun came through the doorway. Jason B. screamed as the gunman yanked the covers off of the bed. A second black man, holding onto Aaron S. by the shirt, came into the room and pushed Aaron S. onto the bed with Holly G. and Jason B. The man also was armed.

The two intruders asked if anyone else was in the house and were told Brad H. was downstairs. One of the intruders went downstairs to get Brad H. while the other stayed in the bedroom. The intruder who stayed upstairs kept demanding to know if there was anyone else in the house, saying, "[D]on't lie, don't lie." Aaron S. eventually told him that Heather M. was in the other upstairs bed-

room. When the intruder who had gone downstairs returned to the bedroom with Brad H., he was carrying a golf club, and he ordered Brad H. onto the floor at the foot of the bed. One of the intruders retrieved Heather M. from the other bedroom and told her to get on the floor in Jason B.'s bedroom as well.

The intruders demanded to know where the phones in the house were and whether there was a safe. One of them was shouting, "Where's the safe? A house this fucking nice[,] there's got to be a safe!" One looked around the house while the other stood guard over the five friends. At one point, the intruders also said that someone needed to "shut . . . up" Holly G.'s dog or they would shoot it. Eventually the dog was muzzled.

The intruders also demanded to know who among Heather M., Aaron S., Brad H., Jason B., and Holly G. had money. When none had any cash, the intruders asked who had ATM cards. Each raised his or her hand, and the intruders asked each how much money he or she had in the bank. After obtaining this information, the intruders had a whispered discussion. They then ordered the five victims to remove their clothes. The intruders then pulled all of the clothes out of the closet in Jason B.'s bedroom, ordered the five into the closet, and told them to sit down. They were threatened not to speak to each other.

The intruders then conversed about wanting to watch two women engage in sex acts and ordered Holly G. and Heather M. to go to the bar area outside of Jason B.'s bedroom. They told the women to "suck that pussy." Holly G. and Heather M. complied; Holly G. performed oral sex on Heather M., and then Heather M. performed oral sex on Holly G. The intruders also demanded that the two women use their fingers to penetrate each other's vaginas; again, the women complied. During these acts, both intruders watched and made further demands, telling the women again to "suck that pussy" and "do it deeper." When Heather M. was performing oral sex on Holly G., one of the intruders hit Holly G.'s knee so that he could get a better view of what was happening.

Next, the intruders brought each of the three male victims out to the bar area one at a time and ordered each to have sexual intercourse with Holly G. Although one of the intruders had

thrown a shirt or other piece of clothing over Holly G.'s face, she remained able to see her feet and distinguish between the three male victims during these acts. The first was Brad H.; the second, Jason B.; the third, Aaron S. At some point during these acts, Heather was moved from beside Holly G. to the closet.

Neither Brad H. nor Jason B. was able to achieve an erection, but penetration of Holly G. nevertheless occurred. The intruders made comments about "popping" someone's "ass," if the absence of an erection prevented fulfillment of their demands. Aaron S. initially defied the intruders, saying, "[N]o, I don't want to do this." One of the intruders then became angry and hit Aaron S. in the back of the head with something hard, causing him to cry out in pain. Aaron S. then attempted to comply by having intercourse with Holly G.

After these acts, the intruders ordered Holly G. back into the closet in Jason B.'s bedroom and brought Heather M. from the closet out to the bar area. They then commanded Aaron S., Jason B., and Brad H., in that order, to have sexual intercourse with Heather M.

During these events, the intruders threatened to shoot if one of the men did not achieve an erection. Holly G. heard one of them say words to the effect of: "[I]t's 11:53, it's 11:54, somebody better get their dick hard, get a hard on." Holly G. heard Heather M. moaning in pain when each of the three men was outside of the closet. When Aaron S. was in the bar area with Heather M., Holly G. heard Aaron S. say again that he did not want to do what he was being ordered to do.

By this time, about midnight, Holly G. had seen enough of the two intruders that she was able to differentiate between them. The one she referred to as the first was a taller, thinner, black male who was wearing an orange and black sweater with the word "FUBU" on it, black jeans, a leather coat, and some kind of boots. The intruder Holly G. referred to as the second was stockier than the other and was wearing a black leather coat.

After the coerced victim-on-victim sex acts, the stockier of the two intruders took Brad H. to a series of ATMs. Before they could leave, there was a problem finding car keys, which caused the in-

truders to say that someone had better find his or her "fucking keys" or someone would be shot.

While Brad H. was gone with the stockier intruder, the taller, thinner intruder ordered Holly G. out of the closet. He ordered her to get on all fours and get herself "wet." To comply, Holly G. placed her finger in her vagina. The intruder then vaginally raped her from behind. During the rape, Holly G. was able to see that the intruder had laid a small, silver handgun on the floor. The gun was 4 inches to 5 inches long and was not a revolver. The other gun Holly G. had seen that night was black.

When the taller, thinner intruder returned Holly G. to the closet, he ordered Heather M. out of it and raped or attempted to rape her. From inside the closet, Holly G., Jason B., and Aaron S. could hear Heather M. moaning. Aaron. S., in particular, was crying and saying, "[T]his shouldn't happen this way." Heather M. was never put back into the closet.

Brad H. and the stockier intruder were away from the home about 30 minutes. The stockier intruder then took Jason B. to two ATMs. Jason B. and the intruder were gone about 20 minutes.

There followed a discussion about which of the remaining victims would leave next with the stockier intruder. Holly G. said she would go. She got out of the closet, put on a white sweatshirt, and took her ATM card out of her purse. The stockier intruder took her through the front door to the outside and told her to get into the driver's side of Jason B.'s silver Dodge Dakota pickup truck. The intruder sat slouched back in the corner of the passenger seat with what Holly G. believed to be a gun in his hand.

At the Commerce Bank ATM to which Holly G. drove at the stockier intruder's direction, Holly G. withdrew $350, the maximum amount allowed in one withdrawal. She then unsuccessfully attempted a $200 withdrawal and then successfully made a $150 withdrawal. This exhausted her available money. When she leaned out of the truck to take the cash out of the machine, the stockier intruder groped her vagina with his gloved hand.

At one point during this trip, Holly G. asked the stockier intruder if he was going to shoot her and the other victims. He said no. She

then asked him if he promised not to shoot them, and he said, "Yeah, I'm not going to shoot you."

Also during the trip to the ATM, the stockier intruder asked Holly G. if the other intruder had had intercourse with her. When Holly G. said that he had, the stockier intruder wanted to know if she had enjoyed it. To appease him, Holly G. said yes. She had seen what she believed to be a gun in his lap. The stockier intruder also asked if she had ever had sex with a black person and if it was better with the taller, thinner intruder than with her boyfriend.

When Holly G. and the stockier intruder were walking back into the house, he told her it was too bad they had not met under other circumstances because she was kind of cute and they could have dated. She replied, "[K]ind of, yeah." He then asked, "[W]hat does that mean?" Holly G. responded that she wasn't really having a good time.

When Holly·G. returned to the closet, she told Aaron S., Brad H., and Jason B.: "I think we're all going to be okay. I asked him, he said he's not going to shoot us."

Aaron S. was the next to leave the home with the stockier intruder. Holly G. thought Aaron S. put on pants and a shirt before they left.

While Aaron S. was gone, the taller, thinner intruder opened the closet door and offered the remaining victims a glass of whiskey, which they refused. Holly G. then heard someone handling a popcorn tin and a change jar. She heard the taller, thinner intruder ask Heather M., who was outside of the closet at the time: "[W]hose is this?" Heather M. said she did not know, but it was probably Holly G.'s. He then asked which of the male victims was Holly G.'s boyfriend, and Heather M. said Jason B. The taller, thinner intruder then opened the closet door and asked for Jason B. When Jason B. identified himself, the intruder asked him if the item that had been found was the only one of its kind. Jason B. said yes. The item was an engagement ring Jason B. had purchased for but not yet given to Holly G.

When Aaron S. returned, the stockier intruder told Holly G. to leave the closet and pushed her into the dining room by jabbing her in the back with something she assumed was a gun. He said,

"Don't worry[.] I'm not going to shoot you yet." The stockier intruder then made Holly G. get down onto all fours and vaginally raped her from behind. He then grabbed her, turned her around, ejaculated into her mouth, and ordered her to swallow. Holly G. was able to see the stockier intruder's face at this point.

Holly G. went to the bathroom, but, when she opened the bathroom door, she saw the taller, thinner intruder raping Heather M. from behind. Heather M. was on all fours, and the taller intruder was on his knees. The bathroom light was on, and the second intruder was only 2 feet to 3 feet in front of Holly G.; so she was able to see his face. The taller intruder shut the door, telling Holly G. he was not finished yet.

Holly G. waited outside the bathroom door for a few minutes and then opened it again. The taller intruder then directed Holly G. to get down on all fours. She complied and he again vaginally raped her from behind. After he stopped, Holly G. heard what sounded like a condom being removed, and then the toilet was flushed.

Holly G. was then directed back to the bar area, where Heather M. was already sitting. The three male victims remained in the closet in Jason B.'s bedroom. The women were cold and Holly G. put on a sweater. The two intruders were talking to each other, and then the stockier one went downstairs. When he came back upstairs, Holly G. heard him say something about a big screen television. Brad H. had a big screen television in his downstairs bedroom.

Holly G. also was able to get a better look at the stockier intruder at that time. She saw his face and noted that his hair was close to his head and not sticking out like the thinner intruder's hair.

At some point, the intruders used cleaning solution to wipe various surfaces and things in the house. When they had finished this task, all five victims were taken to the garage. Holly G. and Heather M. were wearing nothing but sweaters. Aaron S. was still wearing pants and a shirt. Brad H. and Jason B. were naked.

Holly G. and Heather M. were directed to get into the trunk of a beige Honda Civic belonging to Aaron S. The intruders then tried to get all three of the men into the trunk, but they could not fit.

Holly G. and Heather M. were then put into the back seat of the Honda, and the men were put into the trunk. Holly G. was then directed to get into the passenger side of Jason B.'s truck. After some discussion between the intruders, as the stockier intruder was taking Holly G. to the truck, the taller, thinner intruder said, "If she gives you any trouble . . . let me know and we'll take care of that."

The taller, thinner intruder drove away from the Birchwood home first in the Civic, followed by the stockier intruder driving the truck. As she rode with the stockier intruder, Holly G. asked him where they were going. He said they were going somewhere to drop the five victims off—away from their cars and the home. Again, Holly G. was able to see the stockier intruder's face; at this point, he was making no effort to keep her from looking at him. Holly G. noted that the clock in the truck showed it was 2:07 a.m.

The Honda and the truck were driven to a soccer field at 29th Street and Greenwich Road, and the intruders got out. Holly G. was ordered to get into the driver's seat of the Civic. The two intruders talked to each other for a couple of minutes, and then the male victims were brought out of the trunk and made to kneel in front of the Civic.

At this point, Holly G. turned to Heather M. and said, "Oh my God, they're going to shoot us." She and Heather M. were then directed to get out of the car. Holly G. knelt by Jason B., and Heather M. knelt by Aaron S.

Holly G. saw that the two intruders were standing fairly close together. She then heard a shot, and everyone started screaming. Aaron S. was pleading, "Please, no" and used the word, "sir." Holly G. heard three more shots.

Holly G. then felt an impact on the back of her head and everything went gray. She remained kneeling, but then she was kicked over and fell forward. She heard talking, heard one of the truck's doors shut, heard its engine start, and then felt another impact. She thought she had been run over. She heard the truck drive away after pausing for a moment, and she waited until she could no longer hear it before she looked to see if the intruders and the truck were gone. She saw the truck go south on Greenwich Road

and, when its lights disappeared, she got up and began checking to see if any of the four other victims was still alive.

Holly G. looked at Jason B. first. She rolled him over and saw blood coming from one of his eyes. She took her sweater off and tied it around Jason B.'s head to try to stop the bleeding. After looking at the others, Holly G. decided she needed to get help. Looking for the nearest safe place, she spotted a house with white Christmas lights in the distance. Now naked and barefoot, Holly G. ran more than a mile through snow, crossing several fences, some with barbed wire, to get to that house.

It was approximately 2:15 a.m. on December 15, when Steve Johnson and his wife heard someone pounding loudly on their front door and ringing their doorbell. Johnson looked outside and saw a naked woman at his door. He opened the door and the woman, Holly G., told him that she and four friends had been abducted, taken to a nearby field, and shot. Holly G. had blood on her back, and her hair was matted as a result of some type of wound. The Johnsons let Holly G. inside, gave her blankets, and called 911.

*Investigation Leading to R. Carr's Arrest and Discovery of Evidence*

Sedgwick County Emergency Communications dispatch received the Johnsons' call at 2:37 a.m. Johnson tried to convey everything Holly G. was telling him to the 911 operator, but he ultimately handed the phone to Holly G. because she was giving him information too fast for him to pass it on. Holly G. was afraid she was not going to survive and wanted the police to know everything that she knew about the Birchwood crimes.

Holly G. told the 911 operator that two black men broke into the Birchwood home at 11 p.m. She said the two intruders put her and her four friends in a closet, took turns raping her and the other woman who was at the house, and took them one-by-one to ATMs to make them withdraw money from their bank accounts. She said the two men then took two of their vehicles, a silver Dodge Dakota pickup truck and a beige Honda Civic, and drove them to a field on Greenwich Road past 37th Street. There, the two men made

them get on their knees and then shot all five of them in the back of the head. The two intruders then drove away in the truck.

Holly G. also gave a description of her attackers to the dispatcher. She said one of the men was tall and skinny, about 6 feet tall, had hair like "Buckwheat," and was wearing an orange and black sweater and black "jean-type" pants. The other had a heavier build, was also about 6 feet tall, and was wearing a black leather coat.

While Holly G. was being treated in a local hospital emergency room, officers obtained additional information from her. She said the intruder with the orange and black sweater was in his early 20s; was about 6 feet tall and weighed 175 pounds; had a bushy afro that stuck out about 2 inches; and was wearing black leather gloves and blue jeans. The other intruder was in his early 20s; was about 6 feet tall and weighed 190 to 200 pounds; and was wearing a black leather coat, black leather gloves, blue jeans, and boots. She said both men were carrying small semi-automatic handguns.

Holly G. had suffered a gunshot wound to the back of her head. The impact fractured her skull; but the bullet did not penetrate into her brain, apparently because it had been deflected by the plastic hair clip she was wearing. Holly G. also had other injuries, including bruises to her face and frostbite to her feet.

While Holly G. was transported and treated at the hospital, law enforcement found Aaron S.'s Honda Civic and the bodies of the four other victims lying in a road at the snow-covered soccer field where they had been shot. Sheriff's Deputy Matthew Lynch was first on the scene. He detected no pulse in Heather M. Aaron S. appeared to be attempting to breathe, as did Brad H. Jason B. did not appear to be breathing and had no pulse. Lynch advised dispatch that there were four "code blue" victims, meaning each was at least in cardiac arrest. EMS arrived on the scene at 2:54 a.m.

Officers collected spent cartridge casings, a bullet fragment, an ATM receipt reflecting a withdrawal on December 15 at 1:17 a.m., and pieces of Holly G.'s plastic hair clip at the soccer field.

Meanwhile, Wichita Police Officer Michael Dean was dispatched to the Birchwood home. He arrived at approximately 3 a.m. About that same time, Sergeant John Hoofer also was dis-

patched to the home. On his way there, Hoofer saw a Dodge Dakota pickup passing him in the opposite direction at about 127th Street. Because the vehicle matched a description that had been put out over the police radio, he turned around to pursue it. In the process, he lost track of it.

Hoofer arrived at the Birchwood home at 3:19 a.m., and he and Dean went inside. The home appeared to have been ransacked. In the bedrooms, dresser drawers had been pulled out; clothes were strewn all over; and the beds had been stripped of their linens. In the living room, an entertainment center had an open space where a television would have been, and a coaxial cable had been pulled through the open space and was lying on the floor. Downstairs, there was a computer desk with no computer. In what law enforcement would later learn was Jason B.'s bedroom, there was a large pool of blood on the corner of the mattress and what appeared to be a bullet hole. On the floor below that part of the mattress was a dead dog. The two officers then went back outside and secured the home as a crime scene.

A short while later, Dean was standing by his patrol vehicle when he saw an older white Plymouth come down 127th Street and drive by the Birchwood residence. He thought this was unusual, because it was 4 a.m. in a secluded residential area where there had been very little traffic, and the streets were snow-packed, making driving conditions hazardous. It was just a few minutes later when Dean saw the same vehicle coming down Birchwood. As the car drove past, Dean saw that the driver was a black male wearing a stocking cap. The driver stared straight ahead as the car passed, never acknowledging the officer or looking at what was now an obvious crime scene surrounded by police tape. Dean thought this was highly unusual and noted the car's Ford County license plate number. He watched as the vehicle turned onto 127th Street and headed back in the direction from which it had come the first time he saw it. He notified Hoofer that he needed to stop the vehicle and identify the driver.

At 4:13 a.m., Hoofer stopped the white Plymouth, a 1988 model, as it was driving away from the area of the Birchwood residence on 127th Street. He noticed a black leather coat on the back seat.

The driver was R. Carr. He showed Hoofer a piece of paper identifying him and listing a Dodge City address. R. Carr told Hoofer he was driving to the apartment of his girlfriend, Stefanie Donley. From R. Carr's description, Hoofer recognized the apartment's location as the 5400 block of East 21st Street, the address of—the Windsor at Woodgate complex. At some point after R. Carr identified himself, the encounter with Hoofer ended; and R. Carr drove away.

At about 4:30 a.m., R. Carr arrived at Donley's apartment. He stayed approximately 15 minutes and left again, returning about 45 minutes later.

About the same time R. Carr returned to the apartment complex, Christian Taylor, another resident of Windsor at Woodgate, was watching the local news as he got ready for work. He saw a report on a quadruple homicide during the previous night and noted that police were looking for a gray or silver Dodge Dakota pickup truck. As Taylor left his apartment to go to his car about 6:25 a.m., he saw a Dodge Dakota pickup truck fitting the description parked on the other side of an empty spot next to his car. The truck was backed in so that its tailgate was facing a fence; the tailgate was down. A large TV was in the bed of the truck. He then saw a black man, later identified as R. Carr, appear from behind the truck. Taylor described the man as in his 20s or 30s, with a few days' growth of facial hair, wearing blue jeans and a black or brown leather jacket, and with a scarf or hood covering his head.

Thinking the truck and the man he saw might have something to do with the quadruple homicide, Taylor got into his car, drove out of the parking lot, and headed to the nearest police station to report what he had seen.

Meanwhile, sometime after 6 a.m., Riwa Obel Nsangalufu, another resident of the Windsor at Woodgate complex, left his apartment to start his car and let it warm up. As he walked, he saw a man, later identified as R. Carr, trying to drag a large television on a blanket toward Building 8. Obel noticed a silver Dodge Dakota that was backed up against the fence with its tailgate down. R. Carr asked Obel to help, explaining he was moving in. After several requests, Obel agreed.

Obel helped R. Carr get the television up a set of stairs to Apartment 819. At that point, R. Carr told Obel that he could get the television inside by himself. R. Carr offered Obel a tip for helping him and displayed some folded bills. Obel refused the money.

R. Carr then knocked on the door of Apartment 819 and Donley came out. She asked R. Carr where he had been all night and said she had been waiting for him.

R. Carr told Donley that his sister had made him take his things out of her garage. He then began bringing various items into her apartment. He also had about $900 in cash that he took out of his pocket. R. Carr, according to Donley, was trying to reach J. Carr, and finally talked to him on the telephone at 5:30 a.m. to 5:45 a.m. R. Carr told Donley that J. Carr was seeing a married woman, that the woman's husband came home, that there was a shootout, and that J. Carr had run off.

A short while later, R. Carr took a shower, and Donley noticed that he removed a pair of red shorts he had been wearing under his pants the previous evening.

An officer investigating Taylor's report located the Dodge Dakota at the apartment complex parking lot and confirmed it had belonged to Jason B. The tailgate of the truck was down, and there were footprints and drag marks in the snow that led to a multicolored comforter on a sidewalk. On the other side of the fence behind the truck, the officer saw clothing that appeared to have been thrown over the fence. There was also a blue-and-white-striped comforter in a trash dumpster next to the pickup truck. Law enforcement later confirmed that the bedding and clothing belonged to residents of 12727 Birchwood.

At about the time that the officer was observing the comforter in the dumpster, Obel was leaving the apartment complex to go to work. The officer stopped Obel, and Obel told the officer about helping a man move a large TV from the truck to an apartment in Building 8. Obel showed the officer Apartment 819.

Officer Jamie Crouch was among the law enforcement agents who responded to the Windsor at Woodgate apartments and he stationed himself outside the balcony of Apartment 819. He heard other officers knock on the apartment's door and announce their

identity as police. A few seconds later, the apartment's sliding glass door onto the balcony opened. R. Carr emerged from the apartment; and he placed his hands on a balcony railing as if he were going to jump from the balcony to the ground.

When the officers knocking on the door entered the apartment, Officer Renay Bryand observed R. Carr coming back into the apartment from the balcony. R. Carr was arrested. On his person, officers found a gas card bearing Jason B.'s name; a watch that belonged to Heather M.; and $996, including 49 $20 bills.

Inside Apartment 819, officers also found numerous items belonging to the residents of 12727 Birchwood. These items included Brad H.'s large television, Jason B.'s checkbook, a garment bag with an identification tag for Aaron S., computer equipment belonging to Aaron S., tools, electronic equipment, clothing and jewelry, and several travel bags. The officers also found a credit card belonging to Holly G. They also found Brad H.'s wallet and Schreiber's Guess watch in a bedroom, under letters addressed to R. Carr. Shorts and t-shirts belonging to R. Carr were recovered from a bathroom and a sofa in the apartment. The officer also found a stocking cap, dark leather gloves, and a dark leather coat. Inside the pocket of the leather coat were two Intrust Bank receipts from 12:06 that morning. The receipts showed balance inquiries made on checking and savings accounts belonging to Brad H.

Inside the Dakota pickup truck, officers found an ATM card bearing Jason B.'s name and a wallet containing his driver's license. They also found two Commerce Bank ATM receipts showing withdrawals that morning. One receipt showed a withdrawal of $200 at 12:31 a.m. from Jason B.'s bank account, and the other showed withdrawals of $350 and $150 at 12:53 a.m. from Holly G.'s bank account.

## J. Carr's Movements and Arrest and Discovery of Evidence

While police were following up on Holly G.'s appearance at the Johnsons' door, J. Carr had called his friend, Tronda Adams, at 3:31 a.m. and said he missed a 2:30 a.m. train he had intended to take to Cleveland, Ohio. Adams granted J. Carr permission to spend the night at the home she shared with her mother, and he

arrived there at approximately 3:45 a.m. He had driven Donley's Toyota Camry and was still wearing a brown leather jacket, an orange and black FUBU sweater, black pants, and brown or black boots—the same clothes he had been wearing the previous evening when he said goodbye to Adams at 9:30 p.m. and left her home with his brother, R. Carr.

J. Carr asked Adams if she had a $20 bill for singles, and she observed that he had more than $500 in his pocket. Adams had never seen J. Carr with that amount of cash in the past. When she asked him where he had gotten the money, J. Carr said he had gone to the bank and withdrawn all of his funds before he was to leave town. Adams thought this was strange because J. Carr was unemployed and did not ordinarily reside in Wichita. Adams would eventually testify that her cell phone records showed that J. Carr made a call to Dodge City at 4:25 a.m. and a call to his sister at 4:26 a.m. She would also testify he woke her sometime between 4 a.m. and 5 a.m. to say that R. Carr was coming over to trade cars.

Later that morning, Adams saw news reports about the quadruple homicide. The reports said the police were looking for two suspects, one wearing an orange FUBU shirt. Adams woke J. Carr to tell him what had happened and to see how he would react to the news report. When she asked him if he had heard about four people getting killed, he said no. When she told him that the gunmen had taken the victims to ATMs and forced them to withdraw cash, J. Carr asked how the police knew that fact. Adams told him that one of the victims had survived.

Adams' mother, Toni Greene, was cleaning about 11 a.m. when she found a maroon jewelry box in one of the pockets of J. Carr's jacket. Inside the box was a diamond engagement ring. Thinking it must be intended for J. Carr's girlfriend in Ohio, she put the ring back where she found it.

About noon, Adams was watching the local television news while her mother and J. Carr were in the room with her. Adams saw video coverage of R. Carr being arrested and told J. Carr to go downstairs with her right away. Once downstairs, Adams asked J. Carr if he had seen the video of his brother being arrested. He said he did. When she asked him what had happened, he told her he

was just hanging around drinking after he had missed his train, apparently at his sister's home. Adams told him that his story was not going to work: He had been wearing the orange FUBU sweater, and the police already had his brother. J. Carr became upset during this conversation and was crying.

While Adams and J. Carr were downstairs, Greene had continued watching the news. Although she did not recognize R. Carr as the person being arrested in the video, she learned that one of the items taken from the Birchwood residence was an engagement ring. She also learned that the police were looking for an older white Plymouth, and she had noticed a white Plymouth parked outside the house earlier that morning.

Greene checked outside to see if the Plymouth was still there. It was. She then called Adams upstairs and told her they needed to leave immediately. Greene told Adams that J. Carr was the person the police were trying to find. She specifically told Adams about the engagement ring she had seen in J. Carr's jacket pocket and the Plymouth that police were looking for parked outside. Adams and Greene went across the street to a neighbor's house, and Greene and the neighbor called the police.

Looking back toward her house, Adams saw J. Carr come to its front door and make an inquiring gesture in her direction. He was again wearing the FUBU sweater. When the police arrived, J. Carr moved away from the door and went back inside. And, a short while later, Adams saw J. Carr running through an alley. He had again removed the FUBU sweater.

After a foot chase, officers apprehended J. Carr. They found more than $1,000 in cash on his person.

Inside Adams' home, police found the orange and black FUBU sweater; leather gloves; and J. Carr's brown leather jacket. The jacket pocket still contained the engagement ring Jason B. had purchased for Holly G., as well as an identification card for J. Carr.

In addition, several items were collected from the white Plymouth. These items included two clocks belonging to Brad H.

While J. Carr was being driven to a hospital after his arrest, pursuant to a warrant for bodily specimens, he asked the transporting detective and officer about an earlier quadruple homicide

in Wichita. When told the suspects had been arrested and charged with capital murder, he asked what capital murder was, how the death penalty was administered, and whether a person who received a lethal injection felt pain.

*Additional Investigation and Evidence Identifications*

Initially, Schreiber was not able to identify either of the men who kidnapped him by viewing photo arrays. However, on the morning of December 15, when Schreiber saw news footage of R. Carr's arrest, he believed R. Carr was one of the men. He called the detective assigned to his case and said he was "about 90 percent sure that [R. Carr was] the person who abducted" him the week before.

Later, at preliminary hearing and trial, Schreiber identified R. Carr as the man who approached his car outside of the convenience store. He did not identify J. Carr as the second kidnapper at either preliminary hearing or trial.

Walenta was shown two photo arrays at approximately 7:15 p.m. on December 15. Walenta said that the first and second photographs in one array fit the general appearance of the person who shot her. She said the eyes of the person in the second photograph "represented what she remembered about the suspect who shot her." The person in the second photograph was R. Carr. The person in the first photograph was in prison at the time of the Walenta incident. Walenta was unable to identify anyone from the second array, which contained a photograph of J. Carr.

Holly G. had been shown two photo arrays at approximately 6:30 p.m. on December 15, and had been asked if she could identify "any of the people in the pictures as the intruders."

Holly G. said she thought the person in position number two in the first array, the same shown later to Walenta, was one of the men. That person was R. Carr. When asked why she thought the person in position number two was one of the men, Holly G. noted his eyes, his features, and his hair.

When she viewed the second array, Holly G. said she thought the other intruder was in position number one, based on her recognition of him and "similar hair as to what [she] remembered," a

"Buckwheat" hairdo standing off the head, kind of clumped together. The person in position number one was not R. or J. Carr and was in custody at the time of the Birchwood crimes. J. Carr was in position number four in the second array.

At preliminary hearing, Holly G. was not able to identify the second, stockier intruder at the Birchwood residence. By the time of the hearing, R. Carr had shaved his head, and he intermittently wore glasses. Holly G. was able to identify J. Carr as the first, taller intruder.

At trial, Holly G. identified both R. Carr and J. Carr—R. Carr as the second, stockier intruder and J. Carr as the first, taller intruder.

*Autopsies*

· Heather M. died of a contact gunshot wound to her head. Her body showed bruising on her lower extremities. Injuries to her genital area were consistent with the application of force, and injuries to her knees were consistent with being placed on her hands and knees for the purpose of sexual intercourse.

· Aaron S. died of a contact gunshot wound to his head. He sustained blunt trauma injuries to his head and neck; and his legs showed bruises, red discoloration, and scrapes. Injuries on his forehead and head were consistent with being hit with a golf club and the gun associated with the murders.

Jason B. died of an intermediate-range gunshot wound to his head. In addition, his body showed blunt trauma injuries. An injury to his buttocks was consistent with being hit with a golf club.

Like Jason B., Brad H. died of an intermediate-range gunshot wound to his head. His face showed blunt trauma injuries.

All of the gunshot wounds to the four Birchwood murder victims were consistent with their bodies being in a kneeling position with their heads down when the bullets entered their skulls.

· Holly G.'s dog sustained "severe injury and fracturing of the neck, almost to the point where the head had fallen down off of the support of the spinal cord and vertebrae." Testimony at trial established that the dog's injuries could have been caused by a golf club. The dog also sustained a puncture wound to its neck.

## DNA and Other Biological Evidence

Semen collected from the carpet in the dining room of the Birchwood home and a hair with attached root from Jason B.'s bedroom matched J. Carr's DNA.

J. Carr's DNA also was found in samples from Holly G.'s rape examination. Semen collected from Holly G.'s labia majora matched J. Carr's DNA; and a sample of Holly.G.'s vaginal discharge was consistent with DNA from her and J. Carr, while all others at the Birchwood home were excluded as contributors. J. Carr was determined to be the major contributor to a mixed DNA profile found in semen from a swab of Holly G.'s lips, and all others at the home were excluded as contributors except for Holly G. and J. Carr.

A stain on J. Carr's boxer shorts matched Heather M.'s DNA. The results on a second stain on the boxer shorts excluded possible contributors other than Holly G., Heather M., and J. Carr.

Heather M.'s DNA was found in blood on the pair of R. Carr's red undershorts left on the bathroom floor when he took a shower at Donley's apartment on the morning of December 15. Heather M.'s DNA was also detected on a white t-shirt on the sofa in Donley's apartment. A test of DNA on a gray t-shirt from the sofa excluded everyone at the Birchwood residence except for Heather M. In addition, R. Carr's semen was found on a white muscle shirt, which he also left on Donley's bathroom floor.

Foreign material found on Holly G.'s thigh was tested and excluded everyone at the Birchwood residence except for her, R. Carr, and J. Carr.

An analysis of swabs from Heather M.'s vaginal entrance, clitoris, vagina, and vaginal vault was positive for the presence of seminal fluid. Blood also was detected on cervical swabs.

DNA samples from the penises of Aaron S., Brad H., and Jason B. also were tested. The sample from Aaron S. included him and Heather M. In addition to Brad H. himself, Holly G. could not be excluded on his sample. Jason B.'s sample was consistent with him, Holly G., and Heather M.

Testing was performed on three other hairs collected from the Birchwood residence.

A Wichita Police Department chemist trained in hair examination originally separated the total of four hairs from other hairs and fibers collected from the Birchwood home. She testified that she performed the separation macroscopically and that she had labeled three of the hairs Negroid and a fourth as "possibly" so.

On further testing, one of the hairs produced no result and may have been a non-human animal hair. Another did not match either R. or J. Carr, both of whom are African-American; that hair was more typical of a Caucasian or a person with European ancestry. Mitochondrial DNA testing on the third hair, which had been collected from the floor of Jason B.'s bedroom, showed that neither R. Carr nor J. Carr could be excluded as the contributor. Persons within the same maternal line will have the same mitochondrial DNA; thus the two brothers would be expected to have the same mitochondrial DNA profile.

Blood on a golf club found at the Birchwood home was positively identified as nonprimate blood.

A law enforcement agent would eventually testify at trial that he observed warts on R. Carr's penis after R. Carr was arrested. Donley had also noticed lesions on R. Carr that she believed to be genital warts. Holly G. learned a few months after the Birchwood crimes that she had contracted HPV (Human papillomavirus), a virus that can cause genital warts.

Schreiber's Guess Watch also was tested for DNA, and the results were consistent with R. Carr.

*Bank Account Transactions*

Bank account records for Brad H., Jason B., Holly G., and Aaron S. showed the following chronology of transactions on December 14 and 15:

December 14, 2000:

Commerce Bank ATM

- 11:54 p.m. $350 withdrawal from Brad H.'s checking account
- 11:55 p.m. $350 withdrawal from Brad H.'s savings account
- 11:55 p.m. attempted $350 withdrawal from Brad H.'s account
- 11:56 p.m. attempted $350 withdrawal from Brad H.'s account

Prairie State Bank ATM
- 11:58 p.m. attempted $500 withdrawal from Brad H.'s account
- 11:58 p.m. attempted $350 withdrawal from Brad H.'s account
- 11:59 p.m. attempted $350 withdrawal from Brad H.'s account

December 15, 2000

Central Bank & Trust ATM
- 12:02 a.m. attempted $200 withdrawal from Brad H.'s account

Intrust Bank ATM
- 12:05 a.m. attempted $100 withdrawal from Brad H.'s account
- 12:06 a.m. balance inquiry on Brad H.'s account

Commerce Bank ATM
- 12:31 a.m. $200 withdrawal from Jason B.'s Prairie State Bank account

Prairie State Bank ATM
- 12:31 a.m. attempted $250 withdrawal from Jason B.'s Prairie State Bank account
- 12:31 a.m. attempted $200 withdrawal from Jason B.'s Prairie State Bank account
- 12:32 a.m. balance inquiry on Jason B.'s Prairie State Bank account
- 12:32 a.m. attempted $200 withdrawal from Jason B.'s Prairie State Bank account
- 12:32 a.m. attempted $100 withdrawal from Jason B.'s Prairie State Bank account
- 12:32 a.m. attempted $100 withdrawal from Jason B.'s Capitol Federal account
- 12:34 a.m. $80 withdrawal from Jason B.'s Capitol Federal account

Commerce Bank ATM
- 12:53 a.m. $350 withdrawal from Holly G.'s account
- 12:54 a.m. attempted $200 withdrawal from Holly G.'s account
- 12:54 a.m. $150 withdrawal from Holly G.'s account
- 1:17 a.m. $350 withdrawal from Aaron S'.s account

Central Bank & Trust ATM
- 1:21 a.m. attempted $200 withdrawal from Aaron S.'s account

### Gun Evidence

Between December 10 and December 12, Adams saw J. Carr with two guns: a small, silver revolver and a black handgun.

On December 10, she was having problems with her boyfriend, and J. Carr gave her the small, silver gun to use for her protection. At 11:15 p.m. on December 11, J. Carr showed up at Adams' home after being dropped off by R. Carr. J. Carr asked Adams to give the small, silver gun back to him. In return, he gave her the black handgun, a semiautomatic.

The next evening, J. Carr told Adams that he needed the black gun back, and she gave it to him. He asked how she had been touching it and scolded her for doing so too much. J. Carr then thoroughly cleaned the gun. He wiped down the barrel and the grip and then he ejected the clip and removed the bullets and wiped down the clip and each bullet.

About 3 months after the quadruple homicide, on March 19, 2001, a Winfield Correctional Facility inmate on clean-up detail found a Lorcin .380 caliber handgun at the intersection of Kansas Highway 96 and Greenwich Road in Wichita. Ballistics testing demonstrated that all of the bullets, casings, and fragments associated with the Schreiber, Walenta, and Birchwood incidents came from the Lorcin .380 handgun. This included a casing found at the scene where Schreiber was left by his abductors, bullets and casings from Walenta's Yukon, a bullet from Walenta's chest, casings and a bullet fragment found at 29th and Greenwich Road, and a bullet from the body of Aaron S. Adams identified the Lorcin as the black handgun that J. Carr had given her the evening of December 11 and that she had returned to him on December 12.

### Shoeprints and Cigar Ash

A print from J. Carr's left Timberland shoe had the same size, shape, and sole design as a shoeprint found on a cardboard sunshade in the garage at 12727 Birchwood. A print from the left shoe of R. Carr's pair of Buffalino boots had the same characteristics as a lift taken from a box under Jason B.'s bed. A print from R. Carr's right Buffalino boot had the same class characteristics as a lift taken from a tarp under Jason B.'s bed. Investigators found ashes on a

desk in the basement that were wider in diameter than those from a normal cigarette. There were no ashtrays, cigarettes, or any other kind of smoking material in the residence. Investigators collected the ashes because they found the presence of the ashes to be "unusual." A partially smoked cigar was recovered from R. Carr's leather coat and another from the dashboard of his white Plymouth.

### Birchwood Neighbor

After work on December 14, the night the Birchwood incident began, Jean Beck went to The Grape, a restaurant at Central and Rock Road in Wichita. The restaurant was a short distance from Walenta's home. Beck left at approximately 10:45 p.m. in her 2000 BMW 323. As she was driving to her home at 12725 Birchwood, the triplex unit next door to 12727 Birchwood, she noticed a newer, tan Toyota four-door car behind her. As Beck turned off 13th Street into her residential area, the driver of the Toyota turned in behind her. Beck called her daughter and asked her to open the garage door at 12725 Birchwood; and, for safety, Beck stayed inside her car until the Toyota had passed her home. After the Toyota went by, it headed back toward 13th Street.

### Defense Evidence

R. Carr put on a competing ballistics expert, who testified that his test firings from the Lorcin .380 were inconclusive in terms of a match to bullets and casings recovered from the crime scenes and bodies of the victims. However, the expert, Richard Ernest, admitted that he did not clean the gun before conducting the test firings and that the gun had significantly degraded by that time. He conceded that his conclusion could have been different if he had fired the Lorcin in the same condition as it was when the State's expert fired it.

J. Carr introduced an exhibit confirming his purchase of an Amtrak passenger train ticket from Newton to Cleveland, to depart at 2:40 a.m. on December 15, 2000.

Additional facts necessary to resolution of particular legal issues will be discussed below.

*Renumbering of Counts in Jury Instructions and Capital Murder Theories*

In its instructions to the jury and in the verdict forms, the alternative capital murder counts set forth in Counts 1 through 8 of the amended complaint were combined into Counts 1 through 4 of capital murder—one for each of the four Birchwood killings—based on alternate theories of guilt under K.S.A. 21-3439(a)(4) (underlying sex crime) or K.S.A. 21-3439(a)(6) (multiple first-degree premeditated murders). At an instructions conference, the State had asserted that it did not matter if the jury was not unanimous on the theory as long as it was unanimous on guilt. A similar combining and renumbering occurred for the alternative counts of aggravated robbery set out in Counts 15 through 22 of the amended complaint. The remaining counts in the amended complaint were renumbered accordingly in the instructions and verdict forms. Accordingly, the 58 charges in the amended complaint were reduced to 50 possible crimes of conviction. For clarity, this opinion consistently uses the count numbers from the amended complaint.

## GUILT PHASE ISSUES AND SHORT ANSWERS

We begin our discussion by setting out the questions we answer on the guilt phase of R. Carr's trial. Many of these are also raised by or applicable to J. Carr. We have taken the liberty of reformulating certain questions to focus on their legally significant aspects or effects. We also have reordered questions raised by the defense and have inserted among them unassigned potential errors noted by us, because we believe this organization enhances clarity. We number all questions consecutively, 1 through 27, despite occasional intervening subheadings.

Our statement of each question is followed by a brief statement of its answer.

*Issues Affecting All Incidents*

1. Did the district judge err in refusing to grant defense motions for change of venue? A majority of six of the court's members answers this question no. One member of the court dissents and writes separately on this issue and its reversibility, standing alone.

2. Did the district judge err in refusing to sever the guilt phase of defendants' trial? A majority of six members of the court answers this question yes. One member of the court dissents and writes separately on this issue. A majority of four members of the court agrees that any error on this issue was not reversible standing alone. Three members of the court dissent, and one of them writes separately for the three on the reversibility question, standing alone.

3. Was it error for the State to pursue conviction of R. Carr for all counts arising out of the three December 2000 incidents in one prosecution? The court unanimously answers this question no.

4. Did the district judge err (a) by excusing prospective juror M.W., who opposed the death penalty, for cause, (b) by failing to excuse allegedly mitigation-impaired jury panel members W.B., D.R., D.Ge., and H.Gu. for cause, or (c) by excusing prospective jurors K.J., M.G., H.D., C.R., D.H., and M.B., who expressed moral or religious reservations about the death penalty, for cause? The court unanimously agrees there was no error on any of these bases.

5. Did the district judge err by rejecting a defense challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct 1712, 90 L. Ed. 2d 69 (1986), to the State's peremptory strike of juror and eventual foreperson W.B.? The court unanimously answers this question yes. A majority of four members of the court agrees that any error on this issue was not reversible standing alone. Three members of the court dissent, and one of them writes separately for the three on the reversibility question, standing alone.

*Issues Specific to Walenta Incident*

6. Was the district judge's admission of statements by Walenta through law enforcement error under the Sixth Amendment and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)? The court unanimously answers this question yes. The court unanimously agrees that this error was not reversible standing alone.

7. Was the evidence of attempted aggravated robbery of Walenta sufficient to support R. Carr's felony murder conviction? A majority of four of the court's members answers this question yes. Three

members of the court dissent, and one of them writes separately for the three on this issue and its reversibility, standing alone.

8. Did the district judge err by failing to instruct the jury on second-degree murder as a lesser included offense of felony murder of Walenta? The court unanimously answers this question no.

*Issues Specific to Quadruple Homicide and Other Birchwood Crimes*

9. Did faulty jury instructions on all four K.S.A. 21-3439(a)(4) sex-crime-based capital murders and a multiplicity problem on three of four K.S.A. 21-3439(a)(6) multiple-death capital murders combine to require reversal of three of R. Carr's death-eligible convictions? The court unanimously answers this question yes.

10. Was a special unanimity instruction required for Counts 1, 3, 5, and 7 because of proof of multiple sex crimes underlying each count? The court declines to reach the merits of this issue because it is moot.

11. Must sex crime convictions underlying capital murder Counts 1, 3, 5, and 7 be reversed because they were lesser included offenses of capital murder under K.S.A. 21-3439(a)(4)? The court declines to reach the merits of this issue because it is moot.

12. Was the State's evidence of aggravated burglary sufficient? The court unanimously answers this question yes.

13. Did the State fail to correctly charge and the district judge fail to correctly instruct on coerced victim-on-victim rape and attempted rape, as those crimes are defined by Kansas statutes, rendering R. Carr's convictions on those offenses void for lack of subject matter jurisdiction? The court unanimously answers this question yes.

14. Was the State's evidence of R. Carr's guilt as an aider and abettor on Count 41 for Holly G.'s digital self-penetration sufficient? A majority of four of the court's members answers this question yes. Three members of the court dissent and one of them writes separately for them on this issue and its reversibility.

15. Were Count 41 and Count 42 multiplicitous? The court unanimously answers this question yes. The court unanimously

agrees that this error requires reversal of R. Carr's conviction as an aider and abettor on Count 42.

16. Was the evidence of R. Carr's aiding and abetting of J. Carr's rape of Holly G. and attempted rape and rape of Heather M. sufficient? The court unanimously answers this question yes.

17. Did Count 43 of the charging document confer subject matter jurisdiction to prosecute R. Carr for attempted rape of Heather M.? The court unanimously answers this question yes.

18. Did the district judge misapply the third-party evidence rule and hearsay exceptions, preventing R. Carr from presenting his defense? The court unanimously answers this question yes. The court unanimously agrees that any error on this issue was not reversible standing alone.

19. Was evidence of results from mitochondrial DNA testing of hairs found at the Birchwood home erroneously admitted? The court unanimously answers this question no.

20. Did the district judge err by denying R. Carr's motion for mistrial after evidence developed at trial that R. Carr had genital warts and that the surviving victim, Holly G., contracted HPV after the second intruder she identified as R. Carr raped her? The court unanimously answers this question no.

21. Did the district judge err by failing to instruct on felony murder as a lesser included crime of capital murder? The court unanimously answers this question no.

*Other Evidentiary Issues*

22. Did the district judge err by automatically excluding eyewitness identification expert testimony proffered by the defense? The court unanimously answers this question yes. The court unanimously agrees that any error on this issue was not reversible standing alone.

23. Did the district judge err by permitting a jury view of locations referenced in evidence, in violation of the defendants' right to be present, right to assistance of counsel, and right to a public trial? The court unanimously answers this question no.

*Other Instructional Issues*

24. Did the district judge err by failing to include language in the instruction on reliability of eyewitness identifications to ensure that jurors considered possible infirmities in cross-racial identifications? The court unanimously answers this question no.

25. Was the instruction on aiding and abetting erroneous because (a) it permitted jurors to convict the defendants as aiders and abettors for reasonably foreseeable crimes of the other, regardless of whether the State proved the aider and abettor's premeditation, (b) it failed to communicate expressly that an aider and abettor had to possess premeditated intent to kill personally in order to be convicted of capital murder, or (c) it omitted language from K.S.A. 21-3205(2)? The court unanimously answers the first question yes. The court unanimously answers the second question no. The court unanimously answers the third question no. The court unanimously agrees that the error on the first question was not reversible standing alone.

*Prosecutorial Misconduct*

26. Did one of the prosecutors commit reversible misconduct by telling jurors to place themselves in the position of the victims? The court unanimously answers this question no.

*Cumulative Error*

27. Did cumulative error deny R. Carr a fair trial on his guilt? A majority of four of the court's members answers this question no. Three members of the court dissent, and one of them writes separately for them on this issue.

## 1. VENUE

The defendants argue that pretrial publicity was so pervasive and prejudicial in Sedgwick County that it prevented trial by a fair and impartial jury, violating their rights under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights, and that District Court Judge Paul Clark abused his discretion by refusing to transfer this case to another county under K.S.A. 22-2616(1). To the extent only

one defendant has explicitly raised a particular argument, we consider it on behalf of the other defendant as well under the authority of K.S.A. 21-6619(b).

*Additional Factual and Procedural Background*

The defendants first moved for a change of venue in March 2002. At a May 28, 2002, evidentiary hearing on their motion, they presented a spring 2002 venue study to demonstrate the depth of media saturation about this case in Sedgwick County.

The study was based on two telephone surveys, one of 401 Sedgwick County residents and one of 200 Wyandotte County residents. Lisa Dahl of Litigation Consultants, Inc., who conducted the surveys, testified that Wyandotte County served as a control county. It was selected because local media coverage of the case had been limited and it was a metropolitan area similar to Sedgwick County in demographic makeup, economy, and crime rates. At the time of the surveys, Sedgwick County had 452,000 residents and Wyandotte County had about 157,000 residents.

The Sedgwick County response rate was 80 percent. Dahl testified that, although the Wyandotte County response rate was lower at 62.89 percent, it nevertheless fell within a range sufficient to provide an accurate representation of the views of the community at large.

The survey showed that 96 percent of the respondents in Sedgwick County were aware of this case, as compared to 29.5 percent in Wyandotte County. Further, 74.1 percent of those surveyed in Sedgwick County held an overall opinion that the defendants were guilty. Approximately half of these respondents said the defendants were "definitely guilty," and the other half said they were "probably guilty." In contrast, 22 percent of the Wyandotte County respondents believed the defendants were "definitely" or "probably" guilty, according to Dahl. Addressing their understanding of the quality of the evidence, 72.3 percent of the Sedgwick County respondents believed it to be "overwhelming" or "strong." Only 16 percent of the Wyandotte County respondents believed likewise.

Personal discussions about this case correlated with more widespread beliefs on the defendants' guilt. Of the 59.1 percent of respondents in Sedgwick County who had engaged in such personal discussions, 86 percent believed that the defendants were "definitely" or "probably" guilty. And, of the 56.4 percent of respondents who had merely overheard such discussions, 82 percent believed the defendants were "definitely" or "probably" guilty.

Dahl also compiled extensive examples of news media coverage of this case, which included both print and online newspaper articles; internet coverage from websites other than those whose content was generated by newspapers; radio coverage, including audio, transcripts and notes from broadcasts, and printouts of stories on their websites; and television footage. Much of the coverage was, not surprisingly, unfavorable to the defendants.

The existence of unfavorable media coverage had been demonstrated in a hearing nearly a year before on the defendants' motion to close proceedings to the media and the Wichita Eagle newspaper's and KWCH-TV's motion to intervene. Thomas David Beisecker, a professor of communication studies at the University of Kansas and president of Advocacy Research Associates, had testified about the content of media coverage in the first few months after the crimes. In addition to describing facts of the crimes and the legal proceedings, Beisecker said, the coverage included discussion of the good character of the victims, R. Carr's parole status and criminal history, and the community's fear and insecurity stemming from the crimes.

Coverage of the crimes in this case was especially intense immediately after the Birchwood crimes and the defendants' arrests. Within 2 days of the crimes the Wichita Eagle had published a story about R. Carr's recent release from jail after his parole violation and detailing his criminal history. The funerals of Heather M., Aaron S., Brad H., and Jason B. were covered extensively. Press coverage and public response to it also focused on fear among Wichita citizens as a result of the string of crimes attributed to the defendants.

Press coverage spiked again when Walenta died on January 2, 2001, and when the amended complaint was filed against the de-

fendants 2 days later. In the months following, various pretrial proceedings such as the April 2001 preliminary hearing and the discovery of the gun used in the crimes prompted additional stories. The 1-year anniversary of the quadruple homicide also prompted media stories.

Measurement of intensity of community opinion was another feature of Dahl's surveys. She testified that the surveys were done more than a year after the crimes and that, if the opinions of members of the public were going to dissipate, they would have done so by the time the telephone calls were placed. Because they had not, she expected that there would be little movement in the opinions evident from the survey results between the time of the survey and the start of the defendants' trial a few months later.

Dahl admitted that her surveys did not explore the question of impartiality and that she was not aware of any studies in her field conclusively establishing that participants in such surveys who voiced opinions on guilt could not ultimately serve as impartial jurors.

After the evidentiary hearing on the motion to change venue, Judge Clark said that he would hear closing arguments from counsel after he had had an opportunity to review the exhibits.

Closing arguments were held on June 13, 2002. Immediately upon the completion of the arguments, Judge Clark spoke. He first found that Dahl was qualified to render an expert opinion and that the venue study was scientifically valid. He then ruled:

"The argument then comes to the emotionally biasing publicity. The purpose in selecting a jury is not to find a jury free of knowledge. It is to find a jury free of bias and prejudice. The study shows and the evidence shows and experience shows that in this particular case, having reviewed the material furnished, the law[,] and the argument of counsel, that the venue in which the defendants will be assured of the greatest number of venire persons free of bias or prejudice from whom a jury may be selected to decide the case solely on the facts in evidence, viewed by the light of the instruments of law, is Sedgwick County, Kansas. The motion is overruled for both defendants."

In late July 2002, a political committee ran an advertisement on local Wichita television stations supporting the candidacy of Phill Kline for Kansas Attorney General. The advertisement identified

R. Carr and labeled him a murderer. Although the advertisement had run in at least one other Kansas media market, it did not identify R. Carr by name in that market.

The ads and reaction to them generated days of coverage on local television news in Wichita and in the Wichita Eagle. Among others quoted was Sedgwick County District Attorney Nola Foulston, the lead prosecutor on the case. She said that "placing this ad in front of a constituency of individuals in our community that are the same people that are going to form a jury pool could have a devastating effect."

The Kline ad and related media prompted the defendants to renew their motion to change venue, and Judge Clark held another hearing on the subject on August 2, 2002. Again, he rejected the defendants' arguments.

Judge Clark's second oral ruling was even more brief than his first: "I . . . know that on venue and fair trial and the ability to have a jury that will be fair, that's determined by a questioning process we will try here first. I will overrule the motion. If it can't be done, we will have a fair trial before this is over, one way or the other. That's all I have on the motions." His written order denying the renewed motion said that he found the evidence was "not clear that a fair, impartial jury cannot be selected."

In the month voir dire was to begin in September 2002, prospective jurors completed sworn questionnaires that inquired about their exposure to pretrial publicity and whether any opinions they held on the case were so set that they would not be able to set them aside. According to the questionnaire responses, 92 percent of the prospective jurors had been exposed to pretrial publicity on this case.

Judge Clark began voir dire on September 9, 2002, prepared to examine up to nine panels of 20 prospective jurors each until 60 were qualified for final selection. He began by excusing a handful of prospective jurors based on their questionnaire responses. He then conducted general voir dire, excusing several prospective jurors for reasons unrelated to pretrial publicity.

At the conclusion of general voir dire, Judge Clark permitted individual voir dire on the subjects of racial prejudice, pretrial pub-

licity, and the death penalty. After individual voir dire of 86 prospective jurors, a panel of 60, plus a panel of 8 prospective alternates, was established.

Nearly all 86 prospective jurors examined individually had been exposed to at least some publicity regarding the case. Several mentioned seeing articles about the case within days before the beginning of jury selection.

Fifty-two of the 86 said they had formed no opinion about the case. Of the 34 who said they had formed opinions about the case, all but three said they could set them aside, presume the defendants' innocence, and decide the case only on the evidence.

The defendants challenged 11 of the 86 prospective jurors for cause in whole or in part because of preconceived opinions of guilt. Judge Clark overruled 10 out of 11 of these challenges, relying on the prospective jurors' statements that they could set their opinions aside and decide the case impartially on the evidence presented.

Jury selection lasted 19 days.

Of the 12 jurors seated after the parties exercised their peremptory challenges, 11 had been exposed to some degree of pretrial publicity; 5 of the 11 said that their exposure was minimal.

Eight of the 12 said they had formed no opinion on the defendants' guilt; 4 had admitted during individual voir dire that they believed the defendants were guilty based on pretrial publicity: D.G., D.M., T.N., and J.S.

The defense had unsuccessfully challenged D.G. for cause. D.G. said that he had heard about the case from television and the newspaper. He had some difficulty recalling the details of the media coverage because of the passage of time since the crimes. Based on how the events were portrayed in media coverage, it appeared to him that the defendants were guilty. He continued to believe that until he was called to jury duty and asked whether he could keep an open mind. In his responses to the questionnaire, D.G. said without equivocation that he could set his opinion aside. During individual voir dire, one of the prosecutors asked him if he understood that it would be improper for a juror to consider outside information when deciding the case, and D.G. responded, "Hopefully, I can separate the two and just try to hear the facts

and evidence presented." The prosecutor suggested that D.G.'s use of the word "hopefully" might cause some to question the strength of his conviction and then asked D.G. a series of follow-up questions. D.G. said he agreed that the defendants were entitled to an impartial jury; acknowledged he would have to base his decision on the evidence, even if it conflicted with information from pretrial publicity; and said he would have no problem doing so. Several of D.G.'s statements were made in response to leading questions, such as this from the prosecution: "And you would agree with me that the defendants . . . are entitled to a jury that could decide their case based upon what is presented here in court?" In response to questioning from R. Carr's counsel, D.G. confirmed his ability to consider only admitted evidence. But, later in the questioning, he occasionally said he would "hope" and "try" to set aside what he had learned from pretrial publicity.

The defense had also unsuccessfully challenged D.M. for cause. D.M. was exposed to television and newspaper coverage. Based on the coverage, D.M. said that he "suppose[d]" he had an opinion that would "lean toward guilt." He said that he understood it would be improper to rely on information from outside the courtroom in making a decision. Then the prosecution asked: "And so you wouldn't do that, would you?" And D.M. said that he "hopefully [would] not" do so. Again, the prosecutor explained that "hopefully" might not be good enough and that justice required a definitive answer. At that point, D.M. said, "Ah, yes. I believe I could put it aside, yes—what I've heard." D.M. agreed that media coverage could be incomplete or inaccurate and that it would be unfair to find a defendant guilty on such information. In response to questions from defendants' counsel, D.M. again confirmed his ability to set aside his previous opinion.

The defense had passed T.N. for cause. T.N said she believed R. Carr and J. Carr were guilty based on coverage in the newspaper. She expressed confidence she could set that opinion aside and said she would not convict someone based on information she read in the press. She said she understood that the media may not be privy to all of the facts and that it would be unfair to base her decision on such information. Some of T.N.'s statements re-

sponded to leading questions, such as this from the prosecution, "So you will not convict somebody based on what you may have read in the newspaper?" In response to questions from defense counsel, T.N. again confirmed that she could set aside her opinion and the information she acquired from pretrial publicity.

The defense had unsuccessfully challenged J.S. for cause. J.S. was exposed to pretrial publicity about the time the defendants were arrested. When asked whether he had formed an opinion of guilt based on the coverage, J.S. said, "Well, yeah, not really based on anything, just, you know, kind of the idea that . . . somebody gets arrested . . . there is bound to be evidence against them." J.S. said that he understood not all persons arrested are guilty—an awareness that would make it easier for him to set his opinion aside. J.S. said that he would make a decision based solely on the evidence.

After voir dire was completed, the defendants orally renewed their motion for change of venue once more, arguing that the process of jury selection demonstrated that pretrial publicity had tainted the pool. Judge Clark overruled the motion, saying that jury selection confirmed "the contrary."

The trial was televised, but Judge Clark restricted media access to evidence, made sure that microphones would not pick up the defendants' confidential discussions with counsel, and allowed witnesses to decide whether their voices or images could be published or broadcast. The judge reserved six seats inside the courtroom for members of the press. He admonished jurors not to pay attention to any of the publicity surrounding the case during jury selection and again at trial. The record does not suggest that the media created any disruption or otherwise interfered with the judge's conduct of the proceedings.

Items identified during testimony as belonging to the victims included Aaron S.'s Koch Industries business card; a ring that Heather M., a teacher, had bought while on a choir tour in Europe; Heather M.'s Catholic Family Credit Union debit card; and Brad H.'s Koch identification card. In describing the state of Aaron S.'s ransacked bedroom, an investigator testified that she had seen an envelope containing cash and checks "that were meant for a ski

trip that he was planning for the youth organization in church."
Next to a toppled clock were some prayer books and religious material.

The jury knew that R. Carr was charged with three counts of criminal possession of a firearm for possessing a gun within 10 years after being convicted of a felony. Donley testified that he was unemployed and made money fighting his dog. In addition, R. Carr's attorney elicited testimony from Donley that R. Carr sold illegal drugs.

*General Legal Framework and Standards of Review*

The defendants argue that Judge Clark's refusal to grant a change of venue violated their right to an impartial jury under the Sixth and Fourteenth Amendments of the United States Constitution and under Section 10 of the Kansas Constitution Bill of Rights. They also argue that the judge abused his discretion under the Kansas statute governing change of venue, K.S.A. 22-2616(1).

The Sixth Amendment guarantees an accused "[i]n all criminal prosecutions" the right to a trial by "an impartial jury." U.S. Const. amend. VI. This protection is incorporated into and made applicable to the states through the due process provision of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

The Kansas Constitution includes a similarly worded guarantee for its citizens in Section 10 of the Bill of Rights, which recognizes a defendant's right to a speedy and public trial "by an impartial jury of the county or district in which the offense is alleged to have been committed." We have not previously analyzed our state constitutional language differently from the federal provision. See *State v. Hall*, 220 Kan. 712, 714, 556 P.2d 413 (1976). And neither the defendants nor the State urge us to do so today.

In addition, K.S.A. 22-2616(1) gives Kansans a vehicle to obtain a change of venue to prevent a local community's hostility or preconceived opinion on a defendant's guilt from hijacking his or her criminal trial:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is

satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

The United States Supreme Court has examined Sixth Amendment venue challenges based on pretrial publicity in two contexts. *Goss v. Nelson*, 439 F.3d 621, 628-29 (10th Cir. 2006) (citing *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 [1963] [presumed prejudice]; *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 [1961] [actual prejudice]).

"The first context occurs where the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community. We 'presume prejudice' before trial in those cases, and a venue change is necessary." 439 F.3d at 628. "In such cases, a trial court is permitted to transfer venue without conducting voir dire of prospective jurors." *House v. Hatch*, 527 F.3d 1010, 1023-24 (10th Cir. 2008).

The second context, "actual prejudice," occurs "where the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool." *Goss*, 439 F.3d at 628; see *Gardner v. Galetka*, 568 F.3d 862, 888 (10th Cir. 2009). "In cases of actual prejudice, 'the voir dire testimony and the record of publicity [must] reveal the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole.' [Citation omitted.]" *Hatch*, 527 F.3d at 1024.

As Professor Wayne R. LaFave and his colleagues have written, a claim that pretrial publicity has so tainted prospective jurors as to make a fair trial impossible cannot be "determined solely by the standards prescribed in the venue change statute or court rule. The federal constitution may also play a significant role." See 6 LaFave, Israel, King, & Kerr Criminal Procedure, § 23.2(a) (3d ed. 2007). And, when in conflict, even constitutionally based provisions on the location of criminal trials must yield to those establishing a defendant's right to an impartial jury. *Skilling v. United States*, 561 U.S. 358, 378, 130 S. Ct. 2896 177 L. Ed. 2d 619 (2010) ("The Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceedings to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial.");

*United States v. McVeigh*, 918 F. Supp. 1467, 1469 (W.D. Okla. 1996) ("right to an impartial jury in the Sixth Amendment . . . will override the place of trial provisions in both Article. III and the Sixth Amendment in extraordinary cases"). The same certainly is true about the relationship between the fair trial provisions of the federal Constitution on the one hand and state constitutional and statutory provisions prescribing the ordinary venue for criminal trials, see, *e.g.*, Kan. Const. Bill of Rights, § 10 (granting right to speedy public trial by impartial jury of county, district where offense allegedly committed), on the other hand. The federal Constitution is supreme.

The defendants invoke both presumed prejudice and actual prejudice in this case. They agree with the State that our traditional standard of review on denial of a motion to change venue has been abuse of discretion. See *State v. Higgenbotham*, 271 Kan. 582, 591, 23 P.3d 874 (2001) (citing *State v. Cravatt*, 267 Kan. 314, 336, 979 P.2d 679 [1999]). But they also urge us to consider whether an unlimited standard of review may be appropriate under *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) ("trial courts must take strong measures to ensure" that defendants tried by impartial jury free from outside influences; appellate courts "have the duty to make an independent evaluation of the circumstances"), and our statutory duty to determine whether a sentence of death "was imposed under the influence of passion, prejudice or other arbitrary factor," K.S.A. 2013 Supp. 21-6619(c)(1).

Because we have not previously been precise about how analysis of presumed prejudice differs from analysis of actual prejudice, about how the two theories are supported by and applied under the federal and state constitutions and in concert with our state venue change statute, or about how our standard of review on appeal may be affected, we begin our discussion of the defendants' venue challenge by tearing apart and then reassembling these concepts.

We follow many of our sister state courts into this particular breach. See *Crowe v. State*, 435 So. 2d 1371, 1376 (Ala. Crim. App. 1983) (pretrial publicity warrants venue change when de-

fendant can show presumed, actual prejudice); *State v. Atwood*, 171 Ariz. 576, 631, 832 P.2d 593 (1992) (prejudice from publicity may be presumed in rare instances); *People v. Loscutoff*, 661 P.2d 274, 276 (Colo. 1983) (identifying actual, presumed prejudice as alternative theories warranting venue change); *State v. Sostre*, 48 Conn. Supp. 82, 85, 830 A.2d 1212 (Super. Ct. 2002) (same); *Sykes v. State*, 953 A.2d 261, 272 (Del. 2008) (relief under venue statute may be satisfied under either presumed, actual prejudice theory); *Noe v. State*, 586 So. 2d 371, 379 (Fla. Dist. App. 1991) (recognizing presumed, inherent prejudice as basis for venue change); *Isaacs v. State*, 259 Ga. 717, 726, 386 S.E.2d 316 (1989) (analyzing presumed prejudice as basis for venue change); *State v. Fee*, 124 Idaho 170, 175, 857 P.2d 649 (Ct. App. 1993) (recognizing separate theories of presumed, actual prejudice available to demonstrate grounds for requested venue change); *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985) (same); *Watkins v. Commonwealth*, 2008-SC-000798-MR, 2011 WL 1641764, at *13 (Ky. 2011) (unpublished opinion) (showing of actual prejudice unnecessary when prejudice can be presumed) *cert. denied* 132 S. Ct. 1580 (2012); *State v. Goodson*, 412 So. 2d 1077, 1080 (La. 1982) (reviewing statutory venue challenge under federal standards established for actual, presumed prejudice); *State v. Chesnel*, 1999 Me. 120, 734 A.2d 1131, 1134 (1999) (recognizing actual, presumed prejudice as separate theories); *Commonwealth v. Toolan*, 460 Mass. 452, 462, 951 N.E.2d 903 (2011) (same); *State v. Everett*, 472 N.W.2d 864, 866 (Minn. 1991) (analyzing evidence for presumed, actual prejudice); *State v. Kingman*, 362 Mont. 330, 344, 264 P.3d 1104 (2011) ("As the basis of a motion for change of venue, the defendant may allege presumed prejudice, actual prejudice, or both."); *State v. Smart*, 136 N.H. 639, 647, 622 A.2d 1197 (1993) (same); *State v. Biegenwald*, 106 N.J. 13, 33, 524 A.2d 130 (1987) (applying different standards to claims of presumed, actual prejudice); *State v. House*, 127 N.M. 151, 166, 978 P.2d 967 (Ct. App. 1999) (recognizing distinction between actual, presumed prejudice); *State v. Knight*, 81AP-257, 1981 WL 11437 (Ohio App. 1981) (unpublished opinion) (describing evidentiary standard for presumed prejudice claims); *State v. Fanus*, 336 Or. 63, 78, 79 P.3d 847 (2003) (citing

United States Supreme Court authority for presumed, actual prejudice); *Commonwealth v. Briggs*, 608 Pa. 430, 468, 12 A.3d 291 (2011), *cert. denied* 132 S. Ct. 267, 181 L. Ed. 2d 157 (2011) (acknowledging doctrine of presumed prejudice as alternative to actual prejudice); *Crawford v. State*, 685 S.W.2d 343, 350 (Tex. App. 1984), *aff'd and remanded* 696 S.W.2d 903 (Tex. Crim. 1985) ("Pretrial publicity will entitle a defendant to a venue change if he can show either (1) news media coverage so damaging that it must be presumed no unbiased jury could be selected, or (2) from the totality of circumstances, actual prejudice."); *McBride v. State*, 477 A.2d 174, 185 (Del. 1984) (same); *State v. Snook*, 18 Wash. App. 339, 349, 567 P.2d 687 (1977) (actual prejudice need not be shown where inherent, presumed prejudice exists); *Sanchez v. State*, 142 P.3d 1134, 1139 (Wyo. 2006) (recognizing presumed prejudice rarely invoked, applicable only in extreme circumstances).

*Presumed Prejudice*

The presumed prejudice doctrine originated in *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963).

In *Rideau*, law enforcement filmed the confession of defendant Wilbert Rideau to a bank robbery, kidnapping, and murder in Calcasieu Parish, a community of approximately 150,000. Local television stations broadcast the confession, reaching approximately 24,000 people in the community the first day, 53,000 the following day, and 29,000 the day after that. Rideau was convicted at a jury trial and sentenced to death. His jury included three persons who had seen the confession on television and two deputy sheriffs from Calcasieu Parish. 373 U.S. at 723-25.

The Court presumed the existence of prejudice necessitating reversal of Rideau's convictions without considering what was said by panel members during voir dire.

"For anyone who has ever watched television[,] the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

. . . .

" '[N]o such practice as that disclosed by this record shall send any accused to his death.' " *Rideau*, 373 U.S. at 726-27 (quoting *Chambers v. Florida*, 309 U.S. 227, 241, 60 S. Ct. 472, 84 L. Ed. 716 [1940]).

The Court invoked the doctrine of presumed prejudice again in *Estes v. Texas*, 381 U.S. 532, 538, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), when extensive publicity before trial swelled into excessive media involvement and exposure during preliminary court proceedings. Reporters and television production crews overran the courtroom and bombarded the viewing public with the sights and sounds of the hearing. These led to disruption during proceedings and, according to the Court, denied defendant Billie Sol Estes the "judicial serenity and calm to which [he] was entitled." 381 U.S. at 536.

In *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), the Supreme Court presumed prejudice after pervasive, highly prejudicial publicity combined with a circus-like environment during the trial of defendant Samuel H. Sheppard, who was accused of bludgeoning his pregnant wife to death.

The media assumed an intensively active role from the outset of the sensational *Sheppard* case. Before trial, the press reported on the defendant's refusal to take a lie detector test or be injected with a "truth serum." 384 U.S. at 338-39. At trial, the courtroom overflowed with members of the press. Their presence inside the bar limited Sheppard's ability to engage in confidential discussions with his counsel, and they roamed freely around the courtroom, at times creating so much noise that the presiding judge and the jury could not hear witnesses' testimony. 384 U.S. at 344. The judge permitted the local newspaper to publish the names and addresses of each juror, exposing them "to expressions of opinion from both cranks and friends." 384 U.S. at 353. The judge's admonitions to jurors was better characterized as "suggestions" or "requests" to avoid exposure to press coverage, and "bedlam reigned," the Court said, thrusting jurors "into the role of celebrities." 384 U.S. at 353, 355.

In reversing Sheppard's murder conviction, the Court stated that publicity alone may not be sufficient to warrant relief, but, when it combines with a judge's inability or lack of desire to control

courtroom proceedings, violation of a defendant's right to a fair trial is readily apparent. 384 U.S. at 354-58.

Since *Sheppard,* federal courts have refined the parameters of presumed prejudice claims, setting an extremely high standard for relief. *United States v. McVeigh,* 153 F.3d 1166, 1181 (10th Cir. 1998), *disapproved on other grounds by Hooks v. Ward,* 184 F.3d 1206 (10th Cir. 1999). A "court must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." *McVeigh,* 153 F.3d at 1181. Reversal of a conviction will occur only "where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.' " *Goss v. Nelson,* 439 F.3d 621, 628 (10th Cir. 2006), (quoting *Hale v. Gibson,* 227 F.3d 1298, 1332 [10th Cir. 2000]); *McVeigh,* 153 F.3d at 1181.

For its part, in its most recent review of a presumed prejudice question, the United States Supreme Court has identified seven relevant factors to be evaluated: (1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty. See *Skilling v. United States,* 561 U.S. 358, 381-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010); *United States v. Mitchell,* 752 F. Supp. 2d 1216, 1220 (D. Utah 2010) (recognizing, applying *Skilling* factors).

The federal appellate courts have been split on the appropriate standard of review for presumed prejudice claims.

The Tenth and Fifth Circuits apply de novo review, based on the directive from *Sheppard* relied upon by defendants here: appellate courts must conduct an "independent evaluation" of the circumstances. See *McVeigh,* 153 F.3d at 1179; *United States v. Skilling,* 554 F.3d 529, 557-58 (5th Cir. 2009), *aff'd in part, vacated in part, and remanded by* 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010).

But a majority of the federal circuits, all but one in an opinion filed before *Skilling* was decided by the United States Supreme Court, have reviewed presumed prejudice claims for abuse of discretion. See *United States v. Misla-Aldarondo*, 478 F.3d 52, 58-59 (1st Cir. 2007); *United States v. Sabhnani*, 599 F.3d 215, 232-34 (2d Cir. 2010); *United States v. Inigo*, 925 F.2d 641, 654-55 (3d Cir. 1991); *United States v. Higgs*, 353 F.3d 281, 307-09 (4th Cir. 2003); *United States v. Jamieson*, 427 F.3d 394, 412-13 (6th Cir. 2005); *United States v. Nettles*, 476 F.3d 508, 513-15 (7th Cir. 2007); *United States v. Rodriguez*, 581 F.3d 775, 784-86 (8th Cir. 2009); *United States v. Collins*, 109 F.3d 1413, 1416 (9th Cir. 1997); *United States v. Langford*, 647 F.3d 1309, 1319, 1332-34 (11th Cir. 2011).

The Montana Supreme Court recently addressed the standard of review question in *State v. Kingman*, and it elected to follow the abuse-of-discretion majority. 362 Mont. 330, 347, 264 P.3d 1104 (2011). The court acknowledged the position of the Tenth and Fifth Circuits, but it held that they failed to offer a "satisfactory explanation for why a trial court is accorded greater deference in evaluating actual prejudice than it is accorded in evaluating presumed prejudice." 362 Mont. at 346. It reasoned that an abuse of discretion standard is more appropriate than de novo review because the "trial judge is uniquely positioned to assess whether a change of venue is called for due to prejudice in the community." 362 Mont. at 347.

We disagree with the Montana Supreme Court and the apparent majority among the federal appellate courts; we do see room for difference in the standard of review applied to presumed prejudice and actual prejudice claims, because presumed prejudice does not consider voir dire conducted in the presence of the trial judge. But we also disagree with the Tenth and Fifth Circuits.

In our view, a mixed standard of review must apply to a presumed prejudice challenge on appeal. The factors enumerated by the United States Supreme Court in *Skilling* require fact findings, whether explicit or necessarily implied, that we must review for support by substantial competent evidence in the record. If such evidence exists, we defer on the fact finding. However, overall

weighing of the factors calls for a conclusion of law, and we must review the conclusion of law under a de novo standard.

We hasten to note that this pattern of review is far from revolutionary. Such a mixed standard is commonplace. It governs our evaluation of the voluntariness of a criminal defendant's confession and the existence of probable cause or reasonable suspicion, for example. Moreover, it is a close analytical relative of the way in which our examination of district court judge decisions for abuse of discretion has evolved:

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594, 182 L. Ed. 2d 205 (2012) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]).

In other words, even our deferential abuse of discretion standard presupposes unlimited review of any legal conclusion upon which a discretionary ruling is based. See *Gonzalez*, 290 Kan. 747, Syl. ¶ 3; see also *State v. Shopteese*, 283 Kan. 331, 340, 153 P.3d 1208 (2007) (discretionary decision must be within trial court's discretion, take into account applicable legal standards); *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (application of abuse of discretion standard of review does not make mistake of law beyond appellate correction).

We now turn to examination of the *Skilling* presumed prejudice factors in this specific case, as of the three points in time when Judge Clark rejected a defense motion for change of venue.

### First Motion for Change of Venue

Judge Clark's rulings on the three motions for change of venue were nothing if not pithy. He did not expressly mention the possibility of presumed prejudice rather than actual prejudice, and he made no discrete factual findings in support of any decision on presumed prejudice.

But, on the record before us, defendants never sought a more complete recitation or writing to explain Judge Clark's venue rulings; and, if they thought the findings were insufficient for appellate review, they had an obligation to do so. See *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013) (Notwithstanding district judge's duties under Supreme Court Rule 165 [2013 Kan. Ct. R. Annot. 265], "a party also has the obligation to object to inadequate findings of fact and conclusions of law in order to preserve an issue for appeal because this gives the trial court an opportunity to correct any findings or conclusions that are argued to be inadequate."). We therefore assume that Judge Clark made the necessary factual findings to support his decision to deny a change of venue on any and all theories. See *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012) (when party fails to object to adequacy of district judge's findings, conclusions, appellate court can presume judge found all facts necessary to support judgment).

The first factor to be examined for presumed prejudice under *Skilling* is media interference with courtroom proceedings. As mentioned above, there is no suggestion in the record that any media representative interfered with courtroom administration in this case at any time, including the period leading up to Judge Clark's consideration of the first motion for change of venue. In each of the cases in which the United States Supreme Court has presumed prejudice and overturned a conviction, it did so in part because the prosecution's " 'atmosphere . . . was utterly corrupted by press coverage.' " *Skilling*, 561 U.S. at 380. There was no such atmosphere here and this factor weighed against presuming prejudice at the time of the ruling on the defendants' first motion.

The second *Skilling* factor is the magnitude and tone of the coverage. The magnitude of the coverage of the crimes and this prosecution was extremely high. But the Sixth Amendment does not demand juror ignorance. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *Goss*, 439 F.3d at 627. "[S]carcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. For these reasons, "[e]xtensive pre-

trial media coverage of a crime alone has never established prejudice per se." *State v. Dunn*, 243 Kan. 414, 424, 758 P.2d 718 (1988) (citing *State v. Ruebke*, 240 Kan. 493, 500, 731 P.2d 842 [1987]; *State v. Porter*, 223 Kan. 114, 117, 574 P.2d 187 [1977]). " '[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.' " *Skilling*, 561 U.S. at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554, 96 S. Ct. 2791, 49 L. Ed. 2d 683 [1976]).

Our review of the tone of at least the mainstream press coverage likely to reach a wide audience leads us to the conclusion that it was more factual than gratuitously lurid. See *United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) (where media coverage tends to be more "factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice"). Although the coverage occasionally disclosed facts that would be inadmissible at trial, the State argues persuasively that some evidence of the victims' good character and community involvement and of R. Carr's criminal behavior would later be properly admitted—for example, the teaching and youth leadership of Heather M., Aaron S., Jason B., and Holly G. and the dog fighting and drug sales of R. Carr. Further, the United States Supreme Court has clarified that the presumed prejudice doctrine "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); see *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994) (pervasive pretrial publicity relating to defendant's prior conviction for killing six people during armed robbery not presumptively prejudicial; "nothing in the record to suggest that this publicity was anything other than factual reporting"); *United States v. Abello-Silva*, 948 F.2d 1168, 1177 (10th Cir. 1991) (no prejudice presumed when press coverage consisted primarily of facts gathered from public records, pretrial hearings); *United States v. Flores-Elias*, 650 F.2d 1149, 1150 (9th Cir. 1981) (fact-based publicity focusing largely on victims, their un-

fortunate plight did not establish prejudice against defendant so great that fair, impartial trial not possible).

Finally, as we have observed many times when considering a defendant's challenge to the admission of gruesome photographs of a crime scene or an ensuing autopsy of a victim into evidence, gruesome crimes give rise to gruesome photographs. See, *e.g.*, *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002) ("Gruesome crimes result in gruesome photographs."). Likewise, a quadruple execution-style homicide and an attempted first-degree premeditated murder preceded by hours of coerced sex acts and robberies naturally gives rise to press coverage that some may fairly characterize as at least occasionally sensational. It can hardly help but be so. See *State v. Ruebke*, 240 Kan. at 500-01 (court unwilling to adopt pretrial publicity rule that individual can commit crime so heinous "that news coverage generated by that act will not allow the perpetrator to be brought to trial"). Yet, overall, we conclude that the primarily factual tone of the press coverage reviewed by Judge Clark at the time of the defendants' first motion compensated for its sheer magnitude, and the second *Skilling* factor did not weigh in favor of presumed prejudice.

The third *Skilling* factor, the size and characteristics of the community in which the crimes occurred, did not weigh in favor of granting the defendants' first motion for change of venue on the ground of presumed prejudice. Laying claim to 452,000 residents and the largest city in Kansas, Sedgwick County had the largest population in the state from which to draw potential jurors. Compare *Skilling*, 561 U.S. at 382 (large Houston population, with 4.5 million potential jurors, minimized potential for presumed prejudice) and *Mu'Min v. Virginia*, 500 U.S. 415, 429, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991) (potential for prejudice mitigated by size of metropolitan Washington, D.C., statistical area; population of more than 3 million among whom hundreds of murders committed each year), with *Rideau*, 373 U.S. at 724-25 (recognizing greater potential for prejudice in parish with 150,000 residents, where confession broadcast to audience of nearly 100,000 over 3-day period). The United States Supreme Court and at least one federal district court and one state supreme court have noted population sizes

similar to Sedgwick County on the way to concluding that the risk of prejudice was diminished. See *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (reduced likelihood of prejudice when venire drawn from pool of more than 600,000); *United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 793-94, 807 (W.D. Pa. 2010) (no presumed prejudice, in part because jury drawn from community with total population of 545,615); *State v. Gribble*, 165 N.H. 1, 19-20, 66 A.3d 1194 (2013) (potential for prejudice mitigated by jury pool of more than 400,000 residents).

The fourth *Skilling* factor is the time that elapsed between the crime and the trial. At the time the first motion to change venue was ruled upon, 17 months had passed since the crimes were committed. Approximately 3 and 1/2 months remained before voir dire would begin. In the ordinary case, one might expect these time frames to mean that public interest in the crimes and the defendants had begun to wane and that it would continue to do so. See *United States v. Lehder-Rivas*, 955 F.2d 1510, 1524 (11th Cir. 1992) ("The substantial lapse of time between the peak publicity and the trial also weighs against a finding of prejudice.") (citing *Nebraska Press Ass'n*, 427 U.S. at 554); *State v. Sanger*, 108 Idaho 910, 913, 702 P.2d 1370, 1373 (Ct. App. 1985) (lapse of 17 months substantially minimizes prejudice). But Dahl testified about the staying power of the relevant press coverage and the extreme public opinions it fostered. Although she expected her surveys to demonstrate marked dissipation by spring 2002, she found less than expected. We consider this factor inconclusive on presumed prejudice at the time Judge Clark ruled on the defendants' first motion for change of venue.

The jury's verdict is the fifth *Skilling* factor. It was unknown at the time that Judge Clark ruled on the defendants' first motion for change of venue.

The sixth *Skilling* factor is the impact of the crimes on the community.

The defendants' evidence in support of their first motion included strongly hostile statements by members of the public in response to press coverage of the crimes and the prosecution, typ-

ically appearing in reader comments sections or on websites, at least some of which appear to have been sponsored by extreme and/or racist groups. It is difficult to extrapolate from these individual comments to the impact on the public as a whole. See *Gribble*, 66 A.3d at 1208 (defendant's reliance on articles quoting residents who expressed anger, bewilderment, heartbreak over crimes "fails to demonstrate. . . how the sentiment expressed by a small number of residents in a county with over 400,000 residents is indicative of presumed prejudice in the potential jury pool"). And the Supreme Court has observed that venue changes have been granted in highly charged cases like "the prosecution arising from the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City," while courts have properly denied such requests in other "cases involving substantial pretrial publicity and community impact, for example, the prosecutions resulting from the 1993 World Trade Center bombing . . . and the prosecution of John Walker Lindh, referred to in the press as the American Taliban." *Skilling*, 561 U.S. at 378 n.11.

Still, certain press stories collected by Dahl and entered as exhibits in the evidentiary hearing on the defendants' first motion documented more widespread public reaction to the crimes. For example, the Wichita Eagle reported on increased numbers of security system purchases in the wake of the Birchwood home invasion. We conclude that this sixth factor weighed in favor of presumed prejudice at the time Judge Clark considered the defendants' first motion for change of venue.

The seventh *Skilling* factor, publicity given to a codefendant's confession, would never be applicable in this case, because neither defendant confessed to any of the crimes with which they were jointly charged. The pretrial publicity before Judge Clark at the time of the first motion thus lacked the smoking-gun type of information the Supreme Court has found to be uniquely prejudicial. See *Rideau*, 373 U.S. at 726 (publicity given to filmed confession "in a very real sense was Rideau's trial—at which he pleaded guilty"); *Sheppard v. Maxwell*, 384 U.S. 333, 338-39, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) (discussing impact of reports of defendant's refusal to take lie detector test); *Irvin v. Dowd*, 366

U.S. 717, 725-26, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (discussing prejudice from defendant's offer to plead guilty to avoid death penalty). The absence of publicity about smoking-gun evidence weighed against presumed prejudice at the time the defendants' first motion was considered. See *Skilling*, 561 U.S. at 382-83 (lack of smoking-gun type of evidence in pretrial coverage made it less memorable, mitigated prejudgment).

Our review of all of the *Skilling* factors at the time of the first motion leads us to conclude that, on balance, there was no presumed prejudice compelling Judge Clark to transfer venue of this case to another county.

We are not persuaded by the defendants' reliance upon *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005), to support their argument for presumed prejudice. In that case, two law enforcement officers, Dennis Doty and Phil Trust, were shot and killed while attempting to execute an arrest warrant for defendant Jackson Chambers Daniels, Jr.

"The murders of Doty and Trust generated extensive and nearly continuous publicity immediately after the shootings and again before Daniels's trial. [Citation omitted.] Articles described SWAT team searches of the neighborhood where Daniels was hiding. [Citation omitted.]

"News accounts described the perpetrator as a Black paraplegic, and Daniels was identified in press accounts as the killer from the very beginning.

"Although the publicity diminished after Daniels's arrest, it resumed as trial approached. Three months before the trial, news articles covered the local school board's proposal to rename its football stadium in honor of officer Doty. One month before Daniels's trial was to begin, on the anniversary of the killings, a statue commemorating fallen police officers was unveiled by the county. The publicity surrounding the memorial and its unveiling ceremony largely referred to officers Trust and Doty. The memorial statue, standing nine feet tall, was located across the street from the Riverside County courthouse where Daniels was tried.

"Based on our review of the California Supreme Court's findings, the public's response to this publicity clearly amounted to a 'huge' wave of public passion. As the California Supreme Court described it, police stations were 'deluged' with calls from citizens offering tips on the investigation and offering to establish a memorial fund. In addition, local newspapers printed numerous letters from readers calling for Daniels's execution. The officers were turned into 'posthumous celebrities,' and approximately three thousand people attended their funerals. That the news coverage saturated the county is reflected in the fact that eighty-

seven percent of the jury pool recognized the case from the media coverage. Two-thirds of those empaneled remembered the case from the press accounts-some recalled that the suspect was a Black paraplegic, others recalled that police officers were shot, and two jurors remembered Daniels by name.

"The press accounts did not merely relate factual details, but included editorials and letters to the editor calling for Daniels's execution. In addition, news articles reflected the prosecution's theory of the case by attributing the killings to Daniels's desire to escape justice. Also well-publicized by the press was Daniels's past criminal offenses, including an arrest for shooting at a police officer. Such information was highly prejudicial and would not have been admissible at the guilt phase of Daniels's trial." 428 F.3d 1211-12.

Based on these facts, the Ninth Circuit presumed prejudice and held that "[t]he nature and extent of the pretrial publicity, paired with the fact that the majority of actual and potential jurors remembered the pretrial publicity, warranted a change of venue," and the refusal to transfer the case "violated Daniels's right to a fair and impartial jury and thus, his right to due process." 428 F.3d at 1212.

The defendants are correct that their case and *Daniels* shared certain characteristics—extensive coverage and citizen awareness; publication of reader viewpoints, some of which demanded vengeance for the victims' murders; and reporting of some facts that would be inadmissible at trial. But the impact on and response from the community was considerably greater in *Daniels*, where the victims were police officers killed in the line of duty, and community sentiment was so strong that monuments were constructed in their honor.

We also are not persuaded by *Daniels* because it appears to be somewhat behind the United States Supreme Court's most recent discussion of presumed prejudice in *Skilling*. Had the judges who decided *Daniels* had the benefit of *Skilling* at the time they filed their opinion, they may not have relied so heavily on extensive media coverage and a high level of community familiarity to reach their result. *Skilling* makes clear that more is needed before the Sixth Amendment requires a change of venue because of presumed prejudice.

*Daniels* also appears to be out of step among other Ninth Circuit decisions. See *Hayes v. Ayers*, 632 F.3d 500, 509 (9th Cir. 2011)

(no presumed prejudice even though "stories about [defendant Royal Kenneth] Hayes were unflattering and included inadmissible evidence"; stories "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"); *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998) (no presumed prejudice in death penalty case despite stories portraying victim as sympathetic, disclosing defendant's criminal history; coverage accurate, factual); *Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1988) (no presumed prejudice in death penalty case despite media coverage of defendant's confession, prior conviction for manslaughter, parole violations; editorials, letters called for defendant's execution). At least one district court in the Ninth Circuit has categorized *Daniels* as an "extreme case likely to invoke strong and lasting impressions" of the defendant because he was "a cop killer, he was hunted by a SWAT team, and one of the men he killed was such an outstanding police officer that his name warranted special public recognition." *United States v. Celestine*, 3:09-CR-00065 JWS, 2009 WL 3676497, at *5 (D. Alaska 2009) (unpublished opinion).

The pretrial publicity at the time of the defendants' first motion, although sustained and unflattering to the defendants, had not made the prosecution into a circus or created a lynch mob mentality. See *Stafford*, 34 F.3d at 1566 (presumed prejudice appropriate only when publicity created circus-like atmosphere, created lynch mob mentality throughout venire). There was no error in Judge Clark's failure to grant the defendants' first motion for change of venue on a presumed prejudice basis.

*Second Motion for Change of Venue*

Our evaluation of presumed prejudice from the vantage point of the second motion for change of venue—considered by Judge Clark in early August 2002 after several television stations aired the Kline ad and secondary coverage of the controversy it generated—changes little. We need only reexamine the second and fourth *Skilling* factors, the magnitude and tone of coverage and the timing of the crime and trial.

We acknowledge that these two factors were affected by the advertisement and resulting coverage, but, we think, only marginally. Although responsible press outlets had refrained from referring to either of the defendants as a murderer before the ad ran, we are confident that the ad's photograph and reference to R. Carr by name as the murderer of the quadruple homicide victims would have been recognized by the vast majority of potential jurors as the overheated campaign pitch it was. There was minimal danger of it being regarded as reliable journalism. As counsel for R. Carr asserted during the hearing on the second motion, the ad was a poor excuse for political speech; but reasonably discerning potential jurors would have recognized that as well.

On the fourth *Skilling* factor, the timing of the crime and trial did not change. However, the ad and stories about its effect on the case and on the primary race fell 2 months closer to the beginning of jury selection than the hearing on the first motion. Although they may have ratcheted up public anticipation of the trial somewhat sooner than could have been expected in the ordinary course, eventually the ordinary course was bound to be followed. Again, sensational crimes inevitably produce at least some breathless press, but the amount attributable to the Kline ad and its secondary coverage was negligible in the grand scheme before us.

There was no presumed prejudice for Judge Clark to recognize by granting the defendants' second motion for change of venue.

### Third Motion for Change of Venue

The defendants' third motion came after the completion of jury selection. In the defendants' view, the process of general and individual voir dire, the strikes for cause and the peremptory strikes, although executed in an orderly fashion, had confirmed their worst fears. They contended they were in the center ring at the circus, where a fair trial would be impossible.

This is the essence of the doctrine of presumed prejudice. If it exists, then, by definition, the problem of damning pretrial publicity and the public opinions on guilt it has spawned are not amenable to correction. No amount of juror education or admonition or instruction will fix them. No number of seemingly sincere assurances

by a venire member that he or she can and will put aside precon-
ceived ideas about the defendants' culpability can be believed.

We simply cannot go there. When we reexamine the seven *Skill-
ing* factors as of the time of the defendants' third motion, again,
we do not believe that Judge Clark erred because prejudice should
have been presumed. The press still was not running amok in the
courtroom. Judge Clark maintained appropriate control. Although
the jury questionnaire responses and the content of individual voir
dire confirmed Dahl's earlier surveys showing that familiarity with
pretrial publicity was wide and deep, defendants did not even claim
that the tone of the coverage had altered in any significant way to
their detriment. The other *Skilling* factors, on the record before
us, also were static or remained inapplicable. The defendants and
their counsel did not show that "an irrepressibly hostile attitude
pervaded the community," *Stafford*, 34 F.3d at 1566, requiring
Judge Clark to transfer the case to a different county.

Even now, with the benefit of the full record of the trial, in-
cluding the verdict, we cannot say that prejudice should be pre-
sumed. In *Skilling*, the Court observed that the jury's acquittal of
the defendant on several insider-trading charges was of "prime
significance," weighing heavily against such prejudice. 561 U.S. at
383. Here, the jury acquitted R. Carr's codefendant, J. Carr, of all
charges stemming from the Schreiber incident despite media cov-
erage connecting both defendants to all three incidents. "It would
be odd for an appellate court to presume prejudice in a case in
which jurors' actions run counter to that presumption." *Skilling*,
561 U.S. at 383-84 (citing *United States v. Arzola-Amaya*, 867 F.2d
1504, 1514 [5th Cir. 1989]). We agree.

*Actual Prejudice*

We now turn to actual prejudice, also a constitutional concern
under the Sixth and Fourteenth Amendments and § 10 of the Kan-
sas Constitution Bill of Rights.

"In reviewing for actual prejudice, we examine . . . 'whether the
judge had a reasonable basis for concluding that the jurors selected
could be impartial.' " *McVeigh*, 153 F.3d 1166, 1183 (10th Cir.
1998) (quoting *United States v. Abello-Silva*, 948 F.2d 1168, 1177-

78) (10th Cir. 1991). The crucible for determination of actual prejudice is voir dire. *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) "The court must review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant." 488 F.3d at 387.

The appellate standard of review of a district judge's decision on actual prejudice is abuse of discretion. Jury selection is a task "particularly within the province of the trial judge." *Ristaino v. Ross*, 424 U.S. 589, 594-95, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). Thus, when a district judge rules that a juror can set aside pretrial publicity and decide the case on the evidence, his or her ruling is entitled to special deference:

"Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.

"Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. [Citation omitted.] In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service. We consider the adequacy of jury selection . . . therefore, attentive to the respect due to district-court determinations of juror impartiality and of the measures necessary to ensure that impartiality." *Skilling*, 561 U.S. at 386-87.

"Negative media coverage by itself is insufficient to establish actual prejudice." *Foley*, 488 F.3d at 387. And the fact that jurors entered the box with preconceived opinions of guilt alone does not overcome a presumption of juror impartiality. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). "The relevant question is not whether the community remembered the case, but whether the jurors at . . . trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984); *Goss v. Nelson*, 439 F.3d 621, 627 (10th Cir. 2006)

(defendant's right to impartial tribunal satisfied when jurors can base decision on evidence).

In this case, although Judge Clark was brief in his ruling on the defendants' third motion for change of venue, advanced at the conclusion of jury selection, his statement referenced his assessment that, despite widespread pretrial publicity, an unbiased jury had been selected in Wichita. Eight of the 12 jurors eventually seated in the defendants' trial held no prior opinions on guilt. The four who admitted to forming such opinions ultimately said that they could set their opinions aside. See *Hale v. Gibson*, 227 F.3d 1298, 1320 (10th Cir. 2000) (defendants must show more than juror's preconceived notion; defendant must show juror's notion fixed). On their face, these voir dire responses provided Judge Clark with a reasonable basis for his ruling. See *Gardner v. Galetka*, 568 F.3d 862, 890 (10th Cir. 2009) (no actual prejudice despite 55 percent of prospective jurors with previous opinion on guilt, including four of 12 seated; court spent 5 days examining prospective jurors about knowledge of facts, ability to set aside opinions of guilt).

The defendants argue, nevertheless, that neither Judge Clark nor we can rely on the jurors' declarations of impartiality, and there is some authority for setting aside juror declarations of impartiality in extreme cases.

In *Irvin*, the United States Supreme Court recognized that adverse pretrial publicity can create so much prejudice in a community that juror declarations of impartiality cannot be credited. *Irvin* involved a situation in which headlines before defendant Leslie Irvin's trial "announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess." 366 U.S. at 725. On the day immediately before trial began, newspapers carried a story "that Irvin had orally admitted the murder of . . . (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.' " 366 U.S. at 726. The press also reported that Irvin had offered to plead guilty in

exchange for a sentence other than death. In addition, the record in *Irvin* evidenced difficulty in impaneling his jury. The court was forced to excuse 268 of 430 potential jurors because they expressed immovable opinions on Irvin's guilt. 366 U.S. at 727. Of the jurors ultimately seated, eight of 12 had admitted to possessing some preconceived opinion on his guilt. Under these circumstances, the Court held that the trial judge erred in accepting the jurors' representations about their ability to be impartial:

"The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. [Citation omitted.] Where one's life is at stake—and accounting for the frailties of human nature—we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards. Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief. One said that he 'could not . . . give the defendant the benefit of the doubt that he is innocent.' Another stated that he had a 'somewhat' certain fixed opinion as to petitioner's guilt. No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.' With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt." 366 U.S. 727-28.

Since *Irvin*, the Supreme Court has twice considered whether a juror's declaration of impartiality should be discounted.

In *Patton v. Yount*, 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984), the jury convicted defendant Jon E. Yount of first-degree premeditated murder and rape of one of his female students. On direct appeal, the state court reversed Yount's conviction and remanded for a new trial. He was again convicted after retrial, and he claimed that pretrial publicity deprived him of his right to trial by a fair and impartial jury. The publicity leading up to his second trial disclosed the result of his first trial, his confession, and his earlier plea of temporary insanity—all information not admitted into evidence at the second trial. Voir dire demonstrated that all

but 2 of 163 veniremen had heard of the case, and that 126 of the 163 would carry an opinion of guilt into the jury box. 467 U.S. at 1029. Eight of the 14 seated jurors and alternates admitted that they had formed an opinion of guilt. 467 U.S. at 1029-30. Nevertheless, the Court distinguished *Irvin* and affirmed Yount's conviction, because jurors' opinions of guilt had weakened considerably in the 4 years that passed between the first trial and the second. "Many veniremen, of course, simply had let the details of the case slip from their minds," the Court said. 467 U.S. at 1033. For others, "time had weakened or eliminated any conviction they had had . . . ." Ultimately, "the voir dire resulted in selecting those who had forgotten or would need to be persuaded again." 467 U.S. at 1033-34.

Likewise, in *Murphy v. Florida*, 421 U.S. 794, 800-01, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975), the Supreme Court refused to set aside juror declarations of impartiality when voir dire responses did not reflect the wave of community hostility present in *Irvin*.

Relying on this authority, the Tenth Circuit also has refused to set aside juror declarations of impartiality. In *Hale v. Gibson*, 227 F.3d 1298, 1333 (10th Cir. 2000), 6 of 12 jurors seated had held some opinion of the defendant's guilt. 227 F.3d at 1333. But all confirmed their ability to be fair and impartial in response to inquiry from the trial court. 227 F.3d at 1332. The panel distinguished *Irvin*, observing that voir dire did not uncover "an atmosphere of hostility toward the defendant, nor did the trial court have a difficult time in seating the jury." 227 F.3d at 1333.

The Tenth Circuit reached the same result in *Gardner*, where 4 of 12 jurors had earlier formed an opinion of guilt. 568 F.3d at 887-90. The panel again distinguished *Irvin*, in part because protective measures taken by the trial court judge during jury selection bolstered the credibility of juror declarations of impartiality. *Gardner*, 568 F.3d at 889-90.

We are satisfied that this case is not as extreme as *Irvin*, and we decline the defendants' invitation to second-guess jurors' assurances that they could disregard pretrial publicity and their previous impressions. As discussed in relation to presumed prejudice, there was no smoking-gun reporting in this case. The jury pool here was

far less polluted by preconceptions on guilt; in *Irvin,* 90 percent of potential jurors believed the defendant was guilty. Here, Judge Clark was not forced to excuse 60 percent of the jury pool at the outset. The number of jurors ultimately seated who had to set aside their earlier opinions was half of that who would have had to do so in *Irvin*; and none of them expressed community outrage. We also are reassured here by the protective measures taken by Judge Clark, including use of jury questionnaires and individual voir dire.

We do find it necessary to express a word of caution on the conduct of sound voir dire before leaving the subject of actual prejudice. Our review of the individual voir dire in this case reveals several instances when Judge Clark appeared to have taken it upon himself to rehabilitate a venire panel member. This effort typically took the form of summarizing the panel member's previous responses to questions in a way that would minimize evidence of bias and then asking for confirmation. In addition, the questioning prosecutor used leading questions on several occasions to induce panel members to voice their ability to be impartial. These behaviors by a judge or a prosecutor cloud appellate evaluation of the record on the actual prejudice, particularly the difficulty of finding unbiased jurors, because we must be mindful of the unintended influence a trial judge and a lawyer for the State may have over lay jurors intimidated by the possibility of participation in deciding a difficult case in an unfamiliar environment. See *Skilling,* 561 U.S. at 455-56 (Sotomayor, J., concurring and dissenting) (criticizing trial judge for addressing topics of juror bias in cursory fashion, failing to use probing, open-ended questions about jurors' opinions, beliefs).

We urge our district judges and all counsel to refrain from suggesting panel member answers that will defeat challenges for cause. Avoidance of these sorts of interactions is necessary to merit the deference inherent in our abuse of discretion review of a judge's ultimate decision on actual prejudice. See *Skilling,* 561 U.S. at 447 (Sotomayor, J., concurring and dissenting) ("In particular, reviewing courts are well qualified to inquire into whether a trial court implemented procedures adequate to keep community prejudices from infecting the jury. If the jury selection process does not befit

the circumstances of the case, the trial court's rulings on impartiality are necessarily called into doubt.").

*Statutory Claims*

We have previously interpreted our state venue change statute to say that the "burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality." *State v. Anthony*, 257 Kan. 1003, 1013, 898 P.2d 1109 (1995).

The first statutory claim by the defense is that we have interpreted and applied K.S.A. 22-2616(1) in an unconstitutional manner. The second is that Judge Clark abused his discretion in denying the defendants' repeated K.S.A. 22-2616(1) motions for change of venue.

On the constitutional challenge to our interpretation and application of the statute, J. Carr has relied on language from *Sheppard*: "[T]here is nothing that proscribes the press from reporting events that transpire in the courtroom. But *where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial,* the judge should . . . transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 362-63, 86 S. Ct. 1507, 16 L. Ed. 600 (1966). He argues that this language establishes a standard of proof of "reasonable likelihood" of unfair trial under the Sixth Amendment. In contrast, he asserts, Kansas courts have elevated the statutory standard of proof from "reasonable likelihood" to "absolute certainty."

We disagree. The standard of proof in our precedent is "reasonable certainty" that the defendant cannot obtain a fair trial in the ordinary venue. *Anthony*, 257 Kan. at 1013; see *State v. Lumbrera*, 252 Kan. 54, 57, 845 P.2d 609 (1992); *State v. Ruebke*, 240 Kan. 493, 499, 731 P.2d 842 (1987). This is wholly consistent with that part of federal constitutional law on which J. Carr focuses. See *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980) (Supreme Court decisions create standard by which Sixth Amendment compels change of venue when party "adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an

impartial jury drawn from that community"); *Williams v. Vasquez,*
817 F. Supp. 1443, 1473 (E.D. Cal. 1993), *aff'd. Williams v. Cald-
eron,* 52 F.3d 1465 (9th Cir. 1995) (Sixth Amendment due process
considerations require change of venue if trial court is "unable to
seat an impartial jury because of pretrial publicity"); *United States
v. Campa,* 459 F.3d 1121, 1143 (11th Cir. 2006) (venue change
warranted only upon showing by defendant that widespread, per-
vasive pretrial publicity saturates community, "reasonable certainty
that such prejudice will prevent him from obtaining a fair trial by
an impartial jury"); see also Fed. R. Crim. P. 21(a) ("[T]he court
must transfer the proceeding against that defendant to another
district if the court is satisfied that so great a prejudice against the
defendant exists in the transferring district that the defendant can-
not obtain a fair and impartial trial there."); 33 A.L.R.3d 17, § 3(a)
(numerous federal, state courts hold change of venue required only
when "the prospects of the defendant not receiving a fair and im-
partial trial are "reasonably certain," or "likely").

Moving to the abuse of discretion claim, we have established a
pattern of evaluating whether the level of prejudice warrants a
venue change under the statute by examining nine factors. *State v.
McBroom,* 299 Kan. 731, 750, 325 P.3d 1174 (2014). Several of the
factors are similar to those set out in *Skilling* for presumed prej-
udice analysis. We review:

"[1] the particular degree to which the publicity circulated throughout the com-
munity; [2] the degree to which the publicity or that of a like nature circulated to
other areas to which venue could be changed; [3] the length of time which elapsed
from the dissemination of the publicity to the date of trial; [4] the care exercised
and the ease encountered in the selection of the jury; [5] the familiarity with the
publicity complained of and its resultant effects, if any, upon the prospective jurors
or the trial jurors; [6] the challenges exercised by the defendant in the selection
of the jury, both peremptory and for cause; [7] the connection of government
officials with the release of the publicity; [8] the severity of the offense charged;
and [9] the particular size of the area from which the venire is drawn." *State v.
Higgenbotham,* 271 Kan. 582, 592, 23 P.3d 874 (2001) (citing *State v. Jackson,*
262 Kan. 119, 129, 936 P.2d 761 [1997]).

This court originally adopted these factors from an A.L.R. report
published in 1970, which examined pretrial publicity as grounds
for a venue change. See *State v. Ruebke,* 240 Kan. at 499-500 (cit-

ing 33 A.L.R.3d 17, § 2[a]). It has continued to employ them as recently as a few weeks ago. See *McBroom*, 299 Kan. at 750.

On the record before us, the first, second, fifth, and eighth factors favored transfer of venue out of Sedgwick County.

On the first factor, Dahl's compilation of press and online publications supported the existence of a high degree of negative publicity circulated throughout the community. The July 2002 Kline advertisement and resulting coverage added to it. On the second factor, Dahl's comparative telephone surveys demonstrated that the effects from pretrial publicity about the crimes and this case were considerably less pronounced in Wyandotte County. And the Kansas City version of the Kline ad did not name R. Carr or call him a murderer. On the fifth factor, Dahl's research also showed that a significant percentage of the Sedgwick County jury pool was affected by what they read and heard about the defendants; and four of the trial jurors admitted that they came to the courtroom with opinions favoring guilt. On the eighth factor, the most serious charged offenses could not have been more severe or their potential consequences more irreversible.

The five other factors enumerated for the first time in *Ruebke* favored denial of the defendants' motions.

On the third factor, 21 months elapsed between the first rush of publicity in the immediate aftermath of the crimes and the defendants' arrests and the beginning of jury selection. Although other spikes in publicity occurred in the interim, it is plain that none ever matched the breadth and intensity of early coverage. On the fourth factor, Judge Clark employed jury questionnaires and individual voir dire, both of which had a natural tendency to encourage candor from prospective jurors asked about sensitive subjects. A preliminarily qualified group of 60 prospective jurors was assembled without the necessity of examination of the nine panels of 20 Judge Clark was prepared to call. On the sixth factor, venire panel members who were unable or unwilling to set aside negative publicity about the defendants or any opinion of guilt such publicity had a role in inducing were excused. On the seventh factor, nothing in the record would support an assertion that representatives of the State had any particular role in publicizing information about

the crimes or the case, and the defendants have wisely conceded the point. And, finally, as discussed in relation to the *Skilling* presumed prejudice factors, the ninth factor of size of the community cut against venue transfer. Wichita exceeds other Kansas cities in population.

Our case precedents also provide useful parallels for this case. See *McBroom*, 299 Kan. at 750-54 (no error to deny venue change despite survey showing 69.3 percent of respondents believed defendant "probably," "definitely" guilty); *Higgenbotham*, 271 Kan. at 593-95 (no error to deny motion to change venue despite defendant's venue survey of Harvey county residents showing 95.7 percent of respondents recall case with minimal prompting, 60.6 percent of respondents believed defendant "definitely," "probably" guilty); *Jackson*, 262 Kan. at 129-32 (no error to deny venue change despite defendant's survey confirming 89.7 percent of respondents recalled case, 60 percent had already decided defendant "definitely," "probably" guilty); *State v. Anthony*, 257 Kan. 1003, 1007, 1014-15, 898 P.2d 1109 (1995) (no error to deny motion to change venue despite defendant's public opinion poll of Salina residents showing 97.5 percent had heard of case, 63.8 percent believed evidence strong); *State v. Swafford*, 257 Kan. 1023, 1035-36, 897 P.2d 1027 (1995) (companion case to *Anthony*; same).

The defendants' attempt to distinguish these cases because the defendants were not being tried under threat of the death penalty is undercut by our decision in *State v. Verge*, 272 Kan. 501, 34 P.3d 449 (2001). *Verge* was a death penalty prosecution.

In that case, defendant Robert L. Verge was convicted of one count of capital murder for the premeditated killings of Kyle and Chrystine Moore in Dickinson County. The defense had engaged Litigation Consultants, Inc., the same firm that prepared the venue survey in this case, to compare potential jurors in Dickinson County to those in Sedgwick County. The results showed 96.7 percent of the Dickinson County respondents could recall the case; 71.7 percent had talked about it; and 64 percent believed Verge was either "definitely" or "probably" guilty. 272 Kan. at 505. These results were similar to those reported in this case—96 percent of Sedgwick County respondents recalled the case and 74 percent

held opinions on guilt. In *Verge*, we affirmed the district judge's decision not to transfer venue.

Here, given the mix of evidence on the nine factors we use to apply K.S.A. 22-2616(1) and our consistent caselaw handed down over more than two decades, we cannot say that "no reasonable person" would have agreed with Judge Clark's decisions on the defendants' motions for change of venue. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) ("Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court.").

The defendants' statutory claims are without merit.

## 2. SEVERANCE

R. Carr challenges the district court's repeated refusals to sever the guilt phase of the defendants' cases, arguing that the error deprived him of his constitutionally protected right to a fair trial.

*Additional Factual and Procedural Background*

Defendants requested severance of their cases for preliminary hearing. The State opposed severance, saying there was no reason to think at that point that R. Carr and J. Carr would mount antagonistic defenses and that there were no problems with one of them making an incriminating statement that would affect the other. See *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (codefendant's confession inculpating accused inadmissible against accused; Confrontation Clause requires defendant charged with crime to have opportunity for cross-examination of declarant). Judge Clark V. Owens II, who was handling the defendants' case at the time, denied the severance request at the April 6, 2001, hearing on the motion. He said it was important to consider whether Holly G. would have to testify "twice or once." He also said that analysis of whether the cases should be severed for trial would be "a totally separate issue," inviting the defense to renew its motion before trial if it still believed severance was necessary and differentiating between the ability of a judge presiding

over a preliminary hearing to analyze evidence and that of a jury at trial.

R. Carr filed another motion to sever trial on March 22, 2002. In a supplement to his memorandum in support of the motion filed under seal the same day, he outlined the theory of his defense. The State did not get a copy of this supplement, which stated:

"2. On the evening of December 14, 2000, Reginald Dexter Carr, Jr., and his brother, Jonathan Carr, met at the home of Tronda Adams and Toni Green. Reginald and Jonathan Carr were both traveling in a beige Toyota Camry belonging to Stephanie Donnelly.

"3. After leaving the Green residence together, Reginald Dexter Carr, Jr. and Jonathan Carr traveled to the apartment complex located at 5400 E. 21st Street in Wichita . . . . Jonathan Carr dropped off Reginald Dexter Carr, Jr. and left in the beige Toyota. Reginald Dexter Carr, Jr., not wanting to alert Stephanie Donnelly that he had loaned her car to his brother, left in his (Reginald's) white Plymouth Fury . . . . Mr. Reginald Dexter Carr, Jr., traveled around the northern part of Wichita . . . and attempted to sell drugs.

"4. Mr. Jonathan Carr met another individual . . . and . . . went to 12727 East Birchwood and committed the crimes more fully set out in the Amended Complaint/Information . . . .

"5. Sometime after the commission of the crimes . . . Jonathan Carr located his brother . . . and made arrangements for Reginald Dexter Carr, Jr., to store the property taken from the Birchwood address in Stephanie Donnelly's apartment at 5400 E. 21st Street, Apt. 819. **Prior to the commission of the crimes at the Birchwood address, Reginald Dexter Carr, Jr. had no knowledge of the facts that were about to unfold, nor did he participate in any preparation or plan to effect the same.**
. . . .

"8. . . . Reginald Dexter Carr, Jr., . . . submits there is no forensic evidence that links him to the Dodge Dakota pickup truck, no conclusive forensic evidence that links him to the scene at 12727 Birchwood, no eyewitness accounts that place him at the Birchwood scene or the scene on Greenwich Road where the bodies were discovered.

"9. In contrast, . . . Jonathan Carr is identified by H.G. as being at both the Birchwood address and the scene on Greenwich Road. He is linked to the scene at Birchwood by forensic DNA evidence and implicated by his own statements to Tronda Adams.

"10. Accordingly, . . . should the Defendants . . . be tried together, Mr. Reginald Dexter Carr, Jr.'s defense will . . . be antagonist[ic] to any defense propounded by his brother, Jonathan Carr."

At a motions hearing on April 23, 2002, the State requested copies of all documents filed in support of the motion, including the sealed supplement. R. Carr objected to disclosure of the supplement; his counsel said he would rather withdraw it than prematurely disclose his theory of defense to the State, even if nondisclosure meant he was left without a factual basis to support the motion to sever. The district judge ultimately ruled that the defense did not have to disclose the supplement, but he did not consider it in support of the motion.

During argument on the motion, R. Carr's counsel observed that the failure to sever created a *Bruton* issue because Tronda Adams would testify regarding statements J. Carr made to her about R. Carr. Counsel further argued, without discussing particulars, that the defendants would advance antagonistic defenses. J. Carr's counsel, Ronald Evans, confirmed that his client's defense would be antagonistic to R. Carr:

"Judge, there is no way if this case proceeds the way it is now with these brothers being tried together that I cannot prosecute Reginald Carr. That's true in the first stage, but it's absolutely true in the second stage . . . .

". . . I have to be Reginald's prosecutor. That adds another prosecutor in the room. There is no way that doesn't prejudice Reginald.

". . . We're going to get into things on Reginald that there's no way the State would get to introduce into evidence against him if he was sitting there by himself."

The prosecutor recognized the danger for prejudice in a joint trial and suggested that two juries could be impaneled.

Regarding Adams' testimony specifically, the State said that it could easily avoid eliciting objectionable testimony from her. But counsel for J. Carr argued that he would nevertheless need to elicit the objectionable testimony from Adams in furtherance of his client's defense.

The prosecutor then elaborated on the two-jury suggestion, stating that one jury could be removed from the courtroom for testimony that might be prejudicial to the defendant it was assigned, and then, if the defendants were found guilty of at least one capital crime, their juries could be separated to hear severed penalty phase trials. She said her proposal would solve the problem of how much

"time and effort that all would have to place in this case and . . . assure that the rights of the victims are protected as well as the rights of the defendant[s]."

R. Carr's counsel opposed the district attorney's proposal. J. Carr's counsel said that he was not opposed to the suggestion, but he would have to see the proposal in writing. He also said that "trying to do two juries is going to be more work than severing the case and just doing two trials."

After a break, the district attorney repeated her proposal but said she was not advocating for severance. "[W]e could adequately, more than adequately, constitutionally protect the rights of the defendants and entitle the State to a fair trial without the necessity for severance," she said.

The district judge denied the severance motion with leave to refile it if the situation warranted, "especially when all the discovery is closed . . . ."

J. Carr filed another motion for severance on July 30, 2002, which R. Carr joined. At an August 9, 2002, pretrial conference, Judge Clark heard argument on the motion. Counsel for J. Carr first outlined J. Carr's theory of defense:

"Number one, the defendants have an antagonistic defense. Judge, the clearest way I can put Jonathan Carr's defense right now is he denies categorically his participation in the events he's accused of. His defense will be he was in Tronda Adams' house early the morning of December 15th. His big brother Reggie brought items over, cash, a ring, left those items with him. He was not told of the crime. He did not participate in the crime. He is prepared to present an alibi to the jury.

"Now, that is as clear as I can make our defense. I can't think of a way to put it that doesn't put the State on notice of where we're going."

Counsel said that he had not been told the details of R. Carr's planned defense, but R. Carr's counsel confirmed his client intended to assert his innocence at trial and to point the finger at J. Carr.

The State argued that the parties had to demonstrate actual prejudice, not mere speculation, to be entitled to severance and demanded both defendants identify specific evidence or make proffers that would demonstrate actual prejudice.

R. Carr cited Adams' testimony about statements made by J. Carr that would prejudice his client. One of the prosecutors acknowledged that this testimony would constitute a problem under *Bruton*, 391 U.S. 123. But she argued the State would not be able to introduce the statements at either a joint or separate trial because, absent a waiver, R. Carr's Fifth Amendment rights would prevent it from doing so. Neither defense counsel responded to this assertion.

J. Carr's counsel said that, in addition to sponsoring Adams' testimony, he had planned to put on evidence of R. Carr's prison record. However, because the court granted R. Carr's motion in limine to exclude evidence of his record, after the State responded to the limine motion by saying it did not intend to introduce R. Carr's criminal history under K.S.A. 60-455, J. Carr could not do so in the joint trial. J. Carr's counsel also said there would be no way relatives of the brothers could testify in a joint trial about which brother was the leader and which the follower.

Again, Judge Clark refused to sever the proceedings, "for the same reasons . . . stated when it was first raised."

The State filed successful pretrial motions in limine to prevent defendants from introducing out-of-court statements made by either one of them unless a hearsay exception applied. The State also moved successfully to prevent defendants from introducing evidence of any third party's guilt for the crimes charged as a result of the Birchwood incident, arguing that Kansas' third-party evidence rule prohibited a defendant from introducing circumstantial evidence of another's guilt when the State's case against the defendant was based on direct evidence. The flaws in these rulings are fully discussed in Section 18 of this opinion.

At trial, J. Carr's defense was simply to hold the State to its burden of proof and to argue that any crimes proven were committed under the control and influence of his brother, R. Carr. J. Carr did not advance an alibi theory on any of the three incidents that formed the basis of the charges.

On the other hand, R. Carr sought to defend on the basis that his brother had committed the Birchwood crimes with someone else.

During opening statements, R. Carr began his attack on J. Carr. His counsel conceded that R. Carr was guilty of possessing stolen property from the Birchwood home and victims, but he said the evidence would show R. Carr was not guilty of the many Birchwood crimes charged. Instead, he asserted, J. Carr and an unidentified, uncharged black male were present at the Birchwood home while R. Carr was not. R. Carr "spent the . . . late night hours of the 14th and the early morning hours of the 15th of December selling drugs in Wichita." Counsel continued:

"He was not . . . with his brother until sometime in the neighborhood of 5:00 or 5:30. He, Reginald Carr, learned that Jonathan Carr was located near Tronda Adams' house, he went there to help his brother, who was in trouble. While there he saw the Dodge Dakota truck, filled with items that had been stolen.

"In an attempt to help his brother, Reginald Carr took those items—he didn't get into the Dodge Dakota truck, the evidence will be that he's never been inside the Dodge Dakota truck. The Dodge Dakota truck was driven to Stephanie Donley's apartment complex, not by Reginald, not by Jonathan, but by a third black male."

J. Carr's counsel objected to this as "argumentative, unsupported by the evidence," but Judge Clark overruled the objection.

Later that day, during a break in testimony, J. Carr's counsel moved for a mistrial, arguing that the "opening statements illustrate an argument that we've made many times early on in this case as to why we needed to be severed from this matter and have a separate trial from Reginald Carr," and again moved for severance.

Judge Clark overruled the motion for mistrial and did not separately address the renewed motion for severance.

Each defendant continued to push for severance when evidence that pointed to the other defendant was admitted. J. Carr renewed the motion when the State moved the admission of photographs of the victims' property found in R. Carr's possession, including photographs of Schreiber's watch, Brad H.'s wallet, and Aaron S.'s television. J. Carr also renewed the severance motion when the State admitted evidence of R. Carr's Buffalino boots, a wallet containing R. Carr's birth certificate, and a witness statement law enforcement completed while interviewing Walenta's husband. J. Carr renewed the motion again when he believed R. Carr opened

the door for the State to introduce autopsy photographs of Heather M. R. Carr renewed the severance motion when a State expert witness testified to a DNA match between J. Carr and samples recovered from carpet at the Birchwood home.

Judge Clark rejected all of these renewed motions.

J. Carr also renewed the severance motion when the State's witness discussed procedures for handling consumable DNA samples associated with R. Carr, and again when the State moved to admit the engagement ring recovered from J. Carr. Again, Judge Clark rejected the idea of severance.

During the State's case, J. Carr contributed to the evidence tending to prove R. Carr's guilt. During his cross-examination of Officer James Espinoza, for example, J. Carr focused the jury's attention on property from the Birchwood residence found in R. Carr's possession. During cross-examination of Schreiber, J. Carr emphasized that Schreiber could identify only R. Carr as one of the men who kidnapped and robbed him.

"Q. But one thing you are certain of, Mr. Schreiber, let me get this clear. You've been certain about this over the last 20 months is Reginald Carr was the driver, is that correct?

"A. Yes.

"[J. Carr's Counsel:] Q. Okay. No further questions. Thank you very much."

Before Adams took the stand, J. Carr's counsel reminded Judge Clark out of the hearing of the jury that R. Carr filed a motion in limine pretrial to exclude certain testimony about him from Adams. J. Carr's counsel requested "guidance from the Court" about the permissible scope of his cross-examination of Adams.

One of the prosecutors informed the judge that there were two separate areas on which she had instructed Adams. One had to do with ownership of a weapon given to Adams; J. Carr had mentioned that it belonged to R. Carr. The other area concerned a remark Adams had overheard J. Carr make during a telephone conversation on the morning of December 15: "[W]hat's Smoke got me into now?" "Smoke" was a nickname used by R. Carr. The prosecutor said she planned to put on evidence about the gun and telephone calls but "not the statement[s] that [J. Carr] made that would in any way implicate Reginald Carr."

Judge Clark said that evidence from Adams on J. Carr's statements about R. Carr remained inadmissible.

J. Carr's counsel made a proffer of Adams' excluded testimony by examining her outside the presence of the jury. Adams said J. Carr initially provided her with a silver gun. When J. Carr came to her home on December 11, 2000, he had a black gun, gave it to Adams, and took back the silver gun. He told Adams that the black gun belonged to "Smoke" and the silver gun belonged to him. On December 13, 2000, Adams said J. Carr came over and took the black gun back. Adams also said that she overheard J. Carr say while on the telephone early on December 15: "[W]hat has Smoke got me into?"

J. Carr's counsel renewed the severance motion again when Judge Clark ordered R. Carr to wear leg and hand restraints in the courtroom during the guilt phase of the trial. That morning, R. Carr had refused to come to trial. And the Sheriff's Department reported that he was making threats to sheriff's officers. J. Carr's counsel argued that R. Carr's misconduct would prejudice his client. He said that Judge Clark was "probably tired of hearing it, but Reginald Carr continues to infect our right to a fair trial."

One of the prosecutors then brought up examples of bad behavior by R. Carr in the courtroom the day before, "one of which was when [R. Carr's counsel] got up to look at a video, the defendant, Reginald Carr, took his chair, pushed [his counsel's] chair by the court guards, physically moved his chair knee-to-knee contact with me in the courtroom." This required court guards "to get up and move him," she said.

Judge Clark said he had seen R. Carr do nothing in the courtroom "that seems disruptive to the process." But he ordered the leg and hand restraints as security measures, making provision to shield them from the view of the jury. He again made no ruling on the renewed motion for severance.

Later that afternoon, Donley took the stand. During R. Carr's cross-examination, counsel attempted to elicit statements R. Carr had made to her about J. Carr the morning of December 15, 2000. J. Carr's counsel objected on hearsay and *Bruton* grounds and renewed his motion for severance. Judge Clark sustained the objec-

tions, instructed R. Carr's counsel to avoid the line of questioning, but overruled the motion.

The defendants again argued unsuccessfully that Judge Clark should have severed their prosecutions when they moved for judgment of acquittal at the close of the State's evidence. They did so again, unsuccessfully, at the close of all evidence admitted in the guilt phase.

J. Carr's counsel devoted a significant portion of his closing argument on the evidence supporting R. Carr's guilt. He reminded the jury that Schreiber identified only R. Carr and that Schreiber's watch was found in R. Carr's possession. With regard to the Walenta murder, J. Carr defended the reliability of Walenta's photo array identification of R. Carr.

Earlier in trial, when J. Carr had cross-examined the coroner on the Birchwood crimes, he attempted to establish that only one man fired the shots that killed the Birchwood victims.

"Q. Based on this, in your opinion, would it not be consistent with one shooter moving down the line shooting Heather and shooting Aaron, then shooting Brad and finally shooting Jason?
"A. I can't comment on that. I can only tell you about the injuries that I found at autopsy."

J. Carr's counsel argued during closing that there was only one gun and one shooter:

"And that evidence shows who shot and killed four individuals. That person is Reginald Carr with that .380 black Lorcin handgun. Reginald Carr was not alone. But the evidence will show who was playing the lead role that night directing things, taking most of the things. That person again was Reginald Carr."

He also reinforced the reliability of Holly G.'s in-court identification of R. Carr:

"[Holly G.]'s eyewitness identification of Reginald Carr is consistent and it's solid. If you go chronologically through the order in which she talks to law enforcement, you will see the same description over and over again."

And he attempted to explain Holly G.'s failure to identify R. Carr at preliminary hearing:

"Now, at the preliminary hearing she identified Jonathan as the person she picked out of the photo array, not Reginald. But we know Reginald shaved his head and

was wearing eyeglasses at the preliminary hearing. And at the time of trial she makes that correction[] and makes the identification."

J. Carr's counsel also argued that the property found in R. Carr's possession and law enforcement's stop of his Plymouth near the Birchwood residence corroborated other evidence of R. Carr's involvement in the Birchwood crimes. He then highlighted the State's DNA evidence, cigar ash evidence, and Holly G's contraction of HPV.

J. Carr's counsel also argued that the black handgun connected to all three incidents belonged to R. Carr.

At the conclusion of his argument, counsel for J. Carr admitted to J. Carr's involvement in some of the charged crimes, but he placed the bulk of moral responsibility on his codefendant brother:

"Please remember that some of these crimes do remain unproven as to Jonathan Carr's guilt. Some of them he is actually innocent of. Now, just because the codefendant Reggie is guilty of all of the charges, just because the evidence shows regarding Jonathan some involvement on some of the counts, don't go back there and just check the box guilty all of the above. Please give Jonathan separate consideration on each count. Please consider his guilt or innocence separate from damning evidence against his brother Reginald. It shouldn't be guilt by association. It should be guilt beyond a reasonable doubt. Remember the testimony and our sole admitted exhibit showed Jonathan was supposed to be on a train to Cleveland from Newton in the early morning hours of the 15th of December. . . . A train that would have taken him back to his family and friends, but a train he never made because of Reggie."

### Standard of Review and Legal Framework

The decision whether to sever a trial is one within the trial court's discretion. *State v. Reid*, 286 Kan. 494, 519, 186 P.3d 713 (2008) (citing *State v. White*, 275 Kan. 580, 589, 67 P.3d 138 [2003]).

Judicial discretion is abused if judicial action is arbitrary, fanciful or unreasonable, or based on an error of law or fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

Under Kansas law, "[t]wo or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting the crime or crimes." K.S.A. 22-3202(3). However, "[w]hen two or more defen-

dants are jointly charged with any crime, the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney." K.S.A. 22-3204.

"[S]everance should be granted when it appears· necessary to avoid prejudice and ensure a fair trial to each defendant." *State v. Davis*, 277 Kan. 231, 239, 83 P.3d 182 (2004) (citing *State v. Aikins*, 261 Kan. 346, 360, 932 P.2d 408 [1997]); see *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (district court should grant severance if there is serious risk that joint trial "would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"). Although a single trial may serve judicial economy and ensure consistent verdicts, the right of a defendant to a fair trial must be the overriding consideration. *State v. Martin*, 234 Kan. 548, 550, 673 P.2d 104 (1983).

We have employed several factors to determine whether there was sufficient prejudice to mandate severance. *Davis*, 277 Kan. at 240 (quoting *State v. Butler*, 257 Kan. 1043, 1063, 897 P.2d 1007 [1995], *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 [1996]). We consider:

" '(1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants.' " 277 Kan. at 240 (quoting *Butler*, 257 Kan. at 1063).

The party moving for severance has the burden to demonstrate actual prejudice to the district court judge. *State v. Hunter*, 241 Kan. 629, 633, 740 P.2d 559 (1987). But the United States Supreme Court has said that a trial judge "has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516, 80 S. Ct. 945, 4 L.

Ed. 2d 921 (1960); see *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989).

On appeal from a denial of severance, the party claiming error has the burden to establish a clear abuse of discretion. *State v. White*, 275 Kan. 580, 589, 67 P.3d 138 (2003). We also have held: "When a decision is made regarding joinder or severance, even if it is determined that there was an abuse of discretion, the defendant has the burden of showing prejudice requiring reversal." *State v. Boyd*, 281 Kan. 70, 80, 127 P.3d 998 (2006) (citing *State v. Crawford*, 255 Kan. 47, 54, 872 P.2d 293 [1994]). But evolving caselaw generally places the burden of demonstrating harmlessness on the party benefitting from the error. See *Ward*, 292 Kan. at 568-69. We apply that general rule in the severance context today.

*Evaluation of Factors*

In the guilt phase of this trial, there is no question that the defendants had antagonistic defenses, and the State concedes this point.

R. Carr argued that J. Carr committed the Birchwood crimes with another person. J. Carr's counsel emphasized the relative weakness of the evidence against his client in the Schreiber and Walenta incidents and consistently stressed the evidence of R. Carr's guilt in the Birchwood incident. Each defendant did his best to deflect attention from himself on the Birchwood crimes by assisting in the prosecution of the other. R. Carr insisted he was not involved at all until a temporary storage arrangement was needed for the stolen property, and J. Carr essentially conceded guilt of both defendants but set up R. Carr as the leader, and thus the more culpable, of the pair. See *White*, 275 Kan. at 590 (quoting *State v. Pham*, 234 Kan. 649, 655, 675 P.2d 848 [1984]) (classic example of "intrinsically antagonistic defenses is where both defendants blame each other for the crime while attempting to defend against the State's case"); see also *Zafiro*, 506 U.S. at 539 (interpreting federal rule on severance similar to Kansas statute: "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, . . . risk of

prejudice is heightened", citing *Kotteakos v. United States*, 328 U.S. 750, 774-75, 66 S. Ct. 1239, 90 L. Ed. 1557 [1946]).

On the second factor, R. Carr contends that the denial of severance forced exclusion of testimony from Donley that was exculpatory to him but would have violated Jonathan's Sixth Amendment confrontation rights under *Bruton v. United States*, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). See *State v. Rodriquez*, 226 Kan. 558, 561, 601 P.2d 686 (1979) (following *Bruton*).

On the second factor, it is also important for us to consider that each defendant apparently made at least one personally incriminating statement about being the one who fired the shots that killed Heather M., Aaron S., Brad H., and Jason B. Both of these statements were referenced during the penalty phase. Temica, the defendants' sister, testified that R. Carr told her he shot the four friends. One of the prosecutors referenced a similar statement by J. Carr, apparently made to fellow prisoners while he was in jail awaiting trial. When the State argued to Judge Clark pretrial that an incriminating statement such as these by one defendant that implicated the other—in that instance, J. Carr's "[W]hat's Smoke got me into?" remark within earshot of Adams—would not have been admissible in a separate trial, it was plainly wrong. J. Carr's remark about "Smoke," given the context in which it was uttered, could have come in at a separate trial of R. Carr through J. Carr himself. It also qualified as a declaration against interest under K.S.A. 60-460(j), if it had to be admitted in a separate trial of either defendant through Adams or the person on the other end of J. Carr's telephone call. In the case of each of the defendant's statements about being the Birchwood shooter, no evidence of either statement could be admitted in the guilt phase of a joint trial under *Bruton*, 391 U.S. 123, because one defendant's confession to that act inevitably incriminated the other as the aider and abettor of that act. But each defendant's statement could have been admitted—and undoubtedly both would have been admitted by the State—in that defendant's separate trial. Each statement could have come into evidence through its hearer or as a declaration against interest under K.S.A. 60-460(j) or as a confession under

K.S.A. 60-460(f). And R. Carr could have tried to use J. Carr's statement claiming personal responsibility for the shooting in the soccer field to bolster his "J. Carr-plus-third-person" defense.

This evidence that was inadmissible in a joint trial because of *Bruton*, 391 U.S. 123, but that would have been admissible at a separate trial of R. Carr, also includes R. Carr's eventually proffered own testimony about what J. Carr said to him during three telephone calls and in person on the night of the Birchwood crimes. Judge Clark ruled erroneously, as fully discussed in Section 18 of this opinion, that these portions of R. Carr's proffer must be excluded under Kansas' third-party evidence rule and as hearsay. Had he not made these erroneous rulings, he would have had to consider the effectiveness of severance to enable R. Carr to get his defense before the jury that would determine his guilt alone.

The third factor from our precedent on severance is not applicable. The fourth factor cut in favor of the State because apparent confessions by each defendant could have come in at separate trials, as discussed above. The fifth factor would be inapplicable unless we assume that the State was willing to grant immunity to one brother to force him to testify against the other in the other's separate trial. This seems unlikely to have happened.

We conclude that Judge Clark's repeated refusal to sever the guilt phase of the prosecution against defendants for trial was an abuse of the judge's discretion.

To begin with, two mistakes of law are immediately recognizable. See *Ward*, 292 Kan. at 550 (judge abuses discretion by making mistake of law). Judge Clark failed to do the necessary analysis when he ruled against severance at the pretrial hearing on August 9, 2002, "for the same reasons . . . stated when it was first raised." There were three reasons stated when the subject of severance first arose: the absence of antagonistic defenses, the absence of an incriminating statement from either defendant, and the desire to avoid putting Holly G. through two trials. The first of these reasons no longer applied.

The second mistake was Judge Clark's apparent willingness to follow the State's misstatement of the law during the same pretrial hearing about the continued inadmissibility of Adams' testimony

about J. Carr's "[W]hat's Smoke got me into?" statement in separate trials.

Furthermore, we see an abuse of discretion in the dearth of record support for Judge Clark's virtually indistinguishable, nearly completely unexplained rulings over time, even though the conflict between the defendant's theories became more and more clear and the pile of evidence that would be excluded because of the joint trial grew ever taller. Given Judge Clark's continuing duty to carefully consider severance to avoid prejudice to a defendant, and the overriding status of the defendant's right to fair trial, Judge Clark's decisions were progressively unreasonable.

*Prejudice*

R. Carr urges us to conclude that Judge Clark's abuse of discretion led not just to prejudice but to prejudice requiring reversal.

R. Carr argues that the State's evidence against J. Carr for the Birchwood crimes was strong, far stronger than its evidence against him. The hair root recovered at the Birchwood home, matching semen samples from the victims, and test results confirming that bloodstains on J. Carr's clothing matched or could not exclude victims Heather M. and Holly G. placed J. Carr at the scene as one of the intruders, and J. Carr failed to contest this in any meaningful way. Because J. Carr, as one of the perpetrators, had to know the identity of the second perpetrator, when J. Carr launched his trial strategy of minimizing his own role in these offenses and emphasizing Reginald's predominant one, a vouching dynamic similar in force to inculpatory accomplice testimony was created, adding credence to the State's case against R. Carr. Meanwhile, *Bruton* combined with Judge Clark's erroneous rulings on the third-party evidence and hearsay to prevent R. Carr from using the State's and his own evidence against J. Carr to even the playing field.

R. Carr suggests that this skewed the appropriate burden of proof and that it means we cannot know whether the jury convicted him based on the State's evidence, Jonathan's vouching, or a combination of the two—rendering the verdict unreliable. See *Zafiro*, 506 U.S. at 543-44 ("Joinder is problematic in cases involving mutually antagonistic defenses because it may operate to reduce the

burden on the prosecutor, in two general ways. First, joinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary. Second, joinder may invite a jury confronted with two defendants, at least one of whom is almost certainly guilty, to convict the defendant who appears the more guilty of the two regardless of whether the prosecutor has proven guilt beyond a reasonable doubt as to that particular defendant."); *State v. McQueen*, 224 Kan. 420, 425, 582 P.2d 251 (1978) ("[W]hen the evidence is clear and convincing as to one defendant and not so as to the other, failure to sever may well cause prejudice which will result in manifest injustice in violation of constitutional due process."); but see *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986) ("claim of disparate evidence justifies severance in only the most extreme cases") (citing *United States v. Bolts*, 558 F.2d 316 [5th Cir. 1977]).

The State's first response is that the strength of its case against R. Carr demonstrates the reliability of the jury's verdict. It is correct that its independent case against R. Carr was overwhelming. See *McQueen*, 224 Kan. at 425 ("When the evidence of participation and identity of those charged is clear and convincing, prejudice from a joint trial may not be great.")

Schreiber, Walenta, and Holly G. all identified R. Carr. Nuclear DNA testing implicated R. Carr as well as J. Carr, specifically blood from R. Carr's shirts and shorts that matched Heather M. and foreign material recovered from Holly G.'s thigh that excluded all known contributors other than him and his brother. DNA from Schreiber's watch was generally consistent with R. Carr's genetic markers. Mitochondrial DNA testing pointed to R. Carr as a possible contributor of one hair collected from the Birchwood home. The State's ballistics expert testified that the black Lorcin was used in all three incidents, and that gun was linked to R. Carr by the eyewitness identifications of him using a similar black gun. Two shoeprints observed at the Birchwood home were consistent with R. Carr's Buffalino boots. Testimony from law enforcement personnel involved in R. Carr's arrest tended to show he attempted to flee by preparing to jump off Donley's balcony, and he gave an alias rather than his correct name. See *State v. Phillips*, 295 Kan.

929, 949, 287 P.3d 245 (2012) (evidence of flight, use of alias is probative of consciousness of guilt); *State v. Ross*, 280 Kan. 878, 881, 127 P.3d 249, *cert. denied* 548 U.S. 912 (2006) (citing *State v. Walker*, 226 Kan. 20, 21, 595 P.2d 1098 [1979]) (same). R. Carr had genital warts, and Holly G. learned a few months after her sexual assault that she had contracted HPV, the virus that causes genital warts. Investigators collected larger-caliber ashes, consistent with those from a cigar, inside the Birchwood home. No other ashtrays, cigarettes, or other smoking materials were found in the home. When arrested, a partially smoked cigar with a plastic tip and a cigar box lid were recovered from the pockets of the leather coat Holly G. testified that R. Carr wore during the crimes. After R. Carr's arrest, law enforcement recovered numerous pieces of property owned by the Birchwood victims and Schreiber, as well as other highly incriminating evidence such as ATM receipts connected to the Birchwood victims' accounts, from R. Carr's person, from his girlfriend's apartment, and from the area and vehicles around it.

The State's evidence also challenged the credibility of R. Carr's defense, to the extent he was able to advance it.

The State's witnesses placed R. Carr near the scene of the Birchwood crimes shortly after they were reported. Holly G. testified that R. Carr drove Jason B.'s truck when the group traveled to the soccer field shortly after 2 a.m. Both intruders left together in the truck after the shootings. Sergeant John Hoofer testified about seeing a truck similar to Jason B.'s in the vicinity of the Birchwood home shortly after 3 a.m. About an hour later, Hoofer stopped R. Carr in his white Plymouth, after he had twice driven by the Birchwood home. R. Carr said he was on his way to Donley's apartment. Donley confirmed R. Carr arrived at her apartment about 4:30 a.m.

Our review of the record persuades us that this was far from a case in which the State, by way of a joint trial, set the defendants upon each other and then coasted. Although its path to R. Carr's convictions was made somewhat smoother and straighter by the judge's related guilt phase errors on severance and on third-party evidence and hearsay, the State presented compelling evidence of R. Carr's guilt, all of which would have been admissible in a severed

trial. See *State v. Pham*, 234 Kan. 649, 654, 675 P.2d 848 (1984) ("When the evidence of participation and identity of those charged is clear and convincing, prejudice from a joint trial may not be great."; citing *McQueen*, 224 Kan. at 425).

On the record before us, we hold that R. Carr is not entitled to reversal on this issue.

### 3. JOINDER OF NONCAPITAL COUNTS

R. Carr challenges the joinder for trial of the noncapital and capital charges against him. His November 19, 2001, motion to sever the charges was denied.

Kansas' criminal statute on joinder of charges and defendants provides:

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." K.S.A. 22-3202(1).

"Whether a defendant will be tried on all separate charges in a single trial is a matter within the discretion of the trial court, and its decision will not be disturbed on appeal unless there is a clear showing of abuse of discretion." *State v. Bunyard*, 281 Kan. 392, Syl. ¶ 2, 133 P.3d 14 (2006).

R. Carr argues that Judge Clark erred in denying his motion because the noncapital and capital charges in the amended complaint cannot be "of the same or similar character" because they are not subject to the same punishment. He further argues that the error requires reversal because it is possible that the jury considered or relied upon evidence pertaining to the Schreiber and Walenta incidents in deciding to impose a sentence of death, in violation of his rights under the Eighth and Fourteenth Amendments.

The State supports Judge Clark's decision as legally appropriate, contending that similarity of punishment is merely one of several factors the court may consider in deciding whether offenses are "of the same or similar character." It is not, the State asserts, a

condition that must be satisfied before a district judge can exercise discretion to consolidate charges for trial. Should we reach a harmlessness inquiry, the State argues that R. Carr suffered no prejudice from any joinder error because the statutory capital sentencing scheme in Kansas combined with the judge's instructions properly limited the evidence the jury could consider on aggravating circumstances justifying imposition of the death penalty.

We have previously identified factors relevant to determining whether crimes qualify as "of the same or similar character." Offenses that have general similarities, that "require the same mode of trial and the same kind of evidence, and occur in the same jurisdiction" are sufficiently alike to be tried together. See *State v. Crawford*, 255 Kan. 47, 53, 872 P.2d 293 (1994) (citing *State v. Ralls*, 213 Kan. 249, 256-57, 515 P.2d 1205 [1973]). We have also looked to similarity of punishment as another factor to consider. *State v. Barksdale*, 266 Kan. 498, 507, 973 P.2d 165 (1999).

The governing statute does not expressly require that joined offenses share common punishments. *Crawford*, 255 Kan. at 53. And we are loath to add a requirement not set out by the legislature. See *State v. Hendrix*, 289 Kan. 859, 862, 218 P.3d 40 (2009) (when statutory language plain, unambiguous, no need to resort to statutory construction; appellate court merely interprets language as it appears, does not speculate, read into statute language not readily found).

Indeed, the plain language of the statute explicitly provides that offenses with different punishments may be joined for trial. Joinder of offenses, "whether felonies or misdemeanors or both," is permitted under K.S.A. 22-3202(1). And the punishments for felonies and misdemeanors are, without question, widely divergent. Compare K.S.A. 2013 Supp. 21-6804 and 6805 (Sentencing Guidelines Act grids for nondrug, drug felonies) with K.S.A. 2013 Supp. 21-6602 (defining classes of misdemeanors, setting out permissible terms of confinement).

This court embraced such an analysis in *State v. Cromwell*, 253 Kan. 495, 856 P.2d 1299, *holding modified by State v. Willis*, 254 Kan. 119, 864 P.2d 1198 (1993), where we examined whether a district judge abused his discretion by refusing to sever the trial of

two sets of charges for rape, robbery, and murder committed on two separate occasions. The defendant argued that a difference in the ages of the two victims, a lapse of 4 years between the two crimes, and the applicability of a hard 40 sentence to one incident but not the other, rendered the sets of charges sufficiently dissimilar to require that they be tried separately. 253 Kan. at 511.

On the subject of punishment similarity, we said:

"The application of the 'hard 40' sentence to [one murder] but not to the [other murder] is not material. The legislature did not consider differences in sentences to be dispositive because K.S.A. 22-3202(1) speaks of the similarities of the crimes, not the sentences, and contemplates potential trial of felonies and misdemeanors together. Moreover, while the consideration of aggravating factors may distinguish the hard 40 from other sentences, the jury considers whether to impose the hard 40 in a separate proceeding after the guilt phase of the trial is complete. Thus, evidence of and argument about aggravating factors need not taint the guilt phase of the trial." 253 Kan. at 511.

This language from *Cromwell* is on point and persuasive. This court's decision in *State v. Thomas*, 206 Kan. 603, 608, 481 P.2d 964 (1971), cited by R. Carr, is not.

The *Thomas* opinion mentioned the dissimilarity of murder and forgery punishments incidentally in its discussion on whether the crimes could be joined for trial as "of the same or similar character." But a careful review of its language demonstrates that the court's primary focus was a complete lack of relationship between the two crimes and the evidence it would take to prove them:

"Testing the offenses consolidated here, against the standards referred to, it cannot be said that murder and forgery are of the same general character; nor is the same kind of punishment required. As we have already observed, the murder evidence was totally unrelated to the forgery evidence—the evidence establishing one offense was no proof of any element of the other offense. The murder evidence was largely circumstantial, while that of forgery was documentary and eyewitness testimony. Except for police officers, who investigated aspects of both cases, the witnesses were separate and distinct with respect to each case." 206 Kan. at 608.

This case is different from *Thomas*. The three December 2000 incidents giving rise to the noncapital and capital charges against R. Carr are related in several important ways. The victims of the crimes identified one or both defendants as the perpetrators. There

was evidence that each incident had a gun in common. Certain aspects of the perpetrators' modus operandi were consistent, at least between pairs of incidents—*e.g.*, one of the perpetrators held a black gun palm down in both the Schreiber and Walenta incidents, the victims in both the Schreiber and Birchwood incidents were forced to drive to ATMs and withdraw money from their bank accounts, a light-colored car followed a woman driving home at night in the lead-up to both the Walenta and Birchwood incidents. Belongings of Schreiber and the Birchwood victims were discovered together. All of the incidents occurred within a few days of each other.

These multiple connecting points were more than enough to justify trying all of the charges arising out of the three incidents together. Identity of possible punishment between the noncapital and capital charges was not required under the plain language of the statute or our caselaw applying it. Judge Clark did not abuse his discretion in denying R. Carr's motion to sever the noncapital and capital counts for trial.

## 4. JURY SELECTION

R. Carr contends that Judge Clark erred in three ways on the parties' challenges for cause: (a) by excusing prospective juror M.W., who opposed the death penalty; (b) by failing to excuse allegedly mitigation-impaired jury panel members W.B., D.R., D.Ge., and H.Gu.; and (c) by excusing prospective jurors K.J., M.G., H.D., C.R., D.H., and M.B., who expressed moral or religious reservations about the death penalty. The State responds that all of these rulings by Judge Clark are supported by the record and that he properly exercised his discretion.

*Excuse of M.W. for Cause*

*Additional Factual and Procedural Background*

The defendants attempt to demonstrate that Judge Clark erred in excusing M.W. on the State's challenge for cause, based on M.W.'s death penalty view, by comparing the record of his questionnaire responses and voir dire to those of 11 other prospective jurors whom the defense challenged unsuccessfully. We therefore

summarize what we know about M.W. and the 11 panel members to whom the defendants compare him.

### M.W.

M.W. said in his responses to the questionnaire that he was morally opposed to the death penalty and could not vote to impose it under any circumstances.

During the State's voir dire, M.W. confirmed that he could never sentence a person to death, even if the court instructed him to do so. M.W. explained that his moral objection was founded on Biblical grounds and that his belief was firmly held and would not change. At times during defense voir dire, however, M.W. vacillated. He declared his ability to impose the death penalty if forced to do so by law and confirmed that his "moral, philosophical, or religious beliefs" would not prevent him "from following the law in this case and doing [his] job as a juror." Still, when counsel for R. Carr asked M.W. if he could sentence defendants to death, "[d]espite what the Bible says," M.W. responded, "The [B]ible comes first."

When the State challenged M.W. for cause because of his conflicting statements, Judge Clark inquired further on M.W.'s death penalty opposition:

"[W]hat I heard you say is you could do your job every step of the way of being a juror, but the good book comes above all in your mind and it says thou shalt not kill and vengeance belongs to the Lord and you could not cast a vote against the Bible; that is, to impose death on another human being."

M.W. said, "Yes, sir", confirming that Judge Clark had summarized his position accurately, and he was excused.

### J.R.

In his questionnaire, J.R. expressed strong support of the death penalty and said he had difficulty understanding how mitigating circumstances could justify a different sentencing outcome.

However, during the State's voir dire, J.R. said he would not support the death penalty in every case without regard to the particular facts. He agreed "absolutely" that the State should be required to prove that there were circumstances sufficient to warrant

imposition of capital punishment, and he said he would consider mitigation evidence in this case.

J.R.'s statements during his voir dire by the defense were less than categorical. When asked whether he could truly give fair consideration to mitigating circumstances, J.R. responded, "I believe I could be fair. I will admit that I have a problem—I have a problem with" age as a mitigating circumstance. The defense asked, "Now by being fair, does that mean that if we get to the second stage is your mind going to already be made up that it's death before we even present any evidence on mitigator[s] or are you going to keep an open mind?" J.R. responded, "I would say I'd have to keep an open mind," and he declared his ability to do so. Later, when defense counsel asked J.R. whether he would be leaning toward a sentence of death if the defendants were convicted of capital murder, J.R. said "[i]t would depend on the evidence." When counsel pushed for a clearer response, J.R. said that he "would probably be leaning toward death."

When the defense challenged J.R. for cause, Judge Clark asked several follow-up questions, some of which were leading. For example, after J.R. expressed some difficulty accepting age as a mitigating factor, Judge Clark inquired, "Even under instruction of law that that's one of the things you have to give consideration to?" J.R. confirmed that he could enter the sentencing phase of this case, if any, with an open mind and could set aside his personal views about the death penalty. The judge rejected the challenge for cause.

### D. Gr.

D. Gr. was another prospective juror who favored the death penalty. But he said during voir dire that it would not be difficult for him to set aside his personal view and that he would consider evidence of mitigating circumstances fairly. He expressed his understanding that the law (as of the time of trial in this case, see *State v. Kleypas*, 272 Kan. 894, 1015-19, 40 P.3d 139 [2001], *cert. denied* 537 U.S. 834 [2002], *later overruled by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 [2006]), required him to impose a life sentence if the State failed to prove aggravating cir-

cumstances outweighed mitigating circumstances, and he confirmed that he would follow the law. He agreed further that the death penalty would not be imposed automatically upon conviction for capital murder and that he would be required to consider aggravating and mitigating circumstances to decide the appropriate penalty. Some of D.Gr.'s statements responded to leading questions from the prosecutor, such as "you're not of the frame of mind to just say okay, I've found them guilty of capital murder and it's over and I'm just going to impose the death penalty?"

During R. Carr's questioning, D.Gr. confirmed that in questionnaire responses he said that "the crime was too great, prison is not the answer." When R. Carr's counsel asked, "given the fact that you think the crimes committed were too great and that prison is not the answer, are you not, in fact, predisposed to vote for death if the State proves any of the aggravating circumstances that they've alleged?" D.Gr. responded, "If they're proven, I would have to vote for the death penalty." But, in responding to counsel's follow-up question, D.Gr. agreed that if any mitigator is found to equal the aggravators that he would be required to vote for life. D.Gr. said that his personal opinions would not impair his ability to consider mitigating circumstances as support for a life sentence and that he would consider mitigators even if convinced beyond a reasonable doubt that the crimes were committed in an especially heinous, atrocious, or cruel manner. D.Gr. again confirmed his willingness and ability to give meaningful consideration to mitigation evidence in response to questions from J. Carr's counsel. The judge rejected the defense challenge for cause.

### D.Ge.

In questionnaire responses, D.Ge expressed strong support for the death penalty but also said that he neither favored nor opposed the penalty as a punishment; instead, he said, he would base his decision on the facts and law.

During the State's voir dire, D.Ge. confirmed his understanding that a juror cannot impose the death penalty automatically upon conviction. D.Ge. also declared that he would apply the law and could impose a life sentence if the evidence and law supported that

outcome. Several of D.Ge's statements responded to leading questions from the prosecution, including the following exchange:

"[Prosecution]: Now, you understand now that just because they're found guilty of the most severe crime doesn't mean that they're automatically given the death penalty. You agree with that now?

"[D.GE]: Yes, I agree with that."

During questioning from R. Carr's counsel, D.Ge. confirmed that he could not impose a sentence of death if the State failed to carry its burden to prove aggravating circumstances outweighed mitigating circumstances. He strongly supported the death penalty in cases of multiple murders and when a murder was committed in an especially cruel and heinous way. In such situations, he was unsure whether any mitigation could warrant a sentence other than death. D.Ge. confirmed, however, that he would first get the facts from both sides and weigh the evidence before arriving at his sentencing decision and that his personal beliefs would not interfere with his ability to do so.

### S.T.

The defense challenged S.T. for cause because they believed her questionnaire responses demonstrated that she would automatically impose the death penalty. But S.T. said during voir dire that, when she answered the questionnaire, she was under the impression that the judge would impose the death penalty if the defendants were found guilty of capital murder; she was not aware of the jury's role in sentencing. Once the process was explained, S.T. said she would not impose the death penalty automatically in the event the defendants were convicted. She confirmed her willingness to consider the defendants' mitigation case fairly and to impose a life sentence if the State failed to prove that aggravating circumstances outweighed mitigating circumstances, and the judge rejected the challenge for cause.

### R.P.

R.P. said that he would "go with the death penalty" if the defendants were found guilty beyond a reasonable doubt. On voir dire, R.P. explained, "[W]ell, heck, I just can't really consider after

what has happened here or in any murder when somebody takes a human life why you wouldn't be in favor of [the death penalty]," and he expressed doubt whether mitigating circumstances could excuse the conduct alleged in this case. But R.P. also said that he would enter the sentencing phase with an open mind and that he would base his sentencing decision on the facts and law. He also said repeatedly during voir dire that he was committed to following the law, and his questionnaire responses indicated he was willing to consider sentences other than death if various mitigating circumstances were presented. He did not believe that his personal views substantially impaired his ability to serve as a juror.

Counsel for J. Carr asked R.P. whether, given his personal views, he would be coming in to the sentencing phase leaning toward death if the jury had just convicted the defendants of killing five people. R.P. responded, "No, it's not—no I haven't. I haven't decided yet." Counsel continued to press the issue: "At that stage— before you heard any of the aggravators or mitigators, are you leaning one way or another of life or death after having been convicted of capital murder?" R.P. said, "No, I haven't really even considered it one way or the other yet. I'm just going to have to do it all when we get all the evidence."

When counsel for J. Carr challenged R.P. for cause, counsel appeared to recognize that, once the parties had explained the jury's role in the sentencing phase, R.P. had clarified his willingness to consider and impose a sentence other than death.

Judge Clark responded to the challenge by asking R.P.:

"Mr. [P.], what I've heard you saying on those aggravators and mitigators— especially on [J. Carr's counsel's] questions—is if the State failed to prove, and you were saying not guilty, but if they failed to prove any aggravating circumstances or if the mitigating circumstances that the defendants put forward outweighed those aggravators, then you'd vote for life. Isn't that what you said?"

R.P. replied, "Yes, sir."

This apparently satisfied the judge that R.P. would be willing to consider evidence supporting aggravating and mitigating circumstances and would sentence to life imprisonment if the State failed to carry its burden of proof. The judge rejected the defense challenge for cause.

### B.Mc.

Counsel for R. Carr asked B.Mc. whether there was "any verdict other than death that is appropriate if an accused is convicted of capital murder." She responded: "If that's the only evidence that was presented and they were convicted of capital murder, no, it would be the death penalty, if that was the only evidence and that's the only decision that was made." Counsel then asked about aggravating and mitigating circumstances, and B.Mc. expressed her willingness to give fair consideration to mitigation evidence. She also said that, even if the State proved the crimes were committed in an especially heinous, atrocious, or cruel manner, she would "have to really consider" a defendant's lack of criminal history as a mitigating circumstance. B.Mc. said that, even though she personally supported the death penalty, she would set that aside, listen to all of the evidence, and weigh it in a manner consistent with the law as instructed.

R. Carr's counsel explained the state of the law on weighing of aggravating and mitigating circumstances, telling B.Mc. that, if the State failed to prove aggravators outweighed mitigators, then the jury would be obligated to impose a sentence of life imprisonment. Asked if she was comfortable with that concept, B.Mc. said, "Yes. I would obey the law in whatever was set before me." In response to questions from J. Carr's counsel, B.Mc. agreed that her personal belief in capital punishment would not "substantially impair [her] ability to consider evidence in mitigation."

Judge Clark rejected the defense challenge to B.Mc. for cause, saying, "I hear her saying she'll consider all the factors present and make a decision based on the evidence and the law."

### S.W.

S.W. responded to the questionnaire in a way that suggested he would vote to impose the death penalty automatically. But, like S.T., S.W. explained that he had completed the questionnaire without a full understanding of the capital sentencing process. Once Judge Clark and the parties explained the process, S.W. said it became clear that defendants are not to be sentenced to death automatically at the time of conviction, and he said he was com-

mitted to follow the law. Judge Clark rejected the defense challenge.

### M.P.

M.P. was a criminal defense lawyer in private practice in Sedgwick County at the time of the trial. In his questionnaire and during the State's voir dire, M.P. expressed his support for the death penalty but said he would not impose such a sentence automatically upon conviction. M.P. agreed to apply the law as instructed, not as he interpreted it or believed it should be. He also expressed his willingness to consider all mitigating evidence in the event of a sentencing phase. Judge Clark rejected the defense challenge.

### K.M.

K.M. favored the death penalty but said she would decide the appropriate sentence based on the facts and the law. And, after the State explained the statutory weighing of aggravators and mitigators, K.M. declared her willingness and ability to vote for a life sentence. She expressed far greater concern about her ability to live with a decision to end another person's life. She also said that she would consider mitigating circumstances, but she did not know how much weight she could give them.

Judge Clark made further inquiry.

"I think the last question, Miss [M], was whether or not you think that everything you've stated here, and maybe it's been yes or no to long questions, based on everything you've heard . . . do you think your ability would be substantially impaired to give consideration to mitigating circumstances should you be selected to serve should the case reach that far?"

K.M. responded, "No." The judge rejected the defense challenge.

### T.F.

T.F. said he personally believed that the death penalty was the only punishment appropriate for taking another person's life. However, after the judge and the prosecution elaborated on the duties and obligations of a juror in a capital trial, T.F. said he could set his opinion aside and give fair consideration to all of the evidence.

He said he would not be leaning toward death in the event of conviction. And he said that he could give fair consideration to evidence the defendants offered in mitigation. Judge Clark rejected the defense challenge.

### T.W.

T.W. admitted to having formed an opinion on the defendants' guilt and said she did not believe it was acceptable that the defense did not have to prove mitigating factors beyond a reasonable doubt. Yet she said that her opinion on guilt was based on pretrial publicity and that she could set it aside and decide the case fairly on the evidence. She also said she was personally opposed to the death penalty but could apply it if the law required her to do so. T.W. said she could give fair consideration to mitigating evidence, even if the State proved the crimes were committed in an especially heinous, atrocious, or cruel manner. She also affirmed that she would hold the State to its burden on sentencing.

The defense challenged T.W. for cause, but not on her views on the death penalty. They challenged her because of her preconceived ideas about guilt.

Judge Clark rejected the challenge, ruling that T.W. had confirmed her ability to set those ideas aside and judge the case based on the evidence and law.

### The Standard of Review and Legal Framework

K.S.A. 22-3410(2)(i) provides that a district judge may remove a prospective juror for cause where "[h]is [or her] state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he [or she] can act impartially and without prejudice to the substantial rights of any party." We have held

"that challenges for cause are matters left to the sound discretion of the trial court, which is in a better position to view the demeanor of prospective jurors during voir dire. A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly erroneous or amounts to an abuse of discretion." *Kleypas*, 272 Kan. at 991 (citing *State v. Dixon*, 248 Kan. 776, 788, 811 P.2d 1153 [1991]).

K.S.A. 22-3410 is designed to protect a criminal defendant's Sixth Amendment right to trial by an impartial jury, a right reinforced by the defendant's Fifth Amendment right to due process. See *Ristaino v. Ross*, 424 U.S. 589, 597-98, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). These protections are incorporated into and made applicable to the states through the due process provisions of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145-149, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). When applied to the jury selection process in a capital trial, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. See *Witherspoon v. Illinois*, 391 U.S. 510, 521, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). This right is balanced against the State's strong interest in seating jurors who are able to apply the sentence of capital punishment within the framework provided for by the federal Constitution and state law. 391 U.S. at 521.

In *Witherspoon*, decided in 1968, the United States Supreme Court struck a balance between the competing interests and held " 'that a sentence of death could not be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' " *Kleypas*, 272 Kan. at 991-92 (citing *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 [1985]). *Witherspoon* recognized a distinction of constitutional significance between prospective jurors who have strong opinions about the death penalty and those whose views would prevent them from applying the law; the former remain eligible to serve, while the latter must be excused. See 391 U.S. at 519-21. And the Court's 1985 *Witt* decision

"clarified the standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty. The Court stated that a prospective juror may be excluded for cause because of his or her views on capital punishment where 'the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *Kleypas*, 272 Kan. at 991 (quoting *Witt*, 469 U.S. at 424).

See *Lockhart v. McCree*, 476 U.S. 162, 184, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) ("the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case").

In *Witt*, "The Court recognized that 'this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." ' " *Kleypas*, 272 Kan. at 991 (quoting *Witt*, 469 U.S. at 424).

On appeal, the question before us is not whether we would have agreed with a district judge's decision on a strike for cause prompted by a panel member's opinion on the death penalty but whether the district judge's decision is fairly supported by the record. *Witt*, 469 U.S. at 434; see *Darden v. Wainwright*, 477 U.S. 168, 176, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (appellate courts must examine context surrounding prospective juror's exclusion, qualification). If the record contains conflicting or ambiguous information, the United States Supreme Court has expressed its belief that deference is owed to "the trial court, aided as it undoubtedly was by its assessment of [the prospective juror's] demeanor." *Witt*, 469 U.S. at 434.

### Record Support for Judge Clark's Rulings

When we consider, as we must, the universe of information from the jury questionnaires and voir dire of M.W. and the 11 jurors the defendants compare to him in support of their argument on this issue, it is apparent that Judge Clark's rulings are fairly supported by the record. See *Brooks v. Armco, Inc.*, 194 S.W.3d 661, 664 (Tex. App. 2006) ("In reviewing the trial court's decision on challenges for cause, we must consider the entire examination, not just answers that favor one side over the other.").

With regard to M.W. specifically, his remarks in response to the questionnaire and to questions from counsel at voir dire were inconsistent. But he finally confirmed to the judge that he could never vote to impose a sentence of death. This response demonstrated that M.W. was not qualified to sit on the jury in this case

under K.S.A. 22-3410(2)(i). And, even if it were less definite, we would defer to the district judge who was able to evaluate M.W.'s demeanor and nonverbal communication, here, whether he had stopped vacillating and given a clear answer. Although it would have been better, as mentioned in Section 1 of this opinion on venue, if the judge had gotten to his final destination on M.W. without asking a leading question, we are satisfied that he did not abuse his discretion in excusing M.W. See *State v. Johnson*, 253 Kan. 75, 85, 853 P.2d 34 (1993) (district judge did not abuse discretion in excusing juror, despite declaration of ability to be fair to both sides, understanding that personal experiences not to be taken into account; panel member acknowledged four times that friends' negative experiences with law enforcement might interfere with her obligations as juror); see also *People v. Ayala*, 24 Cal. 4th 243, 275, 99 Cal. Rptr. 2d 532, 6 P.3d 193 (2000) (trial judge properly exercised discretion to remove prospective juror for cause after she said she did not believe she had strength to sentence another person to die; reviewing courts should defer to trial court when prospective juror unclear); *Humphreys v. State*, 287 Ga. 63, 72, 694 S.E.2d 316 (2010) (appellate court refuses to substitute its judgment for trial court's when three prospective jurors' statements equivocal, contradictory about ability to give meaningful consideration to three sentencing options); *Russeau v. State*, 171 S.W.3d 871, 879 (Tex. Crim. 2005) ("When a prospective juror's answers are vacillating, unclear, or contradictory, we accord deference to the trial court's decision. We will not second-guess the trial court when the prospective jurors are persistently uncertain about their ability to follow the law.").

Furthermore, we are not persuaded otherwise by the defendants' insistence that Judge Clark applied a differential standard as between M.W. and the 11 persons to whom M.W. is compared. Each of the 11 assured the judge that he or she could put aside personal opinions and decide this case on the evidence and the law. The fact that many of them shared one characteristic with M.W.—intermittent equivocation on whether he or she could do what would be asked of him or her—does not change the other, more salient fact: The 11 ultimately professed ability and willing-

ness to discharge their duties as jurors. One did not—M.W. Again, we see no abuse of discretion by Judge Clark. See *State v. Nix*, 215 Kan. 880, 882-83, 529 P.2d 147 (1974) (no abuse of discretion to deny challenge for cause; prospective juror confirmed ability to listen to evidence, decide case on evidence, court's instructions).

*Failure to Excuse W.B., D.R., D.Ge, and H.Gu. for Cause*

The defendants argue that Judge Clark abused his discretion by denying their challenges against jurors W.B., D.R., D.Ge., and H.Gu for cause because these panel members' voir dire responses established that they would impose a sentence of death automatically upon conviction or could not consider and give effect to mitigating evidence, *i.e.*, they were "mitigation impaired."

The State responds that each of the four prospective jurors stated unequivocally that he or she would follow the court's instructions, even if they required a life sentence.

*Additional Factual and Procedural Background*

W.B.

W.B. expressed his support for the death penalty in his responses to the questionnaire. However, during the State's voir dire, W.B. said he could give fair consideration to the evidence and apply the law. He said he understood a juror's statutory duty to weigh aggravating circumstances against mitigating circumstances, and he expressed no objection to or concern with voting for a life sentence if the law required that result.

Under questioning by counsel for R. Carr, W.B. said that he had supported the death penalty "for almost forever." When counsel for J. Carr asked why, W.B. said, "[W]hy not?" He then said that he supported the death penalty because it was the law of Kansas and served a societal purpose.

During continued voir dire by J. Carr's counsel, Ron Evans, the following exchange occurred:

"J. Carr's Counsel: Do you think after you convicted them, if you convict them, after you convict them of capital murder you would be leaning toward a death sentence?

"W.B.: According to the law, yes.

"J. Carr's Counsel: What if the Judge instructed you that you have to have an open mind, even after you've convicted them of capital murder, as to what sentence you should impose?

"W.B.: I'm pretty sure the Judge would give us some kind of parameter of how open your mind should be.

"J. Carr's Counsel: It should be completely open, as relates to—to the sentence.

"W.B.: To the sentence, it would still be death.

"J. Carr's Counsel: You would lean toward death based on your conviction of capital murder?

"W.B.: Right.

"J. Carr's Counsel: That scale that's on the judge's desk, you're saying that that scale, after you convicted them of capital murder, would be tilting toward death?

"W.B.: Yes."

Counsel for J. Carr suggested to W.B. that such a position was likely to interfere with his ability to consider mitigating circumstances. W.B. disagreed, saying, "[Y]ou have to weigh it, you have to measure it, there has to be some storybook, you have to hear the evidence[;] you've got to know the facts." W.B. then said he held no opinion on whether the death penalty should be applied in this case.

The defense challenged W.B. for cause, asserting that he was mitigation impaired.

Before ruling on the challenge, Judge Clark said, "I don't hear [him] saying that. I hear him saying he would be willing to follow the instructions of law, weighing mitigators and aggravators and make a decision in his best judgment as he sees the facts in light of the law." He then asked W.B. whether that was an accurate interpretation of his testimony. W.B. said it was.

Judge Clark rejected the defense challenge.

### D.R.

D.R. expressed strong support for the death penalty in her questionnaire responses. Yet she agreed in voir dire that the death penalty should not be imposed automatically upon conviction and that the State would need to prove that it was an appropriate sentence. D.R. identified several mitigating circumstances set out in the

questionnaire as aggravating circumstances, but she said in voir dire that those responses were based on an incomplete understanding of the capital sentencing process. Once she became aware of the sentencing phase, she expressed her willingness and ability to consider all mitigation evidence.

During voir dire by counsel for R. Carr, D.R. said she would listen and give fair consideration to his mitigation evidence. But she expressed doubt that certain mitigators, such as the age of a defendant or the defendant's minor role in the offense could excuse or justify the crimes that formed the basis of the charges.

Judge Clark made further inquiry of D.R.:

"THE COURT: I think Miss R. is misunderstanding the questions being put in such a way. Let me say this: Should you be chosen to serve on the jury, you will receive a very detailed set of instructions rather than just two, and whether or not one aided or assisted or abetted in a crime would be determined in the guilt part.

"If your guilt was not as great, that might be determined, but if there is a possibility that the jury would say it doesn't make any difference on participation, he's guilty of capital murder, then you would take that evidence that the participation was relatively minor. Then you make a decision as to what would be the proper penalty under the facts for the individual who had a relatively minor role, whether it be the getaway man or didn't know anybody was going to be killed, whatever the situation, you would consider it but you would consider it for a different reason when you are trying to figure out what the proper penalty is to be assessed against that individual under this set of facts.

"D.R.: Right.

"THE COURT: There's probably been 20 years of litigation up in the Supreme Court of the United States and the State of Kansas. I think what you are confusing is these two parts. As you just said awhile ago, you didn't know any of that August 28th and here it's given to you this morning in a brief set and asked questions about it, and if you are saying that under no circumstances at all would you consider these mitigating factors. . . . If there is no set of facts that would influence you to consider age or what part somebody played in a crime going forward, should a sentence of less than death be imposed, you are not a proper person for this jury.

"But if you are saying that you can consider anything they bring forward and you'll look at it and you'll weigh it if they prove any aggravating factors, you'll weigh it and make your decision by weighing what you think the mitigators and the aggravators are worth and listen to one of these and make a decision on what is the proper penalty to be imposed on that individual under this set of facts. Is that what you are saying?

"D.R.: Yes.

"THE COURT: Okay."

Still later, during voir dire by counsel for R. Carr, when asked whether she could follow the law, D.R. said, "I'll do what the Judge tells me." Counsel said that people sometimes want to follow the law but cannot because of their beliefs; he asked whether D.R. agreed with this observation. D.R. replied, "You can't step outside the law. You have to follow the law." Then counsel asked D.R. if she could set aside her beliefs and follow the law. D.R. answered, "I can try. That is all I can say. I'm sorry."

The defendants challenged D.R. for cause, arguing that she "cannot tell us that she can follow the law. She says she will try but that's no assurance."

Again, Judge Clark spoke directly to D.R.:

"THE COURT: I don't think that was the question. The answer was I'll try. Will you follow the law that I say applies in the case?

"D.R.: Yeah.

"THE COURT: Will you base your decision on the evidence in the case and not on any preconceived notions or anything?

"D.R.: Yeah, because I only read the silly headlines anyway. They don't say much.

"THE COURT: Well, I think they were talking more about the preconceived notion about what you thought concerning the death penalty, what ought to happen concerning the death penalty.

"D.R.: No. Whatever you tell me, I'll follow the law."

The judge then rejected the defendants' challenge.

### D.Ge.

D.Ge., discussed above as a comparison prospective juror for M.W., at times expressed unwillingness to consider a sentence other than death in the face of certain aggravating circumstances. But D.Ge. said on voir dire by the State that he understood a jury could not impose the death penalty automatically upon conviction. He also said that he would apply the law and could impose a life sentence if the evidence and law supported that outcome. D.Ge. confirmed that he could not impose a sentence of death if the State

had failed to carry its burden to prove aggravating circumstances outweighed mitigating circumstances.

The defense challenged D.Ge. for cause, and Judge Clark rejected the challenge.

### H.Gu.

During voir dire by counsel for R. Carr, H.Gu. was asked what sentence she would support, assuming the defendants were convicted of the capital murder charges. She initially said she would need to be "convinced" that a sentence other than death was appropriate. Explaining herself later in voir dire, H.Gu. said that she had been confused by the question; she thought counsel for R. Carr was asking about the verdict on the guilt phase, not about the sentencing phase. After counsel for R. Carr and Judge Clark clarified the law governing capital sentencing proceedings, H.Gu. said without equivocation that she would set aside her personal beliefs and apply the law as instructed. She also said she would give fair consideration to the defendants' mitigation case.

The defense challenged H.Gu. for cause, and Judge Clark rejected the challenge.

### The Standard of Review and Legal Framework

The same standard of review and legal framework applicable to a district judge's decision to excuse a prospective juror who cannot set aside his or her objection to the death penalty applies equally to decisions not to excuse prospective jurors challenged for cause based on their inability to consider a sentence other than death. See *Morgan v. Illinois*, 504 U.S. 719, 728-29, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992) (applying *Witherspoon*, 391 U.S. at 518, and *Witt*, 469 U.S. at 423-24). The United States Supreme Court has explained:

"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any pro-

spective juror who maintains such views. If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729.

In addition to a defendant's rights under the Sixth Amendment and the Fifth Amendment's Due Process Clause, the Eighth Amendment right not to be subjected to cruel and unusual punishment requires jurors in a death penalty case to be able to give consideration to evidence of mitigating circumstances. See *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (sentencer, in all but rarest capital case, must not be precluded from considering, as mitigating factor, any aspect of defendant's character, record, or circumstances of offense).

### Record Support for Judge Clark's Rulings

The defendants assert that these four prospective jurors should have been removed for cause because they were mitigation impaired. In their view, these four prospective jurors confirmed that they would impose a sentence of death automatically upon conviction and/or they confirmed they could not fairly consider mitigating circumstances.

The defendants are correct that selected passages from the questionnaire and voir dire responses of these four prospective jurors yield cause for concern, but the entirety of the record on them convinces us that it fairly supports Judge Clark's rulings. Again, our resolution of this issue has been complicated by the judge's use of leading questions, particularly glaring in his rehabilitation of W.B. and his rehabilitation—twice—of D.R. But all four jurors eventually professed understanding of and fidelity to the law governing the jury's role and function in capital sentencing. Thus we conclude that Judge Clark did not abuse his discretion in refusing to excuse them for cause. See *Reaves v. State*, 639 So. 2d 1, 4 (Fla. 1994) (no error in denial of challenge to four prospective jurors who suggested they would vote automatically for death penalty in event of conviction; record contained evidence prospective jurors rehabilitated); *Brockman v. State*, 292 Ga. 707, 739 S.E.2d 332, 347 (2013) (trial court did not err by rejecting challenges for cause; "When viewed as a whole, the voir dire of [two jurors] shows that,

while they indicated a leaning toward the death penalty, they would listen to all the evidence and would fairly consider both sentencing options."); *Humphreys v. State*, 287 Ga. 63, 72, 694 S.E.2d 316 (2010) (no abuse of discretion when trial court denied challenges on six panel members; all six jurors "expressed a leaning toward the death penalty, [but] they all stated that they would listen to and consider mitigating evidence and that they could give fair consideration to and vote for each of the three sentencing options"); *State v. Odenbaugh*, 82 So. 3d 215, 238-241 (La. 2011), *cert. denied* 133 S. Ct. 410 (2012) (no abuse of discretion to deny challenge for cause, although juror repeatedly stated death penalty justified in circumstances like those at issue in case, could not find situation in which life sentence would be proper under similar facts; juror did not suggest he would automatically impose death penalty upon conviction); *Leatherwood v. State*, 435 So. 2d 645, 654 (Miss. 1983) (no abuse of discretion in denying challenge for cause when prospective jurors strongly supported death penalty; "[w]hen questioned by counsel both jurors said that they could put aside their personal feelings, follow the law and instructions of the court[,] return a verdict based solely upon the law and the evidence[,] and not vote for the death penalty unless the evidence warranted it."); *State v. Braden*, 98 Ohio St. 3d 354, 360, 785 N.E.2d 439 (2003) (trial court in capital murder prosecution not required to grant challenge for cause to prospective juror who stated he would automatically go to death sentence upon finding defendant guilty; prospective juror stated he would have to hear all facts before making decision, would have to consider the alternatives, would have to weigh mitigating factors; other responses showed commitment to being fair-minded); *Moore v. State*, 999 S.W.2d 385, 400 (Tex. Crim. 1999) ("When the record reflects that a venireman vacillates or equivocates on his ability to follow the law, the reviewing court must defer to the trial court.").

### *Violation of Section 7 of the Kansas Constitution Bill of Rights*

R. Carr also argues on this appeal that Judge Clark violated Section 7 of the Kansas Constitution Bill of Rights by excusing six

prospective jurors—K.J., M.G., H.D., C.R., D.H., and M.B.—based on their religious opposition to the death penalty.

### Additional Factual and Procedural Background

Judge Clark excused these jurors because they said they could not impose the death penalty under any circumstance. K.J. said that her objection to the death penalty was "[n]ot only religious. There are other beliefs also that I feel that way." M.G. relied on religious beliefs and general beliefs that the death penalty was morally unjust and humans should not be killing other humans. H.D. said she objected to the death penalty on moral and religious grounds; she said the two could not be separated easily because her moral code was founded upon or influenced by her religion. C.R. testified that her own personal moral code prevented her from imposing the death penalty under any circumstance. D.H. expressed moral and·religious opposition to the death penalty, which would prevent him from supporting any sentence other than life imprisonment. M.B. stated that his religious views, life experience, upbringing, and personal moral code would prevent him from supporting a sentence of death under any circumstance.

### The Standard of Review and Legal Framework

Section 7 of the Kansas Bill of Rights provides that "[n]o religious test or property qualification shall be required for any office of public trust." We have held that this section "does not provide any greater limitation than already provided under K.S.A. 43-156," *Kleypas*, 272 Kan. at 993, which provides that "[n]o person shall be excluded from service as a grand or petit juror in the district courts of Kansas on account of . . . religion . . . ."

Meanwhile, K.S.A. 22-3410(2)(i) provides that a prospective juror may be challenged for cause as unqualified to serve when he or she is partial or biased. A person who admits that he or she cannot follow the law requiring imposition of the death penalty in specific situations is, by definition, unqualified by partiality. See *State v. Campbell*, 217 Kan. 756, 765, 539 P.2d 329 (1975) (allegation of discrimination in selection of jury necessarily requires showing recognizable, identifiable class of persons, otherwise en-

titled to be jury members, purposefully, systematically excluded) (citing *Brown v. Allen*, 344 U.S. 443, 73 S. Ct. 397, 97 L. Ed. 469 [1953]).

We recognize and acknowledge the existence of some tension between these statutes. The necessity of and process to achieve "death qualification" of jurors under K.S.A. 22-3410(2)(i) butts up against K.S.A. 43-156 when the reason a prospective juror can never participate in imposition of the death penalty, compelling removal of that person for cause, has a basis in a religious code.

This tension is resolved with a fine distinction with its roots in family law. We recently decided *Harrison v. Tauheed*, 292 Kan. 663, 256 P.3d 851 (2011), a case involving parents in conflict over custody of their child because of the mother's religious faith and related practices. In *Tauheed*, we drew a line between belief and behavior. We cautioned district judges resolving such disputes, instructing them to avoid discrimination between parents on the basis of religious belief or lack of belief but to act as required when behavior prompted by the belief or lack of belief was incompatible with the best interests of the child. 292 Kan. at 683-84.

Like parents, jurors cannot be discriminated against on the basis of their religious belief or lack of belief. But they can be excluded from jury service when their belief or nonbelief makes it impossible for them to act in conformance with the signature requirement of that service: impartiality under the rule of law.

Judge Clark did not abuse his discretion or violate Section 7 of the Kansas Constitution Bill of Rights or K.S.A. 43-156 when he excused K.J., M.G., H.D., C.R., D.H., and M.B. for cause. See *Kleypas*, 272 Kan. at 993 (no violation of Kansas Constitution Bill of Rights, statute when prospective jurors excused for inability to be impartial, follow oath).

### 5. REVERSE *BATSON* CHALLENGE TO PEREMPTORY STRIKE

R. Carr argues that Judge Clark failed to follow the three steps required under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), when he refused to permit the defense to exercise a peremptory challenge to remove W.B from the jury. W.B., like the defendants, is a black man. R. Carr argues further

that Judge Clark's error was structural and entitles him to reversal of all of his convictions on all counts. The State responds that Judge Clark did not err, and, in the alternative, that any error was harmless.

## *Additional Factual and Procedural Background*

Of the panel of 60 prospective jurors qualified for final selection in this case, 3 were black, C.B., D.M., and W.B.

During individual voir dire, the defendants passed C.B. and D.M. for cause. The State challenged D.M. for cause based on his death penalty views. The defense successfully rehabilitated D.M., and the trial court rejected the State's for-cause challenge. The State later exercised peremptory challenges to remove both C.B. and D.M. The defendants lodged an unsuccessful *Batson* challenge to the State's strike of C.B. The defendants were successful in keeping D.M. on the jury.

The defendants had challenged W.B. for cause unsuccessfully, as discussed in Section 4 of this opinion. Then R. Carr attempted to exercise his 12th, and last, peremptory strike against W.B.; and the State lodged a *Batson* challenge, arguing that the defense was striking "one of the remaining black males that we have." Counsel for R. Carr replied:

"First, Your Honor, I think they have to make the prima [facie] case that I have engaged in a pattern of challenging based on race. I don't think they've done that.

"Secondly, with the number of jurors having—I have to shepherd my peremptory challenges and not use them promiscuously. [W.B.] based on an answer on voir dire is one of the mitigation-impaired jurors we have. He told us he was in favor of death on most, if not all, of the mitigating circumstances. He left blank— he gave inconsistent answers with regard to the same. After being questioned, rehabilitated and questioned again, he indicated on the record that after a conviction he would be leaning towards death.

"Lastly, in response to Mr. Evans' question, why are you in favor of the death penalty, based on my listening to [W.B.], he answered in a sarcastic and contemptuous manner, [']why not[']. This is not a racial challenge—there is not a racial reason for my challenge of [W.B.]"

Judge Clark sought no more comment from the prosecution. Then he said:

"To me it works both ways. Once it's raised, then the reason that's adequate under law must be stated. I find that the reason stated might be supported under a certain interpretation but they are not adequate under the law. I will sustain the *Batson* challenge."

Counsel for J. Carr then announced that he too would exercise his final peremptory challenge to remove W.B. Anticipating the State would reassert its objection to the strike under *Batson*, counsel spoke, first referencing W.B.'s responses on the jury questionnaire:

"Our reasons for exercising a preempt on W.B. have absolutely nothing to do with his color. When I—when I got these questionnaires, obviously we didn't know the color of W.B. and I had him rated at the very—as one of the very worst jurors of the first panel. I rated this based on his answers. On his marking 5 on the death penalty scale, that didn't make him one of the worst, but it started making me think that perhaps he would not be a favorable juror, especially on a death penalty case. He circled 'D,' in favor, based on the law and the facts. It's another factor, though, that I look at in trying to rate the jurors. I still don't know whether he's white or black.

"I come down, I look at his markings on the aggravators and mitigators. He thinks that the defendant not having a significant history of prior criminal activity is an aggravator. He marked 'F.' He also marked 'F,' in favor of the death penalty, on the mitigator and statutory mitigator 'E.' He marked 'F' on a third statutory mitigator, 'I' the defendant acted under extreme distress or substantial domination of another person. He also marked 'F' on that statutory mitigator. He left 'M,' that's the age mitigator, blank. It is my memory, and I don't have any notes on this, it seems like someone asked him about that and I don't think he expressed any interest in that being any sort of mitigation, the age of the defendant.

"Based on those answers, I had W.B. rated, at least from Jonathan Carr's perspective, as a very poor juror. And it surprised me when, frankly, it probably shouldn't have, it surprised me when he hit the juror box and I saw he was an African-American man.

"When he was questioned, I didn't—didn't take his answers to be favorable to us at all. And I would reiterate the reasons stated by [R. Carr's counsel]. It's my memory when we asked him those questions about which way he was leaning, if they found Jonathan Carr guilty of capital murder, he said he would be leaning toward death. And I was the one questioning him and I was looking him right in his eye when I asked him, why are you for death. And it was me that he focused with his eyes, and I took it to be part sarcasm, and I saw some contempt in his eyes when he said to me, why not. And I gave him the laundry list of reasons why, you know, the - of why people are for the death penalty. And again, when he answered that, when I was trying to help him, give him a reason, I found his answer very unsatisfactory. Not a thoughtful answer.

"And last, but certainly not least, Judge, we voted to strike W.B. for cause. We think that he—you know, with all due respect to you, Judge, I respect your ruling, but we moved for you to excuse him for cause because we think he's mitigation impaired. I don't think we have any choice but at least to move him excused—certainly peremptory challenge or we waive that error. I mean he is as bad a juror from a death perspective. I think he is the worst juror from a death perspective Jonathan Carr could possibly have that's left on the panel. And that has nothing—nothing to do with the fact he's an African-American man. I would have been for striking him regardless of his race based on his answers. So those are my racially neutral reasons. It has nothing to do with the fact W.B. is an African-American. We move—he's our 12th challenge."

Judge Clark confirmed that the State intended to challenge the exercise of J. Carr's peremptory strike of W.B. and, without hearing further argument, sustained the challenge.

Judge Clark seated W.B. on the jury, and W.B. was elected Presiding Juror.

### Batson's Requirements and Standards of Review

*Batson's* central teaching is that the Equal Protection Clause of the Fourteenth Amendment forbids the prosecution from engaging in purposeful discrimination on the basis of race when it exercises peremptory challenges. 476 U.S. at 89; *State v. Hood,* 242 Kan. 115, 123, 744 P.2d 816 (1987) (adopting *Batson* framework). This prohibition was extended to a criminal defendant's use of peremptory challenges in *Georgia v. McCollum,* 505 U.S. 42, 46-55, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992). When the State challenges a peremptory strike under *McCollum,* such a challenge has come to be known as a "reverse *Batson*" challenge. *United States v. Thompson,* 528 F.3d 110, 115 (2d Cir. 2008).

A district judge's handling of a *Batson* or reverse *Batson* challenge involves three steps, each subject to its own standard of review on appeal. See *State v. McCullough,* 293 Kan. 970, 992, 270 P.3d 1142 (2012) (citing *State v. Hill,* 290 Kan. 339, 358, 228 P.3d 1027 [2010]; *State v. Pham,* 281 Kan. 1227, 1237, 136 P.3d 919 [2006]).

"Under the first step, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race." *McCullough,* 293 Kan. at 992. "Ap-

pellate courts utilize plenary or unlimited review over this step." 293 Kan. at 992 (citing *Hill,* 290 Kan. at 358).

"[I]f [a] prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion." *McCullough,* 293 Kan. at 992 (citing *Hill,* 290 Kan. at 358). The scope of review on a district judge's ruling that the party attempting the strike has expressed racially neutral reasons is abuse of discretion. *State v. Sledd,* 250 Kan. 15, 21, 825 P.2d 114 (1992) (citing *Smith v. Deppish,* 248 Kan. 217, 807 P.2d 144 [1991]).

In the third step, the district judge determines whether the party opposing the strike has carried its burden of proving purposeful discrimination. "This step hinges on credibility determinations because usually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard." *McCullough,* 293 Kan. at 992 (citing *Pham,* 281 Kan. at 1237; *Hill,* 290 Kan. at 358-59). As set forth above, judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable; or based on an error of law or fact. *State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 (2011).

*Preservation*

The State asserts that the defendants waived their right to pursue this issue on appeal by failing to object to the judge's procedure in district court. Although there may be a debatable fact question on this point, because this is a death penalty case, K.S.A. 2013 Supp. 21-6619(b) makes this preservation attack beside the point. The statute requires us to consider all errors asserted on appeal in a death-penalty case. See *State v. Cheever,* 295 Kan. 229, 241, 284 P.3d 1007, *cert. granted in part* 133 S. Ct. 1460 (2013), *vacated and remanded on other grounds* 134 S. Ct. 596 (2013).

*Judge Clark's Error*

We have no hesitation in ruling that Judge Clark erred in his consideration and grant of the State's reverse *Batson* challenge to each of the defendants' peremptory strikes of W.B.

The record establishes that, after the State raised its objections to the defendants' strikes of W.B.—merely pointing out on R. Carr's strike that W.B. was "one of the remaining black males that we have" in the venire and merely answering, "Yes, your honor," when the judge asked if the prosecution intended to renew its objection on J. Carr's strike—Judge Clark did not make a finding on the record that the State had established a prima facie case of discrimination. Moreover, defense counsel for R. Carr and J. Carr each articulated more than one race-neutral reason for striking W.B., including his demeanor and death penalty views. See *State v. Angelo*, 287 Kan. 262, 274-75, 197 P.3d 337 (2008) (recognizing this court has upheld peremptory strikes based on counsel's intuition, interpretation of juror demeanor, body language); *Smith v. Deppish*, 248 Kan. 217, 229, 807 P.2d 144 (1991) (characteristics of juror's nonverbal communication, demeanor race-neutral); see also *United States v. Barnette*, 644 F.3d 192, 215 (4th Cir. 2011), *cert. denied* 132 S. Ct. 1740 (2012) (wavering personal view of death penalty race-neutral basis for strike under *Batson*); *Berry v. State*, 802 So. 2d 1033, 1042 (Miss. 2001) ("A challenge . . . based upon a juror's views on the death penalty is an acceptable race neutral reason."). Again, Judge Clark did not articulate why the reasons given by the defense in the second *Batson* step were inadequate; he did not hear any argument from the State on why the reasons stated by defense counsel should be dismissed as pretextual. Then Judge Clark simply sustained the State's challenges, gliding by the third step under *Batson* entirely.

The State's reliance on our decision in *Angelo*, 287 Kan. 262, to persuade us otherwise is misplaced. *Angelo* is distinguishable from stem to stern.

First, in that case, we reviewed an unsuccessful *Batson* challenge by the defense; it did not review a successful reverse *Batson* challenge by the State. In addition, the record was clear in that case

that the district judge heard argument from the parties on each step of the required analysis before ruling. This court noted: "Specifically, after initially stating that it had not detected a pattern of discrimination, [the district judge] heard the State's reasons and supporting information for striking the jurors and then asked for, and received, [the defendant's] responses." 287 Kan. at 274. This directly enabled our holding that the district judge had considered all of the information and "impliedly held [the defendant] failed to prove that the State's reasons were pretextual and that he therefore failed in his ultimate burden to prove purposeful discrimination." 287 Kan. at 275. What happened in *Angelo* did not happen here, and it is not persuasive authority.

An exercise of discretion built upon an error of law qualifies as an abuse of that discretion. See *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) ("[A]buse-of-discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law."). Judge Clark abused his discretion on the State's reverse *Batson* challenge to the defendants' peremptory strikes of W.B.

*Harmlessness*

R. Carr argues that Judge Clark's error was structural. The State urges us to apply harmless error analysis.

Our examination of these opposing viewpoints begins with a review of the United States Supreme Court's decision in *Rivera v. Illinois*, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009).

In *Rivera*, the Court held that state courts have the authority to determine the appropriate remedy when a trial court judge erroneously denies a defendant's peremptory challenge in good faith. Defendant Michael Rivera attempted to exercise a peremptory challenge against a Hispanic juror. 556 U.S. at 152-53. The trial court erroneously denied Rivera's peremptory strike, exercising a *sua sponte* reverse *Batson* challenge. The juror eventually was elected foreperson of the jury, and Rivera was found guilty. 556 U.S. at 153-54. The Illinois Supreme Court agreed that the trial judge erroneously granted the reverse *Batson* challenge, but it rejected the notion that such error was reversible absent a showing

of prejudice. 556 U.S. at 155. The United States Supreme Court granted certiorari "to resolve an apparent conflict among state high courts over whether the erroneous denial of a peremptory challenge requires automatic reversal of a defendant's conviction as a matter of federal law." 556 U.S. at 156.

The Court first characterized the right to peremptory challenge as one that arises under state law without federal constitutional protection:

"[T]his Court has consistently held that there is no freestanding constitutional right to peremptory challenges. [Citation omitted.] We have characterized peremptory challenges as 'a creature of statute,' [citation omitted] and have made clear that a State may decline to offer them at all. [Citations omitted.] When States provide peremptory challenges (as all do in some form), they confer a benefit beyond the minimum requirements of fair [jury] selection, [citation omitted] and thus retain discretion to design and implement their own systems [citation omitted].

"Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution. 'A mere error of state law,' we have noted, "is not a denial of due process." [Citations omitted.] The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.' [Citations omitted.]" 556 U.S. at 157-58.

Accordingly, the Court left the duty to tailor appropriate relief for deprivations of this state law right to the state courts:

"Absent a federal constitutional violation, States retain the prerogative to decide whether such errors deprive a tribunal of its lawful authority and thus require automatic reversal. States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error per se. Or they may conclude, as the Supreme Court of Illinois implicitly did here, that the improper seating of a competent and unbiased juror does not convert the jury into an ultra vires tribunal; therefore the error could rank as harmless under state law." 556 U.S. at 161-62.

Under *Rivera*, the first issue we must decide is whether Judge Clark acted in good faith. If not, his error offends Fifth and Fourteenth Amendment due process protections and may require automatic reversal of all of R. Carr's convictions. See *Bell v. Jackson*, 379 F. Appx. 440, 445 (6th Cir. 2010) (*"Rivera* leaves open the possibility that a *Batson* error might require reversal as a matter of

due process if the trial judge repeatedly or deliberately misapplie[s] the law or act[s] in an arbitrary or irrational manner."). If, on the other hand, Judge Clark acted in good faith, his error does not implicate federal constitutional guarantees, and the decision on its remedy is a matter of state law.

At least two courts have considered a trial judge's good and bad faith and their effects since *Rivera*.

In *Pellegrino v. AMPCO System Parking*, 785 N.W.2d 45 (Mich. 2010), the Michigan Supreme Court considered a trial court's ruling on a reverse *Batson* challenge in a civil action. The court first observed that *Rivera* "contrasted a judge's good-faith mistake with one arising because the judge deliberately misapplied the law or because the judge had acted in an arbitrary or irrational manner." 486 Mich. at 350. The court determined that the trial judge "deliberately refused to follow the three-step process required under *Batson* because [the judge] thought that process required the court to 'indulge' in 'race baiting.'" 486 Mich. at 351. Despite never finding a *Batson* problem in the first place, the judge "arbitrarily proceeded" as if the State had established such a violation and disallowed the defendant's peremptory strike. 486 Mich. at 350-51. This required automatic reversal of the Court of Appeals decision, remand to the district court, and a new trial before a different judge. 486 Mich. at 354.

In *Chinnery v. Virgin Islands*, 55 V.I. 508, 2011 WL 3490267 (V.I. 2011), the Supreme Court of the Virgin Islands held that the trial judge erred in sustaining the prosecution's reverse *Batson* challenge, and the prosecution argued that the error should be deemed harmless. The court recognized that *Rivera* granted it the authority to decide the standard of reversibility or remedy in such a situation, as long as the judge's error was made in good faith. But this error was not made in good faith. During jury selection, the prosecution had challenged two of defendant's peremptory strikes under *Batson*. Defense counsel explained that the strikes were based on the jurors' social class and how they had looked at him. The judge responded: "I don't do that," and sustained the reverse *Batson* challenge. 2011 WL 3490267, at *7. Still, the judge allowed the defendant to use his peremptory challenge to remove one of

the two jurors. The Virgin Islands Supreme Court reacted to this behavior by the trial judge:

"[T]he Superior Court, like the judge in *Pellegrino*, denied [the defendant] his right to exercise his peremptory challenges based on its own personal preferences rather than a good-faith attempt to follow *Batson*. Moreover, even if the Superior Court initially acted in good-faith—which we have no reason to doubt—its ultimate decision to nevertheless allow [the defendant] to choose to strike one of the two prospective jurors—notwithstanding the fact that it had rejected [the defendant's] race-neutral explanation and upheld the People's *Batson* challenge with respect to both jurors—was inherently arbitrary and irrational." 2011 WL 3490267, at *7.

The court reversed and remanded for new trial, because the absence of good faith meant that the error rose to the level of a deprivation of due process. 2011 WL 3490267, at *7.

Here, the defense argument that Judge Clark's error was not made in good faith rests entirely on the fact that his application of the three steps of *Batson* was incomplete. But acceptance of this argument would tend to elevate every *Batson* error to one made in bad faith, and we are unwilling to take the first step in that direction. See *Bell*, 379 F. Appx. at 445 ("But aside from the brevity with which the trial court addressed his objections, [the defendant] offers nothing to show that any error was more than" one made in good faith).

Instead, we have carefully examined the entire record to determine whether Judge Clark's conduct on the reverse *Batson* challenge was part of a pattern of hostile behavior toward the defense. As discussed throughout this opinion, although we have identified isolated instances in which Judge Clark's performance might have been improved, the record does not demonstrate that either his general performance or his specific decision on this reverse *Batson* challenge is deserving of the perverse distinction of a bad faith label. This case is different from *Pellegrino* and *Chinnery*, in which trial judges defied or refused to apply *Batson* analysis or appeared to reverse themselves in midstream. The record discloses no such deliberate or erratic conduct on the part of Judge Clark.

We turn now to the question of the remedy for a good faith mistake, a question delegated to us for decision by *Rivera*. A review

of the positions taken by other state and federal courts reveals a split of authority.

Several states have concluded that reversal is automatically required when a trial court erroneously denies a defendant his or her right to exercise a peremptory challenge. The Iowa Supreme Court's decision in *State v. Mootz*, 808 N.W.2d 207 (Iowa 2012), outlines the arguments commonly advanced in support of a structural error approach well.

In *Mootz*, the defendant appealed his conviction for assault on a law enforcement officer resulting in bodily injury. During voir dire, the defense sought to use a peremptory strike to remove a Hispanic member of the venire, and the trial judge prevented it from doing so. The judge ruled erroneously that the strike was based on the venire member's race, and he was seated on the jury and elected foreperson.

At the Iowa Court of Appeals level, the panel held that the trial judge erred by denying the defendant his right to exercise the peremptory strike, but it treated the mistake as harmless error. 808 N.W.2d at 214. The panel analogized to *State v. Neuendorf*, 509 N.W.2d 743, 747 (Iowa 1993), in which the Iowa Supreme Court had held that prejudice would not be presumed when a defendant was forced to "waste" a peremptory challenge to correct an erroneous denial of a challenge for cause. *Mootz*, 808 N. W. 2d at 221.

On review of the court of appeals decision, the Iowa Supreme Court distinguished *Neuendorf* and its more recent holding in *Summy v. City of Des Moines*, 708 N.W.2d 333, 340 (Iowa 2006) (prejudice will not be presumed when court erroneously grants litigant's challenge for cause), because the *Mootz* venire member ultimately was seated on the jury, whereas prospective jurors in *Neuendorf* and *Summy* ultimately were not. The court also said it had limited ability to assess accurately what impact the objectionable juror had on the proceedings. 808 N.W.2d at 225. "A defendant could only show prejudice by showing that the juror he sought to remove was biased. However, if the juror were biased, then the juror would be removable for cause, and the question regarding the peremptory challenge would become moot." 808 N.W.2d at 225. The Iowa Supreme Court found it unacceptable that a de-

fendant could be left with no remedy for a reverse *Batson* error, and it imagined the drafters of the state rule governing peremptory strikes would feel the same. 808 N.W.2d at 225-26.

Appellate courts in Alabama, California, Connecticut, Florida, Georgia, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, New York, South Carolina, Vermont, Washington, and Wisconsin are in accord with Iowa in holding that reverse *Batson* error committed by a trial judge in good faith is structural; seven of them arrived at the position after *Rivera* was handed down, and eight before. See *Zanders v. Alfa Mut. Ins. Co.*, 628 So. 2d 360, 361 (Ala. 1993) (reversing judgment and remanding for new trial in *civil* action); *People v. Gonzales*, B224397, 2012 WL 413868 (Cal. Ct. App. 2012) (unpublished opinion) (where defendant forced to go to trial with a juror that they could not excuse due to an erroneously granted *Batson/Wheeler* [*People v. Wheeler*, 22 Cal. 3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978)] motion, error requires reversal); *State v. Wright*, 86 Conn. App. 86, 97-98, 860 A.2d 278 (2004) (reversing and remanding for new trial); *Elliott v. State*, 591 So. 2d 981, 987 (Fla. Dist. App. 1991) (reversing and remanding for a new trial); *Jackson v. State*, 265 Ga. 897, 899, 463 S.E.2d 699 (1995) (granting new trial without conducting harmless error analysis); *State v. Pierce*, 131 So. 3d 136, 144 (La. App. 2013) (denial of peremptory through erroneous Batson ruling "implicates a constitutional right guaranteed to the defendant by the State of Louisiana; thus, a harmless error analysis is inappropriate"); *Parker v. State*, 365 Md. 299, 311, 778 A.2d 1096 (2001) (granting new trial where trial judge erred in deeming the facially-valid, race-neutral reasons "unacceptable" and in reseating stricken jurors); *Commonwealth v. Hampton*, 457 Mass. 152, 164-65, 928 N.E.2d 917 (2010) ("We continue to adhere to the view [post-*Rivera*] that, for purposes of State law, the erroneous denial of a peremptory challenge requires automatic reversal, without a showing of prejudice."); *State v. Campbell*, 772 N.W.2d 858, 862 (Minn. App. 2009) (confirming structural error approach of Minnesota Supreme Court in *State v. Reiners*, 664 N.W.2d 826, 835 [Minn. 2003], will continue to be applied post-*Rivera*); *Hardison v. State*, 94 So. 3d 1092, 1101-02 (Miss. 2012) (follows lead of Iowa, Massachusetts, Minnesota,

New York, Washington; post-*Rivera* "a trial court cannot deprive defendants of their right to a peremptory strike unless the trial judge properly conducts the analysis outlined in *Batson* . . . . when a trial judge erroneously denies a defendant a peremptory strike by failing to conduct the proper *Batson* analysis, prejudice is automatically presumed, and we will find reversible error"); *People v. Hecker*, 15 N.Y.3d 625, 662, 917 N.Y.S.2d 39, 942 N.E.2d 248 (2010) (refusing to depart from pre-*Rivera* precedent establishing automatic reversal as proper remedy when trial judge erroneously sustains reverse *Batson* challenge); *State v. Short*, 327 S.C. 329, 489 S.E.2d 209 (Ct. App. 1997), *aff'd* 333 S.C. 473, 511 S.E.2d 358 (1999) (automatic reversal proper remedy); *State v. Yai Bol*, 190 Vt. 313, 323, 29 A.3d. 1249 (2011) (reversal automatic where defendant "compelled to abide a juror not to his liking" as a result of erroneous *Batson* ruling); *State v. Vreen*, 143 Wash. 2d 923, 931, 26 P.3d 236 (2001) (erroneous denial of peremptory strike requires automatic reversal); *State v. Wilkes*, 181 Wis. 2d 1006, 513 N.W.2d 708 (Wis. App. 1994) (same) (unpublished opinion).

Several other states have chosen the path of the Illinois Supreme Court in *Rivera*—applying harmlessness analysis to reverse *Batson* errors made in good faith. For the most part, these courts reason that the primary purpose of statutory peremptory strikes is to ensure a defendant's right to trial by a fair and impartial jury. And, as long as all seated jurors are qualified and impartial, a defendant has suffered no constitutional injury and any error can be deemed harmless. See *State v. Darnell*, 209 Ariz. 182, 98 P.3d 617, 621 (Ct. App. 2004), *rev. denied and ordered depublished* 210 Ariz. 77, 107 P.3d 923 (2005) (harmless error review applies when trial court wrongly grants *Batson* challenge to defendant's use of peremptory strike); *Pfister v. State*, 650 N.E.2d 1198, 1200 (Ind. App. 1995) (harmless error applies; error in case could not be deemed harmless); *Moore v. Commonwealth*, 2011-SC-000700-MR, 2013 WL 1790303, at *4 (Ky. 2013) (unpublished opinion) (preserved *Batson* error subject to usual standards of harmless error analysis); *State v. Letica*, 356 S.W.3d 157, 165-66 (Mo. 2011) (erroneous *Batson* ruling resulting in denial of peremptory challenge subject to harmless error analysis; error harmless under facts); *Cudjoe v. Com-*

*monwealth*, 23 Va. App. 193, 203-04, 475 S.E.2d 821 (1996), *overruled on other grounds by Roberts v. CSX Transp., Inc.*, 279 Va. 111, 688 S.E.2d 178 (2010) (statutory harmless error statute supplants structural error; on record, unable to conclude error did not affect verdict).

In federal appellate courts, before *Rivera* was decided, the majority rejected harmlessness analysis when a trial judge erroneously prevented a defendant's peremptory challenge. See *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998); *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 159 (3d Cir. 1995); *United States v. Hall*, 152 F.3d 381, 408 (5th Cir. 1998); *United States v. McFerron*, 163 F.3d 952, 955-56 (6th Cir. 1998); *United States v. Underwood*, 122 F.3d 389, 392 (7th Cir. 1997), *cert. denied* 524 U.S. 937 (1998); *Ford v. Norris*, 67 F.3d 162, 170 (8th Cir. 1995); *United States v. Annigoni*, 96 F.3d 1132, 1143 (9th Cir. 1996) (en banc).

But these opinions were largely dependent upon language from *Swain v. Alabama*, 380 U.S. 202, 219, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965): "The denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." And the United States Supreme Court has now called this language into question.

In *United States v. Martinez-Salazar*, 528 U.S. 304, 120 S. Ct. 774, 782, 145 L. Ed. 2d 792 (2000), the Ninth Circuit had relied on *Swain* to support its holding that the trial court's erroneous denial of peremptory challenges required automatic reversal. The United States Supreme Court did not address this aspect of the Ninth Circuit's decision because it found no error, but it observed in dicta that "the oft-quoted language in *Swain* was not only unnecessary to the decision in that case—because *Swain* did not address any claim that a defendant had been denied a peremptory challenge—but was founded on a series of our early cases decided long before the adoption of harmless-error review." 528 U.S. at 317 n.4.

The Court took another swipe at the *Swain* language in *Rivera*, when it said that the language had been "disavowed" in *Martinez-Salazar* and further observed that it

"typically designate[s] an error as 'structural,' therefore 'requir[ing]' automatic reversal,' only when 'the error necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' [Citation omitted.] The mistaken denial of a state-provided peremptory challenge does not, at least in the circumstances we confront here, constitute an error of that character." *Rivera*, 556 U.S. at 160.

Since *Rivera*, the Ninth Circuit has abandoned its earlier practice of treating a trial judge's erroneous denial of a defendant's peremptory challenge as structural error. See *United States v. Lindsey*, 634 F.3d 541, 544 (9th Cir. 2011), *cert. denied* 131 S. Ct. 2475 (2011). Other federal circuits have followed suit. *United States v. Gonzalez-Melendez*, 594 F.3d 28, 33-34 (1st Cir. 2010); *Jimenez v. City of Chicago*, 732 F.3d 710, 715 (7th Cir. 2013), *cert. denied* 134 S. Ct. 1797 (2014); *Avichail ex rel. T.A. v. St. John's Mercy Health Sys.*, 686 F.3d 548, 552-53 (8th Cir. 2012).

Kansas does not have a post-*Rivera* case on point.

Sixteen years before *Rivera* was decided, one Court of Appeals panel reversed a conviction when the trial judge erroneously interfered with a defendant's right to exercise a race-neutral peremptory challenge under K.S.A. 22-3412. *State v. Foust*, 18 Kan. App. 2d 617, 624, 857 P.2d 1368 (1993). The panel said: "Although it may seem minimal, the deprivation of even one valid peremptory challenge is prejudicial to a defendant and may skew the jury process." 18 Kan. App. 2d at 624.

In this court's opinion in *State v. Heath*, 264 Kan. 557, 588, 957 P.2d 449 (1998), the defendant argued that the district judge's error in failing to remove an unqualified juror for cause deprived him of his statutory right to exercise one of his peremptory challenges. The defendant used a peremptory strike to correct the judge's mistake on the challenge for cause. We held any error was harmless, reasoning that "[t]he whole purpose of peremptory challenges is as a means to achieve an impartial jury . . . [t]here is no evidence that the jury constituted was not impartial." 264 Kan. at 588.

In fact, this court long treated the Kansas peremptory challenge statute as little more than a procedural device to ensure compliance

with a defendant's constitutional right to trial by a fair and impartial jury:

"The constitutional guaranty is that an accused shall be tried by an impartial jury. The matter of peremptory challenges is merely statutory machinery for carrying out and securing the constitutional guaranty. Error in overruling a challenge to a juror is not ground for reversal unless the accused was prejudiced thereby. The real question is—'Was the jury which tried defendant composed of impartial members?' In the absence of any objection on the part of defendant to any member as it was finally drawn to try him we cannot say it was not impartial." *State v. Springer*, 172 Kan. 239, 245, 239 P.2d 944 (1952).

Although there are authorities from our sister states and the federal courts that come down gracefully on both sides of the issue, we are persuaded that an error such as the one committed in this case should be subject to harmlessness review. The mistake was made in good faith, and our Kansas precedent, although sparse, favors the view that a peremptory challenge is simply a procedural vehicle for vindication of a defendant's right to an impartial jury. The erroneous denial of a peremptory challenge does not require automatic reversal. This holding is not only permissible under *Rivera*, but also consistent with this court's development of harmless error review in recent years and the legislature's expressed preference for the same. See *Pabst v. State*, 287 Kan. 1, 13, 192 P.3d 630 (2008) (vast majority of errors fall within category of "trial error[s]" subject to harmless error review); K.S.A. 60-261 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); K.S.A. 60-2105 (appellate courts shall disregard "mere technical errors and irregularities" not affecting substantial rights).

Having already decided in the previous section that there was no error in denying the defense challenge for cause to W.B., we see no prejudice from his ultimate seating on the jury. R. Carr is not entitled to reversal of any of his convictions because of Judge Clark's error on the reverse *Batson* challenge. See *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012) (no reasonable probability that such error affected the outcome of the trial in light of the entire record).

### 6. CONFRONTATION AND ADMISSION OF WALENTA STATEMENTS

R. Carr argues that admission of statements made by Walenta violated his Sixth Amendment right to confront the witnesses against him and requires reversal of his felony murder conviction.

All parties agree that our review of this constitutional question is unlimited. See *State v. Belone*, 295 Kan. 499, 502-03, 285 P.3d 378 (2012) (citing *State v. Bennington*, 293 Kan. 503, 507, 264 P.3d 440 [2011]; *State v. Marquis*, 292 Kan. 925, 928, 257 P.3d 775 [2011]; *State v. Leshay*, 289 Kan. 546, 547, 213 P.3d 1071 [2009]; *State v. Ransom*, 288 Kan. 697, 708-09, 207 P.3d 208 [2009]); see also *State* v. *Brown*, 285 Kan. 261, 282, 173 P.3d 612 (2007) (confrontation issues under both federal and state constitutions raise questions of law subject to unlimited appellate review).

All parties also agree that our analysis of the merits of this issue should be guided by *Crawford v. Washington*, 541 U.S. 36, 56, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). *Crawford*, a 2004 United States Supreme Court decision on the Confrontation Clause, has superseded *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), which guided Judge Clark's rulings at the time of the defendants' trial.

*Additional Factual and Procedural Background*

During the several weeks that Walenta survived after she was shot, she made several statements about the crime and her attacker. Her initial statements were made to her neighbor Kelley, who came to Walenta's assistance within minutes of the shooting. Walenta also was interviewed by several law enforcement investigators while in the hospital. One of the statements she gave to investigators included her tentative identification of R. Carr from a photo array. This conversation took place in the presence of Walenta's husband.

No representative of the defendants was able to question Walenta before she died.

R. Carr filed a pretrial motion in limine to exclude any statement Walenta made to Detective Randall Reynolds. At a hearing on the unsuccessful motion, counsel clearly based the objection to Reynolds' testimony on this subject on the federal Confrontation Clause.

At trial, neither R. Carr's counsel nor J. Carr's counsel objected to Kelley's testimony about Walenta's statements until after Kelley had testified that Walenta told her the person who shot her was a black man with wiry hair. At that point, the following exchange occurred:

"[J. Carr's counsel]: Your Honor, at this time we're going to go ahead and make an objection based on hearsay. There was an argument in a previous pretrial motion in this regard and we would ask that it be a continuous objection to anything Miss Walenta said.

"[R. Carr's counsel]: Join, Your Honor.

"THE COURT: I'll overrule the objection, but I'll give you a continuing one to the line of testimony."

After the continuing objection was granted, Kelley also testified that Walenta had told her she was shot three times and that a light-colored car had followed her onto her street.

Wichita Police Officer Joshua Lewis and Detective James Whittredge testified about statements Walenta made to them. Lewis testified that, on December 11, Walenta described her attacker as a black male about 6 feet tall, approximately 30 years old, with long black hair. She also told Lewis and Whittredge that she had been followed by a light-colored four-door vehicle. Whittredge testified that Walenta told him she did not know the gunman and that he had not tried to rob her but had indicated he needed help. Walenta also told Whittredge that the gunman—a black male in his 30s, 5 feet 7 inches to 6 feet tall, with long straight wiry hair—disappeared very quickly after the shooting. Walenta associated the gunman with the light-colored four-door vehicle that had been following her.

Reynolds testified that he spoke with Walenta about the crime on December 13 and 15. Among other things, during the first interview, Walenta told Reynolds that the man who shot her got out of the passenger side of the vehicle and that he held his gun palm down. She also told Reynolds that the man ran immediately after he shot her, and, at the same time, she noticed that the car that had followed her started to pull away. She was unsure whether the shooter was left behind.

Reynolds testified that he returned to the hospital to show Walenta photo arrays containing pictures of R. Carr and J. Carr after their arrests on December 15. Walenta said that a photo of R. Carr in the second position and a photo of another individual in the first position in one array fit her attacker's general appearance. But she said that the photo of R. Carr had eyes matching what she remembered. Reynolds had Walenta write this information on the photo array containing R. Carr's picture. Walenta could not select anyone who looked familiar from the array containing J. Carr's photo. Reynolds also testified that, after Walenta died, he asked her husband to help him decipher Walenta's handwritten notes on the photo array containing R. Carr's picture.

Defense counsel lodged several objections during the testimony of the three law enforcement officers about Walenta's statements. Judge Clark overruled all of the specific objections but twice granted additional continuing objections to such testimony.

Walenta's husband, Donald, testified that he was present during most of the law enforcement interviews with his wife, including the one in which Reynolds showed his wife the photo arrays. Donald heard the words his wife spoke to Reynolds and observed her write on the photo array. He did not actually see what she had written until Reynolds spoke to him after Walenta's death. Looking at the array while on the stand at trial, Donald testified that his wife wrote: "No. 1 and No. 2 represent the man who assaulted me. The general appearance of No. 1 . . . fits the assailant but the eyes, eye set of No. 2 also represents what I remember." Neither defendant objected to Donald's testimony.

*Preservation of the Confrontation Clause Issue for Appeal*

Because the Walenta felony murder was not subject to the death penalty, we do not apply K.S.A. 21-6619(b), which requires us to overlook a preservation problem in the review and appeal from a judgment of conviction resulting in a sentence of death.

The State suggests that the defendants failed to preserve any Confrontation Clause issue on Walenta's statements for our review.

We agree with the State as to the part of Kelley's testimony that preceded Judge Clark's granting of a continuing objection. The

defense objections to Kelley's testimony that Walenta told her a black man with wiry hair was the gunman came too late.

We disagree with the State that lack of preservation bars our consideration of the Confrontation Clause issue as to the three law enforcement witnesses. The record reflects multiple defense objections during their testimony, at least one referencing the Confrontation Clause objection raised pretrial and at least two leading to more continuing objections being granted by Judge Clark.

We agree with the State that there is a preservation problem with a Confrontation Clause issue on the testimony from Walenta's husband about what his wife said to and wrote for Reynolds in his presence. See K.S.A. 60-404 (contemporaneous objection rule); see also *State v. McCaslin*, 291 Kan. 697, 706, 245 P.3d 1030 (2011) (application of contemporaneous objection rule when Confrontation Clause objection not specific in district court).

It is true that we have made an exception to the general contemporaneous objection rule to consider Confrontation Clause arguments raised by defendants tried before *Crawford* was decided. See *State v. Brown*, 285 Kan. 261, 281, 173 P.3d 612 (2007) (citing *State v. Miller*, 284 Kan. 682, 709, 163 P.3d 267 [2007]). But doing so in this case would be inappropriate. Here, defense counsel repeatedly exhibited full awareness of the potential of a Confrontation Clause violation; they registered numerous objections to the testimony from Kelley and the law enforcement witnesses about what Walenta communicated to them. The total absence of a defense objection during Donald's testimony looks far more like strategy than ignorance.

*Violation of Sixth Amendment*

*Crawford*, 541 U.S. at 53-54, established that the Sixth Amendment Confrontation Clause prevents out-of-court statements that are testimonial in nature from being introduced against a criminal defendant unless the declarant is unavailable and the defendant has had a previous opportunity to cross-examine him or her.

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.

Ct. 1354, 158 L. Ed. 2d 177 (2004), we held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

This brings us to other points of agreement among the parties.

First, the State and the defendants agree that, under the standards set out by the United States Supreme Court in *Davis*, and by this court in *Brown*, 285 Kan. at 291, Walenta's statements presented through Kelley were not testimonial. They also agree that Walenta's statements to the three law enforcement officers—Lewis, Whittredge and Reynolds—were testimonial.

"Statements . . . made in the course of police interrogation . . . are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

The State and the defendants also agree as a general matter that, despite the general *Crawford* rule, testimonial statements of an absent declarant who has never been cross-examined by the defense may be admitted under the doctrine of forfeiture by wrongdoing. The doctrine applies when the declarant's absence is attributable to wrongdoing by a defendant specifically intending to prevent the declarant from testifying. See *Giles v. California*, 554 U.S. 353, 388, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008) (in order to apply doctrine, State must prove by preponderance of evidence that defendant's wrongdoing specifically intended to prevent testimony); *State v. Belone*, 295 Kan. 499, 504, 285 P.3d 378 (2012) (district judge erred by admitting victim's testimonial statements to police when defendants' intent to prevent testimony not shown); *State v. Jones*, 287 Kan. 559, 567-68, 197 P.3d 815 (2008) (same).

That is the point at which the parties' agreement ends. The State invokes the doctrine to save the testimony from the three law enforcement officers, and the defense argues that the doctrine was inapplicable. We need not settle this dispute because we are persuaded that answering the question of whether any error on this issue was harmless is dispositive.

*Harmlessness*

Harmless error analysis applies to errors under *Crawford. Belone*, 295 Kan. at 504-05; see *Lilly v. Virginia*, 527 U.S. 116, 139-40, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999) (Confrontation Clause violation subject to harmless error review). A Kansas court cannot declare an error implicating a right guaranteed by the United States Constitution harmless unless it is persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, that the error did not contribute to the verdict. *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013); *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]), *cert. denied* 132 S. Ct. 1594 (2012). The State, as the party benefiting from any error here, bears the burden to establish that any Confrontation Clause error was harmless. *Ward*, 292 Kan. at 568-69.

The State can bear its burden here. The nontestimonial statements of Walenta to Kelley to which she testified and the statements and actions of Walenta in her husband's presence to which he testified without objection make the law enforcement testimony harmless, because they covered much of the same ground. Walenta had told Kelley about the black man with wiry hair who shot her three times and about a light-colored car that followed her home, and Kelley passed this information on to the jury. Walenta's husband was able to tell the jury about what was probably Walenta's biggest contribution to the law enforcement investigation, her writing on the photo array containing R. Carr's picture. Reynolds' testimony about the composition of the photo array, including designation of R. Carr's picture as "No. 2" had been properly admitted without any violation of *Crawford*. These facts were not communicated by Walenta at all.

In contrast, the only items of evidence drawn from Walenta's statements that the three law enforcement witnesses may have added to the mix were her various and vague estimates of the perpetrator's height and age, the fact that he held his gun palm down, and the fact that he ran away as the light-colored car appeared to be leaving immediately after the shooting. The specific way the

gun was held was the only directly incriminating item against R. Carr among these, because Schreiber testified that the first man who approached him held his gun in the same way. Walenta's age and height estimates were too vague to have much practical impact on the jury's consideration. And the description of the light-colored car's departure was no more significant, and probably less significant, than the circumstances of its arrival just behind Walenta's Yukon on her dead-end street, a fact about which Kelley had already testified. As to J. Carr, the only other piece of incriminating information that came from one of the three officers was that the gunman exited the passenger side of the light-colored car. Like the car's departure, this tended to show the involvement of a second perpetrator. But the idea that two people participated in the Walenta incident was testified to without objection by a different law enforcement witness.

Under these circumstances, we deem any error in admitting Walenta's statements through the three law enforcement witnesses harmless beyond a reasonable doubt.

## 7. SUFFICIENCY OF EVIDENCE ON WALENTA FELONY MURDER

R. Carr argues that his felony murder conviction for the killing of Walenta must be reversed because the State failed to present sufficient evidence of the underlying attempted aggravated robbery.

### Additional Factual and Procedural Background

There were no eyewitnesses to Walenta's shooting who testified at trial. Walenta was alone when she was shot in the driver's seat of her Yukon in her driveway and died a few weeks later.

Several other witnesses were permitted to testify to what Walenta told them about the crime before she died. Their information included the following: Walenta noticed a light-colored car following her as she drove home. When she pulled into her driveway, she saw the car park. A black male got out of the passenger side of the car, approached the driver's side of her Yukon. Walenta said that the man did not try to rob her but instead indicated that he needed help. When Walenta rolled down her window a few inches,

the man immediately stuck a handgun into the opening, holding it palm down and pointing it at her head. When she turned the ignition, the Yukon's starter made a grinding sound because the car was already running. The man told her not to move the car. When she nevertheless shifted into reverse, the man shot her three times. Then he ran. Walenta saw the light-colored car begin to move away after the shots were fired, and it possibly left the gunman behind.

Evidence at trial also showed several common elements among the three incidents that gave rise to the charges against the defendants.

The gun used to shoot out one of Schreiber's tires, to shoot Walenta, and to shoot at least Aaron S. in the soccer field after the crimes at the Birchwood residence was the black Lorcin seen in the possession of J. Carr by Adams on the night of Walenta's shooting. A light-colored car followed Walenta home on the night she was shot, and a similar car followed a female next-door neighbor of the three friends who lived in the Birchwood triplex when she drove home alone shortly before the home invasion. The Schreiber and Birchwood incidents involved two black men, one of whom was identified by a victim as R. Carr. Walenta also picked R. Carr's picture out of a photo array as the person whose eyes most resembled those of her attacker. The Schreiber crime began with a man identified as R. Carr approaching Schreiber's driver's side window. Both Schreiber and four of the Birchwood victims were taken to ATMs to withdraw money from their bank accounts, and the perpetrators took other property from them. All three incidents occurred within days of each other in the northeast part of Wichita: the Schreiber incident began on December 7; the Walenta incident occurred on December 11; the Birchwood crimes occurred on December 14 and 15.

During an instructions conference at the defendants' trial, the State requested an instruction telling jurors they could consider evidence related to the Schreiber and Birchwood incidents "for the limited additional purpose of determining the intent, identity, and motive of the defendant as alleged in the counts involving [Walenta] as an alleged victim." R. Carr's counsel objected to the instruction, and Judge Clark denied the State's request. The jury

did receive an instruction telling it that each charged crime was a separate and distinct offense and that the jury "must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge." Judge Clark also informed the jury that, in order to find R. Carr guilty of felony murder, the State had to prove beyond a reasonable doubt that the killing of Walenta "was done while in the commission of or attempting to commit aggravated robbery."

*Evaluation of Evidence*

When the sufficiency of the evidence is challenged in a criminal case,

"the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011)." *State v. Qualls*, 297 Kan. 61, 66, 298 P.3d 311 (2013).

A conviction for felony murder cannot stand without sufficient evidence of one of the enumerated inherently dangerous felonies listed in K.S.A. 21-3436. See *State v. Williams*, 229 Kan. 290, 300, 623 P.2d 1334 (1981). Sufficient evidence, even for the gravest of offenses, may consist entirely of circumstantial evidence. *State v. Ward*, 292 Kan. 541, Syl. ¶ 13 (2011).

R. Carr does not argue that we are prohibited from reviewing all evidence, including inadmissible evidence, to determine sufficiency of the evidence on his felony-murder conviction. That we assumed error on the admissibility of law enforcement statements in the previous section is no barrier to consider those same statements here. See *State v. Jefferson*, 297 Kan. 1151, 1166, 310 P.3d 331 (2013) (reviewing court considers erroneously admitted evidence in reviewing sufficiency of evidence).

When the evidence of the Walenta felony murder is considered in isolation, we agree with R. Carr that it was insufficient to support his conviction of aggravated robbery or attempted aggravated robbery. There simply was nothing to support an inference that the man who shot Walenta took property or intended to take property

from her. *Cf. State v. Calvin*, 279 Kan. 193, 200, 105 P.3d 710 (2005) (felony-murder conviction affirmed based on underlying felony of attempted aggravated robbery; testimony offered indicating defendant intended to rob murder victim). The State's case was just as consistent with an intention to commit other crimes—*e.g.*, aggravated assault, attempted rape or other sex crimes, attempted aggravated kidnapping.

But our agreement with R. Carr on this point does not entitle him to reversal.

We have recently decided in another case that jurors may consider evidence from a string of residential burglaries on the issue of whether one of the perpetrators of those burglaries was present and participating in yet another burglary in the string, one that ended in murder of the homeowner. See *McBroom*, 299 Kan. 731, 756-59, 325 P.3d 1174 (2014).

Likewise, the jury in this case could consider evidence against R. Carr on the joined charges arising from the Schreiber and Birchwood crimes when deciding whether to find him guilty or not guilty on the Walenta felony murder. The Schreiber and Birchwood evidence did not qualify as suspect other crimes propensity evidence under K.S.A. 60-455 and did not require a limiting instruction. See *State v. Cromwell*, 253 Kan. 495, 509, 856 P.2d 1299 (1993). In addition, the instruction given on the jury's duty to consider each charge "separately on the evidence and law applicable to it, uninfluenced by [the jury's] decision as to any other charge" did not prevent jurors from considering all of the evidence admitted in this joint trial. Under *McBroom*, some of the evidence supporting the Schreiber and Birchwood charges also supported or was, in the words of the instruction, "applicable" to the Walenta charge.

With these rules established, the jury in this case was free to take into account that the three incidents giving rise to the charges against R. Carr were close together in time. Both Schreiber and Holly G. identified R. Carr as one of their assailants, and Walenta selected R. Carr's picture from a photo array as the one in which the eyes most resembled her attacker. Ballistics testing showed that the gun used in all three incidents was the same. Schreiber described the man who approached him in the driver's seat of his car

as holding that gun palm down, which was the same as Walenta's description of her attacker. The Schreiber and Birchwood crimes definitely involved two men, who committed multiple aggravated robberies, and the Walenta crime appeared to involve a confederate of the gunman who waited in the light-colored car that followed Walenta home. A light-colored car also made a similar pass on the street of the Birchwood triplex just before the home invasion and its aftermath. As with Walenta, the person driving the car had followed a female neighbor going home alone in the late evening.

Because all of this evidence could be considered in conjunction with Walenta's communicated recollections of the circumstances surrounding her shooting—and because this evidence included multiple aggravated robberies facilitated by similar perpetrators using similar tactics and the same gun—we reject R. Carr's challenge to the sufficiency of the evidence to convict him of Walenta's felony murder based on aggravated robbery. A rational factfinder could have found R. Carr guilty of this murder beyond a reasonable doubt.

### 8. LESSER INCLUDED OFFENSE INSTRUCTIONS FOR FELONY MURDER

R. Carr did not request any lesser included offense instructions for felony murder at trial. During deliberations, the jury asked: "Can a lesser count be considered for a defendant on [the Walenta killing]?" Judge Clark responded: "The answer is no."

Because R. Carr sought no lesser included offense instructions, we review his assertion that Judge Clark nevertheless should have given them for clear error. K.S.A. 22-3414(3); *State v. Briseno*, 299 Kan. 877, 326 P.3d 1074 (2014); *State v. Williams*, 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 (2012).

"To determine whether an instruction or a failure to give an instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record."

"If the reviewing court determines that the district court erred in giving or failing to give a challenged instruction, then the clearly erroneous analysis moves to a reversibility inquiry, wherein the court assesses whether it is firmly convinced

that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶¶ 4-5.

Under K.S.A. 22-3414(3), a district judge must give lesser included offense instructions "where there is some evidence that would reasonably justify a conviction of some lesser included crime." At the time of the trial in this case, felony murder was excepted from application of K.S.A. 22-3414(3) under a court-made rule. See *State v. Becker*, 290 Kan. 842, 856-57, 235 P.3d 424 (2010) (lesser included offense instructions need not be given in felony murder case unless evidence of underlying felony weak, inconclusive, conflicting).

In *State v. Berry*, 292 Kan. 493, Syl. ¶ 6, 254 P.3d 1276 (2011), this court abandoned the court-made exception to K.S.A. 22-3414(3). And we said that the holding of *Berry* would apply to all cases then pending on direct appeal, which would include this one. 292 Kan. at 514.

After *Berry* was decided, the legislature eliminated all lesser included offenses of felony murder. See L. 2012, ch. 157, sec. 2; see also K.S.A. 2012 Supp. 21-5109(b)(1).

In *State v. Wells*, 297 Kan. 741, Syl. ¶ 8, 305 P.3d 568 (2013), we examined the legislature's action and held that it "was not merely procedural or remedial but substantive," which meant the new legislation was not retroactive and would not cover this case.

The 2013 legislature acted again in reaction to *Wells*, making explicit its intention that the abolition of lesser included offenses of felony murder be retroactive. See L. 2013, ch. 96, sec. 2 (adding subsections [d], [e] to K.S.A. 2012 Supp. 21-5402; [d] reiterates abolition; [e] expresses retroactive intention).

In light of these legal developments, this court ordered the parties to submit supplemental briefing. They did so. Those supplemental briefs do not address the prerequisites that a lesser included offense instruction be factually and legally appropriate, and, for purposes of argument, we assume that at least second-degree murder would have met those criteria under the *Berry* rule. The outcome on this issue then turns only on whether the 2013 statutory

amendments eliminating lesser included offenses for felony murder apply in this case.

R. Carr argues that the amendments cannot apply without violation of the Ex Post Facto Clause. We have now decided this issue adversely to him in *State v. Todd*, 299 Kan. 263, Syl. ¶ 4, 323 P.3d 829 (2014), and do not revisit the rule or rationale of that case here.

R. Carr does not make an explicit due process argument to defeat application of the amended statutes eliminating lesser included offenses to felony murder. But he does assert that a defendant's theory that the State has overcharged and he or she should be convicted instead of a lesser included offense is a type of defense to the more serious charge. See *State v. Plummer*, 295 Kan. 156, 159, 168, 283 P.3d 202 (2012) (defendant's theory of defense on aggravated robbery commission of theft followed by scuffle with security guard trying to prevent escape of suspect; district judge erred in refusing to instruct on theft). And a criminal defendant's right to present a defense and have jury instructions supporting the defense given is based in due process principles. See *State v. McIver*, 257 Kan. 420, Syl. ¶ 1, 902 P.2d 982 (1995); *State v. Wade*, 45 Kan. App. 2d 128, 135, 245 P.3d 1083 (2010). Thus, to the extent R. Carr relies on due process, we dispose of that argument as well by observing that we have now decided this issue against his position. See *State v. Gleason*, 299 Kan. 1127, 329 P.3d 1102 (2014).

## 9. INSTRUCTION, MULTIPLICITY ON CAPITAL MURDER

Defendant J. Carr argues in his separate appeal that faulty instructions on the K.S.A. 21-3439(a)(4) sex crime-based capital murders and a multiplicity problem on three of the four K.S.A. 21-3439(a)(6) multiple-death capital murders combined to require reversals. R. Carr makes the multiplicity argument. Because J. Carr and R. Carr were tried together on the same alternative charges and a single set of jury instructions, and because their jury completed identical verdict forms for the two defendants in exactly the same way, J. Carr's arguments on this combination of infirmities and its effect apply equally to R. Carr. Thus, although R. Carr made

a less comprehensive argument on these problems, we address it in his case as well. See K.S.A. 2013 Supp. 21-6619(b) (court authorized to recognize, react to unassigned errors appearing in record on capital case "if the ends of justice would be served thereby").

We focus first on the jury instructions on sex crime-based capital murder and the wording of the verdict forms. Next this opinion addresses the multiplicity issue on three of the four capital murder convictions. Ultimately, we conclude that these errors require reversal of three of R. Carr's four capital murder convictions.

*Additional Factual and Procedural Background*

The amended complaint charged both defendants with capital murder in Counts 1 through 8. Each odd-numbered count among these eight was alternative to the even-numbered count following it.

The odd-numbered counts alleged capital murder of one person—Heather M., Aaron S., Brad H., or Jason B.—under K.S.A. 21-3439(a)(4), which prohibits premeditated murder of a victim of rape, criminal sodomy, or aggravated criminal sodomy in the commission of, subsequent to, or in the attempt of any of those three crimes.

The even-numbered counts alleged capital murder of all four victims of the quadruple homicide under K.S.A. 21-3439(a)(6), which prohibits the "premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." Each count was drafted to accuse the defendants of killing one of the four victims in a transaction in which the three others also were killed. The only difference from one even-numbered count to the next was the position of the victims' names.

A single set of jury instructions on the alternative capital counts applied to both defendants, and the eight capital counts from the amended complaint were combined into four instructions labeled Counts "One (1)" through "Four (4)." The heading of each instruction named one of the quadruple homicide victims as its subject,

but the text of the four instructions was exactly the same, with the exception of the shifting positions of the four victims' names on the multiple-homicide alternative.

For example, Instruction No. 12 on the capital murder of Heather M. read:

"INSTRUCTION NO. 12
"COUNT ONE (1)
"HEATHER [M.]

"Each defendant is charged in Count One with the crime of Capital Murder. Each defendant pleads not guilty to the charge.

"To establish this charge against an individual defendant, each of the following claims must be proved. Each must be proved beyond a reasonable doubt.

"1. That the defendant intentionally killed Heather [M.];

"2. That such killing was done with premeditation;

"3. (A.) That Heather [M.] was a victim of rape and/or aggravated criminal sodomy, and such killing was done in the commission of or subsequent to such rape and/or aggravated criminal sodomy;

"OR

"3. (B.) That the premeditated and intentional killing of Heather [M.] and the killing of Brad [H.], Jason [B.] and Aaron [S.] was [sic] a part of the same act or a part of two or more acts connected together or constituting parts of a common scheme or course of conduct;

"4. That this act occurred on or between the 14th day of December, 2000, and the 15th day of December, 2000, in Sedgwick County, Kansas.

"The elements of the crime of Rape are found in Instruction No. 37 and those of Aggravated Criminal Sodomy are found in Instruction No. 39."

Instruction number 37, incorporated into each of the four instructions on the elements of capital murder, read:

"INSTRUCTION NO. 37
"COUNT SEVENTEEN (17)
"H.G.

"Each defendant is charged in Count Seventeen with the crime of Rape. Each defendant pleads not guilty.

"To establish this charge against an individual defendant, the following elements must be proved. Each must be proved beyond a reasonable doubt.

"1. That the defendant caused H.G. to commit an act of sexual intercourse with Heather [M.];

"2. That the act of sexual intercourse was committed without the consent of H.G. under circumstances where she was overcome by force or fear; and

"3. That this act occurred on or between the 14th day of December, 2000, and the 15th day of December, 2000, in Sedgwick County, Kansas.

"Sexual intercourse means any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse."

Instruction 39, also incorporated into each of the instructions on the elements of capital murder, read:

"INSTRUCTION 39
"COUNT NINETEEN (19)
"H.G.

"Each defendant is charged in Count Nineteen with the crime of Aggravated Criminal Sodomy. Each defendant pleads not guilty.

"To establish this charge against an individual defendant, the following elements must be proved. Each must be proved beyond a reasonable doubt.

"1. That the defendant caused H.G. to engage in sodomy with Heather [M.];

"2. That the act of sodomy was committed without the consent of H.G. under circumstances where she was overcome by force or fear; and

"3. That this act occurred on or between the 14th day of December, 2000, and the 15th day of December, 2000, in Sedgwick County, Kansas.

"Sodomy means oral contact or oral penetration of the female genitalia or oral contact of the male genitalia or anal penetration, however slight, of a male or female by any body part or any object."

In other words, the four jury instructions on the elements of sex crime-based capital murder—whether the victim named in the heading was Heather M., Aaron S., Brad H., or Jason B.—directed jurors to Instructions 37 and 39 for the elements of the crimes capable of supporting convictions of the defendants for capital murder under K.S.A. 21-3439(a)(4). And Instructions 37 and 39 were the elements instructions for rape and aggravated sodomy of Holly G., and *not* of any of the four homicide victims.

Instruction No. 72, the jury's final instruction, said that its "agreement on a verdict must be unanimous."

The verdict forms for each defendant also combined the alternative counts from the amended complaint into four counts and were identically worded from count to count and from defendant to defendant, with the exception of their headings and the shifting positions of the four victims' names on the multiple-homicide alternative.

For example, the verdict form for R. Carr for Count 1, the capital murder of Heather M., read:

"We, the jury, being duly sworn upon our oath make the following findings concerning the crimes charged against the defendant Reginald D. Carr, Jr.:

"COUNT ONE (1)
"CAPITAL MURDER
"HEATHER [M.]

"1. _____ Guilty of the Capital Murder of Heather [M.]
Please circle the letter (A. and/or B.) in front of each statement that you find has been proved by the evidence:
A. We find that the evidence proves that Heather [M.] was a victim of rape and/or aggravated criminal sodomy and she was killed in the commission of or subsequent to such rape and/or aggravated criminal sodomy.
B. We find that the evidence proves that the premeditated and intentional killing of Heather [M.] and the killing of Brad [H.], Jason [B.] and Aaron [S.] was [sic] a part of the same act or a part of two or more acts connected together or constituting parts of a common scheme or course of conduct.

OR

(FIRST LESSER INCLUDED OFFENSE)

"2. _____ Guilty of the First Degree Murder of Heather [M.]

OR

(SECOND LESSER INCLUDED OFFENSE)

"3. _____ Guilty of the Second Degree Murder of Heather [M.]

OR

"4. _____ Not guilty of Count One (1)

The jury found both defendants guilty on all four counts of capital murder. On each of the four verdict forms for both defendants, the jury circled both the A and B options.

*The Legal Framework and the Parties' Arguments*

The defense arguments on this issue have their genesis in a rule recognized by the United States Supreme Court in 1931 in *Stromberg v. People of State of California*, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931).

In that case, the defendant was charged with displaying a red flag in violation of a statute that prohibited the display "as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character." 283 U.S. at 361. The instructions charged the jury in the language of the statute, and jurors were told they could find the defendant guilty if she had displayed the flag for any of the three listed purposes. The jury returned a general verdict of guilty. 283 U.S. at 361, 363, 367-68.

The state appellate court, while doubting the constitutionality of the statute's prohibition of a display "as a sign, symbol or emblem of opposition to organized government," nevertheless upheld the defendant's conviction because it believed the rest of the statute to be constitutional. 283 U.S. at 361.

The United States Supreme Court rejected the state appellate court's reasoning, saying:

"We are unable to agree with this disposition of the case. The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the [jurors were] instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause . . . . It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." 283 U.S. at 367-68.

*Stromberg* was followed by two other United States Supreme Court cases relevant here.

In *Yates v. United States*, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds Burks v. United States*,

437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978), the Supreme Court applied the logic of *Stromberg* to a case in which neither of the two ways in which the jury could have arrived at conviction was constitutionally inadequate, but one of them was barred by the statute of limitations. "In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates*, 354 U.S. at 312 (citing *Stromberg*, 283 U.S. at 367-68); *Cramer v. United States*, 325 U.S. 1, 36, 65 S. Ct. 918, 89 L. Ed. 1441 [1945]); *Williams v. State of North Carolina*, 317 U.S. 287, 291-92, 63 S. Ct. 207, 87 L. Ed. 279 [1942]).

In the other case, *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), the Court addressed a situation in which an absence of proof, rather than legal insufficiency, was at issue. The Court left the holdings of both *Stromberg* and *Yates* intact. See *Hedgpeth v. Pulido*, 555 U.S. 57, 58, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008) ("A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one.") (citing *Stromberg*, 283 U.S. 359; *Yates*, 354 U.S. 298).

Acknowledging that "a host of our decisions" before and after *Yates* had applied " 'the rule of the *Stromberg* case to general-verdict convictions that may have rested on an unconstitutional ground," the Court recognized that *Yates* extended the holding of *Stromberg* to a new situation, one in which a possible basis of a general verdict "did not violate any provision of the Constitution but was simply legally inadequate." *Griffin*, 502 U.S. at 55.

*Griffin* did not do likewise when the problem with a possible avenue to conviction was factual rather than legal. 502 U.S. at 59 (citing *Duncan v. Louisiana*, 391 U.S. 145, 157, 88 S. Ct. 1444, 20 L. Ed. 2d 491 [1968]).

Our Kansas precedent demonstrates at least some inclination to embrace the general rationale and result of *Stromberg*, as extended by *Yates*. See *State v. Kunellis*, 276 Kan. 461, 78 P.3d 776 (2003) (when verdict shows jury specifically rejected legally sound theory

in favor of what court deems legally unsound theory, conviction must be reversed).

Several federal circuit courts and other state courts follow *Stromberg* and *Yates*. See *United States v. Lawson*, 677 F.3d 629, 655 (4th Cir. 2012), *cert. denied* 133 S. Ct. 393 (2012) (*Yates* requires reversal when case submitted to jury on two or more theories, one theory legally inadequate; general verdict cannot rule out jury reliance on inadequate theory); *United States v. Howard*, 517 F.3d 731 736-37, (5th Cir. 2008) (same); *People v. Morgan*, 42 Cal. 4th 593, 612-13, 170 P.3d 129 (2007) (prosecutor's argument on one legally adequate, one legally inadequate theory requires reversal when instructions did not guide jury; impossible to determine which theory formed basis of verdict); *Fitzpatrick v. State*, 859 So. 2d 486, 491 (Fla. 2003) (conviction resting on general jury verdict that may have been based on legally insufficient theory cannot be sustained); *Robinson v. State*, 266 S.W.3d 8, 14 (Tex. App. 2008) *petition for discretionary review refused* (Feb 25, 2009) (jury's option to convict on legally defective theory egregious error in capital murder case).

In *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), the United States Supreme Court recognized two rules that could be taken from *Stromberg*:

> "One rule derived from the *Stromberg* case requires that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground. . . .
>
> "The second rule derived from the *Stromberg* case . . . made clear that the reasoning of *Stromberg* encompasses a situation in which the general verdict on a single-count indictment or information rested on *both* a constitutional and an unconstitutional ground." 462 U.S. at 881-82.

The defense argument is that all four of the capital murder convictions must be reversed; one conviction, because it rested on both a legally adequate and legally inadequate ground, and three convictions, because they rested on two legally inadequate grounds. The State argues that the jury unanimously found the defendants guilty on each ground and that at least one ground was valid for each conviction, preserving all four verdicts.

Our overview of the legal framework and the parties' arguments brings us to the question of whether either or both of the capital murder theories pursued by the State was legally inadequate. As stated, we first focus on the instructions given for the sex crime-based K.S.A. 21-3439(a)(4) capital murder alternative.

### K.S.A. 21-3439(a)(4) Instructions Evaluation

Neither defendant objected to the K.S.A. 21-3439(a)(4) instructions. Our review is therefore governed by K.S.A. 22-3414(3): "No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto . . . unless the instruction or the failure to give an instruction is clearly erroneous." See *State v. Kleypas*, 272 Kan. 894, 939, 40 P.3d 139 (2001) (clearly erroneous standard applies in death penalty cases).

We have recently expanded on exactly what "clearly erroneous" means.

In *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012), we said that the phrase serves as both a conditional grant of reviewability when the instruction issue was not preserved below and as a standard of reversibility if error in the instruction is identified. 295 Kan. at 515. We deal here with reviewability, which is not only provided for by K.S.A. 22-3414(3) itself; it is also provided for by K.S.A. 2013 Supp. 21-6619(b) for death penalty cases. Under *Williams*, once reviewability is resolved, we determine de novo whether there was any error in the instructions. To make that determination, we " 'consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.' " *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *Williams*, 295 Kan. 506, Syl. ¶ 4).

As we explained the concept of "legally and factually appropriate" in *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012):

"[A]n instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm . . . .

"Next, even if the instruction is legally appropriate when viewed in isolation, it must be supported by the particular facts of the case at bar."

Under *Williams*, the burden to show error is always on the complaining party, in this case, the defendants.

The defense characterizes the portions of the capital murder instructions focused on K.S.A. 21-3439(a)(4) as legally inappropriate because they failed to state the elements required to prove the offense and thus violated the defendants' rights under the Sixth and Fourteenth Amendments to the United States Constitution. In particular, J. Carr argues in his brief:

"[B]ecause a conviction of capital murder under K.S.A. 2l-3439(a)(4) is dependent upon elements of a specific sex offense against the particular victim killed—indeed, it is the commission of the sex offense which elevates the intentional and premeditated killing of a particular person from ordinary premeditated first-degree murder to capital murder—the elements pertaining to the underlying sex offense are essential elements of the crime of capital murder that must be submitted to a jury and found unanimously beyond a reasonable doubt as required under the Sixth and Fourteenth Amendments to the United States Constitution. *See Apprendi* v. *New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000) (Sixth Amendment requires that finding of fact which increases the maximum sentence be found by a jury beyond a reasonable doubt); *Ring* v. *Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556,122 S. Ct. 2428 (2002) (Sixth Amendment right to jury trial extends to finding of fact necessary to impose death penalty), *overruling Walton* v. *Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047(1990). *See also Schad* v. *Arizona*, 501 U.S. 624, 637-643, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991) (when legislature's definition of offense specifies facts which are 'necessary to constitute the crime,' due process and fundamental fairness, and the rationality that is a component of fundamental fairness, require that such facts be found by the jury beyond a reasonable doubt) (quoting *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970) . . .). Consequently, when the jury is instructed on the elements of a capital murder charge under K.S.A. 2l-3439(a)(4), the instruction must specify and set forth the elements of the underlying sex offense on which the conviction of capital murder depends." *State v. Carr*, No. 90,198, Brief of Appellant, 90-91.

This argument is correct. The portions of the capital murder instructions focused on K.S.A. 21-3439(a)(4) incorporated the elements from two other instructions, 37 and 39, that attempted to describe sex offenses against Holly G. rather than the victim of the murder. Although Judge Clark used the then-current PIK instruction on capital murder, he apparently did not fully grasp the import of the comments to that instruction, which included: "When defendant is charged with a capital murder done in the commission of or subsequent to another offense, the elements of the other offense should be set out in a separate instruction." PIK Crim. 3d

56.00-A (2002 Supp.). Instead, Judge Clark directed the jury to instructions that, although they were separate, dealt with crimes against a victim other than those who were the victims of the capital crimes. We note that the PIK Committee has now made the error committed here more obvious by placing the elements of the underlying offense against a capital murder victim in the capital murder instruction itself. See PIK Crim. 4th 54.020.

Numerous cases of this court have held that "[w]hen a statute makes the commission of a crime or the intent to commit a crime an element of another crime, the jury instructions must set out the statutory elements of the underlying offense." *State v. Richardson*, 290 Kan. 176, 182, 224 P.3d 553 (2010) (instructions should have identified, defined moving violations forming basis for charge of felony fleeing, attempting to elude police officer) (citing *State v. Rush*, 255 Kan. 672, 679, 877 P.2d 386 [1994] [when judge instructed on burglary, element of defendant knowingly entering building "with intent to commit a theft therein" mentioned; yet instruction failed to instruct jury completely on elements of theft]); *State v. Linn*, 251 Kan. 797, 801-02, 840 P.2d 1133 [1992] *superseded by statute on other grounds State v. Hedges*, 269 Kan. 895, 8 P.3d 1259 [2000] [aggravated burglary instruction must set out elements of offense intended by accused when making unauthorized entry]); see *State v. Rivera*, 48 Kan. App. 2d 417, 446-47, 291 P.3d 512 (2012) (defendant charged with involuntary manslaughter, endangering child; although elements of endangering child set out in instruction for that charge, error to omit them in instruction on involuntary manslaughter).

The disconnect between the K.S.A. 21-3439(a)(4) language in the capital murder instructions and the incorporated language in Instructions 37 and 39 on rape and aggravated criminal sodomy means that those portions of the capital murder instructions were incorrect statements of the governing law. Because a complete and accurate listing of the elements of the charged offense is fairly described as one of the most basic requirements of criminal jury instructions, one of the indispensable building blocks of any resulting conviction, see *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), under *Williams*, the instructions

were legally inappropriate; under *Stromberg* and *Yates*, they were legally inadequate. See *Griffin*, 502 U.S. at 55. For our purposes, we need not consider whether the instructions also were factually inappropriate.

Were we reviewing these instructions in isolation under *Williams*, we would next move to the reversibility under the "clearly erroneous" rubric. See *Williams*, 295 Kan. at 516. Under *Stromberg*, however, the next question is whether the other theory available to the jury was legally adequate. Consequently we turn to the alternatives based upon multiple homicides under K.S.A. 21-3439(a)(6) to determine whether they provided the jury a legally adequate alternative on which to base the capital convictions.

### K.S.A. 21-3439(a)(6) Multiplicity Evaluation

R. Carr challenges three of his four capital murder convictions, to the extent they were based on the multiple-homicide theory of K.S.A. 21-3439(a)(6), as multiplicitous.

"When an appellate court reviews a ruling on a double jeopardy or multiplicity issue, an unlimited scope of appellate review applies. *State v. Thompson*, 287 Kan. 238, 243, 200 P.3d 22 (2009); *State v. Harris*, 284 Kan. 560, Syl. ¶ 3, 162 P.3d 28 (2007)." *State v. Appleby*, 289 Kan. 1017, 1026, 221 P.3d 525 (2009). Such a claim raises a question of law. *State v. Scott*, 286 Kan. 54, 65, 183 P.3d 801 (2008) (quoting *Harris*, 284 Kan. 560, Syl. ¶ 3).

Multiplicity is the charging of a single offense in more than one count of a complaint or information. It creates the potential for multiple punishments for a single crime, offending the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. *Scott*, 286 Kan. at 65 (quoting *Harris*, 284 Kan. 560, Syl. ¶ 1).

Although neither defendant objected at trial to the State pursuing multiple capital murder convictions under K.S.A. 21-3439(a)(6), their multiplicity claim can be considered for the first time on appeal in order to serve the ends of justice and prevent a denial of fundamental rights. *Harris*, 284 Kan. at 569; *State v. Nguyen*, 285 Kan. 418, 433, 172 P.3d 1165 (2007) (addressing mul-

tiplicity claim for first time on appeal because it implicates fundamental right not to be placed in jeopardy twice for same offense). In addition, K.S.A. 2013 Supp. 21-6619(b) requires us to "consider . . . any errors asserted" in a death penalty case.

All four capital convictions against the defendants rest, at least in part, on a jury finding that each defendant intentionally and with premeditation killed more than one person under K.S.A. 21-3439(a)(6). The State concedes that only one capital conviction under this statutory subsection can stand, and that the three others, to the extent they rest on that theory, are multiplicitous. See *Harris*, 284 Kan. at 571-78 (unit of prosecution under K.S.A. 21-3439[a][6] is more than one killing; more than one victim required to have prosecutable offense; killing of second, subsequent victim makes murder of group of victims punishable by death).

Under the language of the amended complaint and the jury instructions in this case, in order to avoid double jeopardy under the federal and state constitutions, R. Carr could be convicted and punished for only one count of capital murder under K.S.A. 21-3439(a)(6) for the killing of all four victims. The jury's reliance on 21-3439(a)(6) to undergird his three other capital convictions was, therefore, legally inadequate under *Stromberg* and *Yates*.

We turn next to whether any of the capital convictions may yet stand because the constitutional error identified in *Stromberg* and *Yates* can be deemed harmless. See *Hedgpeth v. Pulido*, 555 U.S. 57, 60-61, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008) (*Stromberg*, *Yates* predated United States Supreme Court's recognition in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967], of harmlessness of some constitutional error; error not structural, subject to harmless error test).

Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. The issue is not whether the jury would have reached a different verdict but rather whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24.

We begin by recalling that *Zant*, 462 U.S. at 881-82, identified two possible errors derived from *Stromberg*—one being that the jury *may* have chosen to base a conviction on a legally inadequate ground rather than the otherwise legally adequate grounds permitted in the instructions, and one being that a jury *did* rely on both an adequate and inadequate ground.

The jury had the option under Section 1 on Guilt of Capital Murder to circle A "and/or" B on the forms, indicating its finding that the State had proved both or just one theory of capital murder. Option A was sex crime-based capital murder under K.S.A. 21-3439(a)(4), and Option B was multiple-homicide capital murder under K.S.A. 21-3439(a)(6). The jury circled both options for each of the four victims.

On three of four of the capital verdict forms, because of the "and/or" between A and B on the verdict forms submitted to the jury, it was permitted to find guilt by selecting a legally inadequate ground under the K.S.A. 21-3439(a)(4) instructions or a legally inadequate ground on the K.S.A. 21-3439(a)(6) multiplicitous charges. Because the jury circled both A and B, we know that the jury's four guilty verdicts on capital murder counts actually were based on both subsections of the statute. This resembles the second type of *Stromberg* error, because we know the jury relied on a legally inadequate ground. And since there was no legally adequate ground presented on three of those charges, we conclude that three of the four capital convictions must be reversed.

On R. Carr's remaining capital conviction, we are convinced that reversal is unnecessary under *Chapman's* harmless error standard.

We have two reasons for this holding.

First is the last line of the jury instructions given by Judge Clark: "Your agreement upon a verdict must be unanimous." When this sentence is read in conjunction with the "and/or" language on the verdict forms, we believe the most sensible and by far most likely construction is that neither A nor B could be circled if jurors did not unanimously vote for guilt on the individual theory following that letter designation. There is nothing in the instructions or verdict form indicating that jurors were told or would have understood that they were free to cobble together theories to get 12 votes for

guilt. This means that one of the jury's unanimous verdicts on the K.S.A. 21-3439(a)(6) multiple-homicide theory was not polluted by either instruction error or multiplicity. This convinces us beyond a reasonable doubt that the instructional error on the sex-crime alternative for this count did not contribute to the verdict obtained on the valid multiple-homicide alternative.

Second is the nature of the evidence on the capital murders. There was no possible dispute that four persons were shot and killed in the early morning of December 15, 2000, while kneeling side by side in the snow. The essence of R. Carr's defense was that Holly G.'s identification of him was mistaken and that he was not one of the two men who participated in these shootings or the crimes that preceded them. He did not, and could not, credibly assert that only Heather M. or only Aaron S. or only Brad H. or only Jason B. died. This reinforces our decision to affirm one of the K.S.A. 21-3439(a)(6) convictions. That subsection of the statute focuses on multiple homicides; it is the fact that more than one person is killed that elevates the crime from premeditated first-degree murder to a death-eligible crime. The jury in this case, indeed, no jury who heard the same evidence as that put on in this case, could have concluded this was not a multiple-homicide situation. There was nothing about the instructions or verdict forms used here that could have altered that reality.

We are left with the task of specifying, for procedure's sake, the conviction that will be upheld. We note in doing so that the manner in which the State charged the multiple murder counts ties each charge to a particular victim when, in fact, it was the murder of all four victims that is punishable by death. Because the charge alleging the capital murder of Heather M. was the first in the amended complaint, the jury instructions, and the verdict forms, we choose that conviction to uphold. In doing so, we wish to make clear that we are upholding R. Carr's capital conviction for the murder of all four of the victims.

## 10. SPECIAL UNANIMITY INSTRUCTION ON CAPITAL MURDER

R. Carr asserts on appeal that the jury should have been given a special unanimity instruction on alternative capital murder

charges based on K.S.A. 21-3439(a)(4) because jurors may not have understood that they needed to be unanimous on the sex crime underlying each capital murder charge under this subsection.

R. Carr's argument reflects a misunderstanding of the difference between a multiple acts issue and an alternative means issue. They differ in critical ways. See *State v. Becker*, 290 Kan. 842, 854-55, 235 P.3d 424 (2010).

At most, if more than one possible sex crime underlay each capital murder charge based on K.S.A. 21-3439(a)(4), that would set up the possibility of an alternative means issue, requiring the State to put on sufficient evidence of each sex crime as a means of committing the one capital murder charged. See *State v. Brown*, 295 Kan. 181, 196-97, 284 P.3d 977 (2012).

If more than one possible sex crime underlay each capital murder charge based on K.S.A. 21-3439(a)(4), that would not set up a multiple acts issue requiring a special unanimity instruction or an election by the prosecution. See *State v. Ultreras*, 296 Kan. 828, 854-55, 295 P.3d 1020 (2013); *State v. Voyles*, 284 Kan. 239, Syl. ¶ 2, 160 P.3d 794 (2007). There was a single offense committed for each of the alternative K.S.A. 21-3439(a)(4) capital murders charged in this case, *i.e.*, the killing of each of the four victims of the quadruple homicide.

Having made these preliminary comments, we decline to further discuss the merits of this issue because it is moot. See *State v. Dominguez*, 299 Kan. 567, 593, 328 P.3d 1094 (2014) (appellate courts do not generally decide moot questions). We have already ruled that instructions on the K.S.A. 21-3439(a)(4) alternative capital murder charges were legally unsound and, to the extent R. Carr's s four capital convictions rested upon them, they have to be reversed.

## 11. SEX OFFENSES AS LESSER INCLUDED OFFENSES OF CAPITAL MURDER

R. Carr argues that his convictions for certain sex offenses must be reversed because the sex offenses constitute lesser included offenses of capital murder under K.S.A. 21-3439(a)(4). Because we have decided that all of the capital convictions, to the extent they

rested upon this subsection of the statute, must be reversed because of fatal instruction error, we need not reach this lesser included offenses argument. It is moot, and appellate courts do not generally decide moot questions. See *Dominguez*, 299 Kan. at 593.

### 12. SUFFICIENCY OF EVIDENCE OF AGGRAVATED BURGLARY

J. Carr has challenged the sufficiency of evidence to prove aggravated burglary of the Birchwood home in his separate appeal. We treat this issue as potential unassigned error in this appeal on behalf of R. Carr. See K.S.A. 2013 Supp. 21-6619(b). Because the defendants were tried together on the same evidence in support of the same complaint and under the same jury instructions, the legal arguments made on behalf of one defendant on this issue apply equally to the other. Under K.S.A. 2013 Supp. 21-6619(b), which permits us to notice unassigned error in a capital case, we take up all defense arguments in this opinion on the Birchwood crimes, regardless of whether any individual argument was raised first by R. Carr or by J. Carr.

Our standard of review on sufficiency of the evidence is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Lopez*, 299 Kan. 324, 328, 323 P.3d 1260 (2014) (citing *State v. Harris*, 297 Kan. 1076, 1081, 306 P.3d 282 [2013], and *State v. Qualls*, 297 Kan. 61, Syl. ¶ 1, 298 P.3d 311 [2013]).

Aggravated burglary requires entering into or remaining within any occupied structure without authority and with intent to commit a felony therein. See K.S.A. 21-3716. The defense argues that there was no evidence in this case that the defendants entered into or remained within the Birchwood home without authority.

We disagree. Even the most serious crime can be proved by circumstantial evidence. See *Lopez*, 299 Kan. at 332 (citing *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 [2002]). And, here, there was abundant evidence, albeit circumstantial, that the defendants entered into and remained within the home without authority.

Although Holly G. did not see the defendants enter the house from the outdoors, she testified that Jason B. had locked up and turned out the front porch light, that he and she had retired to his bedroom for the night, and that the porch light came back on and she heard Aaron S.'s voice and another voice she did not recognize. Right away, she said, the door to Jason B.'s bedroom burst open and the defendants, both holding guns, entered. One of them ripped the covers off the bed. The other brought Aaron S. into the room, holding him by the back of his shirt, and threw him onto the bed. Both defendants started shouting questions and orders. Brad H. had to be brought in from his bedroom in the basement of the home. Heather M. had to be brought in from Aaron S.'s bedroom. This testimony certainly supported an inference that any other visitor was unexpected and unwelcome.

It is true that Holly G. did not testify that any of the Birchwood victims ever demanded or requested that the defendants leave the home, but the absence of such an explicit demand or request, given the guns that the defendants persisted in waving around and their intermittent oral threats, cannot be equated with permission for their continued presence in the home.

The cases cited by the defense are distinguishable and unconvincing. See *State* v. *Hall,* 270 Kan. 194, 14 P.3d 404 (2000); *State* v. *Gutierrez,* 285 Kan. 332, 172 P.3d 18 (2007). They deal with situations in which defendants entered structures when they clearly had permission to do so and the issue was whether permission was withdrawn. The evidence before the jury in this case, viewed in the light most favorable to the State, supported a reasonable inference that Aaron S. responded to a knock at the front door and was met by two armed men who immediately threatened him with guns and entered without consent, taking him captive as they did so. It also supports the inference that the armed men remained in the home without permission, but only by terrorizing Holly G. and the four other victims.

This issue is without merit.

## 13. COERCED VICTIM-ON-VICTIM ACTS

Under assorted issue headings in their briefs to this court, the

defendants have argued that there are three types of infirmities in their rape and attempted rape convictions on charges in which the defendants are alleged to have forced one of the Birchwood victims to engage in a sex act with another victim, *i.e.*, "victim-on-victim" acts. The three types are: charging deficiency in the amended complaint; jury instruction error that mimicked the charging deficiency; and insufficiency of evidence.

*Additional Factual and Procedural Background*

The victim-on-victim rape and attempted rape counts as charged by the State in the amended complaint were: Count 25 for rape of Holly G. for her coerced digital penetration of Heather M.; Count 26 for rape of Heather M. for her coerced digital penetration of Holly G.; Count 29 for rape of Holly G. for her coerced sexual intercourse with Brad H.; Count 30 for rape of Brad H. for his coerced sexual intercourse with Holly G.; Count 31 for rape of Holly G. for her coerced sexual intercourse with Jason B.; Count 32 for rape of Jason B. for his coerced sexual intercourse with Holly G.; Count 33 for rape of Holly G. for her coerced sexual intercourse with Aaron S.; Count 34 for rape of Aaron S. for his coerced sexual intercourse with Holly G.; Count 35 for attempted rape of Aaron S. for his coerced attempted sexual intercourse with Heather M.; Count 36 for attempted rape of Heather M. for her coerced attempted sexual intercourse with Aaron S.; Count 37 for attempted rape of Jason B. for his coerced attempted sexual intercourse with Heather M.; Count 38 for attempted rape of Heather M. for her coerced attempted sexual intercourse with Jason B.; Count 39 for attempted rape of Brad H. for his coerced attempted sexual intercourse with Heather M.; and Count 40 for attempted rape of Heather M. for her coerced attempted sexual intercourse with Brad H. Count 41 for rape of Holly G. based on her coerced digital penetration of herself will be addressed separately below.

The language of each of the rape counts for victim-on-victim sex acts followed an identical pattern, typified by the first among them, Count 25:

"[O]n or between the 14th day of December, 2000, A.D., and the 15th day of December, 2000, A.D., in the County of Sedgwick, State of Kansas, one REGIN-

ALD D. CARR a/k/a REGGIE CARR and JONATHAN D. CARR a/k/a JONA-THAN HARDING did then and there unlawfully, cause H[olly] G. to commit an act of sexual intercourse by digital penetration of the vagina of Heather [M.] while H[olly] G. did not consent to the sexual intercourse when H[olly] G. was overcome by force or fear; . . . .

*"Contrary to Kansas Statutes Annotated 21-3502(1)(a), Rape . . . ."*

In other words, the amended complaint accused the defendants of causing one of the five persons at the Birchwood home to engage in sexual intercourse with another of the persons at the Birchwood home, when the person caused to engage in the act did not consent and was overcome by force or fear.

The attempted rape counts contained the same causation language and allocated the roles among the participants in the same way. But, instead of alleging sexual intercourse, they alleged an overt act toward commission of sexual intercourse.

None of the victim-on-victim charges of rape or attempted rape stated that the second Birchwood participant did not consent or was overcome by force or fear.

Before trial, R. Carr moved to dismiss the victim-on-victim charges for rape and attempted rape, alleging that the complaint failed to allege criminal conduct under Kansas' rape statute. According to R. Carr, Kansas' rape statute did not criminalize the act of forcing two nonconsenting persons to engage in sexual intercourse. The district court denied the motion, saying, " '[H]e who acts through another acts himself.' "

The trial evidence in support of each of the victim-on-victim rapes and attempted rapes came from Holly G.'s description of the events at the Birchwood home. This evidence did not differentiate between the defendants or parse their individual contributions to the causation described in the amended complaint.

Each of the judge's instructions for the victim-on-victim sex crimes also followed an identical pattern, typified by the first among them, Instruction No. 37, on which Holly G. was the designated victim:

"Each defendant is charged in [Count 25] with the crime of Rape. Each defendant pleads not guilty.

"To establish this charge against an individual defendant, the following elements must be proved. Each must be proved beyond a reasonable doubt.
1. That the defendant caused H[olly]G. to commit an act of sexual intercourse with Heather [M.];
2. That the act of sexual intercourse was committed without the consent of H[olly]G. under circumstances where she was overcome by force or fear; and . . . ."

Again, none of the instructions for the victim-on-victim sex crimes stated that the second participant in the completed or attempted rape did not consent or was overcome by force or fear. The person designated as the victim in each instruction was the person caused to engage in the criminal act perpetrated upon his or her friend.

In addition, Instruction No. 8 informed the jury that:

"A person who, either before or during its commission, intentionally aids, abets, advises, or counsels another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the person's participation, if any, in the actual commission of the crime.

. . . .

"A person who, either before or during its commission, intentionally counsels, procures or uses force or the threat of force to compel another to commit a crime is responsible for the crime although the other who directly committed the act constituting the crime lacked criminal or legal capacity."

The verdict forms for each of these crimes simply gave the jury the option of choosing guilty or not guilty of the crime against the victim designated in the relevant instruction.

*The Standard of Review and the Controlling Statutes*

Resolution of this issue requires us to interpret the rape, aggravated criminal sodomy, attempt, and criminal liability statutes; and interpretation of a statute raises a question of law subject to unlimited review on appeal. See *State v. Johnson*, 297 Kan. 210, 215, 301 P.3d 287 (2013).

In addition,

" '[i]t has long been the rule in Kansas that all crimes are established by legislative act. There are no common law crimes in the state, and there can be no conviction except for such crimes as are defined by statute. *State v. Young*, 55 Kan. 349, 356, 40 P. 659 (1895).'

" 'It is also the rule in this state that a criminal statute will not be "extended by courts to embrace acts or conduct not clearly included within its prohibitions." *State v. Doyen*, 224 Kan. 482, 488, 580 P.2d 1351 (1978).' " *State v. Stewart*, 281 Kan. 594, 598, 133 P.3d 11 (2006) (quoting *State v. Sexton*, 232 Kan. 539, 542-43, 657 P.2d 43 [1983]).

K.S.A. 21-3502 sets out the elements of rape. Its subsection (a)(1)(A) defines the crime as "[s]exual intercourse with a person who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." K.S.A. 21-3501(1) defines "sexual intercourse" as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse."

An attempt, under K.S.A. 21-3301(a), is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

K.S.A. 21-3205 provides:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

. . . .

"(3) A person liable under this section may be charged with and convicted of the crime although the person alleged to have directly committed the act constituting the crime lacked criminal or legal capacity or has not been convicted or has been acquitted or has been convicted of some other degree of the crime or of some other crime based on the same act."

*Charging Deficiency*

Because defendants filed a pretrial motion to question whether these counts in the amended complaint charged crimes under Kansas law, we apply the standard that predates our opinion in *State v. Hall*, 246 Kan. 728, 764-65, 793 P.2d 737 (1990), *overruled on other grounds Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003) (charging document challenge raised for first time on appeal must meet higher burden). See *State v. Reyna*, 290 Kan. 666, 677, 234 P.3d 761 (2010). Under the pre-*Hall* standard, " '[A] conviction based upon an information which does not sufficiently charge the offense for which the accused is convicted is void.' " *State v.*

*Schultz,* 252 Kan. 819, 835, 850 P.2d 818 (1993) (quoting *State v. Bird,* 238 Kan. 160, 166, 708 P.2d 946 [1985]). This issue presents a question of law over which this court's review is unlimited. *Reyna,* 290 Kan. at 675.

In all of the counts challenged, the defendants were charged with "causing" the victim of the rape or attempted rape to rape or attempt to rape another person. The State identified the victim in each count by denoting the individual who did not consent to the sexual intercourse and who had been overcome by force or fear. The individual counts did not identify whether the other person involved did not consent or was overcome by force or fear. The defendants did not personally, physically rape or attempt to rape anyone under these counts. The coercion described in each count was exerted by the defendants only on the victim.

We see several interrelated problems with these charges.

First, our rape statute does not make causing a rape to be committed a crime. This is in contrast to other Kansas statutes, such as the one defining aggravated criminal sodomy. See K.S.A. 21-3506(a)(3)(A) (crime includes "causing a person, without the person's consent, to engage in sodomy with any person . . . [w]hen the victim is overcome by force or fear). Here, each defendant was properly charged, tried, and convicted of two counts of aggravated criminal sodomy for causing Holly G. to perform oral sex on Heather M. and for causing Heather M. to perform oral sex on Holly G. The aggravated criminal sodomy statute and the two counts borrowing from its language make clear that the victim is the person unwillingly caused to engage in the sexual conduct by the defendants. The rape statute does not.

Second, the State's eventual intermittent invocation of aiding and abetting theory under K.S.A. 21-3205(1) does not cure the charging deficiency, because aiding and abetting theory requires the existence of a principal. Aiding and abetting presupposes the existence of more than one actor, the defendant and the principal he or she assists. See *United States v. Townsend,* 924 F.2d 1385, 1394 (7th Cir. 1991). " '[T]o establish guilt on the basis of aiding and abetting, the State is required to show that a defendant knowingly associated with the unlawful venture and participated in such

a way as to indicate that [the defendant] was facilitating the success of the venture.' " *State v. Robinson*, 293 Kan. 1002, 1038, 270 P.3d 1183 (2012) (quoting *State v. Baker*, 287 Kan. 345, 366, 197 P.3d 421 [2008]). There was no principal for the defendants to have intentionally aided, abetted, advised, hired, counseled or procured to commit the crimes under the language of these charges. The only person aided, abetted, advised, hired, counseled, or procured was the person each charge identified as the victim of the crime.

The State also has attempted to rely on innocent agent theory under K.S.A. 21-3205(3). At first, it attempted to persuade us that the victim of each of these crimes also qualified as the defendants' innocent agent who committed the crimes at their behest. This theory is inconsistent with our precedent on innocent agency.

Our leading case on innocent agent theory is *State v. Doyen*, 224 Kan. 482, 580 P.2d 1351 (1978). In that case, we held that Ross Doyen, a candidate for reelection to the Kansas Senate, could not be convicted of fraudulent campaign finance reporting after withholding campaign contributions from his treasurer. 224 Kan. at 491. The State charged Doyen with "causing false campaign finance reports to be filed" in violation of K.S.A. 25-4129, which prohibited intentionally making any false material statement in a campaign finance report. 224 Kan. at 484. The State also maintained that Doyen was liable as an aider and an abettor or under an innocent agent theory.

We rejected each of the State's three arguments. First, the statutory definition of the crime did not support criminal culpability for "causing" fraudulent reporting. 224 Kan. at 488. The theory of the case thus required impermissible judicial extension of the conduct prohibited by the legislature. 224 Kan. at 488-89. Second, the State's aiding and abetting theory of the case failed because the treasurer had acted in good faith and fully and timely reported all contributions known to him. We explained: "The rule which holds an aider and abettor liable is thus not applicable since, under the facts of this case, there is no other person who committed a crime as the principal who was aided and abetted by the defendant Doyen." 224 Kan. at 490. Finally, the State's innocent agent theory failed because, as a candidate, Doyen was outside of the class of

persons contemplated by the statute and could not himself violate it. 224 Kan. at 490-91.

"[A]s a general rule, if a person causes a crime to be committed through the instrumentality of an innocent agent, he is the principal in the crime and punishable accordingly . . . . This general rule is applicable . . . only in factual situations where the defendant could be found guilty as a principal if he committed the act himself." *Doyen*, 224 Kan. at 490.

Doyen could not be found guilty as a principal if he committed the act himself, because the statute did not make him responsible for filing campaign finance reports. Only the campaign treasurer had that responsibility. 224 Kan. at 488.

As in *Doyen*, the governing statute does not make causing rape, as charged here, a crime. The purported principal, *i.e.*, the person caused to commit rape or attempted rape, could not be convicted of the crime because, like Doyen's campaign treasurer, he or she did not possess even general criminal intent to commit the *actus reus* necessary for the crime. See *State v. Brown*, 291 Kan. 646, 654, 244 P.3d 267 (2011) (*mens rea* for rape general intent); see also *People v. Hamlin*, 170 Cal. App. 4th 1412, 1460, 89 Cal. Rptr. 3d 402 (2009) (duress can negate intent, capacity to commit crime). Neither R. Carr nor J. Carr could be found guilty as a principal because, as with Doyen and the finance report filings, they did not physically participate in the completed or attempted crime.

More recently, the State also has argued that the innocent agent in each of these scenarios was the person upon whom the defendants caused the crimes to be perpetrated, *e.g.*, Heather M. in Count 25. Given the facts as ultimately testified to by Holly G., this could have been properly charged under our rape statute, but it was not. See Kadish, *Complicity, Cause and Blame: A Study in the Interpretation of Doctrine*, 73 Cal. L. Rev. 323 (1985) (discussing difficulty of charging certain crimes when agency of another required). There is no question that the conduct the State attempted to punish demonstrated depravity on the part of the two intruders. But the language in each of the counts under examination stated only that the defendants compelled the victim to commit an act; it said nothing about how the other participant or anticipated participant in the *actus reus*, *i.e.*, the sexual intercourse,

came to be involved. The counts certainly did not treat the other participant as an essential component of the crime, the agent without whom the defendants committed no crime under Kansas law.

These charging weaknesses made certain problems of proof and jury instructions nearly inevitable. But we need not reach those problems today because we hold that the charging deficiencies deprived the district court of subject matter jurisdiction. This renders R. Carr's convictions on Counts 25, 26, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40 void.

Two final points bear mention.

The State is correct that the Kansas rape statute is gender-neutral on the identity of the rapist and the person raped. It is legally possible for a female to rape a male. See *State v. Brooks*, 46 Kan. App. 2d 601, 616, 265 P.3d 1175 (2011). But the definition of sexual intercourse in K.S.A. 21-3501(1) incorporated by the rape statute is anatomically specific; it makes the participation of a female indispensable, because it requires penetration, however slight, of a woman's sex organ. Thus a male can only rape another male with female participation—whether contributed by a willing criminal confederate whom he aids and abets; a coerced participant, as here; or by one willing to participate in the sex act but unaware of the defendant's nefarious behavior. The accused male can aid and abet a female principal, or he can act as a principal by employing a female agent, but he cannot accomplish the crime as defined by our legislature without her. Of course, a male can also aid and abet a male principal, regardless of how the principal commits the crime.

Count 41 of the amended complaint charged rape of Holly G. based on her digital penetration of herself after J. Carr told her to "get [herself] wet." Count 41, despite defense argument to the contrary, does not suffer from the same deficiencies as the vacated victim-on-victim rape and attempted rape counts. First, it is distinct because no second victim is involved. Also, again, it is possible under Kansas law for an accused male to be criminally culpable as the principal in a rape of an unwilling female victim overcome by force or fear, even though the accused has acted through an innocent agent to accomplish penetration by the required finger,

male sex organ, or object. As Count 41 charged, Holly G. was both the female victim whose sex organ was penetrated and the innocent agent who achieved penetration for the principal, J. Carr; and R. Carr was J. Carr's accomplice.

### 14. Sufficiency of Evidence on Count 41

In J. Carr's separate appeal, he has challenged the sufficiency of evidence to support his conviction on Count 41. Because R. Carr also was convicted on Count 41 as an aider and abettor, we notice this unassigned potential error in his appeal under K.S.A. 2013 Supp. 21-6619(b).

On a sufficiency claim we determine whether, viewing all of the evidence in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

J. Carr's argument is that Holly G.'s testimony was inadequate to establish that he "ordered her to commit an act of penetration, or that he even suggested it." In his view, because other options were available to Holly G. to accomplish the end he desired, the State did not prove rape beyond a reasonable doubt.

The Count 41 rape was charged under K.S.A. 21-3502(a)(1)(A), which defines rape as "[s]exual intercourse with a person who does not consent" under circumstances when "the victim is overcome by force or fear." K.S.A. 21-3501(1) defines "sexual intercourse" as "any penetration of the female sex organ by a finger, the male sex organ or any object."

As discussed in Section 13 of this opinion, the Kansas rape statute is gender-neutral on the identity of the penetrating participant. The finger used for a digital rape need not belong to a male. See K.S.A. 21-3502; *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010) (defendant convicted in digital rape case female). But the definition of sexual intercourse under Kansas law requires the participation of a female so that the necessary penetration of a female sex organ can occur. See K.S.A. 21-3501(1).

In addition, it is possible under Kansas law for an accused male to be criminally culpable as the principal in a rape of an unwilling

female victim overcome by force or fear, even though the accused has acted through a—willing or unwilling, innocent or not-so-innocent—agent to accomplish penetration by the required finger, male sex organ, or object. See K.S.A. 21-3205(1); K.S.A. 21-3205(3).

On the facts of this case, according to the State, Holly G. was both the female whose sex organ was penetrated and the innocent agent who achieved penetration for the principal, J. Carr. The State asserts that its proof of all of the other rapes committed at the Birchwood residence permitted the jury to draw a reasonable inference that J. Carr's intent when he ordered Holly G. to "get [herself] wet" was for her to do exactly as she did.

Although there may have been nonpenetration options available to Holly G. when J. Carr issued his order to her, we agree with the State. Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational factfinder could have convicted J. Carr as the principal and R. Carr as the aider and abettor on Count 41.

### 15. MULTIPLICITY OF COUNTS 41 AND 42

Neither R. Carr nor J. Carr raises an issue on appeal of whether their convictions of rape on both Counts 41 and 42 in the amended complaint are multiplicitous. Under the authority of K.S.A. 2013 Supp. 21-6619(b), we notice this unassigned error as to each defendant—in this appeal for R. Carr as the aider and abettor and in J. Carr's separate appeal as the principal.

As discussed in Section 14, the Count 41 rape charge was based on Holly G.'s digital penetration of herself when J. Carr commanded that she "get [herself] wet." The Count 42 rape charge was based on J. Carr's penile rape of Holly G. immediately after she digitally penetrated herself.

When digital penetration is used to "assist" in accomplishing [the] ultimate goal of penile penetration, they are not factually separate; they constitute unitary conduct. See *State v. Weber*, 297 Kan. 805, 810-11, 304 P.3d 1262 (2013); *State v. Colston*, 290 Kan. 952, 964, 235 P.3d 1234 (2010). The digital penetration and penile penetration that form the basis for Counts 41 and 42 will not sup-

port two convictions here, and thus Count 42 must be reversed. See *State v. Scott*, 286 Kan. 54, 68, 183 P.3d 801 (2008) (reversal of multiplicitous conviction appropriate remedy).

### 16. ACCOMPLICE CULPABILITY FOR CODEFENDANT'S SEX CRIMES

R. Carr does not argue on appeal that the evidence was insufficient to convict him as an aider and abettor of J. Carr's rapes and attempted rape of the two female Birchwood victims. But J. Carr does raise an aider and abettor sufficiency claim in his separate appeal, arguing that the State's evidence did not support his guilt beyond a reasonable doubt for R. Carr's rape and aggravated criminal sodomy of Holly G.

Because the evidence underlying all of these sex crimes was substantially similar in one respect—Holly G. did not testify that the codefendant aider and abettor had actual, contemporaneous knowledge of the commission of the crime by the principal or that the aider and abettor was present in the immediate vicinity of the principal and the victim during the sex act—we notice this unassigned aider and abettor sufficiency claim for R. Carr under the authority of K.S.A. 2013 Supp. 21-6619(b).

*Additional Factual and Procedural Background*

Counts 41 and 42 apparently charged rape of Holly G. by J. Carr, with R. Carr as the aider and abettor. The conduct leading to these counts, according to Holly G.'s testimony, occurred outside of Jason B.'s bedroom near the wet bar while the second intruder was out of the home to take Brad H. to make ATM withdrawals. Count 43 apparently charged attempted rape of Heather M. by J. Carr, with R. Carr as aider and abettor, during the same time window.

Holly G. was the third person taken out of the home to make ATM withdrawals. At the time of her trip with the second intruder, whom she later identified as R. Carr, both intruders had already actively participated in coercing the victims to perform sex acts with each other while the intruders watched. During the ATM trip, the second intruder asked Holly G. whether the first intruder had raped her during his absence from the home. When she said yes,

he asked her whether the rape had been her first sexual experience with a black man and, particularly perversely, how she would rate its comparative quality.

Soon after the second intruder finished his fourth trip to the ATM, he raped and sodomized Holly G. in the dining room of the home. Count 44 apparently charged this rape by R. Carr, with J. Carr as the aider and abettor. Count 45 charged aggravated criminal sodomy of Holly G., apparently by R. Carr, with J. Carr as the aider and abettor. These two crimes took place in the dining room of the home. Holly G. did not testify about J. Carr's exact position in the home during the commission of these crimes.

The second intruder evidently was near Holly G. when she went to the bathroom after he had raped and sodomized her. When Holly G. opened the door to the bathroom, she witnessed the first intruder raping Heather M. and was ordered to shut the door. This rape of Heather M. apparently was charged in Count 46, with R. Carr as the aider and abettor. After J. Carr had finished with Heather M., he raped Holly G. in the bathroom as well. This rape apparently was charged in Count 47.

*Evidence in Support of Charges*

Again, on a sufficiency claim we determine whether, viewing all of the evidence in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *McCaslin*, 291 Kan. at 710.

There was abundant evidence in this case to support the jury's conviction of R. Carr as an aider and abettor of J. Carr on Counts 41, 42, 43, 46, and 47.

All of Holly G.'s testimony about what occurred during the intruders' time at the Birchwood residence described their concerted, joint action and mutual encouragement. Even when they were temporarily in different rooms of the home, and even when the second intruder left the residence four times to take individual victims to make ATM withdrawals, the two intruders encouraged and enabled one another in the commission of all of the sex crimes.

The evidence of the second intruder's conversation with Holly G. during their ATM trip is especially telling—strongly indicative of his approval of and willingness to facilitate the first intruder's sexual violence. Knowing what the second intruder knew when he returned to the home with Holly G., there is no evidence that he did anything to discourage or disapprove of the first intruder. On the contrary, he eventually joined in by raping and sodomizing Holly G. himself, implicitly endorsing the first intruder's similar behavior. The second intruder also did nothing to intervene in Heather M.'s rape by the first intruder, even though it is likely he became aware of it when Holly G. became aware of it. Finally, there is no testimony that he uttered a word of protest when the first intruder then raped Holly G.

It is simply not necessary that an aider and abettor be contemporaneously aware that his or her principal is committing a crime that the aider and abettor has encouraged or facilitated. It also is not necessary that an aider and abettor be in the immediate vicinity of the principal and the victim during commission of the crime. See K.S.A. 21-3205; *State v. Wilson*, 221 Kan. 359, 366, 559 P.2d 374 (1977) (driver of get-away vehicle intentionally aids, abets in commission of crime, may be charged with, convicted of crime despite not participating at scene); *State v. Dunn*, 243 Kan. 414, 430, 758 P.2d 718 (1988) (same).

R. Carr is not entitled to reversal of his convictions on Counts 41, 42, 43, 46, and 47 for insufficiency of the evidence. His conviction on Count 42 must be reversed as multiplicitous with his conviction on Count 41, as fully discussed in Section 15 of this opinion.

### 17. SUBJECT MATTER JURISDICTION ON ATTEMPTED RAPE

R. Carr challenges his conviction on Count 43 of the amended complaint, an attempted rape of Heather M., arguing that this count did not name him as a perpetrator and thus failed to confer subject matter jurisdiction on the district court.

The State argues that, if a jurisdictional defect existed in the complaint, it was one of personal rather than subject matter jurisdiction and that R. Carr's failure to challenge the defect in a pretrial

motion waived any claim of error. The State bases its argument on a reading of the complaint as a whole, observing that the caption of the amended complaint contained R. Carr's name, and that, unlike the three counts charging criminal possession of a firearm against R. Carr, which do not contain J. Carr's name at all, Count 43 does contain R. Carr's name in its text.

### Additional Factual and Procedural Background

Of the 58 counts in the amended complaint, 54 allege that both R. Carr and J. Carr committed the subject crime. Of the remaining four counts, three are the charges against R. Carr alone on criminal possession of a firearm. The remaining count, Count 43, reads:

"[A]nd on or between the 14th day of December, 2000, A.D., and the 15th day of December, 2000, A.D., in the County of Sedgwick, State of Kansas, one JONATHAN D. CARR a/k/a JONATHAN HARDING did then and there unlawfully, towards the perpetration of the crime of Rape, as defined by K.S.A. 21-3502, commit the following overt act, to wit: attempt to cause Heather [M.] to engage in an act of sexual intercourse with REGINALD D. CARR a/k/a REGGIE CARR and JONATHAN D. CARR a/k/a JONATHAN HARDING while Heather [M.] did not consent to said sexual intercourse while Heather [M.] was overcome by force or fear, with the intention to commit said crime;

. . . .

*Contrary to Kansas Statutes Annotated 21-3301 and 21-3502(1)(a), Attempted Rape, Severity Level 3, Person Felony, Count Forty-Three*"

In contrast, all other charges stemming from the Birchwood crimes begin with the words: "[A]nd on or between the 14th day . . . , one REGINALD D. CARR a/k/a REGGIE CARR and JONATHAN D. CARR a/k/a JONATHAN HARDING did then and there unlawfully . . . ."

The jury instruction on the amended complaint's Count 43 said that "each defendant" was charged with the attempted rape of Heather M., *i.e.*, it did not contain the same error alleged in the complaint. And the jury found R. Carr guilty.

It is apparent that the State intended to charge both defendants for each crime in the amended complaint, one on the theory that he was the principal and one on the theory that he was the aider and abettor, with the exception of the three counts for criminal possession of a firearm. The original complaint charged only R.

Carr with aggravated criminal sodomy of Holly G. and only J. Carr with rape of Holly G. In contrast, Counts 42 and 44 of the amended complaint each charge both defendants with rape of Holly G. Count 45 of the amended complaint charges both defendants with aggravated criminal sodomy.

The jury was instructed that a person who "intentionally aids, abets, advises, or counsels another to commit a crime" is criminally responsible for those crimes, as well as any other crime that "was reasonably foreseeable." R. Carr's appellate challenges to this instruction are discussed in Section 25 of this opinion.

*Personal or Subject Matter Jurisdiction*

A jurisdictional issue raises a question of law over which we exercise unlimited review. See *State v. Alonzo*, 296 Kan. 1052, 1054, 297 P.3d 300 (2013).

Jurisdiction is typically divided into two separate components—personal and subject matter. *State v. Bickford*, 234 Kan. 507, 508, 672 P.2d 607 (1983). A court must be vested with both types of jurisdiction in order to act. 234 Kan. at 508-09. Personal jurisdiction requires that a "party must appear generally or submit to the jurisdiction of the court" and subject matter jurisdiction authorizes the court to hear and determine a case. 234 Kan. at 509.

Generally, an accused who pleads to the merits of the action "waives all objections with respect to the court's jurisdiction of his person." *State v. Wharton*, 194 Kan. 694, 696, 401 P.2d 906 (1965) (citing 22 C.J.S., Criminal Law § 162, p. 421; 4 Wharton's Criminal Law and Procedure, § 1890, p. 759 [1957]). The State contends this is exactly what R. Carr did here. In contrast, the issue of subject matter jurisdiction may be raised at any point by any party, even the court. *State v. Patton*, 287 Kan. 200, 205, 195 P.2d 753 (2008).

The State is incorrect on whether Kansas treats this type of alleged defect as a matter of personal or subject matter jurisdiction. If the omission here truly qualifies as an omission of R. Carr's name from the charge, we believe there is a subject matter jurisdiction problem. See *State v. Breedlove*, 285 Kan. 1006, 1013, 179 P.3d 1115 (2008) (citing *State v. Johnson*, 283 Kan. 649, 656, 156 P.3d 596 [2007] [court without jurisdiction when jury instructed on

crime not originally charged, nor lesser included of crime originally charged]; *State v. Elliott*, 281 Kan. 583, Syl. ¶ ¶ 1, 2, 133 P.3d 1253 [2006] [municipal courts without subject matter jurisdiction over felony driving under the influence]; *State v. Belcher*, 269 Kan. 2, 8-9, 4 P.3d 1137 [2000] [court without jurisdiction; crime of conviction not lesser included offense of charged crime]); see also *State v. Chatmon*, 234 Kan. 197, 205, 671 P.2d 531 (1983) (battery conviction clear violation of due process when neither charged in information nor lesser included offense of charged rape), *abrogation on other grounds recognized by State v. Everett*, 296 Kan. 1039, 1045, 297 P.3d 292 (2013).

*Application of* State v. Hall

This court has recognized that "the fundamental purpose of the pleading is to inform the defendant of the charge so that the defendant may prepare a defense." *State v. Hall*, 246 Kan. 728, 754, 793 P.2d 737 (1990), *overruled on other grounds by Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003).

In *Hall*, the defendant asserted for the first time on appeal that his conviction on a particular charge was void for lack of subject matter jurisdiction because of omission of an essential element of the crime in the charging document. This court recognized the error and reversed the conviction based on existing precedent. 246 Kan. at 746-47. But, at the conclusion of the opinion, we enunciated a new rule to be applied in future cases when a defendant complained of a defective charging document for the first time on appeal. 246 Kan. at 765. We said: "Common sense will be a better guide than arbitrary and artificial rules. The sufficiency of an information should be determined on the basis of practical rather than technical considerations when addressed for the first time on appeal." 246 Kan. at 754 (citing *State v. Wade*, 244 Kan. 136, 141, 766 P.2d 811 [1989]; *State v. Micheaux*, 242 Kan. 192, 199, 747 P.2d 784 [1987]; 1 Wright, Federal Practice and Procedure: Crim.2d § 125 p. 385 [1982]).

Since *Hall*, the proper procedure for a defendant to challenge a defect in the complaint, information, or indictment is to file a motion to arrest judgment under K.S.A. 22-3502. *Hall*, 246 Kan. at

760. The motion, to be filed within 14 days of the verdict, asks the district court to "arrest judgment if the complaint, information or indictment does not charge a crime or if the court was without jurisdiction of the crime charged." K.S.A. 22-3502.

When such a motion "is timely filed, the trial court, in reviewing the motion, shall test its merit by utilizing the rationale of our pre-*Hall* cases." *Hall*, 246 Kan. at 764. The same is not true when a charging document's ability to confer subject matter jurisdiction is challenged for the first time on appeal. Then

"we shall look to whether the claimed defect in the information has: (a) prejudiced the defendant in the preparation of his or her defense; (b) impaired in any way defendant's ability to plead the conviction in any subsequent prosecution; or (c) limited in any way defendant's substantial rights to a fair trial under the guarantees of the Sixth Amendment to the United States Constitution and the Kansas Constitution Bill of Rights, § 10. If a defendant is able to establish a claim under either (a), (b), or (c), the defective information claim, raised for the first time on appeal, will be allowed." 246 Kan. at 765.

In addition,

"[t]ardily challenged informations are to be construed liberally in favor of validity. The validity of an information is to be tested by reading the information as a whole. The elements of the offense may be gleaned from the information as a whole. An information not challenged before verdict or finding of guilty or pursuant to K.S.A. 22-3502 by a motion for arrest of judgment will be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." 246 Kan. at 764 (citing *United States v. Watkins*, 709 F.2d 475, 478 [7th Cir. 1983]).

The omission of R. Carr's name in the first part of the text of Count 43 is akin to a technical defect. He has not argued or demonstrated that he was misled by the wording error; that his defense would have been any different, had the error not occurred; or that he suffered any other undue prejudice. His failure to file a motion for arrest of judgment within 14 days of the verdict is fatal to this claim on appeal.

### 18. THIRD-PARTY EVIDENCE AND HEARSAY EXCEPTIONS

R. Carr asserts that Judge Clark misapplied Kansas third-party evidence rule and erred by rejecting appropriate hearsay exceptions, making it impossible for him to testify on his own behalf

about three telephone calls he received from J. Carr during the night of the Birchwood crimes and about face-to-face interaction with J. Carr and another black male in possession of Jason B.'s truck and other stolen property. See *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed 2d 37 (1987) (discussing federal constitutional underpinnings of right to testify in one's own defense, relying on Fifth, Sixth, Fourteenth Amendments); Kan. Const. Bill of Rights, § 18 (right to remedy for injuries by due course of law). These errors by Judge Clark, R. Carr argues, also interfered with his due process right to present his theory of defense. See *Rock*, 483 U.S. 44; *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

*Additional Factual and Procedural Background*

Review of the merits of this issue requires a fairly detailed examination of pertinent events at several stages of the district court proceedings to discern the bases of the parties' positions and Judge Clark's decisions.

R. Carr's planned defense on the Birchwood incident was that all of the crimes were committed by J. Carr and an unknown and uncharged black male.

Nearly 6 months before trial began, R. Carr filed a sealed supplement to a memorandum in support of a motion to sever the defendants' trials. The supplement was not provided to the State. Appellate counsel now describes its contents as a written proffer of R. Carr's anticipated trial testimony. For ease of reference, we set out the pertinent part of the supplement here:

"2. On the evening of December 14, 2000, Reginald Dexter Carr, Jr. and his brother, Jonathan Carr, met at the home of Tronda Adams and Toni Green. Reginald and Jonathan were both traveling in a beige Toyota Camry belonging to Stephanie [Donley].

"3. After leaving the Green residence together, Reginald Dexter Carr, Jr. and Jonathan Carr traveled to the apartment complex located at 5400 E. 21st Street in Wichita, Sedgwick County, Kansas. Upon their arrival, Jonathan Carr dropped off Reginald Dexter Carr, Jr. and left in the beige Toyota. Reginald Dexter Carr, Jr., not wanting to alert Stephanie [Donley] that he had loaned her car to his brother, left in his (Reginald's) white Plymouth Fury. After leaving the apartment

complex, Mr. Reginald Dexter Carr, Jr. traveled around the northern part of Wichita, Sedgwick County, Kansas, and attempted to sell drugs.

"4. Mr. Jonathan Carr met another individual whose name is not now known to the defendant, Reginald Dexter Carr, Jr. Mr. Jonathan Carr and the other unknown individual went to 12727 East Birchwood and committed the crimes more fully set out in the [a]mended [c]omplaint . . . .

"5. Sometime after the commission of the crimes associated with the [] Birchwood address, Jonathan Carr located his brother, Reginald Dexter Carr, Jr. and made arrangements for Reginald Dexter Carr, Jr. to store the property taken from the Birchwood address in Stephanie [Donley's] apartment . . . .

**"Prior to the commission of the crimes at the Birchwood address, Reginald Dexter Carr, Jr. had no knowledge of the facts that were about to unfold, nor did he participate in any preparation or plan to effect the same.**

"6. After receiving information from his brother, Jonathan Carr, as to the approximate location of the origin of the property, Reginald Dexter Carr, Jr. drove by the area of 12727 E. Birchwood. Mr. Reginald Dexter Carr, Jr. was detained briefly and questioned by law enforcement officers on 127th Street East.

"7. Later that morning, December 15, 2000, Mr. Reginald Dexter Carr, Jr. was arrested at [Donley's apartment,] after unloading the stolen property from the Dodge Dakota pickup truck owned by Jason [B.]."

A few weeks before trial was to begin, the State filed two in limine motions. One sought to prevent introduction of out-of-court statements made by any defendant who had not waived his right against self-incrimination and testified at trial. The other motion sought to prevent defendants from introducing "circumstantial evidence" that someone other than they had committed the charged crimes. The State quoted language from *State v. Bornholdt*, 261 Kan. 644, 666, 932 P.2d 964 (1997), *disapproved on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004): "[W]hen the [S]tate relies on direct evidence, circumstantial evidence that someone other than the defendant committed the crime charged is irrelevant in the absence of other evidence to connect such third party with the crime."

R. Carr filed a written response but made an argument only on the third-party evidence motion, which he challenged as premature. He also argued that the motion failed to set forth a factual basis, giving it the appearance of a "discovery device."

J. Carr filed more lengthy responses to both motions. His response to the hearsay motion argued that the State's nonspecific

request to exclude hearsay was overly broad and premature. On the third-party evidence motion, he also argued that the motion was premature and too vague to allow Judge Clark to "intelligently rule." The State must specify, he said, the evidence it wanted to exclude. J. Carr also argued that there was no difference between the probative value of direct evidence and the probative value of circumstantial evidence and that the third-party evidence rule, as outlined by the State, would deprive him of his right to present a defense. He suggested that the proper standard for admission of third-party evidence should be whether the evidence raised an inference capable of leading a jury to conclude there was reasonable doubt on the defendant's guilt.

At the hearing on the two motions, the State said its hearsay motion had been filed because of statements at earlier court proceedings about the possibility of alibi defenses. The prosecutor said that the State was not seeking to exclude any out-of-court statements by a nontestifying defendant that would fall within an exception to the rule that hearsay is inadmissible; rather, the State wanted to raise the issue early to ensure that such information was not heard by the jury before Judge Clark had an opportunity to rule on the applicability of any exception.

On the third-party evidence motion, the State again asserted, citing to *Bornholdt*, that the Kansas rule prohibited a criminal defendant from introducing circumstantial evidence of a third person's guilt when the State's case would include direct evidence against the defendant:

"Direct must be countered with direct . . . .

"[T]he direct evidence that the State is looking at in filing this motion is eyewitness direct testimony which must be countered by similar direct in order to disprove identification as opposed to circumstantial evidence that some other person did this crime. It is commonly called outside the courtroom . . . the SODDI defense, some other dude did it."

The prosecutor also clarified that the State sought to eliminate circumstantial evidence of another perpetrator's guilt only on the crimes charged as a result of the Birchwood incident, not on the charges arising out of the Schreiber or Walenta incidents.

Counsel for J. Carr responded by acknowledging the *Bornholdt* language cited by the State and said that, if he were to introduce evidence of a third party's culpability, he knew he would have to establish a link between the third party and the crimes beforehand. Counsel for R. Carr said he had nothing to add to the argument.

Judge Clark's brief ruling contained the word "sustained" but was otherwise difficult to decipher:

"Everybody agrees then on *Bornhol[d]t* that direct and circumstantial type evidence and then the incidents that occurred on the 7th and 11th, any evidence concerning that would be circumstantial. So, I'll sustain it then and just say that if any evidence like that is anticipated, please bring it to somebody's attention so we can handle it properly."

The State drafted the written order memorializing the court's rulings on the motions. Although there are references to the "orders" in transcripts of later hearings, we have found no order on the hearsay motion in the record and the parties have not cited to one. The essential portion of the order on the third-party evidence motion simply indicated the motion was sustained. The order had no other substantive content.

The subject of third-party evidence did not come up again until the opening statement of R. Carr's counsel at trial. He told the jury that the evidence on the Birchwood crimes would show that four "Negroid hairs" were recovered and submitted for mitochondrial DNA testing, that one ultimately was not tested, that two showed contributors with the defendants' maternal lineage, and that the fourth came "from an as yet unidentified black person." He also told the jury that R. Carr and J. Carr parted during the evening of December 14, 2000, and did not see each other again until about 5 a.m. the next morning, when J. Carr contacted R. Carr and asked that he come to Adams' house. When R. Carr arrived, he saw J. Carr and another black male, who was in possession of a truck filled with stolen property. The three decided that the truck would be driven to Donley's apartment by the other black male; that R. Carr would return Donley's car, which J. Carr had, to Donley's apartment, and that R. Carr would leave his old Plymouth for J. Carr.

Counsel for J. Carr objected to these statements by counsel for R. Carr as argumentative and unsupported by evidence. Judge Clark overruled the objection.

Counsel for R. Carr resumed his opening statement:

"He left—Reginald left his car with Jonathan, the third black male drove the truck. When they got to the apartment complex the third black male did not assist in carrying any of the stolen property into Ms. Donley's apartment, it was decided that person would pick up his share later."

Counsel then turned to a description of R. Carr's arrest and subsequent attempts by law enforcement to have the victims of the various crimes identify him. Counsel concluded his opening statement, however, by returning to the subject of the Birchwood crimes.

"The evidence will show that the Birchwood address is replete with Jonathan Carr's DNA. The evidence will also show that there is the DNA of an unidentified third party there. The evidence will also show that the Lorcin automatic weapon that you heard talk about contains the DNA of three unidentified people, none of that DNA is Reginald Carr's.

"Ultimately, the DNA evidence will show that Jonathan Carr, not Reginald Carr, Jonathan Carr committed most, if not all of the crimes which are alleged in the complaint and that he did it with a third black male who still walks the streets of Wichita."

At that point, the prosecution objected to the comments, and the judge sustained the objection, labeling the remarks "improper."

After opening statements were completed and testimony taken from three witnesses, the jury was excused from the courtroom for lunch. The State then asked the judge to impose sanctions on the lawyer for R. Carr who had made the opening statement, John Val Wachtel, and sought an instruction to the jury to disregard Wachtel's remarks about another perpetrator. The State argued that Wachtel had deliberately violated the judge's order on the motions in limine, both by suggesting that J. Carr had made statements to R. Carr about the Birchwood crimes and by suggesting that a third black male was involved.

"Unless counsel intends to call some individual that he failed to name in his opening statement, some third individual that has confessed to this crime or made

some other statements directly to Reginald Carr, that individual would fall in the category—or those statements would fall into the category of circumstantial evidence, unless based, again, on statements made by Jonathan Carr, which are not admissible, nor appropriate. The Court ruled on this."

The prosecutor also said that she had spoken with counsel for both defendants that morning before the opening of court and that she believed each understood the opening statement material that was off limits under the court's orders in limine.

"When I made those comments to [Wachtel] I told him that in addition to objecting, if there's a violation of the Court's orders in limine, that that would certainly place us in a situation which might necessitate a mistrial and that he certainly would not want to do that. He indicated he would not be mistrying anything."

## Cocounsel for R. Carr responded to the prosecution's argument about Wachtel:

"Well, first of all, let's talk about the hearsay evidence when we're talking about statements of Jonathan Carr. If I remember correctly, it was [the State] that initially started talking about conversations between Tronda Adams and Jonathan Carr. And I don't think Mr. Wacht[e]l ever talked about conversations between Jonathan Carr and Reginald Carr. I think the record's clear and I think the Court can examine it.

"As to the order in limine, when we had that hearing I believe it was all—we all understood that if there was evidence of—direct evidence of the defendants' guilt and circumstantial evidence that someone else did it and we had evidence of that, unless we could connect it up, it wasn't admissible.

"I think at this point in time, number one, it is premature; number two, I don't think the State has any direct evidence that Reginald Carr committed this crime. They don't have an in-court identification of the surviving victim. And we're only talking about the events on the 14th and 15th. They've got a photo array where she goes well, it looks like the guy. They don't have any DNA evidence that connects him up with this thing, all's they have is property that he has after the fact.

"On the other hand, the evidence that we've got that somebody else is involved in it is we've got DNA evidence in this apartment that nobody can identify, we've got a black Negroid hair that belongs neither to Jonathan Carr nor Reginald Carr. You know, my way of looking at it we've got more direct evidence that Reginald Carr didn't commit this crime than we do direct evidence that he did.

". . . I don't think Mr. Wacht[e]l has violated any order in limine, we have followed the law as we know it to be. And he hasn't done anything wrong. If the court finds at some later point in time that the evidence doesn't support what he said in this opening statement, then perhaps that's a different story. But as this

Court well knows from sitting on many, many cases, we present this evidence as best we possibly can and we expect it to produce what Mr. Wacht[e]l has said."

At that point, Judge Clark turned to counsel for J. Carr. J. Carr's counsel noted that the prosecutor alluded to the possibility of a mistrial and then moved for one. He said:

"And Your Honor, I think that Mr. Wacht[e]l's opening statements illustrate an argument that we've made many times early on in this case as to why we needed to be severed from this matter and have a separate trial from Reginald Carr. So if a mistrial were not granted, we again move to sever, withdraw from these proceedings to have our own separate trial."

One of the prosecutors clarified that the State was not seeking a mistrial; instead, she said, it sought enforcement of Judge Clark's earlier orders in limine. She argued further:

"This Birchwood case is a direct evidence case. [Holly G.] did identify Mr. Reginald Carr in a photo ID lineup, array. In addition to that, there's DNA evidence that connect[s] Mr. Carr, Reginald Carr. The blood of [Heather M.] is on the clothing collected.

"Now, that may—could be argued as direct or circumstantial. In any event, the evidence certainly is strong in support of the ID that [Holly G.] made in the photo lineup."

Judge Clark then spoke:

"First of all, the motion for mistrial on behalf of Mr. Jonathan Carr is overruled. The last statement [about the uncharged black male on the streets of Wichita], I believe I said that's misconduct. So stated. And as I understand evidence, lawyers don't get up and make declarations concerning evidence in opening statements that they don't have. If that declaration made about this some other party isn't supported in evidence, the inference that it's intentional misconduct would be well supported.

"And what we'll do is examine the evidence and see what the evidence is and I'll instruct on what that means to the jury one way or the other."

On the 10th day of trial, the State's expert on the results of mitochondrial DNA tests on the four hairs testified. One of the hairs yielded no results, perhaps, according to the expert, because it came from an animal or was too old and degraded. Two matched the mitochondrial DNA samples taken from the defendants. One did not match those samples and, the expert said, contained more of a Caucasian or European profile.

At the end of that day, after the jury had been excused, Judge Clark took up several miscellaneous matters. Among other things, he again addressed the third-party evidence rule:

"Now, as to the law that if it be shown that a perpetrator at a crime is at the scene of the crime by direct evidence, then the circumstantial evidence may not be used to support the inference of a third party was there absent direct evidence of that fact. That's the law. That will be the law of this case."

After a brief interruption for the jury to pass through the courtroom, the judge continued:

"I think we've reached a point that I can advise you all because we're getting close to the defense case in chief, so I think I've heard all the evidence that I need to, to make that decision.

"And looking at—in the order of proof, and let's call it the 12727 Birchwood, H. G. puts both defendants present as perpetrators at that crime. Therefore, before any evidence to support the inference that a third party was there can be accepted, there must be direct evidence that a third party was there."

No further argument or comments were made on the topic at that time.

Three trial days later, the State presented the testimony of the Wichita Police Department chemist who had been asked to separate Negroid hairs from other hairs and fibers from the Birchwood home for DNA testing. She had labeled three of the hairs Negroid and the fourth "possibly" so.

The next day, a nuclear DNA analyst for Sedgwick County testified that he had examined a root attached to one of the two hairs for which the defendants and their maternal relatives could not be ruled out and that he had determined it did not come from R. Carr. J. Carr could not be excluded.

Later in the trial, during R. Carr's case-in-chief, his counsel advised Judge Clark outside the presence of the jury that R. Carr was weighing whether to testify. Counsel made an oral proffer to facilitate the judge's ruling on whether R. Carr's testimony would be admissible under the hearsay rule and its exceptions.

Counsel said that R. Carr would testify that he and J. Carr were together in the early evening of December 14 at Adams' house, that they parted ways, and that J. Carr then spent his time with the unknown, uncharged black male. Later that night and early on

December 15, J. Carr called R. Carr three times. Counsel described those calls and related events and made a brief argument:

"Later on that night sometime—the time is unclear, but after 11:00 o'clock, Reginald Carr got a telephone call from Jonathan telling him that he needed to come to a location, and that Jonathan Carr said this dude—or this nigger is trippin' and talked about shooting people. Mr. Carr was distraught and emotional when he made those statements.

"Mr. Carr received another phone call from Jonathan, at which time Jonathan told him that this third person was—Jonathan was at or near [Adams'] house. Jonathan called and told him with regard to the third person that the person was down the street, flipped out, trippin['.] Jonathan was crying. Reginald asked about dealing with this person. Jonathan said the person had a gun. Reginald came to that location, spoke with the third person, and decisions were made with regard to what would be dealt with [on] that property. The decision was that the property would be taken to [Donley's] house, [Donley's] apartment.

"Also, there was another phone call in which Jonathan was distraught, talked about that same third person as, quote, trippin', unquote, and that he had shot people. And that—warned Mr. Reginald Carr that the evidence was—that the material at Mr. Carr's house was not only stolen, but that people had been killed and that Jonathan was leaving town.

"Those hearsay statements on behalf of Jonathan Carr and on behalf of the third party, we think are admissible in this case. Excited utterances.

"The—forgive me, your Honor, I don't remember the name of the rule as I stand here right now, but there's a rule that basically says no such statements about that kind of activity would not be made if they were not true [sic]. And the, statements with regard to the third person, identifying person of the res gestae of the possession of stolen property, are statements against interest. A simple rule on the earlier one.

"That is my proffer of what that hearsay testimony would be."

Counsel for J. Carr had no objection to the admission of the proffered testimony, although it included out-of-court statements made by his client. He said that he would look forward to cross-examining R. Carr and that the content of the proffer strengthened his argument that the defendants had antagonistic defenses.

The prosecution did object to admission of the testimony, arguing it was "violative of the hearsay principles" and "inappropriate and improper" and "pure hearsay." In addition, the prosecutor argued:

"[T]he Court has made it abundantly clear that he doesn't get to do this on his 'some other dude did it' kind of defense when they're direct cases. And this is

inappropriate. And I still don't have a name of anybody that I can go to, and apparently it's in the possession of Mr. Wacht[e]l and his client."

After clarifying for the State that R. Carr did not know the name of the third party, counsel for R. Carr was asked to repeat the part of the proffer dealing with a phone call from J. Carr when he was near Adams' house. Counsel did so, saying:

"There was a telephone call. I do not know the time. It was after 11:00 o'clock. It was from Jonathan to Reginald talking about this third person trippin', shooting people, problems that were going on, gave directions to the residence. There was another phone call which invited Jonathan—Reginald to Tronda's house. Reginald went there. There was another conversation about the fellow down the street flipped out, trippin'. Jonathan was crying. Reginald went down and spoke to that person. There was another phone call later on after the third party had driven the truck to Reginald's house. At that time there were more discussions about people having been shot with respect to the stolen property. That was Jonathan that called Mr. Carr. And that's the proffer."

One of the prosecutors asked a clarifying question—whether R. Carr spoke personally to the other unknown black male—and was apparently satisfied that she received an answer. The other prosecutor then argued that R. Carr wanted to admit "hearsay evidence which the Court has clearly said is unexceptional" as to J. Carr. She also repeated that admission of the testimony would result in a

"direct violation of the Court's ruling under what we refer to as the SODDI defense, some other dude did it, or suggestion thereof . . . . [T]here is no direct evidence here unless Reginald Carr is saying that he was there and watched it as an eyewitness or something more direct. There would be no direct evidence under the proffer that's made that should allow them to make this suggestion about another person. Not only to make a suggestion about another person, but introduce hearsay evidence of an individual who's not identified and [whom the defense is] refusing to identify, not only by name, but even by saying where they went down the street to speak to them. It's highly inappropriate. They've not identified any particular exception that [it] would clearly 'fall under because it doesn't."

Judge Clark offered counsel for R. Carr an opportunity to cite law in support of admission of the proffered evidence, and counsel said again that hearsay exceptions for declarations against interest

and excited utterances should apply. The judge then ruled from the bench:

"The declarations proffered under Mr. Reginald Carr's proffer just now fits no exception to the hearsay rule that I know of. They are not direct evidence of any participation by a third party. And based on everything I know right now, they're not admissible in evidence. They're offered to prove the truth of the matter stated therein. They're hearsay."

R. Carr did not testify at trial.

*Third-Party Evidence Rule*

The parties agree that the appellate standard of review for a district judge's ruling on a motion in limine invoking the third-party evidence rule is abuse of discretion. See *State v. Brown*, 285 Kan. 261, 303, 173 P.3d 612 (2007) (application of third-party evidence rule subject to review for abuse of discretion); see also *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010) (standard of review on evidentiary decision depends on rule, principle applied by district judge). When a district judge exercises his or her discretion based on an error or misunderstanding of law, there is an abuse of that discretion. See *Brown*, 285 Kan. at 294.

The only third-party evidence case cited by the State before Judge Clark was *State v. Bornholdt*, 261 Kan. 644, 932 P.2d 964 (1997), *disapproved by State v. Marsh*, 278 Kan. 520, 102 P.3d 445(2004). The State was correct that *Bornholdt* parroted certain earlier cases saying "[w]hen the [S]tate relies on direct evidence, circumstantial evidence that someone other than the defendant committed the crime charged is irrelevant in the absence of other evidence to connect such third party with the crime." 261 Kan. at 666. But the State and Judge Clark failed to realize that *Bornholdt*'s treatment of the subject was superficial; it did not explore the rule's origins or examine the soundness of its rationale.

The more recent and authoritative opinion at the time of trial of this case was *State v. Hooker*, 271 Kan. 52, 63, 21 P.3d 964 (2001), which stated a more complete, more nuanced third-party evidence rule and began to expose a recent tendency in some earlier caselaw to conflate uncorroborated evidence that someone else merely had

a motive to commit the crime with circumstantial evidence that someone else actually did commit the crime.

*Hooker* involved a home invasion in which one of the victims identified Hooker as one of two men who forced their way into a townhome and shot one of the residents in an apparent robbery attempt. Hooker sought to introduce evidence that two other people had threatened to harm the deceased victim. This court held that Hooker failed to provide evidence to connect the two other persons with the victim's death.

In it, this court said:

"We have found that when the State's case relies heavily on circumstantial evidence, it is error to exclude circumstantial evidence that someone else committed the crime when the defendant's proffered evidence includes the timely placement of another person at the murder scene. See *State v. Hamons,* 248 Kan. 51, Syl. ¶ 2, 60-61, 805 P.2d 6 (1991) (finding an abuse of discretion to exclude evidence that another person had threatened the victim and was at the scene of the murder near the time of the murder where there was no eyewitness identification, but concluding that the error was harmless).

"Conversely, we have been stricter on admission when the State relies on direct evidence, such as eyewitness identification. Circumstantial evidence that someone other than the defendant committed the crime is irrelevant in the absence of other evidence to connect that other person with the crime charged. *State v. Bornholdt,* 261 Kan. 644, Syl. ¶ 19, 932 P.2d 964 (1997). We have found no abuse of discretion in excluding such evidence in cases involving eyewitness identification testimony. *E.g., State v. Brown,* 230 Kan. 499, 500, 638 P.2d 912 (1982); *State v. Henderson,* 205 Kan. 231, 239-40, 468 P.2d 136 (1970); *State v. Potts,* 205 Kan. 42, 44, 468 P.2d 74 (1970).

"Hooker failed to show that the two people who allegedly made threats were involved in [the victim's] death. We have said:

" 'There is a general rule supported by numerous decisions that evidence of the motive of one other than the defendant to commit the crime will be excluded where there is no other proof in the case which tends to connect such other person with the offense with which the defendant is charged. [Citations omitted.]' *State v. Neff,* 169 Kan. 116, 123, 218 P.2d 248, *cert. denied* 340 U.S. 866 (1950)." *Hooker,* 271 Kan. at 65-66.

Within 2 years after trial of this case, we recognized and reasserted the lessons of *Hooker* in *State v. Evans,* 275 Kan. 95, 62 P.3d 220 (2003).

The facts in *Evans* were analogous to the facts here in many ways. Defendant Larry Evans was accused of shooting the victim,

Michael Prince, during a heated discussion involving Evans, Prince, and a third man, Andrew Reed. Prince sprayed Reed and Evans with mace. Seconds later, a shot was fired, fatally wounding Prince. Evans was charged with first-degree murder. The State filed a pretrial motion in limine, anticipating a defense attempt to show Reed was responsible for the murder. The State argued that it had direct evidence that Evans committed the crime; thus Evans should be prohibited from presenting circumstantial evidence that Reed was responsible for Prince's death.

"The State asserted that it had two eyewitnesses who observed Evans shoot Prince. The State hypothesized that the defense would attempt to put forth evidence of other witnesses who saw Reed with the gun immediately after the fatal shot was fired but who had not observed Reed shoot Prince with the gun. The State contended that circumstantial evidence that another had committed the murder was inadmissible absent corroborating evidence, stating that Evans had corroborating evidence if that evidence was not excluded as hearsay. The hearsay evidence the State was referring to was the testimony of a defense witness who would testify that after the shooting Reed admitted that he shot Prince and that he dumped Prince's body in the woods.

"Defense counsel argued against the motion in limine, asserting that the circumstantial evidence the State sought to exclude was proper evidence for the jury to consider . . . ." *Evans*, 275 Kan. at 97.

On the first day of Evans' trial, the trial judge advised the parties that he was sustaining the State's motion, conditioned upon the State producing testimony that Evans was observed shooting at the victim. Ultimately, Evans was able to testify that, after he heard the shot, he looked up and saw Reed putting a gun down to his side. And another witness testified that Reed admitted to him and to others that he had shot Prince. Evans was not allowed to present other witnesses who would have said they also saw Reed with the gun immediately after the shot was fired. 275 Kan. at 98.

Evans argued on appeal that the district judge erred by limiting his evidence of Reed's guilt and that the interpretation of the third-party evidence rule applied in his trial was unconstitutional.

Our decision on the appeal observed that the third-party evidence rule had been correctly applied in previous cases to exclude defense evidence that someone else merely had a motive to commit the crime or that someone else merely bore a physical resemblance

to a defendant. In those cases, the third-party evidence rule prevented mere speculation and conjecture. Evans' evidence, on the other hand, linked a third party to the scene of the crime holding the murder weapon immediately after the fatal shot was fired. Such evidence should not be excluded under the rule. 275 Kan. at 104-105.

Returning to first principles, we dismissed any artificial distinction between direct and circumstantial evidence:

"This court has recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. See [*State v.*] *Beard*, 273 Kan.789, Syl. ¶ 5[, 46 P.3d 1185 (2002); *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001); *State v. Juiliano*, 268 Kan. 89, 97, 991 P.2d 408 (1999). Additionally, it must be noted that this court has stated that a conviction for even the gravest offense may be sustained on circumstantial evidence. *State v. Sanders*, 272 Kan. 445, Syl. ¶ 5, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002); [*State v.*] *Clemons*, 251 Kan. 473, 488, 836 P.2d 1147 (1992). Circumstantial evidence that would be admissible and support a conviction if introduced by the State cannot be excluded by a court when offered by the defendant to prove his or her defense that another killed the victim." *Evans*, 275 Kan. at 105.

We ultimately determined, under the K.S.A. 60-261 standard, that the exclusion of the additional evidence in *Evans* could not be labeled harmless and reversed the defendant's murder conviction. This outcome on the state common-law claim eliminated the need for us to reach the constitutional question. 275 Kan. at 106.

*Evans* was followed by *State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd and remanded* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), and *vacated in part* 282 Kan. 38, 144 P.3d 48 (2006). *Marsh* explicitly disapproved of the oversimplification of the third-party evidence rule in *Bornholdt* and like cases. *Marsh*, 278 Kan. at 532. It also made important points about how to approach the admissibility of third-party evidence.

*Marsh* first made clear that the determination of admissibility of third-party evidence starts at the same place that the question of admissibility of any evidence starts:

"The general rule is that, unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is 'evidence having any tendency in reason to prove any material

fact.' K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are designed to establish. *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 (1999). We have also recognized the 'probative values of direct and circumstantial evidence are intrinsically similar, and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each.' *State v. Scott*, 271 Kan. 103, Syl. ¶ 2, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001)." *Marsh*, 278 Kan. at 530.

Second, *Marsh* emphasized that Kansas' third-party evidence rule, as originally conceived and applied, made admission of a third party's motive alone improper.

"[T]he so-called third party evidence rule has limited application and is most assuredly subordinate to the general rules of evidence and the statutory definition of relevancy in K.S.A. 60-401(b).

. . . .

"[W]hile evidence of the motive of a third party to commit the crime, standing alone, is not relevant, such evidence may be relevant if there is other evidence connecting the third party to the crime." 278 Kan. at 531.

*Marsh* explicitly set out a corollary on circumstantial evidence connecting a third party to a crime: "[Such] evidence . . . will not be excluded merely because the State relies upon direct evidence of the defendant's guilt. In short, there is no bright line rule." 278 Kan. at 531.

And finally, *Marsh* gave direction to district court judges. "[T]here must be the sound exercise of judicial discretion dependent on the totality of facts and circumstances in a given case. . . . This require[s] the district judge to consider whether the evidence [is] relevant under K.S.A. 60-407(f), and [] failure to do so constitutes error." 278 Kan. at 531-32.

Subsequent Kansas cases have applied the third-party evidence rule as described in *Marsh*. See *State v. Inkelaar*, 293 Kan. 414, 441, 264 P.3d 81 (2011) ("[I]n this case, none of the evidence proffered by the defense connected [the third party] to the charged crimes."); *State v. Tahah*, 293 Kan. 267, 275, 262 P.3d 1045 (2011) ("We conclude that under the totality of facts and circumstances in this case, the [third-party evidence] neither indicate[s] [the third party's] motive to commit the crimes nor otherwise connect[s] him to the murder."); *State v. Brown*, 285 Kan. at 305 ("[N]one of the evidence offered by Brown amounted to anything more than base-

less innuendo. There is nothing tying these third parties to the shooting."); *State v. Adams*, 280 Kan. 494, 505, 124 P.3d 19 (2005), *disapproved on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012) ("[A] district judge must evaluate the totality of facts and circumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged.")

These cases illustrate that neither the district judge in the first instance nor we on appeal should focus on the strength of the State's case against a defendant when deciding the relevance of any third-party evidence that he or she has offered. Relevance is a function of whether the evidence has "any tendency in reason to prove any material fact," K.S.A. 60-401(b). The ultimate fact to be determined in any criminal trial is the defendant's guilt or innocence, and evidence having any tendency in reason to establish that material fact should be admitted regardless of its relative strength or weakness when compared to the State's case. See *State v. Krider*, 41 Kan. App. 2d 368, 376, 202 P.3d 722 (2009) ("[W]e are convinced the district court appropriately applied the [third-party evidence] rule [when it] evaluated *the totality of the defendant's proffered evidence.*" [Emphasis added.]); K.S.A. 60-407(f) ("all relevant evidence is admissible"); *Krider v. Conover*, 497 Fed. Appx. 818, 822 (10th Cir. 2012), *cert. denied* 133 S. Ct. 1469 (2013) (Kansas rule consistent with United States Supreme Court rule in *Holmes v. South Carolina*, 547 U.S. 319, 327, 126 S. Ct. 1727, 164 L. Ed. 2d 503 [2006]). The fact that third-party evidence consists solely of the defendant's own testimony should make no difference. See *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) ("[T]he most important witness for the defense in many criminal cases is the defendant himself. There is no justification today for a rule that denies an accused the opportunity to offer his own testimony.")

These authorities lay the foundation for our conclusion that the State led Judge Clark into error on his application of the third-party evidence rule to exclude the testimony of R. Carr about the unknown, uncharged black male with J. Carr on the night of the Birchwood crimes.

Ignoring for the moment any elements of the proffered testimony that could be subject to challenge as hearsay, as well as the merits of any such challenge, R. Carr was prepared to testify not that the unknown person had a motive but that he observed him after being summoned to a location by a distraught J. Carr, that this observation of the third person with J. Carr took place in the time frame of the crimes, that the third person possessed property belonging to the Birchwood victims, and that he was present for at least one discussion between R. Carr and J. Carr on the general subject of the temporary storage of that stolen property. He also was prepared to testify that he saw the third party drive the truck to Donley's apartment complex.

Rather than evaluating the relevance of this evidence, the record demonstrates that Judge Clark based his third-party evidence ruling entirely on a faulty comparison between the strength of the State's case, using a functionally nonexistent distinction between direct and circumstantial evidence. This was an abuse of discretion, and we decline the State's invitation in its brief to reinforce it by ruling that R. Carr's proffered evidence was irrelevant and inadmissible because it was unlikely to lead to acquittal on the Birchwood crimes. Its persuasive power or lack thereof is a reversibility consideration, not a factor in whether we hold there was error. We will turn back to the question of reversibility after discussing the secondary argument advanced in the district court for the evidence's exclusion: hearsay.

*Hearsay and Its Exceptions*

R. Carr argued to Judge Clark that the hearsay elements of his proffered evidence were admissible under two exceptions to the hearsay rule: declarations against interest and excited utterances. On appeal, he adds a third on out-of-court statements by codefendant J. Carr: confessions.

Before Judge Clark, the prosecutor never made a coherent legal argument in opposition to R. Carr's attempt to admit out-of-court statements by J. Carr (and probably the third party) as declarations against interest or excited utterances.

Before trial, the State's motion in limine sought to exclude only defendant's out-of-court statements, and the prosecutor said at the hearing on the motion that she was not addressing any statement to which a hearsay exception applied. The prosecutor's objection at the time of counsel Wachtel's opening statement reference to the "third black male who still walks the streets of Wichita" stated no ground for the objection, and Judge Clark merely ruled at the time that the reference was "improper" and later, "misconduct." There was no argument from either side on hearsay when Judge Clark again took up the subject of third-party evidence after the testimony of the mitochondrial DNA analyst. When R. Carr's counsel made the oral proffer, the prosecution's hearsay objections were limited to: "violative of the hearsay principles"; "inappropriate and improper"; "pure hearsay"; "hearsay evidence which the court has clearly said is unexceptional," an overstatement of Judge Clark's previous action on the issue; "hearsay evidence of an individual who's not identified"; "highly inappropriate"; and, after Wachtel had mentioned the hearsay exceptions for statements against interest and excited utterances, "They've not identified any particular exception that [it] would clearly fall under because it doesn't." Nevertheless, Judge Clark ruled in the State's favor on the hearsay issue. He gave no explanation other than to say that any out-of-court statements covered by R. Carr's proffer offered for truth of the matter asserted "fit[] no exception . . . that I know of."

On appeal, the State still makes no direct effort to counter R. Carr's arguments for application of the, now, three hearsay rule exceptions. Rather, it argues that a determination that the evidence is not admissible under the third-party evidence rule is a determination that the evidence is not relevant; therefore, the hearsay argument is an attempt "to get in through the back door what the totality of the evidence demonstrates he cannot properly admit through the front." Of course, we have now decided the third-party evidence issue in a way that means the State's relevance-based argument is meritless.

Our standard of review is abuse of discretion. Again, this standard includes a review to determine that the discretion was not guided by erroneous legal conclusions. *Brown*, 285 Kan. at 294.

Our evaluation of the three hearsay exceptions argued by R. Carr is impeded by the silence of the State and Judge Clark on the governing law and by the absence of any specific articulation of the statements supposed to have been made by J. Carr (and possibly the third party) in the record. Yet the State has never challenged the sufficiency of the proffer, and we forge ahead. See *Marsh*, 278 Kan. at 529 (in absence of challenge to proffer, issue preserved).

*Declarations Against Interest*

K.S.A. 60-460(j) defines a declaration against interest:

"*Declarations against interest.* Subject to the limitations of exception (f) [concerning confessions], a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

R. Carr relies primarily on *State v. Brown*, 258 Kan. 374, 904 P.2d 985 (1995), and *Chambers v. Mississippi*, 410 U.S. 284, 292, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), to support his argument.

In *Brown*, the defendant sought to introduce statements that another person made to three witnesses admitting that he, not the defendant, shot the victim. This court noted that K.S.A. 60-460(j) "includes a requirement the defendant make a showing of trustworthiness by the out-of-court declarant." 258 Kan. at 382. Quoting *State v. Jones*, 246 Kan. 214, 219, 787 P.2d 726 (1990), *Brown* recognized several factors that a district judge may consider in determining whether a hearsay statement is admissible as a declaration against interest.

" 'A trial judge has wide discretion in determining the admissibility of a declaration against interest and may consider such factors as the nature and character of the statement, the person to whom the statement was made, the relationship between the parties, and the probable motivation of the declarant in making the statement.' " 258 Kan. at 382.

*Brown* also discussed *Chambers*, noting the four factors discussed in that case in determining that a third party's admissions were admissible as declarations against interest:

"First, the admissions were made spontaneously to a close acquaintance shortly after the murder. Second, each confession was corroborated by some other evidence in the case. Third, each confession was unquestionably self-incriminatory and against interest. Finally, the third party who was said to have admitted committing the crime was present in the courtroom, had been under oath, and was available for cross-examination." 258 Kan. at 382-83.

*Brown* recognized that the fourth factor listed in *Chambers* is inapplicable under K.S.A. 60-460(j).

R. Carr argues that J. Carr's statements to him fall clearly within these requirements:

"They were against his interest, as they implicated him in multiple homicides, they were corroborated by the DNA evidence and the physical evidence which placed Jonathan at the scene of the crime and, as they were made while the events were occurring, and immediately afterwards, were certainly spontaneous and there is no evidence of motivation to make the statements."

The material in the oral proffer that appears to quote J. Carr is limited. During the first phone call, J. Carr said that R. Carr needed to come to a location and that the third person was " 'trippin' and talked about shooting people." During the second call, J. Carr said he was near Adams' house; that the third person had a gun. During the third call, J. Carr said that the third person had been "trippin' " and had shot people, that the property was stolen and people had been killed, and that J. Carr was leaving town. The proffer also indicated J. Carr's in-person presence when the stolen property was obtained by R. Carr but attributed no particular statement to J. Carr.

These statements during the telephone calls were not clear on exactly what J. Carr's role in the crimes had been, but they at least imply his presence when the crimes were committed. Viewed objectively, they made him vulnerable to at least criminal investigation, if not prosecution. See *State v. Hughes*, 286 Kan. 1010, Syl. ¶ 8, 191 P.3d 268 (2008). Subjectively, J. Carr no doubt hoped his brother would help him avoid punishment. See *State v. Cooper*, 20 Kan. App. 2d 759, 763, 892 P.2d 909 (1995); *State v. Palmer*, 8 Kan. App. 2d 1, 6, 657 P.2d 1130 (1982).

The statements, as described, appear to have been spontaneous, and J. Carr's presence at the Birchwood home and the soccer field

certainly was eventually corroborated. In short, given the mix of factors to be evaluated under *Brown* and *Chambers*, we are comfortable concluding that the J. Carr statements meet the hearsay exception for declarations against interest, and Judge Clark abused his discretion by, at a minimum, ruling otherwise prematurely.

On the unknown third person, the proffer says only that R. Carr spoke to him and, somehow, at some unspecified later point, a decision on what to do with the stolen property was arrived at by someone. No part of the proffer quotes the unidentified third person. This part of R. Carr's anticipated testimony was not hearsay at all, and the declaration against interest exception was unnecessary to make it admissible as circumstantial evidence of the central fact in this case—R. Carr's guilt or innocence.

### Excited Utterances and Confessions

Because we have concluded that R. Carr's anticipated testimony about statements made by J. Carr was admissible under the declarations against interest hearsay exception, we need not reach R. Carr's alternative arguments on excited utterances under K.S.A. 60-460(d) or confessions under K.S.A. 60-460(f).

### Reversibility

R. Carr argues that all of his convictions on the Birchwood crimes must be reversed, because Judge Clark's exclusion of his proffered evidence under the third-party evidence rule and as hearsay was structural error that prevented him from presenting his defense.

We first examine the nature of a criminal defendant's right to present a defense and then the possibility of a remedy for its violation.

### Nature of Right to Present a Defense

Recognition of a defendant's right to present a defense can be traced to *Chambers*, in which the United States Supreme Court rejected a state's "voucher" rule, preventing a party from impeaching his own witness and its application of the hearsay rule, because their combination hamstrung a defendant's effort "to develop his defense." 410 U.S. at 296. The Court relied upon due process and

the right of confrontation and the right of a defendant to present witnesses on his own behalf, concluding the combined effect of the voucher and hearsay rules denied the defendant "a trial in accord with traditional and fundamental standards of due process." 410 U.S. at 302.

Since *Chambers*, the Court has reviewed many cases in which the defendant asserted his right to present a defense was denied by a procedural rule or evidentiary ruling. Summarizing this history, the Court recently described the "right" as follows:

" '[T]he Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense,' " *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 [1984]), but we have also recognized that ' "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials,' " *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 [1998]). Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. See [*Holmes*], 547 U.S., at 331, 126 S. Ct. 1727 (rule did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (rule arbitrary); *Chambers v. Mississippi*, 410 U.S. 284, 302-303, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (State did not even attempt to explain the reason for its rule); *Washington v. Texas*, 388 U.S. 14, 22, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (rule could not be rationally defended)." *Nevada v. Jackson*, 569 U.S. ____, 133 S. Ct. 1990, 1992, 186 L. Ed. 2d 62 (2013).

This court also has described a defendant's right to present a defense, sometimes calling it "fundamental" and "absolute." In one of our first post-*Chambers* cases, we said:

"The defendant's theory of defense as to why the attack occurred was excluded by the trial court. The defendant had a right to present his theory of defense. He had the right to introduce into evidence what he believed was the motive and intent by the deceased for what he claimed was an attack by the deceased upon his person. This was an integral part of his claim of self-defense or justifiable homicide. It is fundamental to a fair trial to allow the accused to present his version of the events so that the jury may properly weigh the evidence and reach its verdict. The right to present one's theory of defense is absolute. The trial court improperly used the evidentiary rules of establishing character to exclude relevant and material information pertaining to the defense." *State v. Bradley*, 223 Kan. 710, 713-14, 576 P.2d 647 (1978).

See *State v. Rowell*, 256 Kan. 200, 209, 883 P.2d 1184 (1994), *abrogated on other grounds by Shadden*, 290 Kan. 803, 235 P.3d 436 (2010) (right to present theory of defense "absolute"); *State v. Mays*, 254 Kan. 479, 487, 866 P.2d 1037 (1994) (same); *State v. Irons*, 250 Kan. 302, Syl. ¶ 2, 827 P.2d 722 (1992).

In other cases, we have not used the same categorical terms:

"A defendant must be permitted to present a complete defense in a meaningful manner, and exclusion of evidence which is an integral part of a defendant's theory violates the right to a fair trial. However, a defendant's right to call and examine witnesses is not absolute and on occasion will be overridden by 'other legitimate interests in the criminal trial process.' *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)." *State v. Green*, 254 Kan. 669, 675, 867 P.2d 366 (1994).

Most recently, we said this about the right:

"Under the state and federal constitutions, a defendant is entitled to present his or her theory of defense. But the right to present a defense is not absolute. Instead, the right is subject to statutory rules and caselaw interpretations of the rules of evidence and procedure." *State v. Astorga*, 295 Kan. 339, Syl. ¶ 2, 284 P.3d 279 (2012), *cert. granted, judgment vacated on other grounds* 133 S. Ct. 2877 (2013).

When all of these authorities are laid side to side, our court's description of the right to present a defense from *State v. Green*, 254 Kan. 669, Syl. ¶ 2, 867 P.2d 336 (1994), seems closest to the position taken by the United States Supreme Court. The right is fundamental but its protection tempered by sensible control of the criminal trial process. A defendant is entitled to a "meaningful opportunity to present a complete defense," but the right is subject to procedural rules and evidentiary rulings that serve legitimate interests. See, *e.g.*, *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (rule under consideration did not rationally serve any legitimate interest); but see *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) ("[T]he proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible."). The right, a critical component of a fair trial, is violated when a district judge excludes relevant, admissible, noncumulative evidence that is an integral part of a defendant's theory of defense.

*State v. King,* 293 Kan. 1057, 1063, 274 P.3d 599 (2012) (proffered testimony of defense witnesses tending to establish bias, interest, improper motives of arresting officer admissible as integral part of defense); *State v. Houston,* 289 Kan. 252, 261, 213 P.3d 728 (2009) (exclusion of evidence of victim's prior violence toward defendant's family members not error because not relevant to self-defense theory); *State v. Cooperwood,* 282 Kan. 572, Syl. ¶ 1, 147 P.3d 125 (2006) (expert opinion testimony on effectiveness of victim's anti-hallucination medication relevant to defense theory, exclusion not error because not necessary for jury understanding of defense); *State v. Lawrence,* 281 Kan. 1081, Syl. ¶ 1, 135 P.3d 1211 (2006) (trial court rulings on evidence of effect of prior shooting on defendant's state of mind not unconstitutional limit on presentation of imperfect self-defense theory).

We have already determined that R. Carr's proffered evidence was relevant and admissible. It was not merely integral to his defense; it was his defense. *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (defendant's testimony may be indispensable). The State has not argued, and we do not divine, how either the third-party evidence rule, as understood and applied by Judge Clark, or the judge's refusal to apply the hearsay exception for declarations against interest was supported by a legitimate interest sufficient to overcome R. Carr's right to present his defense.

### Remedy for Violation

R. Carr urges us to treat the violation of his right to present a defense—particularly given its effective preclusion of his ability to testify to anything useful to the defense—as structural error that is automatically reversible.

R. Carr cites a single case from the Supreme Court of Louisiana to support his argument, *State v. Hampton,* 818 So. 2d 720 (La. 2002). *Hampton* is too different from R. Carr's situation to have much persuasive punch. In it, the defendant had told his counsel continuously that he wanted to testify; counsel responded that it was not the defendant's decision to make. Here, the record before us indicates that R. Carr decided not to testify after consulting with counsel in the wake of the judge's rulings.

In addition, although the United States Supreme Court has not ruled on the issue, it appears the majority of courts that have considered the issue have applied a constitutional harmless error standard to denial of a defendant's right to testify. See *Palmer v. Hendricks*, 592 F.3d 386, 398 (3d Cir. 2010); *Ortega v. O'Leary*, 843 F.2d 258 (7th Cir. 1988); *Wright v. Estelle*, 572 F.2d 1071 (5th Cir. 1978); *Quarels v. Com.*, 142 S.W.3d 73 (Ky. 2004).

The United States Supreme Court has held that denial of a defendant's right to present a defense is subject to the constitutional harmlessness standard. See *Crane v. Kentucky*, 476 U.S. 683, 691, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

Under the constitutional harmlessness standard, again, we must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

The State, as the party benefitting from the alleged error, must demonstrate harmlessness. It summarizes the evidence against R. Carr on the Birchwood crimes in its brief:

"[Holly G.'s] identification of Reginald, both immediately following the attack and at trial, as one of the two black males responsible for the crimes perpetrated against her and her friends. [Holly G.'s] identification was buttressed by multiple scientific sources, including the mitochondrial DNA analysis, which revealed that of the four hairs collected from the Birchwood scene and submitted for analysis only two were of African-American lineage and defendant could not be excluded as the donor of either one; the nuclear DNA test results, which demonstrated defendant also could not be excluded as the donor of the DNA evidence recovered from [Holly G.'s] inner thigh and which identified the blood on defendant's shirt and underwear as that of [Heather M.]; and the medical evidence, which demonstrated that a few short months after the attack [Holly G.] developed the same sexually transmitted disease that defendant carried."

"Additional evidence to support the identification included footwear impressions taken from a Voicestream box and tarp at the Birchwood residence and determined to match the size, shape, and character of the 'B-Boots' Reginald wore. A cigar-type ash, . . . matched the diameter of the cigar recovered from Reginald's coat pocket. Both pieces of evidence supported [Holly G.'s] assertion that Reginald played an active role in the commission of the offenses.

"Further, the court heard evidence that it was Reginald who was in possession of a vast majority of the property taken from the Birchwood residence, given that it was recovered from both the apartment where he was staying and his Plymouth

vehicle. That property included a big screen TV, various electronics, bedding, luggage, a vast amount of clothing, and numerous personal items belonging to each victim—including checkbooks, wallets, credit cards, drivers' licenses, sets of keys, gas cards, watches, and day planners—as well as numerous ATM receipts and just under $1000.00 in cash, a particularly notable fact given that Reginald was unemployed. Moreover, Reginald was stopped by law enforcement officers after driving by the Birchwood residence at approximately 4:00 a.m. on the morning of the killings.

"Finally, at the time of the proffer the court was aware of the evidence that highlighted Reginald's link to the Lorcin handgun used in the commission of the murders and that, despite his efforts to dispose of the gun, it was ultimately recovered and tested, revealing that each bullet and cartridge was fired from that gun."

Given the remarkable strength of the State's case against R. Carr, we are persuaded beyond a reasonable doubt that there was no impact on the trial's outcome from the exclusion of R. Carr's proffered testimony.

### 19. ADMISSION OF MITOCHONDRIAL·DNA EVIDENCE

R. Carr argues on appeal that Judge Clark erred in admitting mitochondrial DNA test results on hairs found at the Birchwood home.

Two of four hairs collected from the Birchwood home by investigators had a mitochondrial DNA sequence matching both defendants. Expert testimony at trial established that persons who share a mother, such as R. Carr and J. Carr, would have the same mitochondrial DNA sequence. One of the two hairs, which included root material, was submitted for more precise nuclear DNA testing. R. Carr was excluded as a possible source of that hair, but J. Carr could not be excluded.

R. Carr filed a motion to exclude evidence of the results of the mitochondrial DNA testing pretrial and again objected to admission of the evidence during trial.

R. Carr argues on appeal that the results of the mitochondrial testing were more prejudicial than probative, that he should not be convicted merely because more precise nuclear DNA testing proved J. Carr's presence at the crime scene, and that the mitochondrial test results could not measure up to a heightened scrutiny or reliability standard applicable in death penalty cases.

*Standards of Review and Admissibility of Evidence*

Appellate review of a district judge's decision to admit or exclude evidence involves a multistep analysis. *State v. Everett*, 296 Kan. 1039, 1044, 297 P.3d 292 (2013) (citing *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 [2010]).

First, an appellate court determines whether the evidence is relevant.

"Evidence is relevant when it has 'any tendency in reason to prove any material fact.' K.S.A. 60-401(b). Accordingly, relevant evidence must be both probative and material. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 [2009]). Whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard. *Shadden*, 290 Kan. at 817, 235 P.3d 436 (citing *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 [2008])." *State v. Bridges*, 297 Kan. 989, 995-96, 306 P.3d 244 (2013).

Under the second step, the appellate court reviews de novo the district judge's conclusion on which rules of evidence or other legal principles apply. *Shadden*, 290 Kan. at 817.

On the third step, this court reviews the district judge's application of the rule or principle either for abuse of discretion or de novo, depending on the rule or principle being applied. 290 Kan. at 817. Admission of scientific or experimental test results such as the mitochondrial DNA testing performed on the two hairs here is reviewed for abuse of discretion. *State v. Pennington*, 254 Kan. 757, 759, 869 P.2d 624 (1994).

In addition, "a judge may, in his or her discretion, exclude otherwise admissible evidence if its probative value is substantially outweighed by the risk that its admission will unfairly prejudice the party against whom it is offered." *State v. Smith*, 296 Kan. 111, 123, 293 P.3d 669 (2012) (citing K.S.A. 60-445; *State v. Leitner*, 272 Kan. 398, 415, 34 P.3d 42 [2001]); see *State v. Marks*, 297 Kan. 131, Syl. ¶ 5, 298 P.3d 1102 (2013) ("It is within a trial court's discretion whether to exclude evidence if its probative value is substantially outweighed by the risk of unfair prejudice.").

In *State v. Miller*, 284 Kan. 682, 690-91, 163 P.3d 267 (2007), this court explained that

"the admission or exclusion of evidence lies within the sound discretion of the trial court. If the trial court determines the probative value of the evidence offered is substantially outweighed by the risk of unfair prejudice, the court may exclude relevant evidence. *State v. Leitner*, 272 Kan. 398, 415, 34 P.3d 42 (2001).

"At the same time, the law in this state favors the admission of otherwise relevant evidence. [Citations omitted.] The Court of Appeals for the Tenth Circuit has explained with regard to Rule 403 of the Federal Rules of Evidence (which has similar language to K.S.A. 60-445 and that used in *Leitner*, 272 Kan. at 415) that '[t]he exclusion of relevant evidence under Rule 403 is "an extraordinary remedy to be used sparingly.' " *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir. 1985) (*quoting United States v. Plotke*, 725 F.2d 1303, 1308 [11th Cir.], *cert. denied* 469 U.S. 843 [1984])."

*Analysis*

The first step of the evidentiary analysis requires this court to determine whether the mitochondrial DNA evidence is relevant, *i.e.*, both material and probative. "Material evidence tends to establish a fact that is at issue and significant under the substantive law of the case. [Citation omitted.] On the other hand, probative evidence only requires a logical connection between the asserted facts and the inferences they are intended to establish. [Citation omitted.]" *Bridges*, 297 Kan. at 999.

R. Carr makes an unconvincing argument that the evidence of the mitochondrial DNA test results on the two hairs was irrelevant. The identity of the perpetrators of the Birchwood crimes was material and in issue. And the mitochondrial DNA sequence in the two hairs had a logical connection to the material fact of identity. There was no other explanation for R. Carr's presence in the home, and the evidence was certainly admissible.

R. Carr's central argument is that Judge Clark should have intervened to keep the probative value of the mitochondrial DNA evidence from being substantially outweighed by the risk of undue prejudice from its admission. He insists that the expert testimony about him not being excluded as the contributor of one of the hairs was "meaningless, as it was conclusively shown that [J. Carr] was at the crime scene, and, in fact, left one of the two hairs." R. Carr says that admission of the mitochondrial DNA evidence, "in the context of this fact scenario, [was] dangerously misleading, as it was much more likely that hair came from [J. Carr] as well."

Although it is true that J. Carr was linked to one of the hairs by more precise DNA testing that eliminated R. Carr as the source of that hair, R. Carr was not excluded as a contributor of the other hair. This evidence that he could not be excluded through mitochondrial DNA testing was not meaningless, because it narrowed the class of individuals who had been present at the crime scene. The relevant comparison is not to other evidence implicating J. Carr but to the absence of evidence implicating anyone not in the Carrs' maternal line of descent.

Moreover, in an attempt to show that probative value was substantially outweighed by risk of unfair prejudice, R. Carr overstates the risk of juror confusion. During direct examination, the expert was very clear that all maternal relatives would have the same mitochondrial DNA profile and that mitochondrial DNA is not a "unique identifier." The expert never suggested that the mitochondrial testing identified who contributed the hair, and she admitted that nuclear DNA testing was a "more discriminatory test" and could distinguish between individuals who have the same mother. On cross-examination of the expert, R. Carr's counsel inquired about the "disadvantages" of mitochondrial DNA testing compared to nuclear DNA testing. The expert agreed that it would not tell her whether either hair belonged to R. Carr, J. Carr, their mother, or any other maternal relative. R. Carr's counsel also succeeded in demonstrating during cross-examination of the analyst who conducted nuclear DNA testing on the hair with the root that it did not come from R. Carr.

The bottom line is that R. Carr's arguments on the existence of an imbalance between probative value and undue prejudice are without merit. The mitochondrial DNA test evidence was admissible and any of its shortcomings when compared with nuclear DNA test evidence was fully explained to prevent juror confusion.

We also reject R. Carr's arguments that he should not have been convicted because more precise nuclear DNA testing had already proved the presence of a maternal relative, J. Carr, at the crime scene, and because the prejudicial nature of the mitochondrial test results could not measure up to a heightened standard of reliability required of the procedures by which a state imposes a death sen-

tence. See *Caldwell v. Mississippi*, 472 U.S. 320, 340, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985) and *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986).

The mountain of evidence against R. Carr included an eyewitness identification by a victim who was able to observe him off and on for several hours; his stop by the police in the Birchwood area very shortly after the home invasion and murders were reported; and the discovery of numerous possessions of the Birchwood victims in or recently in his possession when he was arrested early on December 15, 2000. His view that he was convicted of the Birchwood crimes on the strength of mitochondrial DNA evidence from one hair is completely implausible. Any weaknesses in the evidence were fully vetted at trial, properly attacking weight rather than admissibility, and did not completely undermine that admissibility under any heightened standard of reliability applicable to capital cases.

### 20. DENIAL OF MISTRIAL AFTER ADMISSION OF WARTS AND HPV EVIDENCE

R. Carr argues that Judge Clark erred by refusing to grant a mistrial after the admission of testimony from Holly G. that she had received a diagnosis of HPV after she was raped.

*Additional Factual and Procedural Background*

Before trial, R. Carr sought medical records for Holly G., and the prosecution discussed the obligation to produce such records with her. Holly G. did not disclose records in response.

At trial, both R. Carr's girlfriend, Donley, and a detective who observed R. Carr during booking testified during cross-examination by R. Carr's counsel that they had seen genital warts or lesions on R. Carr's body. When Holly G. heard this testimony from the detective, she informed prosecutors that she had learned after she was raped that she had HPV, the virus that causes genital warts or lesions.

After Holly G. informed the State of her diagnosis, the State immediately disclosed the new information to defense counsel. The State recalled Holly G. to testify, and she said that she received

the diagnosis of HPV from her family doctor several months after she was raped at the Birchwood triplex.

Counsel for R. Carr did not object to this testimony and did not cross-examine, but he moved for mistrial because of the failure to disclose the HPV diagnosis before he had elicited the detective's testimony on cross-examination. Counsel argued that Holly G.'s testimony "should [not] have been allowed because we had specifically requested the information."

Judge Clark denied the motion for mistrial, stating:

"Let's find that it was discoverable. . . . I'll treat [the defense objection] as if it were contemporaneous under the theory that it could be cured with an instruction. I'll find that . . . there is no fault as the District Attorney did not know it, nobody, even law enforcement, knew it until the cross-examination of [the detective] . . . . And then the witness H.G. made known her medical condition.

"The objection to it is overruled. I will allow it to stand but make the record clear that it's something that's been raised and objected to . . . on the basis of it is—well, it doesn't even rise to the level of excusable neglect. It's just purely something that couldn't have been discovered under any way that I know of by the District Attorney."

## Standards of Review

We review a district judge's denial of a motion for mistrial for an abuse of discretion. *State v. Waller*, 299 Kan. 707, 722, 328 P. 3d 1111 (2014). " '[T]he party alleging the abuse bears the burden of proving that his or her substantial rights to a fair trial were prejudiced.' *State v. Angelo*, 287 Kan. 262, 283, Syl. ¶ 16, 197 P.3d 337 (2008) (citing *State v. White*, 284 Kan. 333, 161 P.3d 208 [2007])." *State v. Leaper*, 291 Kan. 89, 96-97, 238 P.3d 266 (2010). We first ask whether the district judge abused his or her discretion when deciding whether there was a fundamental failure in the proceedings. If so, we then examine whether the district judge abused his or her discretion when deciding whether the problematic conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. *State v. Harris*, 293 Kan. 798, 814-15, 269 P.3d 820 (2012).

Abuse of discretion is also the governing standard of review when we evaluate a district judge's decision on whether to admit or exclude evidence as a sanction for violation of a discovery order.

See *State v. Bridges*, 297 Kan. at 998; *State v. Johnson*, 286 Kan. 824, 832, 190 P.3d 207 (2008). We have said that there is no due process right to have testimony excluded when a witness or party violates a discovery order, because K.S.A. 22-3212(g) grants discretion to a district judge to determine a "just sanction" for the violation. *Johnson*, 286 Kan. at 832.

*Discovery Violation*

R. Carr frames the issue before us as one involving a discovery violation that resulted in admission of evidence causing unfair and harmful surprise, the consequence of which should have been the requested mistrial. We therefore begin our analysis by examining whether Judge Clark erred in his implicit ruling that there was no discovery violation. If this decision was based on an error of law, then Judge Clark abused his discretion by failing to exercise it properly. See *State v. Ward*, 292 Kan. 541, 570, 256 P.3d 801 (2011) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]).

When a criminal case is filed, a prosecutor is required to "endorse the names of all witnesses known" on the charging document. K.S.A. 22-3201(g). At later times prescribed by the court, a prosecutor may endorse additional witnesses that have become known. K.S.A. 22-3201(g). "The purpose of the endorsement requirement is to prevent surprise to the defendant and to give the defendant an opportunity to interview and examine the witnesses for the prosecution in advance of trial." *State v. Shelby*, 277 Kan. 668, 674, 89 P.3d 558 (2004).

In addition, K.S.A. 22-3212(a) requires that a prosecutor, upon request, provide the defendant with, among other things, the results of medical reports and scientific tests or experiments made in connection with the case. K.S.A. 22-3212(b) requires a prosecutor, upon request, to provide the defendant with access to documents material to the case that are in the possession of the prosecutor.

After initial compliance with a discovery order, if a party discovers additional material responsive to a previous request, "the party shall promptly notify the other party or the party's attorney or the court of the existence of the additional material." K.S.A. 22-

3212(g). If a party fails to comply with this obligation, the court "may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems just under the circumstances." K.S.A. 22-3212(g).

In addition to these and other statutory discovery requirements, " ' "[p]rosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant." *State v. Carmichael,* 240 Kan. 149, 152, 727 P.2d 918 (1986).' [*State v. Aikins,*] 261 Kan. [346,] 381[, 932 P.2d 408 (1997)]." *State v. Francis,* 282 Kan. 120, 150, 145 P.3d 48 (2006). This duty was first articulated by the United States Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The duty does not extend to inculpatory evidence. *State v. McIntyre,* 259 Kan. 488, 497, 912 P.2d 156 (1996).

In this particular case, R. Carr asked the State pretrial for any follow-up medical records for Holly G. Prosecutors attempted to comply by talking to Holly G., but she failed to disclose the existence of any such records or the information they would contain. When prosecutors learned during trial about Holly G.'s HPV diagnosis, they complied with K.S.A. 22-3212(g) immediately by sharing the new information with opposing counsel and the judge. The information, given the testimony of Donley and the detective about R. Carr's genital warts or lesions, was inculpatory rather than exculpatory.

R. Carr does not allege that the State is responsible for Holly G.'s discovery violation based on her mistaken belief that the follow-up diagnosis contained "private, confidential information." And we see no discovery violation by the prosecutors. Judge Clark did not abuse his discretion in deciding as much.

*Fundamental Failure*

We also see no abuse of discretion in Judge Clark's implicit decision that there was no fundamental failure in the proceedings.

R. Carr's reliance on *State v. Lewis,* 238 Kan. 94, 708 P.2d 196 (1985), does not persuade us that Judge Clark should have recog-

nized a fundamental failure here. *Lewis* was a much more extreme case, involving prosecutorial misconduct in failure to disclose a critical piece of evidence, blood on a knife, about which the defense had been misled until late in the trial. Defendants had used the absence of blood as a lynchpin of their theory of the case, claiming that the victim's wounds came from broken glass rather than their knife attack. 238 Kan. at 95-96.

We simply are not faced with a situation where R. Carr's identification as one of the men who raped Holly G. rose and fell on the circumstantial evidence of his visible genital warts or lesions and her later HPV diagnosis. Holly G. identified R. Carr directly as the second intruder at the Birchwood home. Any causal relationship between HPV and the genital warts or lesions observed on R. Carr was merely corroboration of what was no doubt compelling testimony from a woman who said she was sexually victimized repeatedly over several hours by R. Carr and his brother.

Having concluded that Judge Clark did not abuse his discretion by failing to recognize a fundamental failure in the proceedings, we need not reach the further question of whether measures other than mistrial could have cured such a failure.

### 21. FELONY MURDER AS LESSER INCLUDED OFFENSE OF CAPITAL MURDER

R. Carr argued in his original brief to this court that Judge Clark erred by failing to give a requested instruction on felony murder as a lesser included offense of capital murder. In view of an intervening statutory change specifically eliminating felony murder as a lesser included offense of capital murder, see K.S.A. 2013 Supp. 21-5402(d), the parties also now debate whether the new statutory language can be applied constitutionally to the defendants.

*Additional Factual and Procedural Background*

Both defendants requested an instruction on felony murder as a lesser included offense of capital murder. Judge Clark agreed with the State that the facts of the case did not support a felony murder instruction. He did give lesser included offense instruc-

tions on first-degree premeditated murder and second-degree intentional murder.

*The Developing Law*

In *State v. Cheever*, 295 Kan. 229, 284 P.3d 1007 (2012), *vacated and remanded on other grounds*, 134 S. Ct. 596 (2013), this court held, 11 years after trial of this case, that felony murder was a lesser included offense of capital murder and that an instruction should be given in any capital case where felony murder was supported by the evidence. 295 Kan. at 259.

After *Cheever*, the 2013 legislature passed Senate Substitute for House Bill 2093, effective July 1, 2013, (L. 2013, ch. 96, sec. 2) which amended the definition of murder in the first degree to provide that felony murder was not a lesser included offense of capital murder. See K.S.A. 2013 Supp. 21-5402(d). The amendment explicitly provided that it was to be applied retroactively to cases such as this. We ordered additional briefing on retroactive effect of this amendment from the parties.

Both defendants have argued that application of the amended statute to them to preclude a lesser included offense of felony murder would violate their Eighth Amendment and Fourteenth Amendment due process rights recognized by *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). Both also argue that application of the amendment to them would violate the Ex Post Facto Clause of the United States Constitution.

A challenge to the constitutionality of a statute raises a question of law subject to our unlimited review. *State v. Cook*, 286 Kan. 766, 768, 187 P.3d 1283 (2008).

In *State v. Gleason*, 299 Kan. 1127, Syl. ¶ 9, 329 P.3d 1102 (2014), we rejected the due process and ex post facto arguments advanced by the defense in this case. The amended statute abolishing felony murder as a lesser included offense of capital murder can be constitutionally applied to the defendants in this case.

This ruling eliminates any need for us to address the argument from the defense that a lesser included instruction on felony murder was supported by the evidence admitted at trial.

## 22. Exclusion of Expert on Eyewitness Identification

R. Carr argues that his convictions must be reversed because Judge Clark denied defense motions to admit expert testimony by Scott Fraser on the reliability of eyewitness identification.

*Additional Factual and Procedural Background*

The defense made a written proffer of Fraser's anticipated testimony. The proffer stated that the testimony was intended to "aid the trier of fact in evaluating eyewitness recognition evidence." It continued:

"[T]he proposed testimony, by providing the jury with scientific findings predicated upon empirical studies about eyewitness recognition, will aid the jury's evaluation of that evidence . . . ."

"The following is a summary of the potential topics . . . :

"1. Memory Decay—The rapidity of memory decay is much more significant than is commonly known. Instead of days or weeks, a substantial decline in a subject's ability to accurately recall details occurs within hours. Dr. Fraser would testify that the scientific conclusions concerning memory decay are beyond the realm of a typical juror's knowledge.

"2. Primacy of Opportunity for Identification—The earliest reliable test of a subject's ability to select or reject a suspect has the highest degree of accuracy. Dr. Fraser would testify that scientific conclusions concerning the earliest test of recognition are not generally known.

"3. Own Race Effect—The accuracy of selections where the victim is of a different race than the perpetrator is significantly less than where the victim and the perpetrator are of the same race. Dr. Fraser would testify that the available empirical evidence concerning this effect is not generally known to the average juror.

"4. Relative Reliability of Selections and Rejections—Rejections (non-selections) in recognition tests, like photographic lineups, are just as reliable as selections. Each should be accorded equal weight in terms of accuracy, authenticity, and information about a victim's memory. Dr. Fraser would testify that the relative validity of recognition test decisions is not generally known.

"5. Confidence—Contrary to common beliefs, a witness' confidence in a selection is not strongly related to the accuracy of that selection.

"6. Post-Event Information—Information gathered after the event, from newspapers, television, or other sources, alters the subject's memory of the episode without the subject's awareness. This phenomenon, as Dr. Fraser would testify, is beyond the ken of the average juror."

At a hearing on the defendants' motions, the State argued that the evidence invaded the province of the jury; the evidence would not be helpful to the jury; and the PIK instruction on eyewitness identification provided adequate safeguards.

Relying on *State v. Gaines*, 260 Kan. 752, 763, 926 P.2d 641 (1996) (expert testimony regarding eyewitness identification should not be admitted), Judge Clark denied the motion.

## Continued Viability of Gaines

On appeal, R. Carr and J. Carr argue that *Gaines* was wrongly decided.

The State cites *State v. Schwarm*, 271 Kan. 155, 164, 21 P.3d 990 (2001) (admissibility of expert testimony lies within sound discretion of trial court), to support its argument that the standard of review on this issue is abuse of discretion. The defense acknowledges this general standard on admission of expert testimony, but it contends that the issue of whether *Gaines* is still good law in Kansas warrants de novo review. See *State v. Jefferson*, 287 Kan. 28, 33-34, 194 P.3d 557 (2008).

Both parties are correct. The continuing viability of an earlier holding is a question of law over which we exercise unlimited review. But, once the legal standard is established, we review a decision to admit or exclude expert testimony for abuse of discretion. An abuse of discretion may arise through a failure to understand or apply the correct legal standard. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]), *cert. denied* 132 S. Ct. 1594 (2012).

In Kansas, we have long held that expert testimony on the reliability of eyewitness identification should not be admitted at trial. *Gaines*, 260 Kan. at 763. This has been true, despite our recognition of problems inherent in the area of eyewitness identification. See *State v. Mitchell*, 294 Kan. 469, 474, 275 P.3d 905 (2012) ("eyewitness identifications can be unreliable and result in wrongful convictions, causing some of the most tragic miscarriages of justice"); *State v. Warren*, 230 Kan. 385, 390-91, 635 P.2d 1236 (1981) ("problem of the potential unreliability of eyewitness iden-

tification has been with us for a long time"). We have steadfastly resisted admission of expert testimony on the subject, asserting that admission of expert evidence on " 'the reliability of eyewitness testimony is not the answer to the problems surrounding eyewitness identifications.' " *Gaines*, 260 Kan. at 763 (quoting *State v. Wheaton*, 240 Kan. 345, 352, 729 P.2d 1183 [1986]); see also *State v. Reed*, 226 Kan. 519, 522, 601 P.2d 1125 (1979) (such testimony invades field of common knowledge, experience, education of laymen). We have relied on cross-examination, persuasive argument, and a cautionary instruction to provide safeguards against unreliable eyewitness identifications. See *Mitchell*, 294 Kan. at 474; *Warren*, 230 Kan. at 393.

The defendants attack the rationale underlying our precedent and note that several state and federal jurisdictions have recently rejected it. See, *e.g.*, *State v. Clopten*, 2009 UT 84, 223 P.3d 1103, 1108 (Utah 2009) ("little doubt" juries generally unaware of deficiencies in human perception, memory, thus give great weight to eyewitness identifications; shortcomings of cross-examination, cautionary instruction as safeguards considered; caselaw excluding expert testimony overturned). Jurisdictions nationwide are split. Compare, *e.g.*, *State v. Guilbert*, 306 Conn. 218, 251, 49 A.3d 705 (2012) (reliability of eyewitness identification not matter within knowledge of average juror; expert testimony admissible), with, *e.g.*, *State v. Young*, 35 So. 3d 1042, 1050 (La. 2010) (expert testimony inadmissible; recognizing debate).

Two years ago, we changed course on another aspect of eyewitness identification evidence, specifically, on the instruction that directs juries to evaluate it especially carefully. In *Mitchell*, we held that the traditional PIK cautionary instruction on the reliability of eyewitness identifications must be responsive to developing research and thus stop listing the witness' degree of certainty as a factor to be evaluated. We were mindful that the instruction had the potential to assign more weight to an expression of certainty than modern scholarship would. We quoted cases from other jurisdictions in which studies on the correlation between eyewitness certainty and accuracy had been discussed, and we ultimately determined that "the available studies are not definitive on the ques-

tion whether there is a significant correlation between certainty and accuracy." 294 Kan. at 481.

We conclude today that Kansas should evolve in a like manner on the subject of the potential contribution expert testimony can make when juries decide the reliability of an eyewitness identification.

At this juncture, with a deeper appreciation of all that we and the average juror do not know, we have little question that the subjects Fraser intended to address are outside the usual knowledge of persons without his education and experience. See *State v. Willis*, 240 Kan. 580, 585-86, 731 P.2d 287 (1987) (when defendant seeks addition of factors to eyewitness cautionary instruction, including cross-racial identification, unconscious transference, after-acquired experience, court concludes terms beyond ordinary lay person's knowledge, experience; inclusion of factors would require expert testimony to support it); see also Kohnken and Maass, *Eyewitness Identification: Simulating the "Weapon Effect,"* Law and Human Behavior, Vol. 13, No. 4 (1989) (only half of judges, jurors surveyed believed perpetrator's use of a weapon had debilitating effect on eyewitness recognition; 88 percent of expert psychologists appreciated weapon's influence on identification). Although many of us are aware of the general fallibility of human memory, we are not well versed in its scientifically documented tendencies to decay or become polluted by outside information and influences over time. We have not read widely and deeply on whether a certain degree of skepticism should accompany our examination of a witness' identification of a person of a different race, but this subject is of legitimate concern when, as here, the victims in all three incidents were white and the defendants black. Neither the court nor laypeople generally are likely to be aware of expert arguments that a failure to identify can be just as significant as an identification. Again, this topic may have had specific bite in this case, notable for the State's extensive reliance on three victims' identifications of at least one of the two defendants; because there also were failures to identify. Schreiber did not identify either defendant in a photo array; Walenta did not identify J. Carr in a photo array; Holly G. did not identify J. Carr

in a photo array, and she did not identify R. Carr at preliminary hearing.

Of course, had Fraser been permitted to testify, all of his testimony on these subjects would have been subject to the crucible of cross-examination, as well as probable examination by competing experts. There is no reason to suspect that our truth-finding system would have collapsed. The State would have been free to present its version of the authorities on which Fraser relied, and a better-educated jury would still have been free to accept or reject Fraser's opinions.

The time has come to eschew *Gaines'* automatic rule of exclusion in favor a more flexible approach—individual evaluation by the judge in each case whether proffered expert testimony on the reliability of eyewitness identifications will be helpful to the jury— and whether it meets any other applicable test for admission of expert evidence. See *United States v. Brien*, 59 F.3d 274, 277 (1st Cir. 1995) (unwilling to adopt blanket rule on admissibility of expert testimony of eyewitness reliability). We do not pass today on the outcome that should be reached in any particular case. We simply alter the map for reaching it.

We conclude that automatic exclusion of Fraser's testimony rested on legal error, which means the judge's decision qualified as an abuse of discretion. See *Ward*, 292 Kan. at 550 (citing *Gonzalez*, 290 Kan. at 755-56).

*Harmlessness*

Having concluded there was error in automatically excluding Fraser's testimony under *Gaines*, we turn to whether its omission requires reversal of the defendant's convictions, the evidence for all of which included eyewitness identifications. See K.S.A. 60-261; *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013) (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

Given the hours Holly G. was in the presence of the two intruders—at the Birchwood home, on her trip with the second intruder to the ATM, and en route to the soccer field—we cannot be persuaded that the exclusion of Fraser's evidence about the subjects listed in the proffer affected the outcome of the trial on any of the

Birchwood crimes. Although we are somewhat less sanguine on the Schreiber crime and Walenta crimes, the commonalities of the gun and various elements of the modus operandi of the perpetrators of those crimes and the Birchwood crimes also mean we cannot be persuaded that admission of Fraser's evidence would have made a difference for R. Carr.

### 23. JURY VIEW OF LOCATIONS REFERENCED AT TRIAL

R. Carr challenges Judge Clark's decision to permit a jury view of more than 20 different locations in Wichita, pursuant to K.S.A. 22-3418. He argues that the jury view violated his right to be present at all critical stages of his trial, his right to the assistance of counsel, and his right to a public trial.

*Additional Factual and Procedural Background*

The State filed a pretrial motion pursuant to K.S.A. 22-3418 requesting the jury view. Each of the more than 20 locations to be viewed was associated in some way with the Schreiber, Walenta, and Birchwood incidents. The prosecutor said that the view would allow jurors to "recall the evidence that they heard [in court] and associate it with the various places involved."

R. Carr's counsel objected and said, "I fear that the view will become the evidence as opposed to the evidence being that which has been here in court." J. Carr's counsel also objected and said that the view would be "very dangerous to everybody's shot at a fair trial."

Judge Clark granted the State's motion.

J. Carr's counsel then asked whether the defendants and counsel would be allowed to accompany the jury when it visited the different locations. Judge Clark declined to answer the question at that time, but said, "[I]f I had to decide right now the answer [would be] no."

Near the end of the State's case-in-chief, the district court judge discussed the jury view procedures with counsel.

"Now, at some point we're going to have a jury view. This is the way it's going to be done. The jury's going to be all together in the custody of the bailiff on a conveyance. There's going to be a driver and a deputy sheriff on that conveyance as well. The role of the driver is obvious. The deputy sheriff's role will be to assist

the bailiff. There will be no talk of the case by anybody. There will be marked law enforcement vehicles that will lead the conveyance and trail the conveyance. The head of the trial security, Sergeant Cliff Miller, will follow the route directed by me. He will be in the lead car and the jury conveyance vehicle will follow that lead car. Any other marked units will follow for security and to help with traffic.

"The jury will receive an admonition before they leave from me that will be along this line, that any decision that you jurors make in this case must be based on the evidence admitted in court, viewed in light of the law that I say must be applied to the evidence. You're going to be taken for a view of certain locations that have been discussed and/or depicted by photographs in the case. The purpose of this jury view is to assist you in understanding the evidence presented in court. During the view do not discuss the case, do not allow any person to discuss the case with you, be alert to your surroundings during the trip, you may take your notebooks with you. And you all have the route, I've given you copies."

R. Carr's counsel renewed his earlier objection to the view, and J. Carr's counsel again asked whether the defendants and counsel would be allowed to be present during the jury view. In response, Judge Clark said:

"To me this is no different than what the bailiff has done at 3:00 o'clock for the seven weeks we've been in trial, that is walks the jury outside at 3:00 o'clock and they have a walk around. There's no cigarette smokers among the 16, I understand they want to go out. This is no different. And they will be in the custody of the bailiff . . . and one deputy will be there, not to say anything, just if the bailiff needs assistance that's all. So that will be the entire party on the conveyance."

From the judge's comments, it was clear to the defendants and their counsel that the answer to the question about accompanying the jury on the view—at least in the same conveyance—was still "no." The record before us does not disclose whether any counsel or members of the public would be permitted to follow the law enforcement vehicles trailing the jury's conveyance.

Later, Judge Clark informed the jury about the plans for the view:

"As you know, any decision you jurors make in this case must be based on the evidence admitted here in court, viewed in light of the law that I say applies to that evidence. And you're going to be taken for a view of certain locations that have been discussed and/or depicted by photograph here in court. The purpose of the view is to assist you in understanding the evidence presented in court.

"Now, during the view do not discuss the case. Don't allow anybody to discuss the case with you. Be alert to your surroundings during the trip, and take your notebooks with you. They allow no food or drink on the conveyance you're going

to be on, I'm told. And on that conveyance you all are going to be together with Ms. Marquez, the bailiff. There will be one deputy sheriff. He's there to help the bailiff if the bailiff needs help. And as I say, no talk by anybody. The person in the lead car that will be leading the conveyance will know where you're going, and your driver of your conveyance will know to follow that car. There will also be marked vehicles following you to help with the traffic. Ms. Marquez will take you now downstairs on the conveyance, and we'll see you as soon as you get back. Thank you very much for your attention. Follow the bailiff."

Judge Clark expected the jury view to take approximately 2 hours.

Before the jury retired to deliberate, it was instructed that "[t]he purpose of the jury view . . . was to assist you in understanding the evidence that has been admitted here in court."

*Standards of Review*

A district judge's decision to allow a jury view under K.S.A. 22-3418 generally is reviewed for abuse of discretion. *State v. Engelhardt*, 280 Kan. 113, 120, 119 P.3d 1148 (2005). But statutory interpretation and constitutional analysis raise legal questions subject to unlimited review on appeal. See *State v. Prine*, 297 Kan. 460, 474, 303 P.3d 662 (2013); *State v. Anderson*, 294 Kan. 450, 464, 276 P.3d 200 (2012).

*Defendant's Right to be Present*

R. Carr first argues that the jury view under K.S.A. 22-3418 violated his right to be present at all critical stages of his trial. The statute provides:

"Whenever in the opinion of the court it is proper for the jurors to have a view of the place in which any material fact occurred, it may order them to be conducted in a body under the charge of an officer to the place, which shall be shown to them by some person appointed by the court for that purpose. They may be accompanied by the defendant, his counsel and the prosecuting attorney. While the jurors are thus absent, no person other than the officer and the person appointed to show them the place shall speak to them on any subject connected with the trial. The officer or person appointed to show them the place shall speak to the jurors only to the extent necessary to conduct them to and identify the place or thing in question."

We have said that, under K.S.A. 22-3405(1) and the confrontation and due process provisions of the federal Constitution, a de-

fendant in a felony case has both a statutory and constitutional right to be present at all "critical stages" of a prosecution. *State v. Herbel*, 296 Kan. at 1109 (quoting *State v. Bell*, 266 Kan. 896, 919-20, 975 P.2d 239, *cert. denied* 528 U.S. 905 [1999]). In determining whether a particular phase of a criminal proceeding is a critical stage, this court has examined "whether the defendant's presence is essential to a fair and just determination of a substantial issue." *State v. Edwards*, 264 Kan. 177, 197, 955 P.2d 1276 (1998). But the United States Supreme Court has ruled that due process does not require a defendant's presence at a jury view. See *Snyder v. Massachusetts*, 291 U.S. 97, 117-18, 54 S. Ct. 330, 78 L. Ed. 674 (1934).

In 2005's *Engelhardt*, defendant Robert Engelhardt was charged with first-degree murder in the stabbing death in a trailer home. At trial, the State moved for a jury view to permit jurors to walk through the trailer where the murder took place. The State contended that the view would assist the jury in understanding the amount of space in the trailer and its layout. Engelhardt's counsel argued that Engelhardt had a right to be inside the trailer during the jury view because it was a " 'critical stage' " of the proceeding and the jury would be seeing evidence. 280 Kan. at 120-21.

Citing the trailer's close quarters, the district judge ruled that Engelhardt would not be allowed inside the trailer with the jurors. Engelhardt rejected the judge's suggested compromise that would have had Engelhardt wait in a car across the street from the trailer during the view. Engelhardt also rejected the prosecutor's suggestion that Engelhardt be permitted to stand outside the trailer with the judge and counsel for both sides during the view. 280 Kan. at 121.

"Ultimately only the jurors were taken to the scene by the bailiff. They had previously been directed by the district judge to enter the trailer two at a time, walk to one end and back, and then get back on the county bus that had transported them. The judge had further admonished the jurors not to talk among themselves or touch anything in the trailer." 280 Kan. at 121.

On review, this court ruled that the jury view did not constitute a critical stage of the proceeding against Engelhardt. 280 Kan. 113, Syl. ¶ 3. We said that "the role of the jury view was strictly cor-

roborative," notwithstanding our recognition that it "enabled the jury to more fully appreciate the space available in the trailer and the distance between the place of the attack and the witnesses who had been in the bedrooms while the attack was taking place." 280 Kan. at 123. The view also permitted members of the jury to see the results of post-crime cleaning described by witnesses. 280 Kan. at 123.

In reaching our conclusion in *Engelhardt*, we also noted that "Kansas cases have consistently upheld jury views outside the presence of defendants." 280 Kan. at 123 (citing *State v. Hickles*, 261 Kan. 74, 88-89, 929 P.2d 141 [1996]; *State v. Laubach*, 220 Kan. 679, 681, 556 P.2d 405 [1976]; *State v. McCorgary*, 218 Kan. 358, 363-64, 543 P.2d 952 [1975], *cert. denied* 429 U.S. 867 [1976]; *State v. Zakoura*, 145 Kan. 804, 812-13, 68 P.2d 11 [1937]; *State v. Harris*, 103 Kan. 347, 352-53, 175 Pac. 153 [1918]; *State v. Adams*, 20 Kan. 311, 323-26 [1878]).

R. Carr recognizes this court's decision in *Engelhardt* but urges us to reconsider its holding. He asserts that the modern majority position of courts from other jurisdictions is that "a jury view constitutes evidence, and is therefore a stage of the trial at which the defendant has the right to be present personally and through counsel."

We are mindful of a split of authority from other jurisdictions on whether a jury view constitutes evidence and what appears to be the related issue of whether a criminal defendant has a right to be present. Compare *Stephenson v. State*, 742 N.E.2d 463, 493-94 (Ind. 2001) (defendant has no right to attend jury view under Sixth Amendment; jury view not evidence), with *State v. Pauline*, 100 Hawaii 356, 378, 60 P.3d 306 (2002) (jury view constitutes independent evidence; defendant has right to be present at view). We have long been mindful of the split among jurisdictions on whether a jury view of a crime scene constitutes evidence. See *State v. Adams*, 20 Kan. 311, 323-26 (1878) (holding defendant need not be present; noting contrary authority); see also 30 A.L.R. 1357 ("Presence of accused during view by jury," originally published in 1924).

Contrary to R. Carr's contention about the modern majority position, it appears that the majority of other jurisdictions still favor the rule that "a view is not itself evidence; like a demonstrative aid, its purpose is only to assist the trier of fact in understanding and evaluating the evidence." 2 McCormick on Evidence § 219 (7th ed. 2013). But the persistent majority certainly is not without its detractors. See *United States v. Gray*, 199 F.3d 547, 548-49 (1st Cir. 1999) ("[M]ost of the usual commentators on matters of evidence either question the rationale for excluding views from evidentiary status, observe that the position has lost favor, or both."); 2 McCormick § 219 (7th ed. 2013) (citing six cases, including *Pauline* and *Gray*).

The Georgia Supreme Court has taken a modified approach under which it recognizes at least two types of jury views: an " 'evidentiary view' " and a " 'scene view.' " See *Jordan v. State*, 247 Ga. 328, 345, 276 S.E.2d 224 (1981). An evidentiary view "permit[s] the jury to view evidence introduced in the case which evidence is so large or affixed that it cannot be brought into the courtroom." 247 Ga. at 345 (*e.g.*, jury view of vehicle admitted as evidence). A scene view, on the other hand, "permit[s] the jury to view the premises relevant to the case to enable the jury to better understand the testimony and other evidence introduced in court . . . . A view of the scene is not 'evidence' in the case." 247 Ga. at 345-46. The Georgia court held that a defendant's right of confrontation was not violated if he or she was absent at a scene view, but it also observed in a footnote that the two types of views are not necessarily mutually exclusive. 247 Ga. at 345 n.23 (*e.g.*, "bullet holes in the walls and ceilings viewed").

We admit to some discomfort about our historical nonevidentiary treatment of jury views outside of a defendant's presence. But we also are cognizant that competing practicalities may sometimes have to control. In this case, for instance, it may have been, practically speaking, impossible for the defendants to ride on the conveyance with members of the jury without a heavier and potentially prejudicial security presence. On the other hand, it does not appear that it would have been impossible to permit counsel to ride with the jury in their clients' stead or that it would have been impossible

to permit the defendants and their counsel to be transported in a law enforcement vehicle traveling behind the jury's conveyance.

We will for the time being continue to adhere to our precedent, the evident leaning of the United States Supreme Court when it said due process concerns were not implicated by the defendant's absence from a jury view in the *Snyder* case, 291 U.S. at 117-18, and the continuing majority rule among other jurisdictions that a jury view is nonevidentiary and not a critical stage of the proceedings requiring the defendant's presence. Neither the Kansas statute nor R. Carr's right to be present was violated when Judge Clark excluded him from the jury view in this case.

We nevertheless urge district judges in future cases to consider all reasonable alternatives to accommodate a criminal defendant's presence at jury views, insofar as it is practically possible to effect it. As the Supreme Court of Hawaii put it in *Pauline*, we may not always continue to "assume that jurors, however they may be instructed, will apply the metaphysical distinction suggested and ignore the evidence of their own senses when it conflicts with the testimony of the witnesses.' " 100 Hawaii at 373 (quoting 2 McCormick on Evidence, § 216 [5th ed. 1999]).

*Defendant's Right to Assistance of Counsel*

The Sixth Amendment also guarantees a defendant a constitutional right to counsel at all "critical stages" of a proceeding. *State v. Lawson*, 296 Kan. 1084, 1096, 297 P.3d 1164 (2013) (quoting *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079, 173 L. Ed. 2d 955 [2009]). Its Kansas codification in K.S.A. 22-4503 has potentially broader coverage; it provides that a defendant is entitled to have assistance of counsel at every "stage" of the proceedings against him or her. See *Lawson*, 296 Kan. at 1096 (critical stage "likewise a stage of the criminal proceeding" under K.S.A. 22-4503).

Having concluded that the nonevidentiary jury view in this case was not a critical stage of the proceeding, we also conclude that R. Carr's Sixth Amendment right to counsel was not violated by it. Our ruling on the dispensability of defendant's presence leads us to the same ruling on the dispensability of defense counsel's. That

being said, we still urge district judges faced with jury view requests in future cases to accommodate the presence of defense counsel where possible.

On the question of whether the legislature intended to provide greater protection for a defendant's right to assistance of counsel than that provided by the Sixth Amendment, *i.e.*, that its choice of the phrase "stage of the proceeding" over the phrase "critical stage of the proceeding" has legal significance, we are doubtful. If greater protection were the goal, the legislature would not have made defense counsel's presence at a jury view discretionary under K.S.A. 22-3418. The better practice for Judge Clark would have been to allow defense counsel to attend the jury view, but the view did not qualify as a stage of the proceeding requiring counsel's presence under K.S.A. 22-4503.

*Defendant's Right to Public Trial*

We decline to reach R. Carr's public trial argument because the record before us does not support it. After careful review, we see nothing in it to indicate that any member of the public's ability to follow the jury's conveyance from place to place during the view was disallowed or impeded in any way.

## 24. MODIFICATION OF EYEWITNESS IDENTIFICATION INSTRUCTION

R. Carr argues that the district court erred when it denied his requested addition to the PIK cautionary instruction on the reliability of eyewitness identifications.

As given, the instruction read:

"The law places the burden upon the State to identify a defendant. The law does not require a defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitation on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

R. Carr proposed adding an eighth factor, informing jurors that they could consider "[t]he race of the witness and the race of the person observed." Judge Clark rejected this proposal.

As discussed with regard to other instructions issues, our first question concerns reviewability. See *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012); *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). R. Carr's request for the addition to the instruction in the district court preserved this issue for appellate review without imposition of the "clearly erroneous" burden under K.S.A. 22-3414(3). See *Williams*, 295 Kan. at 515-16.

We next address whether the requested additional language was legally appropriate, applying a de novo standard of review. See *Plummer*, 295 Kan. 156, Syl. ¶ 1. This is where R. Carr's argument fails. The seventh factor set out in the instruction was a catch-all, covering "any other circumstances that may have affected the accuracy of the eyewitness identification." In our view, it was not necessary to list additional factors or to fail to highlight additional factors for the jury's consideration. Under the catch-all's broad language, counsel for the defense were free to argue any factor the evidence would support.

Under K.S.A. 2013 Supp. 21-6619(b), which permits us to notice unassigned error in a capital case, we recognize that the PIK cautionary instruction on eyewitness identification reliability contained a factor we recently identified as erroneous. See *State v. Mitchell*, 294 Kan. 469, Syl. ¶ 4, 275 P.3d 905 (2012) ("Jurors should not be

instructed that the degree of certainty expressed by the witness at the time of an identification of the defendant is a factor they should weigh when evaluating the reliability of that eyewitness identification testimony."). No case to date has found the inclusion of this factor reversible error, and we continue that streak here. See *State v. Dobbs*, 297 Kan. 1225, 1241, 308 P.3d 1258 (2013). Under the circumstances of this case, there is no reasonable possibility the jury would have rendered a different verdict absent the inclusion of the erroneous certainty factor. Reversal is not required.

### 25. AIDING AND ABETTING INSTRUCTION

Between the two of them, the defendants challenge the aiding and abetting instruction given by Judge Clark on three grounds. They argue that it was clearly erroneous because it permitted jurors to convict them as aiders and abettors for reasonably foreseeable crimes of the other, because it failed to communicate that an aider and abettor had to possess premeditated intent to kill personally in order to be convicted of capital murder, and because it omitted language from K.S.A. 21-3205(2).

To the extent that one defendant or another does not advance an argument among these three, we notice any unassigned error under K.S.A. 2013 Supp. 21-6619(b). We cannot know which defendant was convicted as a principal and which as an aider and abettor on many of the joint charges, including those for capital murder. Thus all three arguments are equally applicable to each defendant.

*Additional Factual and Procedural Background*

After the close of the evidence, the jury was instructed on the elements of capital murder. Jurors were told that, in order for them to find a defendant guilty, the State must prove beyond a reasonable doubt that the defendant intentionally killed the victim and that "such killing was done with premeditation." The instruction also specified that "each defendant" was charged with the offense, and that "[e]ach defendant pleads not guilty to the charge."

With respect to the attempted first-degree premeditated murder charge, the jury was instructed on the elements of attempt, includ-

ing specific direction that a finding of guilt could not be reached unless the defendant performed an overt act toward the commission of the crime of first-degree murder with the intent to commit that crime. The jury also was instructed on the elements of first-degree premeditated murder. Like the capital murder instruction, the instruction further specified that "each defendant" was charged with the offense, and that "[e]ach defendant pleads not guilty to the charge."

Judge Clark also gave the jury Instruction No. 8 on accomplice liability, to which neither defendant objected. Part of this instruction has been quoted before in Section 13 of this opinion. We include a quote of the entire instruction here for ease of reference:

"A person who, either before or during its commission, intentionally aids, abets, advises, or counsels another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the person's participation, if any, in the actual commission of the crime.

"A person who, either before or during its commission, intentionally aids, abets, advises, or counsels another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable.

"A person who, either before or during its commission, intentionally counsels, procures or uses force or the threat of force to compel another to commit a crime is responsible for the crime although the other who directly committed the act constituting the crime lacked criminal or legal capacity."

Given the multiple charges against the defendants, Judge Clark also instructed that "[e]ach crime charged against an individual defendant is a separate and distinct offense," and that the jury "must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge." Judge Clark further instructed that the State bore the burden to prove "each individual defendant is guilty" and that the defendants must be presumed innocent.

The State had relied on an aiding and abetting theory to argue that J. Carr was guilty of capital murder of Heather M., Aaron S., Brad H., and Jason B. and guilty of attempted first-degree premeditated murder of Holly G., but one of the prosecutors also told

the jury during closing argument that it did not matter "who the shooter was" in those crimes. In reference to the criminal possession of firearm charges against R. Carr, one of the prosecutors told the jury in closing that R. Carr should be found guilty on the basis of his possession of "[t]his firearm," referring to the black Lorcin, on December 7, December 11, and December 14 and 15.

### Reasonable Foreseeability of Crimes of Another

The defendants argue that the "reasonably foreseeable crimes" paragraph of Instruction No. 8 requires reversal of their capital murder and attempted first-degree premeditated murder convictions, because it allowed the jury to find either of them guilty, not because he acted with premeditation, but because he aided and abetted his codefendant in the commission of one of the preceding Birchwood offenses and the victims' shootings were a reasonably foreseeable outcome of those other offenses.

For example, if the jury believed that one of the defendants aided and abetted his codefendant in the commission of aggravated kidnapping of one of the Birchwood victims and that the four murders were reasonably foreseeable outcomes of the aggravated kidnapping, then the jury could have convicted the defendant of capital murder, even if there was insufficient evidence that he acted with premeditation. In essence, in the defendants' view, the challenged language in the instruction allowed the jury to substitute a "reasonably foreseeable" standard for the essential element of premeditation for an aider and abettor of capital murder.

Again, we apply a "clearly erroneous" standard when a party fails to object to an instruction at trial. See *State v. Williams*, 295 Kan. at 510. We do so in death penalty cases as well as in other criminal cases. See *State v. Kleypas*, 272 Kan. 894, 939, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *abrogated on other grounds Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Under the clear error framework, the first question we must address is whether error occurred at all.

The first paragraph of Instruction No. 8 was based on PIK Crim. 3d 54.05 (Responsibility for Crimes of Another), and the second paragraph was based on PIK Crim. 3d 54.06 (Responsibility for

Crimes of Another—Crime Not Intended). PIK Crim. 3d 54.05 conforms to K.S.A. 21-3205(1). PIK Crim. 3d 54.06 conforms to K.S.A. 21-3205(2).

We have previously approved of both PIK Crim. 3d 54.05 and 54.06 when they have been used independently. See *State v. Manard*, 267 Kan. 20, 34, 978 P.2d 253 (1999) (PIK Crim. 3d 54.05); *State v. Gleason*, 277 Kan. 624, 636-38, 88 P.3d 218 (2004) (PIK Crim. 3d 54.06).

But we have held that a district judge commits error by giving both instructions together in a case when a defendant is charged with a specific-intent crime. *State v. Overstreet*, 288 Kan. 1, 13, 200 P.3d 427 (2009) (prosecution for attempted first-degree premeditated murder). We have agreed with the defense position here—in such a situation, the reasonably foreseeable language allows the jury to substitute a "reasonably foreseeable" standard for the specific intent element of the charged offense. See *State v. Engelhardt*, 280 Kan. 113, 119 P.3d 1148 (2005). And, since our 2005 decision in *Engelhardt*, we have consistently applied this rule. See *State v. Cofield*, 288 Kan. 367, 373, 203 P.3d 1261 (2009) ("reasonably foreseeable crimes" aiding and abetting instruction erroneous in that it allowed the jury to apply a foreseeability standard to support conviction requiring specific intent of premeditation); *Overstreet*, 288 Kan. at 13 (PIK Crim. 3d 54.06 "reasonably foreseeable crimes" instruction improper when defendant charged with attempted first-degree premeditated murder).

Judge Clark committed error when he included both the first and second paragraphs of Instruction No. 8, without further explaining that the "reasonably foreseeable" language did not eliminate the State's burden to prove an aider and abettor's specific intent on any crime requiring such an element, including capital murder and attempted first-degree premeditated murder.

Having held there was error, we turn to whether that error was reversible under K.S.A. 22-3414(3). To do so, we review the entire record to determine whether we are firmly convinced the jury would have reached a different verdict but for the error. The burden of demonstrating clear error rests with the defendants. *Williams*, 295 Kan. at 516.

When faced with the question of whether error of the type here merited reversal in prior cases, we have twice determined reversal was not necessary, see *Cofield*, 288 Kan. at 373-74 (large number of shots fired; defendant, cohorts took loaded guns on car ride; victims vulnerable; defendant confessed he fired at victims); *Engelhardt*, 280 Kan. at 133-34 (evidence established victim stabbed approximately 55 times; defendant clearly involved, not an innocent bystander), and once that it was, see *Overstreet*, 288 Kan. at 14-15 (evidence suggested defendant driver, not shooter; prosecutor's statements compounded instruction error). On one of the cases in which we ruled that reversal was not necessary, clear error was the governing standard. See *Cofield*, 288 Kan. at 372-73. On the case in which reversal was necessary, clear error also was the governing standard. See *Overstreet*, 288 Kan. at 9-10. Together, these cases lead us to conclude that the difference between ordinary error and clear error on this issue depends on the strength of the State's case for the existence of premeditation and thus the likelihood that the "reasonably foreseeable" language may have played a role in the jury's finding or findings of guilt.

Premeditation means

"to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." PIK Crim. 3d 56.04(b) (approved in *State v. Saleem*, 267 Kan. 100, 105, 977 P.2d 921 [1999]).

While the State can certainly establish a defendant's premeditation with direct evidence, more frequently, it must rely on circumstantial evidence. *State v. Scaife*, 286 Kan. 614, 620, 186 P.3d 755 (2008).

" 'Circumstances which may give rise to the inference of premeditation include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.' " *State v. Sanchez-Cazares*, 276 Kan. 451, 459, 78 P.3d 55 (2003) (quoting *State v. Murillo*, 269 Kan. 281, 286, 7 P.3d 264 [2000]).

Both R. Carr and J. Carr begin their arguments in support of the existence of clear error with a simple observation: There were two defendants implicated in the capital murders and the attempted first-degree premeditated murder, but the identity of the shooter is unknown. This sets the stage for each to assert that the other was the actual triggerman and to plead ignorance of the triggerman's plan to shoot the victims.

Specifically, R. Carr suggests that the record lacks evidence of premeditation on his part. He points to the statements the Birchwood intruder identified as him made to Holly G. He also points to the pattern of the first kidnapper's behavior in the Schreiber incident—Schreiber was kidnapped, driven to ATMs, then driven to a remote location and left alive with his damaged car. R. Carr asserts that this pattern demonstrates that he would have had every reason to expect the same outcome when the Birchwood victims were driven to the soccer field. Finally, R. Carr also argues that the Birchwood intruder identified as J. Carr played the lead in the final stages of that incident—he drove the first car on the way to the scene of the shootings.

J. Carr makes a mirror-image argument, contending the record lacks evidence of his premeditation. He notes that, before the Birchwood incident, he had acquired a train ticket for travel out of the Wichita area very early on December 15, 2000. He had prepared for the trip the previous day by buying a box for his belongings with Adams. J. Carr observes that Holly G. discussed the possibility of the victims being shot only with the other Birchwood intruder; during those conversations, the intruder identified as J. Carr was out of earshot. Despite his acquittal on the crimes charged as a result of the Schreiber incident, he also argues that the second kidnapper would have relied on the first kidnapper's pattern of behavior with Schreiber, including the fact that he was left alive in a remote area.

Both defendants have chosen well among the facts in evidence, but we do not have that luxury. In order to determine whether clear instruction error demands reversal, we must examine the entire record and make a de novo determination. See *State v. Phillips*, 295 Kan. 929, 936-37, 287 P.3d 245 (2012).

Viewed in its entirety, we have no trouble concluding that the record contains a wealth of evidence of both the eventual principal's and the eventual aider and abettor's premeditation. Four of the five circumstances we have identified as influential on the question of premeditation plainly existed in this case.

Both Birchwood intruders were armed with handguns, and the victims were shot with one of them, the black Lorcin. Holly G. saw a black gun in the possession of the intruder identified as R. Carr. Adams had seen the black gun in J. Carr's possession within a few days of the Birchwood incident. See *Sanchez-Cazares*, 276 Kan. at 459 (use of an SKS semi-automatic assault rifle circumstantial evidence of premeditation).

The record also convincingly establishes lack of provocation on the part of the Birchwood victims. None knew R. or J. Carr. There was some evidence the entire encounter was accidental, because a light-colored car had followed the victims' neighbor from the unit next door home just before the incident began. See *State v. White*, 263 Kan. 283, 295, 950 P.2d 1316 (1997) (lack of provocation, use of deadly weapon sufficient to infer premeditation).

Several facts concerning the Birchwood intruders' conduct both before and after the killings also tend to show premeditation.

First, the black Lorcin was used in the gun-facilitated kidnapping and robbery of Schreiber and in the shooting of Walenta in the days leading up to the Birchwood crimes. See *State v. Drennan*, 278 Kan. 704, 718, 101 P.3d 1218 (2004) (prior similar murder probative of premeditation in charged murder); *State v. Henson*, 221 Kan. 635, 645, 562 P.2d 51 (1977) (evidence of a previous similar incident relevant to show premeditation).

Second, during the crimes at the Birchwood home and again in the soccer field, the two intruders had conversations between themselves, giving rise to an inference of mutual consultation and planning.

Third, as events began to unfold at Birchwood, the intruders made some effort to conceal their identities. For instance, they covered Holly G.'s face with an article of clothing; and, when the intruder identified as R. Carr drove her to the ATM, he specifically instructed her not to look in his direction. By the time the group

was en route in two vehicles to the soccer field, the intruder identified as R. Carr had stopped trying to conceal his identity. See *State v. Hernandez*, 232 Ariz. 313, 324, 305 P.3d 378 (2013) (jury could have found defendant acted as accomplice, intending to aid codefendant in committing capital murder, based on planned home invasion, no attempt to conceal his identity from victims); *State v. Ellison*, 213 Ariz. 116, 134, 140 P.3d 899 (2006) (evidence defendant planned home invasion, did not attempt to conceal identity, among other evidence, sufficient to establish aiding and abetting premeditated capital murder, imposition of death sentence).

At the soccer field, both intruders had the victims kneel down. See *People v. Youngblood*, 165 Mich. App. 381, 387, 418 N.W.2d 472 (1988) (premeditation can be based on circumstantial evidence of organized conduct suggesting existence of plan); *State v. Stewart*, 714 S.W.2d 724, 726 (Mo. App. 1986) (evidence supported finding of premeditation when defendant part of coordinated attack on victim). The two intruders were standing in close proximity to one another. As the shots began, and the victims started screaming, neither intruder attempted to intercede. See *State v. Edgar*, 281 Kan. 47, 68, 127 P.3d 1016 (2006) (defendant's failure to oppose commission of crime supports inference defendant assented to, approved of, encouraged its commission; thus aided, abetted); *State v. Ly*, 277 Kan. 386, 395, 85 P.3d 1200 (2004) (failure to intercede in events culminating in homicide supports guilt on aiding, abetting). The five victims were shot execution-style. See *People v. Robinson*, 37 Cal. 4th 592, 630, 124 P.3d 363 (2005) (execution-style shooting of kneeling victim supported theory that murder premeditated); *People v. Bloyd*, 43 Cal. 3d 333, 348, 233 Cal. Rptr. 368, 729 P.2d 802 (1987) (execution-style killings at close-range "very strong evidence" of premeditation); see also *Nguyen v. Knowles*, CIV S-03-2381 MCE, 2011 WL 1076751, at *19 (E.D. Cal. 2011) (unpublished opinion), *subsequently aff'd* 475 F. Appx. 128 (9th Cir. 2012), *cert. denied* 133 S. Ct. 277 (2012) ("the speed and effectiveness with which the victim was killed indicated premeditation and deliberation by all four defendants").

After the two intruders left the soccer field, the evidence suggests that they returned to the Birchwood home to steal the victims'

belongings, including the big screen television mentioned in one of their conversations. The same morning, law enforcement found both defendants in possession of the victims' property. The jury could have inferred that the capital murders and the attempted first-degree premeditated murder were carried out, at least in part, to facilitate the subsequent stealing, again, demonstrating premeditation. See *Drayden v. White*, 232 F.3d 704, 709-10 (9th Cir. 2000) (defendant's conduct after murder—including cleaning of scene, search of victim's apartment, stealing of car, other property—evidence of premeditated plan to rob victim, calculated strategy to kill him in furtherance of plan); *People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998) (premeditation supported by evidence defendant took victim's automobile, items from her home after killing, attempted to sell them); *State v. Hardimon*, 310 N.W.2d 564, 566 (Minn. 1981) (jury's finding of premeditation supported by evidence defendant remained in house looking for items to steal after victims killed).

The two Birchwood intruders also made repeated threats throughout the crimes. When Aaron S. resisted their demands, they struck him in the head, hard enough that he cried out in pain. When Holly G. asked the intruder identified as R. Carr if he and the other intruder planned to shoot the victims, he initially responded "no." Later, however, after poking Holly G. in the back with what she believed to be a gun, he said, "[D]on't worry, I'm not going to shoot you *yet*." (Emphasis added.) See *State v. Broadus*, 206 Kan. 766, 769, 481 P.2d 1006 (1971) (prior threats, along with other circumstantial evidence, supports finding of premeditation).

In the end, the fact that the State could not firmly establish which Birchwood intruder was the principal and which the aider and abettor of the capital murders and attempted first-degree premeditated murder, even in light of the erroneous "reasonably foreseeable" language in Instruction No. 8, is overcome by the strength of the circumstantial evidence throughout the whole record on the intruders' shared premeditation. See *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011) (quoting *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 [2002]) (circumstantial evidence "sufficient to

establish even the gravest offenses"). The two intruders worked as a team throughout the night, and this included their concerted joint action at the soccer field. See *State v. Bradford*, 272 Kan. 523, 528, 34 P.3d 434 (2001) (defendant's argument that he was not trigger-man failed to provide defense to accomplice liability for capital murder, in light of evidence of his collaboration); *State v. Wakefield*, 267 Kan. 116, 123, 977 P.2d 941 (1999) (evidence sufficient to convict defendant as aider, abettor, when he knew cohort ascending stairs of home to kill victims, continued removing items from home rather than intercede).

Furthermore, in this case, the State did not pin a legally flawed theory of guilt on the capital murders and the attempted first-degree premeditated murder to the erroneous instruction. See *Overstreet*, 288 Kan. at 14-15 (prosecutor's argument reinforced erroneous instruction). Rather, one of the prosecutors told the jury that the State had charged both defendants with all of the crimes against the Birchwood victims "because of their equal participation in those intended crimes." The only time that the "reasonably foreseeable" language was mentioned was in reference to one of the rapes of Holly G. On the capital murders and the attempted first-degree premeditated murder, the State properly focused its arguments on the strength of its evidence of both intruders' premeditation.

Judge Clark's other instructions also emphasized the requirement of premeditation as a condition precedent to conviction of either defendant on the capital murders and the attempted first-degree premeditated murder. The judge also told the jury that it could convict defendants of second-degree murder as a lesser included offense of capital murder if there was no premeditation. See *State v. Ellmaker*, 289 Kan. 1132, 1139-40, 221 P.3d 1105 (2009) (reviewing court must "examine the instructions as a whole, rather than isolate any one instruction, and determine if the instructions properly and fairly state the law as applied to the facts of the case").

The inclusion of the "reasonably foreseeable" language in Instruction No. 8 was not clearly erroneous.

*Personal Premeditated Intent to Kill*

The defense also takes issue with the wording of the first paragraph of Instruction No. 8, asserting it was clearly erroneous because it failed to explain that an aider and abettor, not only a principal, must have personally possessed premeditation on the capital murders and attempted first-degree premeditated murder before conviction would be appropriate.

We have rejected this defense argument in two cases decided this year. See *State v. Gleason,* 299 Kan. 1127, Syl. ¶ 1, 329 P.3d 1102 (2014); *State v. Betancourt,* 299 Kan. 131, 138-41, 322 P.3d 353 (2014). We will not revisit those holdings or their supporting rationales at this time.

*Omission of K.S.A. 21-3205(2) Language*

The final defense complaint about the aiding and abetting instruction is that its second paragraph should have included an additional phrase from K.S.A. 21-3205(2) to avoid being labeled clearly erroneous.

As mentioned, this paragraph of the instruction was based on PIK Crim.3d 54.06, which, in turn, is based on K.S.A. 21-3205(2). That statute reads: "A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable *by such person as a probable consequence of committing or attempting to commit the crime intended.*" (Emphasis added.) The emphasized language was left out of Instruction No. 8.

J. Carr, in particular, argues that the omission meant the jury never heard about a critical causation element of aider and abettor liability. In the words of his brief, "the unintended crime has to be more than reasonably foreseeable; it has to be foreseeable as *a consequence* of the actions taken to commit the intended crime." (Emphasis added.) He relies on our decision in *Overstreet,* 288 Kan. at 14-15, in which we noted that the jury may have improperly convicted the defendant, not because he had the requisite intent, "but because the murder was a reasonably foreseeable *consequence of*" an aggravated assault. (Emphasis added.)

J. Carr also argues that omission of the word "probable" before the word "consequence" means Instruction No. 8 failed to convey to the jury how likely the unintended crime must be in order for an aider and abettor to be held criminally liable. His last critical observation is that what may be a "probable consequence" for two defendants with a long history, such as the defendants here, may be something different for two defendants who lack that history.

We note that the newer version of the PIK instruction includes the language the defense campaigns for here, see PIK Crim. 4th 52.140, leading us to recommend its use as the better practice in the future. Still, because we have approved the PIK Crim. 3d version of the instruction without the language as recently as our 2004 decision in *State v. Gleason*, 277 Kan. 624, 636-38, 88 P.3d 218 (2004) we adhere to our precedent and hold that Judge Clark did not commit clear error in omitting the phrase from Instruction No. 8 at the defendants' 2002 trial.

### 26. PROSECUTORIAL MISCONDUCT

R. Carr has not argued prosecutorial misconduct in his appeal. But J. Carr argues in his separate appeal that one of the prosecutors committed misconduct by encouraging jurors during closing argument to place themselves in the position of the victims in the three incidents. Under K.S.A. 2013 Supp. 21-6619(b), we take up this argument as unassigned in R. Carr's case.

*Additional Factual and Procedural Background*

The prosecutor began her closing argument in this way:

"Ladies and gentlemen of the jury, you have been here a long time and you've heard a lot of evidence. You've seen a lot of exhibits, over 850. You've heard from over 95 witnesses. There are multiple counts against the defendant Jonathan Carr, 47; 50 against the defendant Reginald Carr. And we've been here in this well-lighted courtroom. You've seen a lot of pictures. But you view it at a distance. We view it in a place where it's about 75 degrees, not 25. We view it in a place where there's no wind chill. We view it in a place where we stand on ground or sit in cushioned chairs, no snow beneath our feet or below our knees. We view it at a distance in such a way that we cannot hear the sounds that were part of these crimes. We cannot hear the threats and the demands made to Andrew Schreiber; Move over, Give us your wallet, Give us your watch, Get down. We cannot hear, We're not done yet. We cannot hear the sounds of someone approaching and the

glass breaking at Ann Walenta's window. We cannot hear the sound of the engine when she's trying to start it again. We can't hear in this courtroom that blasting horn, that plea for help. We can't hear in this courtroom those demands that were made at Birchwood to those five young people. We can't hear, We're going to pop your ass. We can't hear, Keep that dog quiet. We can't hear the screams of [Jason B.] when he realizes someone is bursting into the bedroom in which he sleeps, or the screams of [Brad H.] when he's assaulted first with gunpoint in the basement. We can't hear those screams that were made and cries that were made in that closet while [Holly G.] was crying while the man she loved, [Jason B.], was at the mercy of a gunman taking all of his money out at the ATM's. And we can't hear the cries of [Aaron S.] in that same closet when he was hearing the moans of the woman he cared about being [brutally] raped. And, you know, we can't hear in this courtroom—as much evidence as we fill it with, we cannot hear [Aaron S.] on his knees screaming, Please, sir, Please, God when he realizes a bullet has been fired into [Heather M.'s] head.

"So we're distanced. But the reality of these crimes [is] in front of you for your decision, your decision based on evidence—overwhelming evidence that proves the guilt of these two men."

### Standard of Review

For many years, we have said that

"review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, e.g., in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012)." *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

### Comment Within Wide Latitude Permitted Prosecutors

The defense argument is that this passage from the prosecutor's closing did nothing to help the jury analyze the evidence, that it focused on the nature of the crimes instead of who committed them, and that it invited the jury to consider the crimes through the eyes of the victim. By focusing on these subjects, rather than the elements of the charged crimes, the suggestion is that the comment was equivalent to an improper victim impact statement or akin to a forbidden "golden rule" argument. See *State v. Stano*, 284 Kan. 126, 150, 159 P.3d 931 (2007) (prosecutor's references to value of victim's life to surviving wife improper); *State v. Corbett*, 281 Kan. 294, 313, 130 P.3d 1179 (2006) ("golden rule" generally

improper); *State v. Donesay*, 265 Kan. 60, 82, 959 P.2d 862 (1998) (victim impact evidence improper); *Walters v. Hitchcock*, 237 Kan. 31, 33, 697 P.2d 847 (1985) ("golden rule" argument may improperly encourage jurors to place themselves in position of plaintiff).

The State contends that the quoted passage was appropriate commentary on the evidence. It cites cases approving prosecution explanations of evidence. See, *e.g.*, *State v. McHenry*, 276 Kan. 513, 78 P.3d 403 (2003), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006); *State v. Cravatt*, 267 Kan. 314, 335-36, 979 P.2d 679 (1999).

"The fundamental rule for closing arguments is that the prosecutor must confine his or her remarks to matters in evidence." *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004). "In closing argument, a prosecutor may comment on admitted evidence as long as the remarks accurately reflect the evidence, accurately state the law, and are not intended to inflame the jury's passions or prejudices or divert the jury from its duty to decide the case based on the evidence and controlling law." *State v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 (2012), *cert. denied* 133 S. Ct. 529 (2012) (citing *State v. Raskie*, 293 Kan. 906, Syl. ¶ 3, 269 P.3d 1268 [2012]); *Corbett*, 281 Kan. at 313 (citing *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 [2004]) ("Prosecutors should not make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.").

We have approved of comparably dramatic performances by prosecutors. In *State v. Hall*, 292 Kan. 841, 257 P.3d 272 (2011), for example, the prosecutor said:

"[T]he blood on that sidewalk that was spilled that day is long since gone. The memories of that day though of the witnesses that you heard from are not. Thank goodness they were here to tell you what happened. And now it's your responsibility to go back, view that evidence, not forget what happened, but expose what happened, and tell this man exactly what he's guilty of: First-degree premeditated murder and criminal possession of a firearm." 292 Kan. at 853.

The defendant challenged these comments on appeal, but we held that they were proper reminders to the jury "of their responsibility to review the evidence" and that the prosecutor could ask the jury

"to return a guilty verdict based on that evidence." 292 Kan. at 854.

Likewise, in *State v. Bennington*, 293 Kan. 503, 532-33, 264 P.3d 440 (2011), when the prosecutor told the jury, " 'The victim's not here to show, to tell you her side of the story . . . . Use your common sense, please, and remember what the DNA is doing for us here. It's speaking for [the victim]. It's telling us who committed these crimes,' " we held that the remarks were not an attempt to create inappropriate sympathy. 293 Kan. at 532-33; see *Cravatt*, 267 Kan. at 335-36 ("When examining the legal intricacies of this case, when reading this cold white paper, don't ever forget the human life that was taken . . . . [The victim] was 21 years old. He'll never live again. The defendant shot him in cold blood. Don't let him get away with it' "; comments designed to encourage jury to "seriously consider the nature of the defendant's act towards the victim").

Under these cases, we detect no error in the prosecutor's remarks here. She properly acknowledged the jury's efforts. She then commented on the enormity of the evidence and the unusually large number of charges. And, finally, she suggested that, despite the difference between in-court descriptions and lived experience, the jury had heard and seen plenty of evidence to convict the defendants. She referenced only facts and events in evidence. She did not explicitly invite the jury to consider the crimes through the eyes of the victims. She did not allude to any lingering trauma or psychological damage to the victims or to their family and friends.

The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle. It is not opening statement; it is not confined to a dry recitation of the evidence presented. Compare *State v. Hilt*, 299 Kan. 176, Syl. ¶ 9, 322 P.3d 367 (2014) ("A prosecutor may use analogies, similes, allusions, and other rhetorical devices in an attempt to bring order to the facts presented at trial, place them in a meaningful context, and construct the whole of a case. Within sensible limits set by similarity and dissimilarity to the facts of a case, a prosecutor's appropriate rhetorical devices may include film allusions and comparisons or be otherwise theatrical."), with *Kley-*

*pas*, 272 Kan. 894, Syl. ¶ 23 ("Opening statements by counsel in criminal prosecutions are not evidence. They are given for the purposes of assisting the jury in understanding what each side expects its evidence at trial will establish and to advise the jury what questions will be presented for its decision.")

We reject the defense argument that the prosecutor exceeded the wide latitude permitted her in this case.

### 27. CUMULATIVE ERROR

R. Carr's final challenge on the guilt phase of his trial is based on the cumulative error doctrine.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007). Moreover, this doctrine does not apply if no error or only one error supports reversal. See *State v. Carter*, 284 Kan. 312, 332, 160 P.3d 457 (2007)." *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

In assessing whether the weight of cumulative errors can be harmless, we examine the errors in the context of the entire record, including remedial efforts of the trial court, the nature and number of the errors and whether they are interrelated, and the strength of the evidence against the defendant. *State v. Warrior*, 294 Kan. 484, 517, 277 P.3d 1111 (2012).

Thus the final question we must answer in the guilt phase is whether the cumulative impact of multiple harmless errors was harmless beyond a reasonable doubt. See *State v. Armstrong*, 299 Kan. 405, Syl. ¶ 10, 324 P.3d 1052 (2014). This "task is undoubtedly more subtle than simply counting up the number of errors discovered." See *Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013).

We have held that there were several errors, none of them, standing alone, requiring reversal of all of R. Carr's convictions. To recap, they are:

- The district judge erred in refusing to sever the guilt phase of defendants' trial.

- The district judge erred when he rejected defendants' challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to the State's peremptory strike of juror and eventual foreperson W.B.
- The district judge erred under the Sixth Amendment and *Crawford v. Washington*, 541 U.S. 56, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), when he admitted statements by Walenta.
- The instructions on all four K.S.A. 21-3439(a)(4) sex-crime-based capital murders were erroneous.
- The convictions on three of four K.S.A. 21-3439(a)(6) multiple-death capital murders were multiplicitous.
- The convictions on the victim-on-victim rape and attempted rape offenses were void for lack of subject matter jurisdiction.
- Count 42 was multiplicitous with Count 41.
- The district judge erred when he misapplied the third-party evidence rule and hearsay exceptions, preventing R. Carr from presenting his defense.
- The district judge erred by automatically excluding eyewitness identification expert testimony proffered by the defense.
- The district judge erred when he instructed the jury to consider an eyewitness' degree of certainty when assessing that witness' reliability.
- The instruction on aiding and abetting was erroneous.

With our standard of review in mind, we first consider which of the 11 identified errors carry any weight in our harmless error analysis. Significantly, 4 of the 11 errors carry no weight. Although we found the instructions regarding the sex-based capital murders to be erroneous, the multiple capital convictions multiplicitous, the victim on victim offenses void, and Counts 41 and 42 multiplicitous, we have cured these errors by vacating the convictions directly arising from these errors. See *State v. King*, 297 Kan. 955, 987, 305 P.3d 641 (2013) (discussing cumulative error, refusing to weigh impact of instructional, multiplicity errors already cured through reversal of affected convictions). Any indirect impact these errors may have had on the remaining convictions is negligible, at best, and does not factor into our analysis.

Similarly, the weight of the erroneous admission of Walenta's statements is negligible given that this error directly affected only the convictions arising from that incident, and we easily held the error harmless because the critical information contained in Walenta's statements otherwise was lawfully admitted.

Likewise, there was limited potential impact from the aiding and abetting instruction's failure to convey that the aider and abettor must have premeditated the killings he assisted. There can be no question that both defendants intended and premeditated the killings when the facts demonstrated that they jointly herded their victims to the garage and forced them at gunpoint into two vehicles, strategically arranged and rearranged the victims between the cars, ultimately placing the three male victims in the trunk of one vehicle, jointly drove the two cars to a remote location, and had a conversation between themselves before assisting one another in arranging the victims on the snow-covered ground. Significantly, neither man protested as the victims were shot, execution-style, one after another.

This leaves us with five errors that carry weight. Four of these errors are interrelated and affected the defendant's ability to argue that he did not participate in the crimes—the failure to sever the trials, the erroneous application of the third-party evidence rule, the erroneous exclusion of expert testimony on eyewitness identification, and an erroneous eyewitness identification instruction. The remaining error, the reverse *Batson* error, more broadly affected the trial. But the combined weight of these individually harmless errors pales in comparison to the strength of the evidence against the defendants.

Indeed, the evidence of both of the defendants' guilt of the Birchwood offenses was not simply strong; it was nothing short of overwhelming. The evidence supporting the defendants' guilt need not be recounted in detail. Suffice it to say that biological evidence, in addition to other physical evidence, heavily implicated both defendants. Most notably, J. Carr's seminal fluid was collected from Holly G., and both Holly G.'s and Heather M.'s DNA matched DNA found in J. Carr's boxer shorts. Similarly, material found on

Holly G.'s thigh implicated both R. Carr and J. Carr. And Heather M.'s blood was found on R. Carr's undershorts.

This highly persuasive biological evidence coupled with other substantial physical evidence of guilt—such as footprints matching R. Carr's found at the Birchwood residence; both men's possession of property stolen from Birchwood, including cash and two vehicles—and the highly persuasive circumstantial evidence of guilt— such as R. Carr's attempt to flee and the clothing J. Carr wore when arrested—lead us to conclude that any effort by either brother to suggest that he was not involved in the Birchwood crimes would be futile.

After weighing the cumulative errors from the trial against the overwhelming evidence of defendants' guilt, we remain unshaken in our confidence in the jury's verdicts. And, although we focus on the Birchwood crimes, having examined the entire record, we conclude beyond a reasonable doubt the cumulative impact of the multiple errors was harmless as to all of the verdicts we affirm today. Consequently, we hold the cumulative impact of those errors does not require reversal of any more of R. Carr's convictions.

### Conclusion for Guilt Phase

For the reasons set forth above, we affirm R. Carr's capital murder conviction under Count 2. We reverse his three remaining capital murder convictions based on the alternative theories under K.S.A. 21-3439(a)(4) and (a)(6).

We affirm R. Carr's convictions on Counts 9 through 24. Because four pairs of these counts were charged in the alternative, this results in affirmance of 12 rather than 16 convictions.

The convictions based on Counts 25, 26, and 29 through 40 are void for lack of subject matter jurisdiction. We affirm the convictions based on Counts 27 and 28.

We affirm R. Carr's conviction on Count 41. We reverse his conviction on Count 42 because it is multiplicitous with Count 41.

We affirm R. Carr's convictions on Counts 43 through 58.

### Penalty Phase Issues and Short Answers

Our majority decision to affirm one of R. Carr's death penalty-

eligible convictions—that based on Count 2 for the murders of Heather M., Jason B., Aaron S., and Brad H. under the multiple-homicide theory of K.S.A. 21-3439(a)(6)—requires us to address several of his penalty phase questions. Again, we have taken the liberty of reformulating certain questions to focus on their legally significant aspects or effects. We also have reordered questions raised by R. Carr and have inserted among them any unassigned potential error noted by us, because we believe this organization enhances clarity. We number all questions consecutively, this time, P1 through P20.

Our statement of each question is followed by a brief statement of its answer or our other response.

Because we conclude on the first question that R. Carr's remaining death sentence must be vacated and the case remanded, we need not reach the merits on all of the other questions. On those questions on which we do reach the merits or otherwise provide guidance on remand, we need not analyze and discuss whether any error, standing alone, would have compelled vacation of the death sentence. Nor need we discuss cumulative error.

P1. Did the district judge err in refusing to sever the penalty phase of the defendants' trial? A majority of six members of the court answers this question yes. One member of the court dissents and writes separately on this issue. A majority of six members of the court agrees that this error requires R. Carr's remaining death sentence to be vacated and the case remanded. One member of the court dissents and writes separately on this issue.

P2. Despite compliance with K.S.A. 21-4624(a), was it constitutional error to omit the four aggravating circumstances asserted by the State from the amended complaint? To provide guidance on remand, the court unanimously answers this question no.

P3. Did the four aggravating circumstances asserted by the State adequately channel the jury's discretion in arriving at the sentence of death? To provide guidance on remand, the court unanimously answers this question yes.

P4. Does the unavailability of a transcript of the jury view deprive R. Carr of a meaningful opportunity for appellate review of

his death sentence? To provide guidance on remand, the court unanimously answers this question no.

P5. Does K.S.A. 21-4624(c)'s allowance of testimonial hearsay (a) offend the heightened reliability standard applicable in death penalty cases or (b) violate the Confrontation Clause of the United States Constitution and *Crawford*, 541 U.S. 36, 56, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)? To provide guidance on remand, the court unanimously answers the first question no. The court unanimously answers the second question yes.

P6. Did the district judge err in excluding mitigating evidence of (a) likelihood of parole or (b) the anticipated impact of R. Carr's execution? To provide guidance on remand, the court unanimously answers the first question no. The court discusses the standard that should govern consideration if the second question arises again.

P7. Did the district judge err by permitting the State's rebuttal witness to testify that he had consulted other experts and that they agreed with his opinion? To provide guidance on remand, the court discusses the standard that should govern consideration if this question arises again.

P8. Did the district judge err in denying an opportunity for sur-rebuttal testimony? The court unanimously agrees that the district judge abused his discretion. The court declines to reach the issue of harmlessness because of the necessity of remand.

P9. Must R. Carr's sentencing on his noncapital convictions have occurred before the penalty phase of his trial, and, if so, should the jury have been informed of the sentences he would serve if he were not sentenced to death? The court declines to reach the merits of the first part of this question because it is moot and, to provide guidance on remand, unanimously answers the second part of the question no.

P10. Did the district judge err in failing to instruct the jury that the existence of mitigating factors need not be proved beyond a reasonable doubt? To provide guidance on remand, a majority of five members of the court answers this question yes. Two members of the court dissent, and one of them writes separately for the two on this issue.

P11. Did the district judge err by failing to instruct jurors that "the crime" to be considered when evaluating aggravating circumstances was capital murder? We discuss this issue to provide guidance on remand.

P12. Was the jury instruction on the role of mercy clearly erroneous? To provide guidance on remand, the court unanimously answers this question no.

P13. Did the wording of Instruction 10, when read with the verdict forms, misstate the law on the need for jury unanimity on mitigating factors not outweighing aggravating factors? To provide guidance on remand, the court unanimously answers this question yes.

P14. Must R. Carr's death sentence be vacated because a fact necessary to imposition of the penalty—his age of 18 or older at the time of the capital crime—was not submitted to the jury or found beyond a reasonable doubt? The court declines to reach the merits of this issue because the situation that prompted it is unlikely to arise again on remand.

P15. Did the district judge err in failing to give a "no adverse inference" instruction? The court declines to reach the merits of this issue because the situation that prompted it is unlikely to arise again on remand.

P16. Does K.S.A. 21-3205 authorize punishing an aider and abettor the same as a principal? The court declines to reach the merits of this issue because the record on appeal does not demonstrate that R. Carr was convicted of capital murder as an aider and abettor.

P17. Is the death penalty an unconstitutionally disproportionate punishment as applied to aiders and abettors of capital murder under Section 9 of the Kansas Constitution Bill of Rights? The court declines to reach the merits of this issue because the record on appeal does not demonstrate that R. Carr was convicted of capital murder as an aider and abettor.

P18. Was the penalty phase infected by prosecutorial misconduct? The court declines to reach the merits of this issue because the situation that prompted it is unlikely to arise again on remand.

P19. Do verdict forms such as those used in this case pose a threat of double jeopardy? The court declines to reach the merits of this issue because it is unripe.

P20. Does Kansas' execution protocol protect against unnecessary pain? The court declines to reach the merits of this issue because it is unripe.

### FACTUAL AND PROCEDURAL BACKGROUND FOR PENALTY PHASE ISSUES

The day after the completion of the guilt phase of defendants' trial, the penalty phase of their trial began.

At the beginning of the penalty proceeding, Judge Clark raised a question about whether courtroom security should be increased in keeping with increased jail security due to the defendants' convictions. Specifically, he asked whether J. Carr should wear leg restraints in the courtroom. The judge acknowledged that J. Carr had not misbehaved, but he nevertheless ordered that he wear the restraints while in court, providing that they be placed so they could not be observed by the jury.

Meanwhile, counsel for R. Carr informed the judge that his client was no longer willing to cover the handcuffs he was ordered to wear with a sweater. The judge permitted R. Carr not to use the sweater, but he admonished him that, if the jury saw the handcuffs, any later allegation of error arising from that view would be regarded as invited by R. Carr.

#### The State's Case-in-Chief

The State elected to rely on the evidence from the guilt phase of the defendants' trial as its case-in-chief during the penalty phase. It asserted the existence of four aggravating circumstances in the capital murders of Heather M., Aaron S., Brad H., and Jason B.: Defendants knowingly or purposely killed or created a great risk of death to more than one person; defendants committed the crimes for themselves or another for the purpose of receiving money or any other thing of monetary value; defendants committed the crimes in order to prevent a lawful arrest or prosecution; and

defendants committed the crimes in an especially heinous, atrocious, or cruel manner.

### The Defense Case

Defense witnesses testified about the defendants' dysfunctional upbringing and their psychological profiles.

### Family History

Defendants' mother, Janice Harding, testified that she and the defendants' father, Reginald, Sr., were 16 and 17 years old when their first child, Temica, was born in Cleveland, Ohio, in 1974. Temica lived with her paternal grandmother for the first year of her life. When Harding turned 18, she and Reginald, Sr., married. They then had three more children: R. Carr in 1977, Regina in 1979, and J. Carr in 1980. All of the Carr children were born prematurely, and J. Carr cried so much from infancy through his late preschool years that he was called "Screaming Man" by his mother and other family members.

Despite the 3-year age difference between her sons, Harding said that R. and J. Carr were "always real close," and J. Carr looked up to R. Carr.

Regina developed a cancerous tumor when she was 2 years old and died before her third birthday. Harding testified that the family deteriorated after Regina got sick. Harding "fell out" with her mother-in-law, who reported Harding and Reginald, Sr., to child protective services after seeing bruises on Regina's legs and arms and across her chest. Harding claimed the child protection case was dismissed because the bruises had been caused when family members had to hold Regina down to administer chemotherapy drugs. However, according to Dr. Michael Cunningham, a forensic psychologist who testified as a defense expert for J. Carr, Harding's mother-in-law, Dorothy Wiley, had described taking Regina into her care because her parents were not clothing her properly. Wiley said she called child protective services after observing spoon-shaped bruises on Regina.

After Regina's death, Harding and Reginald, Sr., began drinking heavily and fighting. The fights, according to Harding, involved

screaming and hitting. Although Harding said the fights never took place in front of the children, she acknowledged that they may have seen them. Temica testified that she saw her father beat her mother with a stick. There was other testimony about Reginald, Sr., chasing Harding with a brick and about Harding hitting him with a baseball bat.

In addition to fighting with Reginald, Sr., Harding often disappeared, sometimes for several days at a time. Harding denied being romantically "involved with anyone in particular." She said she was just "kind of leaving to get away from" Reginald, Sr. Harding said she did not tell her children when she was leaving; she just packed up and went. She also admitted there were times when she left her children alone in the house, going out to a club with a neighbor after she put them to bed. Nevertheless, Harding described herself as a "stay-at-home" mom who "cooked every day, cleaned house, did laundry," and she said that Reginald, Sr., "worked, paid all the bills[;] nothing was behind."

Temica testified about her mother staying out and not coming home in this period. When Harding did come home, Temica said, she would stay a couple of days and then leave again. During these episodes, either Reginald, Sr., would take care of the children, or he would take them to an aunt's house.

Other family members also described Harding's unpredictable disappearances from home while her children were growing up. Cunningham testified that a paternal aunt described Harding as "promiscuous," saying she went to clubs and failed to come home at night. After days or weeks, the aunt said, Harding would return with "incredible stories about how she had been ill or had been in the hospital, even though the family had seen her at nightclubs, coming out of nightclubs, during the time that she was reporting to them that she had been in the hospital."

### Divorce and Abandonment by Father

Harding and Reginald, Sr., separated when R. Carr was 5 or 6, then divorced. Reginald, Sr., remarried 2 months after the divorce and eventually lost all meaningful contact with his children from his first marriage.

R. Carr had always been his father's favorite. In the opinion of Harding's sister, pediatrician Phyllis Harding, the divorce affected R. Carr more than the other children. Temica recalled that, as a youngster, R. Carr missed his father and cried often for him. Grief would turn to anger when his father promised to visit and failed to appear as arranged. In particular, both Temica and his mother recounted that when R. Carr was in his early teens and having trouble in school, arrangements were made for him to go to California to live with his father. Although R. Carr had a ticket for the trip, his father called the day his son was supposed to leave and said that he could not come to California after all. R. Carr saw his father only one time after that disappointment.

Temica herself last saw her father when she was in fourth or fifth grade. He refused to accept a collect telephone call from her on the night before she testified.

### Post-Divorce Atmosphere

After the divorce, Temica testified, her mother also was not available to her children. She was "never at home, never at home . . . . [I]t was just me, Jonathan and Reginald there, period." At one point, Harding began staying frequently with her future husband, Rick Austin, at his parents' house.

When she was home, Harding was described as "holing up" in her bedroom and generally unaffectionate with her children. Cunningham reported that Harding would emerge from her bedroom, fix dinner, leave it on the stove, and carry her plate back to the bedroom, where she and Austin would remain, typically with the door shut. If the children wanted to interact with either Harding or Austin, they would have to knock on the door and sometimes have to talk through it.

Temica said she believed Austin was involved in chopping down stolen cars and was hiding from law enforcement. Harding testified that Austin once threatened her with a gun, which "pissed off" R. Carr, who did not like Austin.

Temica also testified that, sometime after the divorce, her mother "just sent me to California" to live with her aunt, Phyllis; Temica did not know why. Temica attended fifth and sixth grades

in California, and her mother never visited her while she was there. R. and J. Carr also were "shipped off," Temica said; J. Carr went to Brownsville, Texas, at one point, and R. Carr was sent to West Virginia. Temica could not recall where she was living during these periods, saying, "I could have been living with anybody."

Temica described eventually getting a job at 15 or 16 and buying school clothes for her brothers, as well as preparing many evening meals and attending school conferences when J. Carr experienced learning problems. When she told her mother that she did not think Harding loved them anymore, Harding beat her. Temica said R. Carr believed Harding did not like him because he had dark skin.

Temica attributed her mother's eventual move from Ohio to Dodge City to what she believed were Austin's illegal activities. She said that R. Carr would have been 13 or 14 years old at the time of the move. Phyllis had moved to Dodge City about a year earlier, and Austin eventually moved to Dodge City as well. He and Harding had been married 8 years by the time of Harding's testimony.

Because Temica was a senior in high school and wanted to graduate with people she knew, she resisted moving to Dodge City. Her mother left her in Ohio with "some guy named Patrick," whom Temica had never met until her mother packed her things and took her to stay with him. Temica would not be reunited with her two brothers until years later, when R. Carr came home after a release from prison in March 2000.

*Methods of Discipline*

To discipline her children when they were growing up, Harding said, she spanked her kids "the same way my momma spanked me." This meant she used belts, a house shoe if there was one around, and, occasionally, an extension cord. The belts had names such as "Heat Daddy," and the children would be required to choose the one she would use for a spanking.

Temica testified that whoever was getting a "whooping" would have to lie on the floor in his or her underwear, and the two other children would hold down his or her arms and legs. Temica de-

scribed one occasion when she was required to take off all of her clothes and take the sheets off a bed. She was then placed on the bed like an "X" and beaten. If the child receiving the beating got up from being held down, then he or she received additional physical punishment.

The defendants' cousin, Phyllis' adopted daughter, Barbara, testified that she remembered being disciplined by Harding as well—with belts, spoons, or an electric cord. She also remembered that one of the other children would hold her legs down. Cunningham testified that J. Carr and Temica both described that their mother's whippings with a belt or extension cord would leave them with welts, bruises, and blood blisters on their backs, legs, or buttocks.

Further defense testimony supported the idea that child maltreatment results in a desensitization to violence and is a major risk factor for future criminality and violence when the child becomes an adult.

### Substance Abuse

Harding testified that she and Reginald, Sr., smoked marijuana on weekends, but, as far as she knew, the children were unaware of their drug use. Harding also told Dr. Thomas Reidy, a forensic psychologist who evaluated and testified for R. Carr, that she had used cocaine. J. Carr reported to Cunningham that he had seen his mother smoke marijuana. Cunningham testified that a parental model for drug use is "a broad risk factor, social and psychological risk factor, for relationship problems, for self-control problems, for feeling of defectiveness, psychological disorders and criminal behavior as well."

Cunningham testified that a paternal cousin who grew up with Harding's children reported that Temica told her when they were 10 or 11 years old that Harding and Austin would do drugs in Harding's bedroom. Cunningham also said that two of J. Carr's peers had told him while he was an adolescent that they sold crack to his mother.

Cunningham testified that accounts from family members led him to believe that Reginald, Sr., was an alcoholic. A sister of Reginald, Sr., said he was routinely drunk when he came to live with

her after his marriage with Harding collapsed. Her daughter described this as well, remembering in particular that Reginald, Sr., would drink cough syrup by the bottle.

J. Carr told Cunningham that he had been given Thunderbird wine mixed with grape Kool-Aid by an uncle at age 8. R. and J. Carr visited the uncle weekly and all three would get drunk. The uncle and R. Carr often would have a girl there as well, while J. Carr would drink until he passed out.

J. Carr first smoked marijuana at age 13 with R. Carr. They would smoke "blunts," cigar-like rolls of marijuana, "every day, all day." After R. Carr was released from prison in March 2000, he and J. Carr smoked marijuana heavily together.

J. Carr also reported using hallucinogenic mushrooms routinely for about a month when he was 18 years old, but he stopped because he was getting delayed hallucinations. He also described smoking "wet"—tobacco or marijuana cigarettes dipped in a mixture of PCP "and typically embalming fluid"—at age 19.

R. Carr had started using drugs at an early age, and he attended school "stoned" during eighth and ninth grades. He was holding drugs for drug dealers by age 11, and selling drugs by age 13. He was using alcohol heavily by age 16.

Harding described police execution of a search warrant for drugs at 3 or 4 a.m. when R. Carr was about 15 years old. She said he was locked up for a probation violation when he was 16 because a urinalysis showed marijuana use. Harding also said she kicked R. Carr out of her house when he was 16 or 17 because she was under the impression he was selling drugs and "didn't want that in the household."

In 1995, R. Carr was arrested for drug possession. After conviction, he was incarcerated at Norton Correctional Facility for 5 years.

J. Carr told Cunningham that he and R. Carr had smoked 4 to 5 blunts in the 24 hours before the Birchwood crimes and had split two fifths of cognac between noon and the 11 p.m. entry into the triplex. J. Carr also told Cunningham that he had smoked "wet" from 30 minutes to an hour before the series of Birchwood crimes began.

*Childhood Sexual Abuse and Behavior*

The defendants' paternal aunt said that each had come to her separately and told her that the other was being sexually abused by one of their mother's boyfriends; but each denied it when she spoke to him directly. Temica testified that she had heard her brothers were forced to have oral sex with her mother's boyfriends. She also testified that, when she was a child, her father sexually abused her, including fondling and attempted rape. She said she never told anyone but thought R. Carr might know because "Reginald pays attention to people."

A paternal cousin also reported that she had been sexually abused as a child by R. Carr, Sr., and her mother verified her report.

Cunningham testified that J. Carr reported to him that, when he was about 6 or 7 years old, R. Carr prompted a peer-age girl named Amber to begin having sexual contact with J. Carr. Apparently the girl had already been involved with R. Carr. Harding appeared to excuse this aspect of R. Carr's early sexual activity by calling the girl "promiscuous." Temica also confirmed J. Carr's report of his involvement with the girl.

Barbara, who grew up with the defendants, testified that her maternal uncle, Michael, sexually abused her when she was 6 years old. Phyllis denied that the defendants' uncle Michael had abused her daughter. Barbara said she did not report the abuse to her mother and grandmother until she was 15, and they both called her a "lying bitch."

Barbara also testified that she had sexual contact with R. Carr, starting when she was 7 years old. She said R. Carr was perhaps 9 years old at the time. This contact continued for a few years, stopping when R. Carr was in high school. She also reported sexual contact with Temica.

R. Carr discovered explicit pornographic photographs of his mother when he was 13 years old, and he was suspended from school during the eighth grade for sexually harassing a teacher.

*Rape Accusation and Suicide Attempts by J. Carr*

In 1989, when J. Carr was in the third grade at Harvey Rice School in Cleveland, a girl in the school accused several boys, including J. Carr, of raping her. The case was dubbed the "Harvey Rice rape case," and the boys' names were mentioned in the newspaper. As a result, J. Carr was teased and called names by schoolmates. Eventually, the girl's accusation was exposed as false.

J. Carr reported to Cunningham that, after the Harvey Rice allegation, his father began bringing him back early from visitation and then quit visiting with him at all, despite maintaining visitation with his brother. Harding sent him to live with Phyllis in Brownsville for more than a year; Harding said she did not visit J. Carr during that time because she "didn't have the monies to travel."

Eventually, J. Carr became so despondent over the incident that he tried to hang himself. At age 17, after dogs that J. Carr was fond of accidentally drank antifreeze and died, J. Carr again attempted to commit suicide—by drinking antifreeze. Harding thought J. Carr also was upset at the time because R. Carr had been sent to prison. After the second suicide attempt, J. Carr went to Ohio to live with a maternal uncle.

*R. Carr's Teen Years and Early Adulthood*

When his family moved from Cleveland to Dodge City, R. Carr initially adjusted well. He had many friends and was involved in extracurricular activities. He liked to draw and write poetry. He had an aquarium in his room and a pet dog.

But, as R. Carr got older, he began to struggle in school—fighting and getting suspended. He finally was expelled when he was 17 and sent to an adult education program. He passed his GED examination with high scores.

About the same time, R. Carr became a father for the first time. His first son was born to Richelle Cossman in November 1994.

R. Carr began taking classes at a local community college, with the goal of becoming an X-ray technician, but his studies came to an end when he was arrested for robbing the college bookstore. He was placed in community corrections, but he violated his probation by smoking marijuana and was jailed for several months.

After release, R. Carr was seeing Amanda Lyons. But he was soon arrested again for possession of drugs. He was convicted of drug possession, theft, aggravated assault, and obstruction of legal process. He was held in the county jail until he turned 18, then sent to Norton, where he remained until he was 23. R. Carr was released from Norton on March 28, 2000.

Lyons' first child with R. Carr, another son, was born in December 1996, when R. Carr was 19 years old and in prison in Norton. The couple married in May 1997, and their second child, a daughter, was born in April 2001, while R. Carr was awaiting trial in this case.

Harding believed that prison changed her son. She said that he had been outgoing, had kept his room clean, and was mannerly and respectful before he was in prison. After his release, he was "standoffish." Other family described him as "hardened" by the experience of prison. They reported that he started going by the name of "Smoke" while in Norton.

Despite his incarceration, R. Carr maintained a relationship with both of his sons. Lyons brought both boys to Norton regularly for visits. When not in prison, R. Carr had exercised regular visitation with his oldest son and had taught him how to ride a bicycle. At the time of trial, his younger son was worried about where his father was sleeping and what he was eating. R. Carr would draw pictures for his children, and his boys wrote letters, made cards, and drew pictures for their father. Cossman and Lyons said that R. Carr's children would continue to have relationships with him, if he were to be incarcerated rather than executed.

R. Carr was arrested for driving under the influence in Dodge City on November 19, 2000, and bonded out the same day. He was arrested again 9 days later on a Department of Corrections warrant for a parole violation. Because of a mistake in calculating his good-time credit on his 1996 prison sentence, the Department declared that his parole expired on December 1, 2000, when it should have continued until June 1 of the following year. As a result, the Department withdrew its parole violation warrant. Even though R. Carr also was being held in jail in Ford County on a forgery charge, the withdrawal of the warrant enabled him to bond

out again, this time on December 5, 2000, 2 days before the Schreiber incident.

### R. Carr's Evaluations and Expert Testimony

Dr. Mitchel Woltersdorf, a clinical neuropsychologist who diagnoses brain disorders, put R. Carr through a battery of tests. R. Carr's MRI and EEG were normal. But Woltersdorf diagnosed him with brain damage, evidenced by significant differences in levels of mental functioning that should be relatively equal. For example, R. Carr had a verbal scale IQ of 86, while his performance scale IQ was 111. Normal point spread would be 5 to 7; a 25-point difference occurs in less than 3 percent of the population. R. Carr also had a 19-point difference between his verbal comprehension score of 84, which reflects left brain hemisphere skill, and his perceptual organization score of 103, which reflects right hemisphere skill. That great a difference occurs in about 14 percent of the population. Woltersdorf said that R. Carr also demonstrated "huge" differences in memory and visual testing; these differences were "way too large" for a normal brain.

According to Woltersdorf, the type of brain dysfunction R. Carr suffered from was not consistent with the type of damage caused by drug or alcohol abuse. Rather, he probably suffered significant head trauma or traumas, most likely during the first 8 or 9 years of his life. The doctor could not say if the brain damage was due to abuse or was related to birth trauma. There was evidence that, at one point during their childhoods, J. Carr had shot R. Carr in the head with a BB gun.

Woltersdorf testified: "A person with a head injury has to make some wise choices to prevent that head injury from ruining [his or her] life." If R. Carr were an ordinary patient, he would need to be placed on medication for mood control and anger control, and he would be counseled about a traumatic brain injury "lifestyle, swearing off caffeine, illicit substances, alcohol." Consumption of caffeine, drugs, and alcohol can make a person with a head injury violent and aggressive.

Woltersdorf also tested R. Carr's emotional status. He found that he suffered from depression, antisocial personality disorder, dis-

trust, and paranoia. In Woltersdorf's opinion, R. Carr's condition was chronic: "[I]t's been there forever."

The antisocial personality disorder also showed up in problems with anger management and difficulties with authority, Woltersdorf said. He emphasized that R. Carr did not choose the disorder. "It's something that he was given, so to speak, in life, somewhere between birth and the fifth year of life . . . . it eventually manifests itself by the adolescent years."

Reidy, the forensic psychologist, prepared a social history for R. Carr. He echoed Woltersdorf's statement that family circumstances are usually the cause of the development of an antisocial personality disorder, noting that families are the strongest socializing force in life, and "deviance begins at home." He said: "The quality of attachments to the parents and other members of the family during childhood is central to how the child will relate to and value other members of society as an adult." Reidy looked at how R. Carr went from being a happy toddler, a "good kid" who liked to push a vacuum cleaner around, to a young adult convicted of four counts of capital murder.

Consequences of parental abandonment and neglect, Reidy said, included

"damage to one's identity, lowered esteem, various and sundry psychological disorders, anxiety disorders, depression particularly[, a]cademic deficits, impaired capacity to trust and care for others[, d]eficient identification with social ideals. One—in this kind of environment, one tends to become morally corrupt and then various kinds of problematic, delinquent, violent behavior can occur."

Reidy also testified that inappropriate sexual exposure at an early age also has lasting negative effects. The long-term risk is "disturbed sexual behavior" that gets expressed in a variety of ways in adulthood. One expression of disturbed sexual behavior is "deviant sexual hyperarousal." This occurs when "[s]ex is viewed as a means of power and control, very much like a rape scenario." Early sexual exposure can lead to impaired sexual impulse control and can cause repetitions and re-enactments of sexual victimization. In sum, R. Carr grew up in a "sexually perverse family atmosphere," Reidy said. This upbringing was likely to leave R. Carr with a distorted view of maleness and sexuality.

Reidy identified other risk factors and consequences for a negative outcome in R. Carr's life, including early aggression and violent behavior evidenced by fights starting at a young age and early gang affiliation; antisocial behavior and attitudes as reflected in arrests for robbery, battery, drug and alcohol use, holding drugs for dealers, and stealing; and emotional and physical abuse. He said that R. Carr's developmental trauma was severe and that protective factors were minimal to nonexistent.

### Evaluation of J. Carr

Harding testified that she learned J. Carr was dyslexic when he was in third grade, right before he was sent to live with Phyllis in Brownsville. She also said he had trouble passing grades during his middle school years and was kept back in seventh grade.

Cunningham's testing measured J. Carr's current abilities at the second- or third-grade range. J. Carr had told Cunningham that he tried to disguise his inability to read in elementary school by avoiding or refusing to read aloud; when he was forced to read aloud, he was ridiculed by his classmates. He finally dropped out of school in tenth or eleventh grade.

Cunningham characterized J. Carr as emotionally disturbed from early childhood on. Cunningham identified the family situation—involving physical and sexual abuse, parental neglect, and emotional detachment—and a genetic predisposition to mental illness and substance abuse as likely contributors to J. Carr's pattern of emotional instability.

Cunningham testified that the family history showed that Harding's solution to her children's increased need, even in the greatest of crises, was to send them to someone else's household. Cunningham said that it was important for a child to be with his brothers and sisters as well as his parents, because "when you move a child from one placement to another, particularly when you disrupt those sibling relationships as well, you are doing grave emotional harm to this child."

Cunningham testified that the neglect Jonathan experienced growing up was not primarily physical in nature. Rather, there was "an issue of very significant emotional neglect, of an absence of

attachment and bonding to parents, of affection, of continuity of care, later on[,] of supervision and guidance."

Cunningham testified that parental detachment such as that in the defendants' home had "ominous implications" for the quality of Harding's relationship with her children, how she sees herself as a mother, and "the quality of her responsibility . . . to these kids."

Cunningham also spoke about Harding's methods of discipline. In his view, although it is damaging for a child to observe violence in the home, it is worse "to be made a party to it . . . . you are the one that's helping administer this abuse, [and it] magnifies the emotional[ly] damaging effects of it."

Cunningham also documented that J. Carr had a serious go-cart accident at age 15, which caused a concussion with unconsciousness of an hour or more and merited a hospital admission.

Cunningham said that he had documented a susceptibility to mental illness stemming from the maternal side of J. Carr's family. Both the maternal grandmother and maternal uncle Michael had significant histories of mental illness. Phyllis described her mother's repeated admissions to state mental hospitals and her noncompliance with medication that prevented her from becoming angry and ranting and raving. Barbara testified that her uncle Michael never took baths and used to "[w]alk around the house with his pants open so you can see his genitals." Michael also exhibited symptoms similar to his mother's, including unpredictable, explosive anger and noncompliance with his medication regimen.

Given significant developmental abuse and neglect, disruptive relationships, and the fact that J. Carr was carrying around a lot of emotional pain as he entered adolescence, Cunningham testified, J. Carr was a prime candidate to "self-medicate" with drugs and alcohol.

Cunningham said that J. Carr also told him that R. Carr was involved with a gang, but J. Carr nevertheless looked up to his older brother. Family members also said that R. Carr influenced J. Carr as they grew up. Temica, specifically, said that R. Carr would ridicule J. Carr as weak, calling him a "wuss" and other disparaging names when he did not do something R. Carr wanted him to do.

Harding said that she warned J. Carr to stay away from R. Carr when he got out of prison because J. Carr would "end up getting in trouble." Her younger son, she said, was "a little different when he's with Reggie."

Using a United States Department of Justice study of risk factors that increase the likelihood of involvement in criminal violence, Cunningham found J. Carr had 18 or 19 out of approximately 22 risk factors. On protective factors, J. Carr exhibited some elements of positive social orientation. Regarding a second study breaking risk factors into categories of individual, family, social, peer, community, and neighborhood, Cunningham found J. Carr had a majority of the risk factors in each category. He said that other risk factors were J. Carr's age and learning disabilities.

Cunningham summed up the factors leading to J. Carr's participation in the crimes as a combination of "some very problematic genetic predispositions," in addition to "neurological abnormalities," "a catastrophic family setting" leading to "substance abuse and disturbed adjustment that are aggravating each other during adolescence. Out of that, you have the influence of his older brother and intoxication at the time. And from that, you have the capital offense."

*Testimony of J. Carr's Friends*

Three of J. Carr's friends testified for him during the penalty phase of the trial.

Leroy and Juanita Culver knew J. Carr when he lived in Dodge City. Jesse Harris knew J. Carr in Ohio through his daughter, who was J. Carr's girlfriend.

J. Carr worked for Leroy for 3 or 4 years. Leroy said that J. Carr was a good worker who wanted to learn and that he was "looking for affection" from somebody. Juanita described J. Carr as "one of the nicest, polite, kind, warm, giving, always—he was the epitome of the finest young man you could find."

Jesse Harris said that J. Carr stayed with his family in Cleveland and that, at some point, he became engaged to his daughter. He never had harsh words or any trouble with J. Carr. He described

him as "a real quiet young man," whom he treated "like one of my own sons."

### Defendants' Roles in Quadruple Homicide

During her testimony in the penalty phase, on questioning from J. Carr's counsel, Temica said that R. Carr admitted to her that he shot "those people," referring to Heather M., Aaron S., Brad H., and Jason B.

There was no testimony from any witness that J. Carr admitted to shooting the victims of the quadruple homicide, but the prosecution made reference to J. Carr claiming to have been the triggerman while he was in jail. During the State's closing argument, when the claim was mentioned again, and defense counsel objected to facts not in evidence, Judge Clark sustained the objection.

### Dueling PET Scan Experts and Denial of Continuance for Surrebuttal

The defense presented testimony from Dr. David Preston, a specialist in nuclear medicine who was qualified as an expert for the defense at the penalty phase regarding PET imaging and its use as a diagnostic technique. Preston said that a PET scan of a person's brain is not accepted to predict or explain criminal behavior, but he did identify what he said were abnormalities in both R. Carr's and J. Carr's scans. Specifically, he said images of their temporal lobes demonstrated marked deficits in metabolism in the regions of the hippocampus and amygdala.

Preston testified that Exhibit A-39, an image of R. Carr's brain, and Exhibit JC-2, an image of J. Carr's brain, displayed images that were higher in back and lower in front to give a larger view of their temporal lobes. He also admitted on direct examination that he had mistakenly classified Exhibit A-40 as a PET scan of a normal young male for comparison purposes. In fact, it was an image of a 50-year old male with a memory problem.

Preston further testified that, in patients he has seen in the past, a closed head injury would be the first thing he would suspect as a cause of the type of deficits he observed in the defendants' scans.

But he said that no history of closed head injuries was provided to him in this case.

The State called Dr. Norman Pay, a neuroradiologist, in rebuttal to Preston. On direct examination, Pay testified that he consulted with the person at Via Christi Medical Center who performed the PET scans on the defendants, the doctor in charge of PET scans at Via Christi, and a neurologist at Via Christi. The State had Pay identify these colleagues, who were in the courtroom, and asked each of them to raise a hand, which they did. Pay said all three were in agreement with him that Exhibits A-39 and JC-2 were skewed in color and were manipulated so that the anterior portion of the temporal lobe, which includes the amygdala, would not appear in the images. When the prosecutor asked Pay if the manipulated images were "by design," he responded, "We were told."

Pay further testified that, looking at all of the PET images, he and the others he consulted had reached the opinion that the scans showed normal metabolism in both defendants' brains.

J. Carr's counsel objected to admission of opinions from Pay's colleagues in the courtroom, but the objection was overruled.

On cross-examination, Pay admitted that he normally does not read PET scans, despite being asked to do so in this case. He said that the difference between JC-2 and State's Exhibit 912, another of J. Carr's PET scan images on which he was relying to give his opinion, might be the presence of "scatter" in 912. Scatter can produce a halo effect that can be eliminated by reducing the background color.

When asked if he could tell whether Preston had manipulated the images so that they would be higher in back and lower in front, Pay responded, "You know, we have to have Dr. Preston here to testify because I don't really know what he did." Pay agreed that if two dots in one of the images were indicative of J. Carr's eyes, it might necessarily involve the area of the hippocampus and amygdala. He also testified on cross-examination that he did not attempt to contact Preston to ask him how he arrived at his conclusions and that he was not there to cast any aspersions on Preston's integrity or competence.

The defense requested a continuance to confer with Preston and recall him as a witness in surrebuttal. Counsel argued that he must be permitted to address the State's allegation that he manipulated the PET images "by design."

Judge Clark characterized the disagreement between Preston and Pay as "a fact question for the jury . . . between experts" and said that Preston "would be repeating what he had said in direct." He denied the motion for continuance.

In closing argument, one of the prosecutors argued that the "truth" as revealed by the "doctors" showed that Preston's "slick" PET scan images and related testimony were "hocus pocus." The prosecutor said that the "foundation of the [defendants'] sympathy and abuse excuse and blame" had come "crashing down" and that they were simply dragging their "laundry" into court.

Additional facts necessary to resolution of particular legal issues will be discussed below.

## P1. SEVERANCE

R. Carr challenges Judge Clark's failure to sever the penalty phase of his trial from the penalty phase of J. Carr's trial. The failure to sever, R. Carr asserts, violated his Eighth Amendment to the United States Constitution right to an individualized capital sentencing determination and requires us to vacate the death sentence on the remaining capital conviction and remand the case for further proceedings. J. Carr makes at least one distinct argument in favor of severance of the penalty phase: He asserts the joint trial inhibited the jury's individualized consideration of him because of family characteristics tending to demonstrate future dangerousness that he shared with his brother.

Although R. Carr's visible handcuffs are not specified as another source of prejudice to J. Carr, they also factor into our decision under K.S.A. 2013 Supp. 21-6619(b). See *Deck v. Missouri*, 544 U.S. 622, 624, 635, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005), *abrogated on other grounds by Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (Constitution forbids use of visible shackles during penalty phase of capital prosecution, unless justified by essential state interest specific to defendant on trial;

shackling inherently prejudicial; negative effects cannot be shown from transcript; when court, without adequate justification orders defendant to wear shackles that will be seen by jury, defendant need not demonstrate actual prejudice to make out due process violation; State must prove beyond reasonable doubt error did not contribute to death verdict); see also *United State v. Jarvis*, 792 F.2d 767, 769-70 (9th Cir. 1986) (jurors' observation of shackled codefendants in courthouse elevator likely to be prejudicial to codefendant alleged to be closely affiliated with them); *Reynolds v. Gomez*, No. 97-16126, 1998 WL 869908, at *1 (9th Cir. 1998) (unpublished opinion) (defendant prejudiced by codefendant's unconstitutional shackling; recognizing danger of guilt by association when prosecution's evidence of codefendants' guilt "inexorably intertwined").

Ultimately, we agree with the defendants that Judge Clark's failure to sever the penalty phase of their trial was error requiring vacation of their remaining death sentences and remand to district court.

Both defendants renewed all motions, which included their motions to sever, in the penalty phase of the prosecution. Judge Clark denied the motions.

In general, during the penalty phase, J. Carr continued the pattern he had set in the guilt phase by emphasizing that R. Carr was the more culpable actor and a negative influence in J. Carr's life.

The Eighth Amendment to the United States Constitution requires the jury to make an individualized sentencing determination. It does not categorically mandate separate penalty phase proceedings for each codefendant in a death penalty case. *United States v. Tipton*, 90 F.3d 861, 892 (4th Cir. 1996) (joint trials in death-eligible cases are not per se unconstitutional); *United States v. Rivera*, 363 F. Supp. 2d 814, 823 (E.D. Va. 2005) ("The defendants [in a capital case] have an Eighth Amendment right to an 'individualized determination' of their penalty phase sentence, however, this important right does not compel an individual penalty phase hearing.").

R. Carr is partially correct when he argues that J. Carr's mitigation evidence qualified as antagonistic to his mitigation case. See

*State v. White*, 275 Kan. 580, 590, 67 P.3d 138 (2003) (citing *State v. Myrick & Nelms*, 228 Kan. 406, 416, 616 P.2d 1066 [1980]).

To the extent mitigation evidence on behalf of J. Carr merely proved R. Carr's criminal history and engagement in a deviant lifestyle that continued at the time of the Birchwood crimes, it was not in conflict with R. Carr's penalty phase case. The jury had already heard R. Carr's counsel and Donley talk about R. Carr's drug sales during the guilt phase. Then, in the penalty phase, jurors heard more on these subjects from witnesses called by R. Carr. Lyons and Cossman testified about his convictions on various offenses. Woltersdorf testified about R. Carr's diagnosis of anti-social personality disorder, for which there is no successful treatment protocol, and he had no disagreement with clinical profiles characterizing R. Carr as a "self-centered and poorly socialized" individual, "primarily concerned with instant gratification of his immediate wants and needs." Reidy testified about R. Carr's early affiliation with a gang, his gang-related fights, his drug-related conflicts, his illegal narcotics use, and his prior arrests.

However, to the extent mitigation evidence on behalf of J. Carr was used by him to differentiate between his and R. Carr's levels of moral, not legal, culpability for the killings of Heather M., Aaron S., Brad H., and Jason B., the penalty phase cases of R. Carr and J. Carr were antagonistic.

Cases in which we have rejected a claim of antagonism attributed to similar fingerpointing between codefendants over which was the likely principal and which the likely aider and abettor when neither was exposed to the death penalty—see *State v. Boyd*, 281 Kan. 70, 82, 127 P.3d 998 (2006); *White*, 275 Kan. at 590-91 (citing *Myrick*, 228 Kan. at 416-17; *State v. Sully*, 219 Kan. 222, 225, 547 P.2d 344 [1976])—are not controlling. In fact, they are not even minimally persuasive.

To begin with, we state the obvious: Until a 2013 amendment of the "Hard 50" statute in response to *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), noncapital cases have not required penalty phase trials to juries at all. Compare K.S.A. 21-4635 with K.S.A. 2013 Supp. 21-6620(b)(2) (re-

quiring separate sentencing proceeding before jury to determine applicability of "Hard 50" sentence).

More important and, perhaps, less obvious: Fingerpointing focused on which of two codefendants was the principal and which the aider and abettor has absolutely no bearing on whether a factfinder should find either guilty or not guilty of the crime. A principal and an aider and abettor are equally culpable *under the law*. See K.S.A. 2013 Supp. 21-5210 (aider and abettor criminally responsible for crime committed by principal); *State v. Soto*, 299 Kan. 102, Syl. ¶ 2, 322 P.3d 334 (2014) ("The Kansas aiding and abetting statute does not add distinct material elements to the definition of a charged crime, thus creating alternative means of committing that crime. Rather, the aiding and abetting statute simply extends criminal responsibility to a person other than the principal actor.").

Whether a defendant is legally guilty or not guilty under the law is no longer at issue in the penalty phase of a capital case. But differentiation in the *moral* culpability of two defendants can have determinative bearing in a joint trial on whether a juror decides to show mercy to one while refusing to show mercy to the other. *State v. Kleypas*, 272 Kan. 894, 1103, 40 P.3d 139 (2001) (mitigating circumstances allow juror to consider factors that "may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense"; improper for prosecutor to argue certain circumstances should not be considered as mitigating circumstances because they do not excuse or justify crime). And mercy from a single juror is all it takes to send a capital defendant to prison rather than to execution. See *State v. Cheever*, 295 Kan. 229, 267-68, 284 P.3d 1007 (2012), *cert. granted in part* 133 S. Ct. 1460 (2013), *vacated and remanded*, 134 S. Ct. 596 (2013) (approving instruction on "exercise of mercy" as proper mitigator). Mercy may overcome even the most obvious imbalance between forceful evidence of aggravators from the State and a defense mitigation case that is so weak it would not pull the skin off a rice pudding.

Our conclusion that the defendants' penalty phase cases were at least partially antagonistic to each other is cemented by J. Carr's cross-examination of Temica, the defendants' sister. That cross-examination elicited Temica's testimony that, during a visit she made to R. Carr in jail, he admitted to shooting the Birchwood victims. Furthermore, we are not satisfied that this testimony inevitably would have been admitted in a severed penalty phase.

Although one may speculate that the State's routine questioning of defense witnesses who had visited R. Carr in jail about the conversations they had there would have prompted Temica to give the same testimony in a separate proceeding, one cannot do better than speculate on this point. On the record before us, it is at least as possible that the State was completely unaware of R. Carr's admission to Temica until J. Carr's counsel exposed it in the middle of R. Carr's mitigation case. The State did not put Temica on the witness stand during its penalty case. It merely followed up during her cross-examination. Once a skilled lawyer is told what to look for, there is a far greater likelihood that he or she will find it and exploit it. And Temica's testimony about R. Carr's admission did not soften so much during her examination by the State—"I believe I heard him tell me something like that. I don't remember . . . like when he asked me who he shot and all that, I don't remember who was, you know, shot by who[m]"—that its probable influence on the jury was neutralized. We have often observed that a confession is the most persuasive evidence in the State's arsenal. See *State v. Yurk*, 230 Kan. 516, 519, 638 P.2d 921 (1982) (confession "one of the strongest forms of physical evidence available to the prosecution"); *State v. Watkins*, 219 Kan. 81, 90-91, 547 P.2d 810 (1976) (same). If any juror was inclined to show mercy to R. Carr because of residual doubt, as R. Carr argues, or because of a belief that J. Carr was the one who fired the black Lorcin in the soccer field, that juror was much less inclined to do so after Temica's testimony was introduced by J. Carr's counsel.

Such a change in perspective would not have been ameliorated by one of the prosecutor's three later references during questioning to J. Carr's jailhouse boasts about being the triggerman—*e.g.*, that he had "lined [the Birchwood victims] up in a ditch and went . . .

pop, pop, pop, in the back of the head." As mentioned, the State never put on evidence to support the prosecutor's references, and Judge Clark ultimately directed the jury to disregard them. In addition, we note that one of the statements attributed to J. Carr by the prosecutor directly implicated R. Carr, not J. Carr, by describing R. Carr's motivation to rape one of the victims in particularly disgusting and demeaning language.

In addition to focusing on antagonism and the possibility that some of the evidence introduced by J. Carr was unlikely to come into evidence during a severed penalty phase, R. Carr argues that J. Carr's mitigation was prone to being used as improper, nonstatutory aggravating evidence against him.

Again, we are compelled to agree.

Although Judge Clark correctly instructed the jury that each defendant was entitled to have his sentence decided on the evidence and law applicable to him, and that "[a]ny evidence in this phase that was limited to only one defendant should not be considered by you as to the other defendant," this is a rare instance in which our usual presumption that jurors follow the judge's instructions is defeated by logic. In view of the defendants' joint upbringing in the maelstrom that was their family and their influence on and interactions with one another, including testimony that tended to show that R. Carr was a corrupting influence on J. Carr, the penalty phase evidence simply was not amenable to orderly separation and analysis. See *United States v. Aquart*, 3:06CR160, 2010 WL 3211074, at *7 (D. Conn. 2010) (unpublished opinion) (ordering separate, sequential penalty phase proceedings when jury might view codefendant brother's lesser culpability as reason for concluding defendant more deserving of death penalty; defendants' plan to call family members to testify about upbringing, character created risk jury could conclude positive traits of one brother missing from other); see also *United States v. Catalan-Roman*, 376 F. Supp. 2d 96, 106 (D.P.R. 2005) (sequential penalty phase proceedings warranted when one defendant's evidence would show jury how codefendant more culpable); *United States v. Green*, 324 F. Supp. 2d 311, 325-26 (D. Mass. 2004) (penalty phase severed when government asserts same aggravating circumstance against

defendants; defendants likely to argue mitigation by shifting blame to other; by arguing not as worthy of death as codefendant); *cf. Espinosa v. State*, 589 So. 2d 887, 894-95 (Fla. 1991), *cert. granted, judgment rev'd* 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992) (J. Barkett, dissenting) (when defendants presenting antagonistic defenses, severance should always be rule in penalty phase of capital case).

This inevitable effect was compounded by the fact that the aggravators against which the evidence must be compared were precisely the same for both defendants. And similarly, the court's instructions identified the same statutory mitigating circumstances for both R. Carr and J. Carr.

In short, Judge Clark's refusal to sever the defendants' penalty phase was error that violated both R. Carr's and J. Carr's Eighth Amendment right to an individualized capital sentencing determination. Can this error be considered harmless? *Satterwhite v. Texas*, 486 U.S. 249, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988); *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). We have identified the appropriate harmless error standard when considering the penalty phase of a capital trial.

"[T]he standard of review and the ultimate question that must be answered with regard to whether [error] in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the [error], viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances." *Kleypas*, 272 Kan. at 1087-88.

The test is not whether a death penalty sentence would have been imposed but for the error; instead the inquiry is whether the death verdict actually rendered in this trial was surely unattributable to the error. *Kleypas*, 272 Kan. at 1087-88.

We conclude that R. Carr's Eighth Amendment right to an individualized sentencing determination was fatally impaired by this failure to sever. The evidence that was admitted, the especially damning subset of it that may not have been admitted in a severed proceeding, and the hopelessly tangled interrelationship of the mitigation cases presented by the defendants persuades us that the jury could not have discharged its duty to consider only the evi-

dence limited to one defendant as it arrived at their death sentences. We cannot say that the death verdict was unattributable, at least in part, to this error.

We therefore order vacation of R. Carr's remaining death sentence and remand to the district court. If a new penalty phase is conducted, it must be severed from any for J. Carr and must be tried before a jury that does not also hear J. Carr's penalty phase.

## P2. Notice of Aggravating Factors

R. Carr moved to bar his penalty phase on the ground that the State failed to give him constitutionally sufficient notice of the aggravating factors it intended to rely upon to seek death, despite its compliance with K.S.A. 21-4624(a).

Our review of this question of law is unlimited. See *Gaudina v. State*, 278 Kan. 103, 104, 92 P.3d 574 (2004); *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002).

R. Carr relies on *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999); and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). We have already disposed of this argument unfavorably to his position. See *State v. Scott*, 286 Kan. 54, 101-02, 183 P.3d 801 (2008). R. Carr has not brought any new considerations to our attention that would merit a change of course on this issue.

## P3. Channeling of Jury's Discretion

J. Carr has argued in his separate appeal that the four aggravating factors the State relied upon to pursue the death penalty against him were inadequate to channel the jury's discretion. We notice this unassigned error in R. Carr's appeal under K.S.A. 2013 Supp. 21-6619(b).

The State alleged the existence of four specific aggravators: that the defendants knowingly or purposely killed or created a great risk of death to more than one person; that they committed the crime for themselves or for another for the purpose of receiving money or any other thing of monetary value; that they committed the crime in order to avoid or prevent a lawful arrest or prosecution;

and that they committed the crime in an especially heinous, atrocious, or cruel manner. See K.S.A. 2013 Supp. 21-6624(b) (multiple murder), (c) (monetary gain), (e) (avoidance of arrest, prosecution), and (f) (especially heinous, atrocious, cruel).

We have rejected the defense arguments advanced here on each of the four aggravators, when those arguments were made on behalf of other death penalty defendants. See *State v. Scott*, 286 Kan. at 108-10 (rejecting argument on multiple murder, monetary gain); *State v. Kleypas*, 272 Kan. at 1025, 1029 (rejecting argument on avoidance of arrest; especially heinous, atrocious, cruel). The defense has not given us cause to revisit these holdings in this case.

### P4. UNAVAILABILITY OF TRANSCRIPT OF JURY VIEW

R. Carr argues that the judge's failure to have a court reporter present at the jury view during the guilt phase of his trial deprived him of an opportunity to make a record sufficient for meaningful appellate review of his death sentence, violating the Eighth and Fourteenth Amendments.

"[D]ue process requires a reasonably accurate and complete record of the trial proceeding in order to allow meaningful and effective appellate review." *State v. Holt*, 298 Kan. 531, 537, 314 P.3d 870 (2013) (citing *Entsminger v. Iowa*, 386 U. S. 748, 752, 87 S. Ct. 1402, 18 L. Ed. 2d 501 [1967]; see *Kheireddine v. Gonzales*, 427 F.3d 80, 84 [1st Cir. 2005]). And, when a claim appears to have a substantial foundation based on the available record but the claim cannot be reviewed because of the incomplete or inaccurate transcript, the proper remedy is reversal. *Holt*, 298 Kan. at 538 (citing *United States v. Wilson*, 16 F.3d 1027, 1031 [9th Cir. 1994]). Still,

"[a] defendant does not have a constitutionally protected right to a totally accurate transcript of the criminal proceedings. See, *e.g., Tedford v. Hepting*, 990 F.2d 745, 747 (3d Cir.), *cert. denied* 510 U.S. 920, 114 S. Ct. 317, 126 L. Ed. 2d 264 (1993); *Robinson v. Smyth*, 258 Fed. Appx. 469, 471 (3d Cir. 2007) (unpublished opinion). A record that is incomplete but that involves no substantial or significant omissions does not require reversal. See, *e.g., United States v. Cashwell*, 950 F.2d 699, 703 (11th Cir. 1992); *United States v. Selva*, 559 F.2d 1303, 1306 n.5 (5th Cir. 1977). Appellants seeking reversal on the grounds that they are denied due process because of an inaccurate or incomplete transcript must make the best

feasible showing possible that a complete and accurate transcript might have changed the outcome of the appeal. *Ortiz-Salas v. I.N.S.*, 992 F.2d 105, 106 (7th Cir. 1993); see *Al-Ghorbani v. Holder*, 585 F.3d 980, 992 (6th Cir. 2009)." *Holt,* 298 Kan. at 538.

See *State v. Stafford*, 223 Kan. 62, 64, 573 P.2d 970 (1977) (inability of State to provide transcript does not entitle defendant to new trial per se); *State v. Jefferson*, 204 Kan. 50, 51-52, 460 P.2d 610 (1969) (same; defendant must make good faith effort to obtain secondary statement of transcript).

As discussed fully in Section 23 of this opinion, R. Carr's substantive jury view arguments do not lead to relief. There is no claim of misconduct by anyone during the view and no other claim with a substantial foundation that requires us to know more than we know now about the view or anything that occurred during it. We are aware of no effort to construct a substitute for a transcript of the view. See Supreme Court Rule 3.04(a) (2013 Kan. Ct. R. Annot. 23) (procedure to be followed when transcript unavailable).

Under these circumstances, we cannot conclude that any constitutional violation has occurred because of the absence of a transcript of the jury view. R. Carr has been provided a reasonably accurate and complete record of the proceedings against him. That is what he is entitled to under the United States Constitution.

## P5. K.S.A. 21-4624(c)

R. Carr challenges the allowance of hearsay under K.S.A. 21-4624(c) during his penalty phase trial. He argues that this statute violates the heightened reliability standard applicable to capital cases. See *State v. Scott*, 286 Kan. at 76 (references to "heightened scrutiny" applied in capital case); *State v. Marsh*, 278 Kan. 520, 525, 102 P.3d 445 (2004), *rev'd and remanded* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), *vacated in part* 282 Kan. 38, 144 P.3d 48 (2006) ("We begin by observing that there is a heightened scrutiny of trial proceedings in a capital case.") (citing *Beck v. Alabama*, 447 U.S. 625, 637-38, 100 S. Ct 2382, 65 L. Ed. 2d 392 [1980]). He also argues that his constitutional rights were violated by the introduction of hearsay evidence under the authority of this statute during the penalty phase of his trial.

We briefly address these arguments to provide guidance on remand. R. Carr's pretrial motion to challenge the constitutionality of the statute was rejected by Judge Clark.

*The Statute and the Standard of Review*

K.S.A. 21-4624(c) provides for a relaxed evidentiary standard during the penalty phase of a capital proceeding:

"In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. Only such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing proceeding shall be admissible, and no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible."

"When the application of a statute is challenged on constitutional grounds, this court exercises an unlimited, de novo standard of review." *State v. Cook,* 286 Kan. 766, 768, 187 P.3d 1283 (2008) (citing *State v. Myers,* 260 Kan. 669, 676, 923 P.2d 1024 [1996], *cert. denied* 521 U.S. 1118 [1997]).

" ' "The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond reasonable doubt. [Citations omitted.]" ' " *State v. Brown,* 280 Kan. 898, 899, 127 P.3d 257 (2006).

*Heightened Standard of Reliability*

R. Carr recognizes that his argument based on the existence of a heightened standard of reliability in capital cases was rejected in *Scott.* That holding stands.

In *Scott,* we addressed defendant Gavin Scott's due process challenge to the constitutionality of K.S.A. 21-4624(c). 286 Kan. at 99. We rejected it, based on federal cases holding a similar federal

provision constitutional. See 286 Kan. at 100 (citing, *e.g.*, *United States v. Fell*, 360 F.3d 135 [2d Cir. 2004]). The Kansas statute's relaxed standard of admission was consistent, we said, with the United States Supreme Court's " 'all relevant evidence' " doctrine, which demands " 'that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.' " *Scott*, 286 Kan. at 100 (quoting *Jurek v. Texas*, 428 U.S. 262, 276, 96 S. Ct. 2950, 49 L. Ed. 2d 929 [1976]).

K.S.A. 21-4624(c), we explained,

"provides for an individualized inquiry, and does not limit the discretion of the sentencer to consider relevant circumstances offered by the defendant. K.S.A. 21-4624(c) provides that only relevant evidence is to be admitted, thus assuring the evidence actually has probative value. Moreover, evidence secured in violation of the United States Constitution or the Kansas Constitution is inadmissible. Consequently, we conclude the relaxed evidentiary standard is sufficient to protect the defendant's right to a fair trial and does not violate either the United States or Kansas Constitutions." *Scott*, 286 Kan. at 100-01.

In the words of the *Fell* opinion upon which we relied in *Scott*: "[T]he Supreme Court has . . . made clear that in order to achieve . . . 'heightened reliability,' *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors . . . . [A relaxed evidentiary standard] does not undermine 'heightened reliability'[;] it promotes it." *Fell*, 360 F.3d at 143-44.

R. Carr argues that the statute's relaxed evidentiary standard should apply only to a capital defendant's mitigating evidence. But his argument is rejected by the authority he cites to support it. See *Gregg v. Georgia*, 428 U.S. 153, 203-04, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (best practice "not to impose restrictions" on State's evidence offered at presentence hearing, as long as defendant not prejudiced).

Although R. Carr accurately observes that K.S.A. 21-4624(c) lacks any balancing test to weigh the probative value of information against any prejudice the defendant may suffer from its admission, a district judge nevertheless continues to fill an inherent role as "gatekeeper of constitutionally permissible evidence." *Fell*, 360 F.3d at 145 ("[I]t remains for the court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence oth-

erwise admissible under applicable evidentiary rules is excluded from trial.").

*Confrontation Clause*

On the Confrontation Clause, R. Carr argues that K.S.A. 21-4624(c) allows introduction of testimonial hearsay in violation of *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In fact, it cannot do so if the federal Constitution forbids it. *Cf. United States v. Cheever*, 423 F. Supp. 2d 1181, 1194 (D. Kan. 2006) (federal Constitution superior to federal rule of evidence).

The United States Supreme Court handed down its opinion in *Crawford* well after the trial of this case in 2002. See 541 U.S. 36. *Crawford* held that the Sixth Amendment bars " 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting *Crawford*, 541 U.S. at 53-54).

Thus the first question before us is whether *Crawford*'s interpretation and application of the Confrontation Clause reaches the penalty phase of a capital proceeding. The United States Supreme Court has not yet answered this question. *United States v. Umaña*, 750 F.3d 320, 360 (4th Cir. 2014) (Gregory, J., dissenting). Until we have a definitive answer from that Court, we recognize that other jurisdictions are split and we accept convincing arguments that confrontation law is applicable to a capital penalty phase trial. Compare *United States v. Fields*, 483 F.3d 313, 324-338 (5th Cir. 2007) (Sixth Amendment confrontation rights do not apply); *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (same); *Muhammad v. Secretary, Florida Dept. of Corrections*, 733 F.3d 1065, 1077 (11th Cir. 2013) (same), *cert. denied* 134 S. Ct. 893 (2014); *Petric v. State*, No. CR-09-0386, 2013 WL 598118 (Ala. Crim. App. 2013) (same); *State v. Shackelford*, 155 Idaho 454, 314 P.3d 136, 142-44, *reh. denied* (2013) (same); *People v. Banks*, 237 Ill. 2d 154, 203, 934 N.E.2d 435 (2010) (same); *State v. Berget*, 2013 S.D. 1, 826 N.W.2d 1, 21, *reh. denied* (2013) (same), with *Vankirk v. State*,

2011 Ark. 428, 385 S.W.3d 144 (2011) (Sixth Amendment confrontation rights apply); *State v. Rodriguez*, 754 N.W.2d 672, 681 (Minn. 2008) (same); *State v. Hurt*, 208 N.C. App. 1, 19, 702 S.E.2d 82 (2010) (same) (2012), *rev'd* 743 S.E.2d 173 (N.C. 2013); see Note, *The Confrontation Clause at Capital Sentencing: Should Prison Incident Reports Be Admissible in South Carolina*, 3 Charleston L. Rev. 739, 742-48 (2009) (detailing split of cases before publication of article in 2009).

Assuming application of Sixth Amendment confrontation rights in the penalty phase of a capital proceeding, R. Carr is right to question whether the State's mention of witness statements recorded in police reports during cross-examination of several defense witnesses should have been permitted. Out-of-court statements of witnesses to investigating law enforcement officers introduced to prove the fact of the matter asserted are textbook testimonial hearsay. See *State v. Jones*, 287 Kan. 559, 565-66, 197 P.3d 815 (2008) (discussing factors to determine whether hearsay statement testimonial).

It is not a wholly satisfactory response to say that the prosecutor's questions did not qualify as admitted evidence, that the statements were used only to impeach defense witnesses, or that the statements were not offered for the truth of the matter asserted. Inclusion of the statements as an explicit basis for the prosecutor's questions obviously implies to the jury that they have a basis in fact, regardless of whether the statements qualify for the label of evidence. But nothing in the record before us demonstrates that such a basis was ever tested. Any impeachment should only be effective if a sound basis for the prosecutor's impeaching question exists. And a sound basis exists only if the statements are true.

At any repeat penalty phase hearing on remand, we caution the parties and the district judge that Kansas now holds that the Sixth Amendment applies in the proceeding and that out-of-court testimonial hearsay may not be placed before the jury without a prior opportunity for the defendant to cross-examine the declarant. This includes any testimonial hearsay referenced in questions posed by counsel.

## P6. Exclusion of Mitigating Evidence

R. Carr challenges Judge Clark's exclusion of evidence of R. Carr's likelihood of parole and the impact of his execution. We provide guidance on these issues for any retrial of the penalty phase on remand.

### Additional Factual and Procedural Background

R. Carr sought to admit testimony of Bill Miskell, public information officer at the Kansas Department of Corrections, about the number of prisoners serving a life sentence who had been paroled and the number who had died in prison. During Miskell's direct examination, counsel for R. Carr asked about Defendant's Exhibits A-33 and A-34. The exhibits showed that, in the previous 20 years, 847 offenders had been incarcerated in Kansas for first-degree or capital murder. Of those, 202 convicted of first-degree murder had been paroled, and 37 inmates convicted of first-degree murder had died in prison. Of those paroled, six had been returned to prison on a new felony conviction. The exhibits also showed that "the average length of time between the admission date and the first parole eligibility date [was] 16 years[] 11 months and 17 days" and that "[t]he average length of time between the first parole eligibility date and the release date [was] 11 months and 17 days."

The State objected:

"The State believes these letters are objectionable, one, because they contain the hearsay of [R. Carr's counsel]; and two, because the content . . . is irrelevant . . . . following the ruling of *State v. Kleypas*, [272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *abrogated on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006),] unless it goes to the defendant's individual characteristics."

When asked to explain the purpose of the testimony, R. Carr's counsel stated:

"I wanted to provide the jury with as much information as I could . . . about [the alternative sentence] . . . . Since Kansas has not had a hard 50 for long enough for a 50-year sentence to be completed, to actually determine how long a person actually serves before they see the parole board and eventually are released, averaging out. I thought we would do a brief historical analogy with the life sentence in Kansas ranging from the 15-year minimum, which was traditionally what a life

sentence meant, up through the 40-year sentence, which we went to after that, to the 25 and the 50."

After hearing from all counsel, Judge Clark ruled:

"To me the issue is, and what we'll instruct on, unless something changes between then and now, is that the jury must decide if aggravating circumstances exist. Then they must decide if those aggravating circumstances they find to exist under the law outweigh the mitigating circumstances. And in doing that they must look at the individual being considered in that determination. I do not find relevance in the proffered Exhibits A-33 or A-34. Objection sustained."

R. Carr also proffered the testimony of Marilyn Scafe, then chair of the Kansas Parole Board. Scafe would have explained to the jury that the Board looked at seven statutory requirements to determine whether someone serving a life sentence should be paroled. According to Scafe, those requirements

"encompass the conditions of the crime, the severity of the crime itself, the background of the offender, taking into consideration their criminal history. It takes into consideration how they've responded since they've been incarcerated, the programs they've taken, their discipline reports they have had or haven't had. Then it also considers all of the plans they have for the future. The parole plan, where they plan to reside, what employment opportunities there are, their support and their opposition. We also have public comments which are solicited from the county of conviction, the judge, the—any of the officials, the judge, the district attorney's office, the sheriff and the police department. And the victim is notified and we take comments from the victim at that point, too."

Scafe also would have said that a prisoner would not necessarily be paroled on the date first eligible. In addition, she would have said that, up to that point, the Board had yet to consider parole for a person sentenced to a hard 25 life sentence.

The State's relevance objection to Scafe's testimony also was sustained.

Judge Clark also excluded certain testimony R. Carr sought to admit from his sister, Temica. Counsel asked her, "[D]o you have any idea what you would like the jury to do in regard to Reggie's sentence?" and "How do you think it will affect you if Reginald

Carr is executed?" The State objected to both questions on relevance, and Judge Clark sustained the objections.

The record contains no proffer of Temica's anticipated answers on the two questions to which the State successfully objected. R. Carr's brief states without citation to record support that Temica would have testified about "the value of Reginald's life to her, and the pain she would suffer should Reginald be executed."

*Likelihood of Parole*

As we have discussed in other sections of this opinion, relevance encompasses both materiality, reviewed de novo, and probative value, reviewed under an abuse of discretion standard. See *State v. Hilt*, 299 Kan. 176, 188-89, 322 P.3d 367 (2014). Whether the information R. Carr sought to introduce on likelihood of parole was relevant turns on whether it was probative on the material question of his likelihood of eventual parole.

In a capital sentencing proceeding, the Eighth and Fourteenth Amendments require that a capital defendant be allowed to present evidence to the jury of mitigating factors, and the jury must be permitted to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); see *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007); *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) *abrogated on other grounds Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). This requirement to allow evidence that bears on the defendant individually does not expressly prohibit broader evidence, but we have ruled that such evidence having to do with general conditions of incarceration may properly be excluded in a penalty phase of a death penalty case, unless it is designed to counter evidence from the State that prison life would be easy. *Kleypas*, 272 Kan. at 1071, 1073.

Neither Miskell's statistical information nor Scafe's testimony about the statutory rubric for granting parole and the fact that it had not yet been considered for anyone serving a hard 25 life sen-

tence appeared to have much, if anything, to do with R. Carr individually. They would have told the jury nothing meaningful about his actual likelihood of being granted parole at some point in the distant future, and thus Judge Clark's decision to exclude this evidence was not an abuse of discretion.

## Execution Impact Testimony

Other jurisdictions that have addressed the admissibility of execution impact testimony are split.

Three jurisdictions whose cases are cited by both parties do not allow such testimony. See *State v. Dickerson*, 395 S.C. 101, 122-23, 716 S.E.2d 895 (2011) (testimony that defendant's family had already lost two members to homicide; suffering would be exacerbated by defendant's death); *Ross v. State*, 954 So. 2d 968, 1012-13 (Miss. 2007) (motion in limine to prevent defendant's family from testifying about impact death sentence would have properly granted); *People v. Armstrong*, 183 Ill.2d 130, 154-55, 700 N.E.2d 960 (1998) (testimony of defendant's sister "regarding the death penalty's effect on the defendant's family" properly excluded as irrelevant).

Oregon permits admission of such testimony. See *State v. Stevens*, 319 Or. 573, 879 P.2d 162 (1994). At issue in the Oregon case was whether the defendant's wife could answer the following question: "Do you have an opinion as to whether it would be better for [your daughter] if her father lived in prison for the rest of his life without possibility of parole or died?" 319 Or. at 576. Because the anticipated testimony might be informative about the defendant's character, it was permissible. 319 Or. at 585.

We agree with the Oregon court that any admitted testimony of this nature needs to have some bearing on the material question of the defendant's character, *i.e.*, be probative on that material fact. This principle should be the lodestar for the district judge conducting any severed penalty proceeding on remand. At this stage, without a proffer of the testimony Temica would have given, see *State v. Evans*, 275 Kan. 95, 99, 62 P.3d 220 (2003) (proponent of excluded evidence has duty to make known substance of expected

evidence in proffer), we can only prescribe the proper question, not predict its correct answer.

## P7. Agreement of Other Experts

R. Carr argues on appeal that the State's rebuttal expert should not have been able to testify about witness colleagues' out-of-court agreement with his opinions. We provide guidance on this issue for any retrial of the penalty phase on remand.

*Additional Factual and Procedural Background*

The State's rebuttal expert, Pay, was extremely critical of defense expert Preston's conclusions and the PET scan images upon which Preston had relied. Pay said that the images failed to show the brain structures Preston had claimed they did, that they used an odd color reduction, and that they had been manipulated—according to what he was told—by design. Pay also testified that the scans did not show abnormal brains and that Preston's conclusions to the contrary were wrong.

Pay also testified that the scans had been performed at Via Christi by a respected technologist, Susan Stratton, at Preston's direction and in his presence. It was clear from Pay's testimony that some of the information upon which his criticisms rested had come from Stratton. When he identified her as the technologist who had performed the scans, the prosecutor instructed Pay to point her out in the courtroom. After he did so, the prosecutor asked Dr. Pay:

"Q. And you have also been in consultation with other members and colleagues in the neurological field; is that correct?
"A. Yes.
"Q. In fact, Dr. Flynn is the head of PET scans; is that correct?
"A. Yes.
"Q. And he is in the courtroom today?
"A. Right.
"Q. Raise your hand, Dr. Flynn.
 (Dr. Flynn complies)
"Q. And you also have conferred with Dr. Bart Grelinger, who is a neurologist in our community. Dr. Grelinger, please raise your hand.
 (Dr. Grelinger complies).

"Q. So each of these documents was reviewed, looked at, and discussed with regard to the findings that were apparent; is that right?
"A. Yes."

After Dr. Pay testified that the images had been manipulated, the prosecutor asked him how. He replied:

"Susan Stratton will attest to this more, but they were manipulated so that the temporal zones are very markedly—well, they are markedly diminished. You don't see too much of it and you don't see the cerebellum at all. It's very, very odd."

And, again, after testifying that the scans simply missed the brain structures Preston was targeting, he was asked:

"Q. You came to learn that that was by design?
"A. We were told."

Finally, the prosecutor sought Pay's opinions about Preston's conclusions:

"Q. In fact, if you were to look at all those pictures and you have conferred with other radiologists and other experts and is there a conclusion as to the function of Jonathan Carr's brain?
"A. You mean with his interpretation?
"Q. With this.
 "[J. Carr's counsel]: Objection to other folks' opinions beside Dr. Pay's, Your Honor.
 "THE COURT: I will overrule the objection.
"Q. You may answer.
"A. Could you repeat the question, please?
"Q. I guess I should, shouldn't I? When you reviewed this and as we talked about the number of individuals who called in to look, did you reach a consensus as to this brain being normal?
"A. Yes.
"Q. Do you have any quarrel?
"A. No.
"Q. Anybody have a problem with that?
"A. No.
"Q. Now looking at Reginald Carr's, if you would, Doctor. . . . What can you tell us about Reginald Carr's brain from the documents you have here?
"A. There's normal metabolic function of both temporal lobes.
"Q. And this again is a consensus opinion?
"A. Yes.
"Q. And you concur?
"A. Yes."

During the State's redirect, this exchange occurred:

"Q. The fact of it is that here in Court today are your colleagues that all work in that area in the different disciplines that worked with you and looked and came to a consensus on both of these tests?
"A. Yes.
 "[R. Carr's counsel]: Objection, Your Honor, leading.
 "THE COURT: It does suggest the answer.
"Q. Did you confer with colleagues?
"A. Yes, I did.
"Q. Did you reach a conclusion?
"A. Yes.
"Q. Did you reach a consensus?
"A. Yes.
"Q. What is that consensus?
"A. That they're both normal."

On recross-examination by R. Carr's counsel, he asked about the colleagues that were consulted:

"Q. Dr. Pay, the colleagues that you consulted with are, I assume, the people that do PET scans? Why aren't they here?
"A. He is here, one of them is here.
"Q. Why didn't he testify?
"A. He could testify for you if you wanted to. He looked at the same scans.
"Q. But you don't read PET scans but you are coming in here giving an opinion about PET scans; is that correct?
"A. Yes."

*Confrontation Clause Applicability*

Both R. Carr and J. Carr characterize this issue as one arising under the Sixth Amendment Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36.

We have already said in Section P5 of this opinion that the Confrontation Clause should apply in the penalty phase of capital proceedings and controls over any contrary interpretation or application of K.S.A. 21-4624(c) regarding relaxed evidentiary standards.

This means that, should the State attempt to admit Pay's testimony about the agreement of his colleagues again on remand, the controlling question will be whether the out-of-court statements of agreement by Pay's colleagues qualify as testimonial hearsay under the Sixth Amendment and *Crawford*.

## P8. Surrebuttal Testimony

R. Carr challenges Judge Clark's refusal to allow a brief continuance so that defense expert Preston could be present during State rebuttal expert Pay's testimony and then testify in surrebuttal.

### Additional Factual and Procedural History

Pay was contacted by the State the day before he was called to the witness stand to testify in rebuttal about Preston's PET scan evidence. Neither Pay nor the State had provided the defense with an expert report or any summary of Pay's anticipated testimony.

The defense initially sought a continuance so that Preston could return to the courtroom before Pay's testimony began. Judge Clark was unwilling to grant such a continuance. He commented:

"If Dr. Preston is coming to say what he did was right, he has already said that. And he has explained why he did the color and he explained why he made the cut . . . . Sounds like experts disagreeing. If that is what it is Dr. Preston has to say, I don't think it is surrebuttal. I think it's evidence presented in direct, not rebutted."

Although additional discussion followed, Judge Clark remained unwilling to grant a continuance. His decision was based on the idea that Preston could properly testify in surrebuttal only if he said something new. If, instead, the defense intended to have him explain to the jury what he did, why he did it, and why what he did was not deceitful or deceptive, the testimony would not be proper surrebuttal.

Judge Clark did allow time for defense counsel to interview Pay before cross- examining him before the jury. He also told counsel: "Then what I will let you do is use my telephone and call Dr. Preston. Ask him what he would say to these questions and I will revisit whether or not to wait until that time. We won't shut everything down until I make that final decision."

Although the record is not crystal clear on the amount of time the defense needed to bring Preston back to court, we see that Pay testified on the morning of November 13, more than 2 months after the trial started with jury selection on September 9. As late as "lunchtime"—the precise time is not in the record, but court recessed for lunch after hearing the parties on this matter—counsel

for the defense told Judge Clark that Preston could be back to testify in surrebuttal by 3:30 p.m.

Ultimately, Judge Clark denied the defense request to have Preston return and testify.

During closing argument, the State referred to Preston's support for the defendants' abnormal mental processes as a "house of cards" that came crashing down under the weight of Pay's testimony; the prosecutor repeatedly emphasized a theme in which Preston's testimony was nothing more than "hocus pocus."

*Denial of Continuance and Surrebuttal*

The use and extent of rebuttal and surrebuttal rests in the sound discretion of the district judge, and his or her ruling will not be reversed unless the discretion has been abused to a party's prejudice. *State v. Martin*, 237 Kan. 285, 291-92, 699 P.2d 486 (1985). In addition, we review denial of a continuance for abuse of discretion. See *State v. Haney*, 299 Kan. 256, 259, 323 P.3d 164 (2014); *State v. Cook*, 281 Kan. 961, 986, 135 P.3d 1147 (2006).

As we have said in other sections of this opinion, discretion is abused if its exercise has relied on an incorrect legal standard. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (citing *Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010).

The rules regarding rebuttal evidence were set out in *State v Martin*:

" 'Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony.' " 237 Kan. at 291-92 (quoting *State v. Weigel*, 228 Kan. 194, Syl. ¶ 9, 612 P.2d 636 [1980]).

In this case, Judge Clark insisted that the defense must produce something new through any surrebuttal testimony from Preston. The State continues to hew to this standard in its briefs to this court. But there is no inflexible legal requirement that rebuttal or surrebuttal evidence be new. It may be evidence that is used to

explain or counteract or simply corroborate previous testimony. Judge Clark abused his discretion on the allowance of surrebuttal and the continuance to facilitate it by exercising his discretion on the basis of a legal error. See *Ward*, 292 Kan. at 550 (citing *Gonzalez*, 290 Kan. at 755-56.

Moreover, even if newness had been a valid legal requirement, Preston should have been permitted to retake the stand to defend his methods against suggestions by Pay and the State that he had deliberately misled the jury. It is hard to imagine a situation in which the allowance of surrebuttal would be more sensible and its denial more arbitrary. Judge Clark also abused his discretion because no reasonable person presiding over a death penalty case that had been in court for more than 2 months would have agreed with his decision to disallow surrebuttal requiring a delay of, at most, a couple of hours. See *Ward*, 292 Kan. at 550 (citing *Gonzalez*, 290 Kan. at 755-56). We need not discuss harmlessness because of the prior necessity of remand.

## P9. SENTENCING ON NONCAPITAL CONVICTIONS

R. Carr argues that sentencing on his noncapital convictions should have preceded the penalty phase on his capital convictions and that the jury should have been informed of the exact sentence he would serve if he were not sentenced to death.

The first argument is likely to be moot, because, on remand, R. Carr's sentencing on his remaining noncapital convictions will already have occurred. The terms handed down on those convictions have not been appealed.

We briefly discuss the second question on whether a capital sentencing jury must be told the exact sentence a defendant will serve if not sentenced to death, because we wish to provide guidance to the district judge on remand.

The defendants filed an unsuccessful joint pretrial motion to have Judge Clark determine and then inform the jury of the exact duration of their sentences, should the jury not return the death penalty. At the instructions conference, J. Carr's counsel renewed the argument, asserting that the jury should be informed "with as much exactitude as possible" of the sentence his client could expect

to receive if not sentenced to death. R. Carr's counsel joined in that argument.

Judge Clark instead included the following in his penalty phase instructions to the jury:

"Should the responsibility to fix a proper sentence in all counts—to include the first four (Capital Murder) fall to me, you are instructed that the total sentence would be such that the individual defendant would not be eligible to appear before The Parole Board for a certain period of time. The period would be a minimum of 50 years and a maximum of 268 years. It is for the court to decide."

R. Carr argues that the exact length of his sentences if no death penalty were imposed had to be shared with the jury under the Eighth and Fourteenth Amendments and Section 9 of the Kansas Constitution Bill of Rights, because the length of the sentences qualified as mitigating. Under Kansas law, the list of statutory mitigating facts includes the following: "A term of imprisonment is sufficient to defend and protect the people's safety from the defendant." K.S.A. 21-4626(9).

The defense relies on the United States Supreme Court's decision in *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), and on our decision in *Kleypas*, 272 Kan. 894, 1080, 40 P.3d 139 (2001).

In *Simmons*, the Court specifically addressed whether a capital defendant's due process rights required his sentencing jury to be informed that he would be ineligible for parole, when the State had used the defendant's future dangerousness as an aggravating circumstance. According to the plurality decision, the prosecution had argued that "a verdict for death would be 'a response of society to someone who is a threat. Your verdict w[ould] be an act of self-defense.' " *Simmons*, 512 U.S. at 157. The defense had asked the trial judge to clarify for the jury that "life imprisonment" would mean no possibility of parole, but the judge refused. Then, during deliberations, the jury sent out a question on exactly that topic: "Does the imposition of a life sentence carry with it the possibility of parole?" 512 U.S. at 160. The judge responded:

" 'You are instructed not to consider parole or parole eligibility in reaching your verdict. Do not consider parole or parole eligibility. That is not a proper issue for

your consideration. The terms life imprisonment and death sentence are to be understood in their plan [sic] and ordinary meaning.' " 512 U.S. at 160.

The plurality held that the defense was entitled to inform the jury of the defendant's parole ineligibility. 512 U.S. at 171. "The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.' " 512 U.S. at 161.

"In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause." 512 U.S. at 163-64.

In a concurring opinion, Justice Sandra Day O'Connor noted that "[i]n a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact," and that "[t]he decision whether or not to inform the jury of the possibility of early release is generally left to the States." 512 U.S. at 176 (O'Connor, J., concurring) (citing *California v. Ramos*, 463 U.S. 992, 1013-14, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 [1983]).

In this case, the judge's decision not to inform the jury of R. Carr's exact sentences in the event of no capital sentences did not deprive him of the opportunity to argue that a term of imprisonment was sufficient to protect the public, *i.e.*, was mitigating. In fact, R. Carr's counsel argued exactly that point during closing:

"Reggie is going to be incarcerated. He will be put in prison basically forever. He is going to be caged up. And Reggie needs to be caged up with the lions in the penitentiary, so all of us rabbits will be safe. That's not going to be a problem with us . . . . By the time he is first eligible to see the parole board, if he gets the minimum sentence he can possibly get, his oldest son will be older than Val Wachtel over there. That's how long he is going to be in the penitentiary. He is actually going to be in there forever. He is never going to be able to walk out and get in his car and drive off."

The situation here was completely different from that before the *Simmons* Court. In *Simmons*, the jury was prevented from considering the clearly mitigating fact that the defendant would never be paroled. R. Carr's jury was not only told his shortest possible sentence, 50 years, a length likely to be mitigating in and of itself, but the possibility that he would face more than five times that long in prison, 268 years or more. Jurors also heard his counsel draw the sensible conclusion that his client would never leave prison alive. On this record, we conclude that *Simmons* did not demand more than R. Carr received in Judge Clark's jury instruction.

Our own decision in *Kleypas*, 272 Kan. at 1080, gives us a bit more pause.

In that case, we ruled that defense counsel's refusal of the district judge's offer to instruct on the possibility of a life sentence with initial parole eligibility at either 25 or 40 years meant that any error based on the absence of that instruction was invited. 272 Kan. at 1080. We also ruled that the district judge's failure to instruct *sua sponte* on the sentences the defendant would receive for his other felony convictions was not error. 272 Kan. at 1080-81. We rejected the notion that the Eighth Amendment required a system "in which the court is required to instruct on the potential sentences a defendant will receive for convictions arising from the same trial as the capital-murder conviction." 272 Kan. at 1081.

Still, we set a somewhat higher bar for a district judge to meet on instructions about a capital defendant's potential term of imprisonment in future cases:

"In the absence of a request, the trial court has no duty to inform the jury in a capital murder case of the term of imprisonment to which a defendant would be sentenced if death were not imposed. Where such an instruction is requested, the trial court must provide the jury with the alternative number of years that a defendant would be required to serve in prison if not sentenced to death. Additionally, where a defendant has been found guilty of charges in addition to capital murder, the trial court upon request must provide the jury with the possible terms of imprisonment for each additional charge and advise the jury that the determination of whether such other sentences shall be served consecutively or concurrently to each other and the sentence for the murder conviction is a matter committed to the sound discretion of the trial court." 272 Kan. at 1081-82.

*Kleypas* was decided in 2001. The trial in this case was held in 2002. The only portions of the express language of the *Kleypas* future directive from which Judge Clark deviated were its require-ment that the jury instruction contain information on possible terms of imprisonment "for each additional charge" and a state-ment that the judge would be responsible for deciding whether sentences were consecutive to or concurrent with each other. Ap-parently Judge Clark did rely on the possible terms of imprison-ment for each additional charge and concurrent or consecutive status when he gave the jury the combined range of initial parole eligibility from 50 to 268 years.

We would not regard either omission or the omissions together as particularly serious. Judge Clark's instruction did not pose a reasonable likelihood that the jury failed to consider constitution-ally relevant evidence in mitigation. However, because it is possible on remand for any district judge presiding over a new, severed penalty phase to give precise information on the unappealed sen-tences already handed down on R. Carr's noncapital convictions, as well as the sentence he will be subject to on his remaining capital conviction if he does not receive the death penalty, it seems wise to do so. We see no reason to keep that information, if available, from the jury, unless the defense objects. The provision of ade-quate societal protection through service of a specific long prison sentence is a statutory mitigator under Kansas law, and the judge should enable the ability of R. Carr's counsel to fully argue its application.

### P10. BURDEN OF PROOF ON MITIGATING FACTORS

R. Carr has argued that the instructions in his penalty phase were fatally flawed because they failed to tell the jury that mitigating factors need not be proved beyond a reasonable doubt. Because this issue may arise again on remand, we provide the following brief guidance to the district judge.

The State acknowledges that the trial court did not expressly instruct the jury on the burden of proof for mitigating circum-stances. The aggravating circumstances instruction and the verdict

forms informed the jury specifically that the State was required to prove aggravating circumstances beyond a reasonable doubt.

In Kansas, a district judge must instruct a penalty phase jury in a capital case not only that it need not be unanimous on the existence of a mitigating circumstance but also that a mitigating circumstance need not be proved beyond a reasonable doubt. See *State v. Gleason*, 299 Kan. 1127, 1195-97, 329 P.3d 1102 (2014) (discussing *Scott*, 286 Kan. at 106-07; *Kleypas*, 272 Kan. at 1078); see also K.S.A. 21-4624 (State expressly burdened with proving existence of aggravating circumstance beyond reasonable doubt; statute silent on standard of proof on mitigating circumstance). When nothing in the instructions mentions any burden other than "beyond a reasonable doubt," jurors may be "prevented from giving meaningful effect or a reasoned moral response to" mitigating evidence, implicating a defendant's right to individualized sentencing under the Eighth Amendment. *Gleason*, 299 Kan. at 1197 (citing *Scott*, 286 Kan. at 107). This is unacceptable.

Were we not already vacating R. Carr's death sentence on Count 2 and remanding the case because of Judge Clark's failure to sever the penalty phase, error on this issue would have forced us to do so. See *Gleason*, 299 Kan. at 1197. In any new penalty phase on remand, the district judge must ensure that jurors understand that mitigating circumstances need not be proved beyond a reasonable doubt.

### P11. "The Crime" in Aggravating Circumstances Instruction

R. Carr argues that a reference to "the crime" in the instruction on his aggravating circumstances was too vague and may have led the jury to rely on his conviction of a crime other than capital murder to find the existence of an aggravating circumstance. We address the merits of this issue to provide guidance on remand.

*Additional Factual and Procedural Background*

In Instruction No. 5, Judge Clark identified the aggravating circumstances in issue for R. Carr. The parts of this instruction pertinent to this issue said that the State sought to prove R. Carr

committed "the crime" for monetary gain; to evade arrest; and in a heinous, atrocious, or cruel manner.

After the close of evidence in the penalty phase, Judge Clark made a few introductory comments before instructing the jury. Among other things, he explained:

"As you know, our focus here is on the first four counts, those are the capital murder counts.

"It is the responsibility of the jury to decide the proper sentence for the individual defendants in those four counts . . . . It is my responsibility to decide on the proper sentence for the individual defendant on all other counts in which you returned a verdict of guilty."

The opening penalty phase instruction also emphasized that the jury sentencing responsibility arose out of its earlier guilty verdicts on capital murder:

"The laws of Kansas provide that a separate sentencing proceeding shall be conducted when a defendant has been found guilty of capital murder to determine whether the defendant shall be sentenced to death. At the hearing, the trial jury shall consider aggravating or mitigating circumstances relevant to the question of the sentence."

In Instruction No. 9, Judge Clark told the jury to mark the verdict form to coincide with its sentencing decision. He said that jurors had "been provided verdict forms which provide for three alternative verdicts in each of the four counts of Capital Murder." Each verdict form also referenced the capital murder counts and made no mention of any other offense.

During the State's closing, the prosecutor reminded the jury to consider all of the guilt phase evidence relevant to the capital murder charges:

"If you recall at the conclusion of the case after the jury's verdict came out, what our position was, was to adopt all of those days of testimony, everything you heard in that Court, and give it to you in this phase saying that the body of the crime, that information should be and can be reconsidered in these aggravating factors, as they would apply to the capital death of Jason [B.] and Aaron [S.], Brad [H.], and Heather [M.]."

Then the prosecutor discussed the aggravating circumstances instructions, including Instruction No. 5, explaining that aggravating

circumstances were those facts and circumstances that enhanced the crime of capital murder:

"In a legal sense, the Court explained that aggravating circumstances are those that increase the guilt or enormity of the crime or add to its injurious consequences but which are above and beyond the crime itself. And you know that *the crime of capital murder* has been found.

"Now you look at the circumstances that would enhance those crimes from the perspective of a rational[], thinking jury to say . . . these aggravators make that crime even worse. And that is what an aggravator is. So we point specifically, we point to each defendant, two defendants, two brothers, two culprits, two criminals, two individuals all found to be culpable *of capital murders* of four people." (Emphasis added.)

The State never mentioned the Schreiber and Walenta incidents in its closing, concentrating only on the reasons the capital murders and aggravating circumstances justified death verdicts.

### References to "The Crime"

There is some question about the correct standard of review for an alleged error in penalty phase instructions in a capital case that was never raised before the district court.

As discussed in other sections of this opinion, in the ordinary criminal case and in the guilt phase of a capital prosecution, reviewability and reversibility of an alleged jury instruction error not raised below are governed by K.S.A. 22-3414(3). We have not previously discussed in detail how that standard meshes with the "constitutional standard" for instruction error set out in United States Supreme Court cases—whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violated the Constitution. See *Jones v. United States*, 527 U.S. 373, 389-90, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999); *Victor v. Nebraska*, 511 U.S. 1, 6, 114 S. Ct. 1239, 127 L.Ed.2d 583 (1994); *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L.Ed.2d 385 (1991); *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L.Ed.2d 316 (1990). But we have relied on the "constitutional standard." *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008); see also *State v. Gleason*, 299 Kan. at 1191. The issue in *Scott* had surfaced in the district court, but our *Gleason* opinion assumed applicability of the constitutional standard without discussing any

potential overlap of the "clearly erroneous" language of K.S.A. 22-3414(3).

We need only raise, not settle, this standard of review issue today in order to provide the guidance needed for the district judge who must handle this case on remand. He or she will be trying to avoid error in the first place. And, regardless of the applicable standard of review, an earlier statement from this court in *Scott* and an opinion from a panel of the United States Court of Appeals for the Tenth Circuit should help him or her to do that.

Although *Scott* did not decide the issue raised in this case, it did say that it was "inadvisable" for an aggravating circumstances instruction to refer to a generic crime rather than capital murder. 286 Kan. at 114. Likewise, in *United States v. Chanthadara*, 230 F.3d 1237, 1263-64 (10th Cir. 2000), the court said that it must be clear to a jury applying the Federal Death Penalty Act that the aggravating circumstance of pecuniary gain must flow from the victim's death, not an underlying felony.

Highly summarized, the motto on remand for drafting of the aggravating circumstances instruction should be: Caution Through Unmistakable Clarity. Given all of the clarification provided by the judge and by the prosecutor's closing argument here, we may ultimately have been able to determine that any error was not reversible under the governing standard of review, but the risk of reversal on this issue can easily be eliminated when this case returns to district court.

## P12. INSTRUCTION ON ROLE OF MERCY

R. Carr argues that Judge Clark erred by defining mercy as a mitigating factor and linking it with sympathy for the defense, rather than conveying to the jury that mercy is "an impulse that comes from the grantor, regardless of whether the recipient deserves it." We briefly address this issue to provide guidance on remand.

The mitigating circumstances instruction in this case included the following on the role of mercy in the jury's deliberations:

"Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense.

"In this proceeding, you may consider sympathy for a defendant. The appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed."

R. Carr argues that Judge Clark should have instead told jurors that they could "recommend mercy for the Defendant and sentence him to life imprisonment," regardless of whether mitigating circumstances outweighed aggravating circumstances. He did not raise this issue in the district court.

As noted in the previous section of this opinion, the intersection of the "clearly erroneous" language we apply in other contexts and the "constitutional standard" that has been applied to instruction challenges arising out of penalty phases in capital cases is unclear. See *State v. Scott*, 286 Kan. 54.

Again, we need not settle the issue today to dispose of this issue. Rather, we adhere to our precedent rejecting the argument that equating mercy to a mitigating factor is error at all. See *Kleypas*, 272 Kan. at 1035-36 (mercy instruction per se simply not required by federal, state law; nor is specific type of mercy instruction); see also *State v. Cheever*, 295 Kan. 229, 268, 284 P.3d 1007 (2012), *cert. granted in part* 133 S. Ct. 1460 (2013), and *vacated and remanded* 134 S. Ct. 596 (2013); *Scott*, 286 Kan. at 99. R. Carr's assertion that we have already moved away from this precedent in *State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd and remanded* 548 U.S. 163 (2006), and *vacated in part* 282 Kan. 38, 144 P.3d 48 (2006), is without merit.

P13. Verdict Forms Instruction

In his separate appeal, J. Carr takes issue with the wording of the verdict forms instruction, No. 10, when read in combination with the wording of the Verdict Form (3). He argues that these elements of Judge Clark's instructions did not prepare jurors for a situation in which they were unanimous on the existence of one or more aggravating circumstances but were unable to agree upon whether mitigators outweighed the aggravators.

We notice this unassigned error on behalf of R. Carr under the authority of K.S.A. 2013 Supp. 21-6619(b).

*Additional Factual and Procedural Background*

The focal point of this issue is the third paragraph of Instruction No. 10, when combined with the verdict form for the jury's third option.

The first three paragraphs of the instruction, which informed the jury about the use of the three verdict form options they were given for each capital count, read:

"When considering an individual defendant, if you find unanimously beyond a reasonable doubt that there are one or more aggravating circumstances and that they outweigh mitigating circumstances found to exist, then you shall impose a sentence of death. If you sentence the particular defendant to death, you must designate upon the appropriate verdict form with particularity the aggravating circumstances which you unanimously find beyond a reasonable doubt. That is Verdict Form (1).

"If you find that the evidence does not prove any of the claimed aggravating circumstances beyond a reasonable doubt, your presiding juror should mark the appropriate verdict form. That is Verdict Form (2). The court will fix a proper sentence for the particular defendant.

"If one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances exist or that those found to exist do not outweigh mitigating circumstances, then you should sign the appropriate alternative verdict form indicating the jury is unable to reach a unanimous verdict sentencing the defendant to death. That is Verdict Form (3). In that event, the court will fix a proper sentence for the particular defendant."

Verdict Form (3) was the same for each victim of capital murder. For Heather M. as the victim and R. Carr as the convicted defendant, it read:

**"VERDICT FORM** (3)
COUNT ONE (I)
CAPITAL MURDER
HEATHER [M.]

As to . . ., Capital Murder of Heather [M.], we the jury being duly sworn upon oath state that we are unable to reach a unanimous verdict sentencing the defendant, Reginald D. Carr, Jr., to death.

(PLEASE INDICATE BY X IN THE BLANK SPACE)

_____A. We are not able to agree unanimously that the evidence proves an aggravated circumstance exists.

_____B. We are not able to agree that the aggravated circumstance(s) that were proved to exist outweighs the mitigating circumstance(s) shown to exist by the evidence.

Date: _____ _____
 Presiding Juror"

Neither R. Carr nor J. Carr objected to Instruction No.10 or Verdict Form (3) at trial.

*Adequacy of Instruction No. 10 and Verdict Form (3)*

The State maintains that the clearly erroneous standard of K.S.A. 21-3414(3) should apply when we review an allegation of instruction error in the penalty phase of a capital case. See *State v. Kleypas*, 272 Kan. 894, 909, 939, 40 P.3d 139 (2001) (clearly erroneous standard governs in guilt phase of capital case). J. Carr's brief instead invokes the standard set out by the United States Supreme Court in *Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990): "The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 494 U.S. at 380.

We employed the *Boyde* standard plus the traditional Kansas non-clearly erroneous jury instruction review standard in *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008):

"In considering a claim that a jury instruction in the penalty phase of a capital trial prevented the jury from giving proper consideration to mitigating evidence, our standard of review is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). However, we consider the instructions as a whole and do not isolate any one instruction. Even if erroneous in some way, instructions do not result in reversible error if they properly and fairly state the law as applied to the facts of the case and could not reasonably have misled the jury. *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006)." 286 Kan. at 104-05.

But, as mentioned in Section 11 of this opinion, *Scott* did not involve a situation in which the jury instruction issue had not been raised in the district court.

Again, as in Sections 11 and 12 of this opinion, we need not traverse the thicket created by the overlap of clearly erroneous review and *Boyde* review today. The choice of standard of review

on this issue is not outcome-determinative, and our purpose is to assist the district court in avoiding error on remand. We therefore concentrate on whether there was error at all, rather than on whether any error would have qualified as reversible.

As discussed, under the Eighth and Fourteenth Amendments, a capital defendant must be allowed to put before the jury his evidence of mitigating factors; the jury must be allowed to consider and weigh relevant mitigating evidence; and the jury must have a method by which it can give effect to its consideration. The question before us is whether Instruction No. 10 and Verdict Form (3) were so confusing and misleading that the defendants' jury was deprived of a meaningful method of giving effect to mitigating evidence.

The first and second paragraphs of Instruction No. 10 covered what were, in essence, the "all" or "nothing" choices before the jury. In *Kleypas*, 272 Kan. at 1060-61, we said that K.S.A. 21-4624 contemplated only two options: Either (1) The jury would agree unanimously and beyond a reasonable doubt that one or more aggravating circumstances existed and that such aggravating circumstance or circumstances outweighed the mitigating circumstance or circumstances found to exist, meaning it would sentence the defendant to death; or (2) the jury would not unanimously find aggravating circumstances outweighed mitigating circumstances.

Verdict Forms (1) and (2) were consistent with the "all" and "nothing" options. It was clear that Verdict Form (1) was to be used when the jury unanimously found the existence of an aggravating circumstance or circumstances and that the aggravating circumstance or circumstances outweighed any mitigators. Verdict Form (2) was to be used when the jury found no aggravators existed. It was clear that, in such a situation, there was no need for the jury to reach the next step, weighing of aggravators and mitigators.

Verdict form (3) staked out the middle ground—when jurors agreed unanimously that an aggravating circumstance or circumstances existed but could not agree unanimously on whether mitigators outweighed aggravators. But what was fairly clear in this

verdict form was garbled in the third paragraph of Instruction No. 10, which we repeat here for ease of reference:

"If one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances exist *or that those found to exist do not outweigh mitigating circumstances*, then you should sign the appropriate alternative verdict form indicating the jury is unable to reach a unanimous verdict sentencing the defendant to death." (Emphasis added.)

The italicized portion of the instruction is simply wrong because it contains an extra "not" that reverses the meaning of the condition precedent to use of Verdict Form (3). Under the controlling law at the time of defendant's trial, the correct italicized portion should have read "or that those found to exist outweigh mitigating circumstances."

This error may or may not have met the threshold for reversal under either K.S.A. 21-3414(3) or the *Boyde* standard. It does not matter. What matters is that it can, and should, be easily corrected on remand.

### P14. DEFENDANT'S AGE OF 18 OR OLDER AT TIME OF CAPITAL CRIME

After briefs were filed in this case, R. Carr sought and received permission to file a supplemental brief based on this court's decision in *State v. Cheever*, 295 Kan. 229, 265, 284 P.3d 1007 (2012) (Jessica's Law precedent on necessity of instruction that jury find defendant's age of 18 or older at time of crime may apply in capital case penalty phase), *cert. granted in part* 133 S. Ct. 1460 (2013) *and vacated and remanded*, 134 S. Ct. 596 (2013). He asserted that Judge Clark erred by failing to instruct the jury it must find beyond a reasonable doubt that the defendants were 18 years old or older at the time of the capital murders, in order for the death penalty to apply. The State filed a responsive brief.

As in *Cheever*, we need not reach the merits of this issue today. Now that the State is aware of this potential appellate issue, it is highly unlikely that it will permit the jury in any new, severed penalty phase to begin deliberations without an instruction on R. Carr's age at the time of the quadruple homicide.

## P15. NO-ADVERSE-INFERENCE INSTRUCTION

R. Carr sought a no-adverse-inference instruction, which, when given in a guilt phase of a criminal prosecution at the time of the trial, would have provided:

"A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference of guilt from the fact that the defendant did not testify, and you must not consider this fact in arriving at your verdict." PIK Crim. 3d 52.13.

J. Carr opposed the instruction, and Judge Clark did not give it.

The giving of such an instruction, if requested in a penalty phase, has been required in at least three of our sister jurisdictions and has been described as the wisest course in a fourth.

In *State v. Storey*, 986 S.W.2d 462, 463-64 (Mo. 1999) (en banc), the Missouri Supreme Court reasoned:

"The privilege against self-incrimination guarantees the right to remain silent and the right not to have adverse inferences drawn from exercising the privilege. U.S. Const. amend. V; Mo. Const. art. I, sec. 19; *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S. Ct. 1112, 1121, 67 L. Ed. 2d 241 (1981). '[T]he Fifth Amendment requires that a criminal trial judge must give a "no-adverse-inference" jury instruction when requested by a defendant to do so.' *Carter*, 450 U.S. at 300. There is 'no basis to distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned.' *Estelle v. Smith*, 451 U.S. 454, 462-63, 101 S. Ct. 1866, 1872-73, 68 L. Ed. 2d 359 (1981). Therefore, when a defendant does not testify in the penalty phase of a capital murder trial, the court must give a 'no-adverse-inference' instruction if the defendant so requests."

See *State v. Munn*, 56 S.W.3d 486, 501-02 (Tenn. 2001) (right against self-incrimination "so fundamental that [it] should be protected at all stages of criminal process"; criminal defendant has constitutional right to no-adverse-inference instruction during penalty phase when properly requested); *Burns v. State*, 699 So. 2d 646, 651 (Fla. 1997) (right against self-incrimination continues through sentencing phase of capital murder trial; failure to give requested no-adverse-inference instruction subject to harmless error analysis); see also *State v. Arther*, 290 S.C. 291, 298, 350 S.E.2d 187 (1986) (absent request, failure to give instruction not reversible

error; but "better course is to give a no adverse inference charge in both the guilty and penalty phases of a capital trial").

However, the United States Supreme Court has recently held that such a rule is not so clearly established by its precedent. See *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1703, 188 L. Ed. 2d 698 (2014) (state court's refusal to give no-adverse-inference instruction did not warrant federal habeas relief under Antiterrorism and Effective Death Penalty Act of 1996; Act requires showing of unreasonable application of Supreme Court precedent; discussing earlier cases holding court may not draw adverse inference from defendant's silence when determining facts about crime that bear on severity of sentence).

Again, we need not reach the merits of this issue today or parse the applicable standard of review, because the situation giving rise to this claim can easily be avoided on remand. Assuming the State goes forward with severed penalty phase trials, the district judge will be able to avoid any question on appeal about a no-adverse-inference instruction by giving the instruction in the case of the defendant who desires it and not giving the instruction in the case of the defendant who does not.

### P16. Capital Punishment for Aider and Abettor under K.S.A. 21-3205

This issue was raised in J. Carr's brief to this court. We notice it on behalf of R. Carr under the authority of K.S.A. 2013 Supp. 21-6619(b), but we do not reach its merits.

The record on this appeal does not establish which of the two defendants was convicted of the murders of Heather M., Aaron S., Brad H., and Jason B. as a principal and which as an aider and abettor. Without that information, there is no factual predicate for examination of this issue.

### P17. Capital Punishment for Aider and Abettor under Section 9

This issue was raised in J. Carr's brief to this court. We notice it on behalf of R. Carr under the authority of K.S.A. 2013 Supp. 21-6619(b), but we do not reach its merits.

The record on this appeal does not establish which of the two defendants was convicted of the murders of Heather M., Aaron S., Brad H., and Jason B. as a principal and which as an aider and abettor. Without that information, there is no factual predicate for examination of this issue.

### P18. PROSECUTORIAL MISCONDUCT

The defendants challenge what they believe to be numerous instances of prosecutorial misconduct during the penalty phase of their trial.

With the exception of one aspect of one issue raised by J. Carr in his direct appeal and unique to him, which we address in our opinion in his case to provide guidance, we need not reach the merits of the prosecutorial misconduct challenge today. Now that the State has been put on notice of the behaviors and comments by its prosecutors likely to give rise to appellate challenge, we are certain it will consider carefully whether engaging in the same behaviors or making the same or similar comments during any proceedings pursued on remand would be worth the substantial risk of undermining those proceedings.

### P19. DOUBLE JEOPARDY

J. Carr claims in his separate appeal that the wording of the verdict forms in this case pose a risk of double jeopardy in the future. We notice this claim on behalf of R. Carr under the authority K.S.A. 2013 Supp. 21-6619(b).

Under the authority of *State v. Burnett*, 293 Kan. 840, 849, 270 P.3d 1115 (2012), we regard this claim as unripe and thus do not reach its merits.

### P20. EXECUTION PROTOCOL

R. Carr alleges that the Kansas execution protocol is constitutionally deficient in three ways—because no doses of the execution drugs are specified, because qualifications for the IV team are not specified, and because there is no directive to ensure that the prisoner is unconscious before a second and a third drug are administered.

This issue was raised by way of pretrial motion in the district court, and the Secretary of the Department of Corrections testified at that time that the execution protocol was "evolving." Judge Clark first said at the hearing on the motion that it was unripe and then in his written ruling that he presumed the Secretary of Corrections "will discharge the duties assigned to [him] in a constitutional manner, therefore the defendants' motion shall be overruled." Judge Clark made no findings of fact and issued no other conclusions of law.

This sparse record, made 12 years ago while the Kansas protocol was "evolving," is simply inadequate for us to address the protocol's constitutionality as of today. Moreover, given our other rulings in this opinion, R. Carr's execution is merely a possibility, not a certainty. We therefore regard the issue as unripe, see *Burnett*, 293 Kan. at 850, and do not address its merits.

### CONCLUSION FOR PENALTY PHASE

Because the district judge's failure to sever the penalty phase of defendants' trial violated R. Carr's Eighth Amendment right to an individualized sentencing determination and cannot be declared harmless error, the death sentence on R. Carr's remaining K.S.A. 21-3439(a)(6) conviction for the murders of Heather M., Aaron S., Brad H., and Jason B. is vacated. This case is remanded to district court for further proceedings consistent with this opinion.

❊ ❊ ❊

BEIER, J., concurring in part and dissenting in part: This case is hard. It is beyond hard. And those of us who have made a life in the law often repeat an old saying: Hard cases make bad law. See *Northern Securities Co. v. United States*, 193 U.S. 197, 364, 24 S. Ct. 436, 48 L. Ed. 679 (1904) (Holmes, J., dissenting); see also *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 899, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) (recognizing legal aphorism).

Unfortunately, it appears that three of the majority's decisions on the guilt phase of this case are examples of why this old saying came to be. I must, therefore, respectfully dissent.

## I. Cumulative Error

Considered collectively, cumulative error

"may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007)." *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675(2009).

"If any one of the errors involves a constitutional violation, the harmless error standard stated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), must be applied to the determination of whether the defendant was denied a fair trial." *State v. Armstrong*, 299 Kan. 405, Syl. ¶ 10, 324 P.3d 1052 (2014). That is the standard that applies here.

A majority of this court has identified 11 errors in Reginald Carr's trial on guilt.

- Six members of the court agree that District Court Judge Paul Clark erred by refusing to sever.
- All seven members of the court agree that Judge Clark committed reverse *Batson* error by seating W.B after peremptory challenge by the defendants.
- All seven members of the court agree that Judge Clark erred in allowing the admission of Linda Ann Walenta's statements through law enforcement testimony.
- All seven members of the court agree that Judge Clark erred in interpreting and applying the third-party evidence rule and the hearsay rule, preventing R. Carr from pursuing his defense to the Birchwood crimes.
- All seven members of the court agree that Judge Clark gave a faulty instruction on the sex-crime-based capital murders.
- All seven members of the court agree that three of the multiple-homicide-based capital murder convictions were multiplicitous with the first.
- All seven members of the court agree that the district court lacked subject matter jurisdiction over any sex crime charges based on coerced victim-on-victim sex acts.

- All seven members of the court agree that one of R. Carr's convictions for the rape of Holly G. was multiplicitous with the other.
- All seven members of the court agree that Judge Clark erred by automatically excluding testimony from an expert on the reliability of eyewitness identifications.
- All seven members of the court agree that Judge Clark erred in instructing the jury to consider an eyewitness' degree of certainty.
- All seven members of the court agree that Judge Clark erred by giving an aiding and abetting instruction that discussed foreseeable crimes.

Two of these errors, standing alone, at least arguably require reversal of *all* of R. Carr's convictions.

It is hard to imagine, for instance, a single error with more pervasive likely impact on the direction and content of the evidence before the jury than Judge Clark's refusal to sever the defendants' prosecutions. See *State v. Martin*, 234 Kan. 548, 551-52, 673 P.2d 104 (1983) (antagonistic defenses, weaker evidence against one codefendant lead to reversal of codefendant's convictions); *Neill v. State*, 827 P.2d 884, 885-90 (Okla. Crim. 1992) (antagonism between defendants arose out of testimony codefendants elicited on cross-examination, statements made by counsel during opening closing; "no judge could have protected the defendants against their own hostility"; "each [codefendant] could only convince the jury of his own innocence by convincing them to convict his [codefendant]"; irreparable prejudice from failure to sever obvious); see also *People v. Bailey*, 182 Ill. App. 3d 867, 870-71, 538 N.E.2d 718 (1989) (trial "more of a contest between two defendants than between the People and each defendant"; reversible prejudice also arose from admission of codefendant's statements to law enforcement); *State v. Sauls*, 356 N.W.2d 516, 517-19 (Iowa 1984) (law enforcement statements, trial testimony of each codefendant implicated other codefendant); *Lafevers v. State*, 819 P.2d 1362, 1366 (Okla. Crim. 1991) (no option but to reverse when codefendants' "interlocking" statements placed both at crime scene but each

claimed other committed rape, murder, burning of victim; both defendants testified; other errors in joint trial also identified); *Silva v. State*, 933 S.W.2d 715, 717-19 (Tex. App. 1996) (joint trial prevented admission of codefendant's statement to impeach his testimony; clear prejudice shown).

And, as the majority describes, 16 of our sister states have either stepped into or already occupied the space expressly left open by the United States Supreme Court in its decision in *Rivera v. Illinois*, 556 U.S. 148, 161-62, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009): They have declared reverse *Batson* error is not subject to harmlessness analysis or have treated it in a way that makes this rule evident. See *State v. Mootz*, 808 N.W.2d 207, 225-26 (Iowa 2012) ("A defendant could only show prejudice by showing that the juror he sought to remove was biased. However, if the juror was biased, then the juror would be removable for cause, and the question regarding the peremptory challenge would become moot."); see also *Zanders v. Alfa Mut. Ins. Co.*, 628 So. 2d 360, 361 (Ala. 1993) (civil action); *State v. Wright*, 86 Conn. App. 86, 95-98, 860 A.2d 278 (2004); *Elliott v. State*, 591 So. 2d 981, 987 (Fla. Dist. App. 1991); *Jackson v. State*, 265 Ga. 897, 899, 463 S.E.2d 699 (1995); *State v. Pierce*, 131 So. 3d 136, 144 (La. App. 2013); *Parker v. State*, 365 Md. 299, 311, 778 A.2d 1096 (2001); *Commonwealth v. Hampton*, 457 Mass. 152, 164-65, 928 N.E.2d 917 (2010); *State v. Campbell*, 772 N.W.2d 858, 862 (Minn. App. 2009); *Hardison v. State*, 94 So. 3d 1092, 1101-02 (Miss. 2012); *People v. Hecker*, 15 N.Y.3d 625, 662, 917 N.Y.S.2d 39, 942 N.E.2d 248 (2010); *State v. Short*, 327 S.C. 329, 335-36, 489 S.E.2d 209 (Ct. App. 1997), *aff'd* 333 S.C. 473, 511 S.E.2d 358 (1999); *State v. Yai Bol*, 190 Vt. 313, 322-23, 29 A.3d 1249 (2011); *State v. Vreen*, 143 Wash. 2d 923, 932, 26 P.3d 236 (2001); *People v. Gonzales*, No. B224397, 2012 WL 413868 (Cal. App. 2012) (unpublished opinion); *State v. Wilkes*, No. 93-2408-CR-FT, 1994 WL 5547 (Wis. App. 1994) (unpublished opinion). And, 16 years before the United States Supreme Court decided *Rivera*, a panel of our Court of Appeals recognized the unknowable harm done by a reverse *Batson* error: "The proper use of the peremptory challenge is vital to the conduct of a criminal defendant's defense. . . . Although it

may seem minimal, the deprivation of even one valid peremptory challenge is prejudicial to a defendant and may skew the jury process." *State v. Foust*, 18 Kan. App. 2d 617, 624, 857 P.3d 1368 (1993).

The overarching goal of *Batson*—race-neutral jury selection—and the record demonstrating that Judge Clark expressly denied R. Carr's selection of W.B. as the target of his last peremptory challenge because of R. Carr's and W.B.'s shared race are in irreconcilable conflict. And, to me, the rationales and outcomes of our 16 sister jurisdictions and our Court of Appeals treating such a conflict as automatically reversible, standing alone, make sense. What good is a right to a peremptory challenge if violation of the right inevitably has no remedy?

But neither the court nor I need go this far in this case.

Under the cumulative error doctrine, I would hold that, when the refusal to sever and reverse *Batson* errors are considered in conjunction with the nine other errors the majority of the court has identified, reversal of all of R. Carr's convictions is required. Research reveals no other Kansas appellate case affirming in the face of such a large number of mostly interlocking errors. Despite the public passion attached to this hard case—indeed, in part because of the public passion attached to this hard case—we should not begin disregarding errors that numerous or mutually reinforcing here.

I readily acknowledge that the evidence against R. Carr on the Andrew Schreiber and Birchwood incidents was unusually strong. But it was not inevitably invincible, particularly if the governing rules had shifted in the directions the majority holds that they should have. My colleagues and I simply cannot know with the degree of comfort generally required in a death penalty case, see *State v. Marsh*, 278 Kan. 520, 525, 102 P.3d 445 (2004), *rev'd and remanded*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), *and vacated in part*, 282 Kan. 38, 144 P.3d 48 (2006) (heightened scrutiny applies to review of capital trial proceedings) (citing *Beck v. Alabama*, 447 U.S. 625, 637-38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 [1980]), that the contours of a severed guilt phase with no reverse *Batson* error and in which R. Carr was permitted to defend

himself under a correct application of the third-party evidence and hearsay rules would have differed so little as to be insignificant. Any anticipated change in perspective could have intensified, had expert testimony on modern research on eyewitness identification been permitted, or had the aiding and abetting and eyewitness instructions contained no error.

## II. INSUFFICIENCY OF EVIDENCE ON FELONY MURDER

I also dissent from the majority's decision that the State's evidence of the attempted aggravated robbery underlying R. Carr's felony-murder conviction in the killing of Walenta was sufficient. There was simply no proof that the man who accosted and shot Walenta in her driveway was trying to rob her, as opposed to committing or attempting to commit another inherently dangerous felony.

The hole in the prosecution's case on the Walenta felony murder is far larger than that facing the State in the recent case *State v. McBroom*, 299 Kan. 731, 325 P.3d 1174 (2014). In that case, the State relied on evidence from a string of burglaries committed by two friends to support one friend's participation in another burglary that led to the killing of the homeowner. We affirmed.

R. Carr's participation was not the missing piece here. In fact, the State's evidence on that was sufficient to satisfy a reasonable factfinder. The missing piece was the entire underlying felony. The State charged and Judge Clark instructed on only aggravated robbery. The circumstances surrounding the crime against Walenta were different enough from those when Schreiber and the five friends from Birchwood were the victims that the evidence against R. Carr in two other incidents could not supply the entire underlying crime in the Walenta incident.

## III. INSUFFICIENCY OF EVIDENCE ON DIGITAL RAPE

Finally, I also dissent from the majority's holding that the evidence against R. Carr for aiding and abetting J. Carr's rape of Holly G. through her digital self-penetration was sufficient. As base and coarse as J. Carr's command may have been, based on Holly G.'s testimony, it did not eliminate other options for the achievement

of his goal. On this evidence, a rational factfinder could not find guilt beyond a reasonable doubt on Count 41. Accordingly, I would affirm R. Carr's Count 42 conviction for aiding and abetting J. Carr's rape of Holly G., because reversal of the Count 41 conviction renders any multiplicity issue moot.

## CONCLUSION

The facts of this case are so vivid, the wrongs done to the victims so callously inflicted, that any human cannot help to be tempted by the siren song of retribution. The song is what makes this case hard; it robs the sailor of reason. But it is the job of judges to resist making bad law, even when the siren's seductive power is at its height. This hard case must be treated as other, less hard cases are treated.

I would reverse all of R. Carr's convictions under the doctrine of cumulative error and would remand the entire case to the district court for further proceedings scrubbed of the 11 errors the majority of the court has identified.

LUCKERT and JOHNSON, JJ., join the foregoing concurring and dissenting opinion.

* * *

JOHNSON, J., concurring in part and dissenting in part: I join Justice Beier's separate opinion, but I also write separately to disagree with the majority's holding that the pretrial publicity in this case did not create the kind of lynch mob mentality that warrants a change of venue. This court's history of never reversing a change of venue denial, together with the majority's holding in this case, suggest to me that we have set the bar so high that nothing will suffice short of an actual mob storming the courthouse, carrying burning torches and a rope tied with a hangman's noose.

In my view, we should do a better job of protecting the cornerstone of our criminal justice system—the right to a fair and impartial jury. And we should do so without regard to whether we agree with the jury's verdict in a particular case and even though we understand the toll that a retrial will take on the innocent victims. A right that is not enforced is no right at all. Moreover, the courts are normally the only place that an individual can find pro-

tection for the rights that others more powerful would deny. See *Law, Justice, and the Holocaust*, Meinecke and Zapruder (2009) (describing how Supreme Court rulings facilitated the elimination of individual rights for Jews in Germany from 1933 to 1945).

As the majority notes, the right to a trial by an impartial jury is guaranteed by both our federal and state constitutions. Neither constitution makes any exception for cases in which there is strong evidence that the defendant committed brutal and despicable criminal acts. To the contrary, the Fourteenth Amendment to the United States Constitution declares in relevant part: "[N]or shall *any* State deprive *any* person of life, liberty, or property, without due process of law." (Emphasis added.) Our Kansas Constitution Bill of Rights, § 10, provides that "a speedy public trial by an impartial jury" shall be provided "[i]n *all* prosecutions." (Emphasis added.) Likewise, our legislature has mandated that a trial court *"shall order* that the case be transferred" where the prejudice against the defendant precludes a fair and impartial trial in the original county. (Emphasis added.) K.S.A. 22-2616(1). Indeed, this court has explicitly held that "[n]either law nor basic justice can tolerate" a rule "that the greater the evidence against a defendant, the less right that defendant has to a fair trial." *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004). To the contrary, the "[d]enial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one." 278 Kan. at 97.

And a fair trial requires that *all* of the jurors sitting in judgment of the criminal defendant must commence the trial presuming that the defendant is innocent. That initial state of mind is mandated because "[u]nder our theory of criminal jurisprudence in this nation, the defendant is clothed with a presumption of innocence until he is proven to be guilty beyond a reasonable doubt by the State." *State v. Williams*, 229 Kan. 646, 663-64, 630 P.2d 694 (1981). It is not enough for a juror to be open to the possibility that the evidence presented at trial will dissuade the juror that the defendant is guilty. It is not enough for the juror to "hope" that he or she will be able to set aside preconceived judgments of guilt or to "try" to disregard inculpatory information to which the juror was exposed prior to trial. Instead, if a juror's state of mind with respect

to the case or to the defendant is such as to create "doubt that he [or she] can act impartially and without prejudice to the substantial rights of [the defendant]," the court has grounds to strike that juror for cause. K.S.A. 22-3410(2)(i) (setting forth one of the grounds for a challenge for cause). In short, the slate upon which the State shall write its guilt-proving evidence must be clean when the trial begins.

Here, the evidence presented by the defense in support of its initial pretrial motion for a change of venue established that a bias or prejudice against the defendant was pervasive throughout Sedgwick County. Nearly everyone surveyed in Sedgwick County (96%) was aware of the case. Almost three out of every four Sedgwick Countians (74.1%) thought the defendant was either definitely guilty or probably guilty, and nearly all of those people (72.3% of those surveyed) thought the evidence of guilt was overwhelming or strong. For the respondents that had either engaged in personal discussions about the case or overheard such discussions, the bias toward believing the defendant to be guilty was an overwhelming 86% and 82%, respectively, *i.e.*, more than four such persons out of five.

Putting the survey results in the perspective of a 12-person jury, the statistical probability was that 9 jurors in Sedgwick County would start the trial holding the belief that, at the least, there was strong evidence that the defendant was probably guilty. As the survey expert predicted, the results obtained during the survey—conducted a year after the incidents—did not change much by the time of trial, as reflected in the pretrial questionnaires. The remaining one-fourth—or less—of the jury pool who had not predetermined the defendant's guilt left him scantily clad in the presumption of innocence. Such nakedness does not pass constitutional muster or meet the statutory mandate.

The survey also revealed that a figurative lynch mob mentality was not inevitable in this state. In Wyandotte County, only about one in five persons (22%) believed defendant to be guilty and about one in six (16%) thought the evidence of guilt was strong or overwhelming. Ironically, whereas 74.1 % of the Sedgwick County surveyed citizens believed defendant was guilty, there was nearly as

high a percentage of Wyandotte County surveyed citizens (70.5%) who were not even *aware* of this case. Thus, the available wardrobe of unbiased venire persons in Wyandotte County was sufficient to clothe the defendant in the presumption of innocence to which he was constitutionally and statutorily entitled, *i.e.*, a change of venue would have provided a reasonable opportunity for a fair trial.

The majority divides the change of venue analysis into two parts and first determines whether we can presume prejudice prior to voir dire because " 'the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community.' " (Quoting *Goss v. Nelson*, 439 F.3d 621, 628 [10th Cir. 2006], citing *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 [1963]). The majority then utilizes the *Skilling* factors to analyze whether it believes that the publicity in this case would likely have caused such an unacceptable level of prejudice for the defendant. See *Skilling v. United States*, 561 U.S. 358, 381-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010). But we need not subjectively ruminate on the degree of prejudice in this case. We have an objective manifestation of the effects of the publicity. As discussed above, the defense provided the district court with the results of a survey—which the judge found to be "valid"—and further provided the court with the testimony of a person—officially designated as an "expert" by the court—who explained what the survey results meant.

Yet, the district court inexplicably ignored the evidence that it declared to be valid. I cannot be as charitable as the majority about the district court rulings. Initially, after being presented with the above-summarized numbers comparing Sedgwick County to Wyandotte County, the district court inscrutably found "that the venue in which defendants will be assured of the greatest number of venire persons free of bias or prejudice from whom a jury may be selected to decide the case solely on the facts in evidence, viewed by the light of the instruments of law, is Sedgwick County, Kansas." But the evidence established the exact opposite, *i.e.*, Wyandotte County had the greatest number of venire persons who were free of bias or prejudice. One simply cannot spin any kind of inference from the evidence that would support the district court's

ruling. And even affording the district court the highest level of deference, we would have to find an abuse of discretion where the court's ruling was based upon an error of fact. See *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Subsequently, the remaining rulings on the motions for change of venue were equally unsatisfactory, especially given the magnitude of what was at stake in this prosecution.

The majority gives scant credence to the survey results, as well. It principally relies on the fact that this court has previously glossed over such survey evidence. I cannot join in perpetuating the practice of dismissing out-of-hand statistically valid evidence that has compelling evidentiary value on the question presented. In *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, Syl. ¶ 2, 214 P.3d 676 (2009), we explained that a history of incorrectly decided cases is not compelling and that this court is not inexorably bound by erroneous or unsound rulings. Here, the survey results provided the answer to the question the majority was contemplating, *i.e.*, whether " 'the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community.' " (quoting *Goss*, 439 F.3d at 628). The comparative survey numbers clearly revealed a pervasive prejudice in Sedgwick County that would make finding an unbiased jury pool a statistical improbability. Ignoring that evidence is erroneous and unsound, if not blatantly unconstitutional.

Moving to the actual prejudice prong and reviewing the voir dire does not change my mind; the district court committed reversible error when it refused to change the venue of this trial at every stage of the process where it was requested. The record establishes at least a "reasonable certainty" that the defendant could not obtain a fair trial in Sedgwick County. Perhaps the trial court beat the pretrial statistical probability that the jury would contain 9 biased jurors out of 12, but not by much.

Again, I cannot be as forgiving as the majority with respect to the trial court's participation in the questioning of the potential jurors. The court repeatedly provided venire persons with the magic words which would permit the court to strike those with misgivings about the death penalty, while passing for cause those

who were predisposed to finding the defendant guilty and/or were mitigation-impaired with respect to the death penalty. Moreover, the court allowed the prosecution to overtly lead the potential jurors into saying or agreeing with statements that would support the result that the State wanted. In my view, the manner in which the questioning was conducted made a sham out of the process. Instead of uncovering disqualifying bias and prejudice, the voir dire questioning in this case too often served to camouflage it.

If nothing else, the voir dire questioning in this case should call into question the bona fides of the fourth *Higgenbotham* factor, *i.e.,* the care exercised and the ease encountered in the selection of the jury. See *State v. Higgenbotham,* 271 Kan. 582, 592, 23 P.3d 874 (2001). Obviously, if the court is disinclined to grant defense challenges for cause and/or is prone to rehabilitating those venire persons making a questionable response, the jury selection process will be eased and expedited. But that does not necessarily signal an absence of prejudice. Moreover, the efficacy of utilizing jury questionnaires and individual voir dire is certainly diluted, if not outright negated, by the tack of leading the prospective jurors into saying what they believe the judge or prosecutor want them to say.

My last comment on the change of venue ruling deals with the majority's use of the deferential abuse-of-discretion review standard to tip the scales in favor of affirming the change of venue denial. I certainly recognize that a judge observing a potential juror's response to voir dire questioning is in a better position to gauge that person's credibility and thereby assess the person's bias and prejudice. But in my view, the district court's initial ruling—that Sedgwick County had more venire persons free of bias and prejudice—fit squarely within the traditional definition of an abuse of discretion, because that "judicial action . . . [was] arbitrary, fanciful, or unreasonable." *Ward,* 292 Kan. at 550. Given the undisputed survey evidence, no reasonable person would have taken the judge's view. Thereafter, I would not use deference as a mechanism to cover for the trial court's initial abuse of discretion, especially in light of the voir dire procedures it employed. To the contrary, I would find reversible error.

Finally, to avoid unnecessarily extending this opinion, I only briefly mention that I would revisit our prior decisions equating the "cruel *or* unusual" language in § 9 of the Kansas Constitution Bill of Rights with the "cruel *and* unusual" language in the Eighth Amendment to the United States Constitution. Recently, in *Gannon v. State*, 298 Kan. 1107, Syl. ¶ 5, 319 P.3d 1196 (2014), we said:

"Because constitutions are the work of the people, the best rule for ascertaining their intention is to abide by the language they have used. It is reasonable to presume that every word in the constitution has been carefully weighed, and that none are inserted, and none omitted, without a design for so doing."

If we meant what we said in *Gannon*, then we should not read the word "or" to mean "and" when interpreting § 9 of our Kansas Constitution Bill of Rights. The set of punishments that is either cruel or unusual is necessarily larger than the set of punishments that is both cruel and unusual. For instance, death is arguably a cruel punishment, even if it is not an unusual one in this country.

\* \* \*

BILES, J., concurring in part and dissenting in part: I agree Reginald Carr's sentencing must be reversed and remanded for new proceedings because the district court failed to sever the cases following the convictions. I write separately to note my disagreement with the majority's dicta in the section entitled "P10. Burden of Proof on Mitigating Factors." 300 Kan. at 302-03. The majority argues R. Carr's sentence was imposed in violation of the Eighth Amendment to the United States Constitution because the district court failed to explicitly instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. I disagree.

As noted in more detail in my dissent in *State v. Gleason*, 299 Kan. 1127, 1210, 329 P.3d 1102 (2014) (slip op. at 100), the majority's conclusion defies the United States Supreme Court's established Eighth Amendment jurisprudence and lacks any persuasive analysis articulating why the circumstances in this case justify a departure from that precedent. The issue for Eighth Amendment purposes is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the

consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). The majority's conclusion is that a per se violation of the Eighth Amendment occurs if a jury instruction correctly states that the State bears the burden of proving aggravating circumstances beyond a reasonable doubt but fails to affirmatively state that mitigation evidence need not be proven beyond a reasonable doubt.

But this alone cannot justify reversal under controlling Eighth Amendment precedent. See *Kansas v. Marsh*, 548 U.S. 163, 173, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); *Walton v. Arizona*, 497 U.S. 639, 651, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); see also *Smith v. Spisak*, 558 U.S. 139, 130 S. Ct. 676, 175 L. Ed. 2d 595 (2010) (instructions and jury forms at penalty phase did not violate Eighth Amendment by requiring jury unanimity as to existence of mitigating factors; instructions and forms did not explicitly advise jury mitigating circumstances need not be unanimously found). The next step must be to decide in the absence of the instruction whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. The majority is wrong when it cuts the analysis short and concludes the failure to simply instruct the jury on mitigation forces an automatic reversal. 300 Kan. at 303.

The Eighth Amendment does not compel our directive in *State v. Kleypas*, 272 Kan. 894, 1078, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), that any mitigating circumstance instruction must inform the jury that mitigating circumstances need not be proven beyond a reasonable doubt. See *Marsh*, 548 U.S. at 173 (holding *Walton* compelled conclusion Kansas capital sentencing scheme satisfied Eighth Amendment requirements because Kansas scheme was functionally identical to scheme found constitutional in *Walton*, except it provided benefit to defendants by placing no evidentiary burden on them). A finding that R. Carr's jury instructions did not conform to the *Kleypas* requirement is not an adequate basis for concluding R. Carr's federal Eighth Amendment rights were violated and reversal is required.

I dissent from that portion of the opinion.

MORITZ, J., joins the dissenting portion of the foregoing concurring and dissenting opinion.

\* \* \*

MORITZ, J., concurring in part and dissenting in part: I write separately for several reasons, initially to register my disagreement with my colleagues, who plaintively seek respect for their position that the "hard" and correct decision in this case is to overturn all of Reginald Carr's convictions and, consequently, his death sentence. 300 Kan. at 321 (Beier, J., concurring in part and dissenting in part).

Justice Beier's separate opinion boldly declares that the majority, in affirming Reginald Carr's convictions, has opted for the easy way out by bowing to public pressure in this high profile case. While it might be satisfying to respond to this harsh and unjustified criticism, I will not waste precious judicial time and resources doing so. Suffice it to say, I feel no pressure or compulsion other than the ever-present compulsion to follow the law rather than my conscience or personal views. Ultimately, following the law, I would find that Reginald Carr received a fair trial, and I would affirm *both* his capital murder conviction and the sentence of death imposed by a jury comprised of 12 of his peers.

Setting aside the rhetoric of that separate opinion, my first substantive purpose in writing this separate opinion is to concur with the majority opinion. I concur because while I agree with the majority's decision to affirm Reginald Carr's convictions, including one capital murder conviction, I disagree with the majority's conclusion that the district court abused its discretion in refusing to sever the defendants' guilt phase trial. Consequently, in conducting a harmless error analysis in the guilt phase, I would not consider the joinder as error, which would effectively strengthen the majority's affirmation of Reginald Carr's convictions. However, even considering the joinder as error, I believe the majority properly finds any errors in the conviction phase harmless and Reginald Carr's cumulative error argument unpersuasive in light of the incredibly overwhelming evidence of guilt. Therefore, I concur with

the majority opinion affirming Reginald Carr's convictions, including one capital murder conviction.

My second substantive, and perhaps more significant, purpose is to dissent to the majority's decision to reverse and remand Reginald Carr's death sentence. Stated conversely, I would affirm the jury's imposition of the death penalty against Reginald Carr. Specifically, I would find the district court did not err in refusing to sever the defendants' penalty phase trial. But even considering a joinder error in the penalty phase, I would affirm the jury's imposition of the death penalty for Reginald Carr. As I detail below, given the unusually egregious facts of this case, Holly G.'s powerful testimony, the overwhelming evidence of aggravating circumstances found by the jury, and the lack of persuasive mitigating evidence, I would hold beyond a reasonable doubt that the jury's decision to impose the death penalty was not attributable to any joinder error below.

Additionally, I join that portion of Justice Biles' separate opinion dissenting from the majority's "alternative" holding that the district court erred in failing to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. As Justice Biles aptly points out, the majority's alternative holding is dicta. I prefer to characterize it as a "belt and suspenders" approach designed to hitch up the majority's already sagging rationale. In any event, like my colleague, I would find that this was not constitutional error and provides no basis for reversal, much less the independent basis suggested by the majority.

*The district court did not abuse its discretion in refusing to sever the defendants' guilt phase trial.*

Severance should be granted under K.S.A. 22-3204 when it appears necessary to avoid prejudice and ensure a fair trial to each defendant. *State v. Davis*, 277 Kan. 231, 239, 83 P.3d 182 (2004) (citing *State v. Aikins*, 261 Kan. 346, 360, 932 P.2d 408 [1997]); see *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) ("[A] district court should grant a severance . . . only if there is a serious risk that a joint trial would compromise

a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.").

I agree with the majority that Reginald Carr and Jonathan Carr presented antagonistic defenses. But the existence of antagonistic defenses is only one of several " 'factors to be considered [by the trial court] in determining whether there is sufficient prejudice to mandate severance.' " *Davis*, 277 Kan. at 240 (quoting *State v. Butler*, 257 Kan. 1043, 1063, 897 P.2d 1007 [1995], *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 [1996]). Unlike the majority, I would conclude the existence of antagonistic defenses, even coupled with the exclusion of weak third-party evidence, failed to establish sufficient risk of prejudice to compel the district court to sever the trial. See *Zafiro*, 506 U.S. at 538-39 (noting the presence of mutually antagonistic defenses is not prejudicial *per se*, and severance is not compulsory, "even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion"). Consequently, I would conclude the district court did not abuse its discretion in failing to sever the guilt phase of the trial.

But, like the majority, I would conclude that if the district court erred in failing to sever the guilt phase, the error was harmless. I need not fully recount that evidence since it is more fully discussed below and in the majority's harmless error analysis. Suffice it to say that biological evidence—including Heather's blood on his under-shorts—strongly connected Reginald Carr to the crime, as did compelling physical and circumstantial evidence—including foot-prints matching Reginald Carr's at Birchwood and Reginald Carr's attempt to flee.

*The district court did not err in refusing to sever the defendants' penalty phase trial.*

Likewise, I reject that the district court erred in failing to sever the defendants' penalty phase trial and that failure rose to an Eighth Amendment violation. The majority's discussion finding an Eighth Amendment violation is logically flawed and, at times, dif-ficult to follow. While I disagree with essentially every step of the majority's analysis of this issue, I will briefly state my objections

before turning to the harmless error issue, which, in my opinion, is where the majority's nearly nonexistent analysis goes entirely awry.

Initially, the majority points out that Reginald Carr contends the failure to sever violated his Eighth Amendment right to individualized sentencing. Yet the majority recognizes that while the Eighth Amendment requires a jury to make an individualized sentencing determination, it does not mandate separate penalty phase proceedings for each codefendant in death penalty cases. 300 Kan. at 275-76; see also *United States v. Tipton,* 90 F.3d 861, 892 (4th Cir. 1996) (joint trials in death-eligible cases are not per se unconstitutional); *United States v. Rivera,* 363 F. Supp. 2d 814, 823 (E.D. Va. 2005) ("The defendants [in a capital case] have an Eighth Amendment right to an 'individualized determination' of their penalty phase sentence, however, this important right does not compel an individual penalty phase hearing.")

Despite acknowledging that the Eighth Amendment does not compel severance, the majority proceeds to analyze whether the defendants presented "antagonistic" mitigation evidence. Without citing the statute, the majority then seemingly analyzes the penalty phase evidence under the same statutory test it applied to determine whether the trial court abused its discretion in denying severance of the guilt phase.

Not surprisingly, the majority never fully explains how partially antagonistic evidence can result in a violation of the statutory right to sever. Nor does the majority clearly state the basis for its conclusion that the trial court erred in refusing to sever the penalty phase trial. Instead, the majority jumps from a discussion of partially antagonistic evidence to the Eighth Amendment requirement of individualized capital sentencing. But, to the extent the majority relies on the Kansas statutory framework for finding an Eighth Amendment violation, this analysis is flawed. Statutory violations do not equate to constitutional violations. See, *e.g., State v. Sawyer,* 297 Kan. 902, 906-07, 305 P.3d 608 (2013) (noting this court's jurisprudence had "obscured" the analytical distinctions between a statutory argument that a judge is unfairly biased and a constitutional argument that a judge is unfairly biased and analyzing the

two bases separately); *State v. Jones,* 273 Kan. 756, 766, 47 P.3d 783 (2002) (holding a violation of statute requiring a juvenile's parents be notified of a proceeding did not rise to a constitutional violation); *State v. Smallwood,* 264 Kan. 69, 74-75, 955 P.2d 1209 (1998) (analyzing separately defendant's argument that the State violated his statutory right to a speedy trial and his constitutional right to a speedy trial).

The majority also determines some mitigating evidence regarding "moral culpability" was "partially antagonistic," although it appears to recognize that most of the two brothers' mitigating evidence was not antagonistic. I am aware of no authority for the majority's implied conclusion that because there is some antagonistic evidence pertaining to moral culpability, Reginald Carr's death sentence violates the Eighth Amendment's individualized sentencing requirement, and the majority cites none, including the string-cited cases. See 300 Kan. at 279-80.

Similarly, the majority seizes upon a comparatively minor theme suggested by Jonathan Carr's evidence in the penalty phase—*i.e.,* that Reginald Carr led Jonathan Carr astray and that their sister testified Reginald Carr told her he was the shooter. The majority points out that had the brothers received separate penalty phase trials, this mitigating evidence presumably would not have been admitted at Reginald Carr's trial. But once again, I find no support for the majority's implication that because this antagonistic evidence *might* not have been admitted in the penalty phase of a separate trial that its admission in a joint trial somehow rose to the level of a constitutional violation.

More importantly, the majority's unsupported Eighth Amendment analysis relies heavily upon the faulty underlying premise that Reginald Carr's jury did not follow the explicit instruction that "[a]ny evidence in this phase that was limited to only one defendant should not be considered by you as to the other defendant." 300 Kan. at 280. Although the majority declares this case to present the "rare instance in which our usual presumption that jurors follow the judge's instructions is defeated by logic," it oddly fails to explain the "logic" to which that solid presumption gives way. 300 Kan. at 280. Unlike the majority, I am not skeptical of this jury ability's to follow instructions simply because of the nature of the

case or the "maelstrom that was [the defendants'] family." 300 Kan. at 280. And not surprisingly, the majority's logic overlooks that this jury had already demonstrated its ability to differentiate between evidence presented by the two brothers when it refused to convict Jonathan Carr on counts related to the Schreiber incident.

Instead, the majority vaguely offers a statement I cannot even loosely characterize as logical: "In view of the defendants' joint upbringing in the maelstrom that was their family and their influence on and interactions with one another, including testimony that tended to show that R. Carr was a corrupting influence on J. Carr, the penalty phase evidence simply was not amenable to orderly separation and analysis." 300 Kan. at 280.

To summarize, I simply cannot agree with the highly flawed and limited rationale offered by the majority for finding constitutional error in the refusal to sever the penalty phase trial. I would find no error and affirm Reginald Carr's death penalty conviction.

*Assuming joinder error in the penalty phase, the death penalty verdict cannot be attributed to that error.*

Even if I agreed with the majority that (1) the district court erred in failing to sever the penalty phase and (2) that error resulted in an Eighth Amendment violation, I would strongly disagree with the majority's conclusory, one-paragraph harmless-error analysis, and I would find that the jury's unanimous decision to render the death penalty was not attributable to any such error. Instead, Reginald Carr's death penalty verdict must be attributed to the overwhelming evidence of extreme terror, humiliation, pain, and anguish inflicted upon the multiple victims. Simply stated, we should not overturn the jury's reasoned decision that this aggravating evidence was not outweighed by mitigating evidence.

Notably, the majority's cursory harmless-error analysis fails to even mention the substantial and compelling evidence of aggravating factors found by the jury. Instead, the majority points to the "especially damning subset [of evidence] that may not have been admitted in a severed proceeding" and the "hopelessly tangled interrelationship of the mitigation cases presented by the defen-

dants" to arrive at its conclusion that the jury simply "could not have discharged its duty to consider only the evidence limited to one defendant as it arrived at their death sentences." 300 Kan. at 281-82.

Again, the flaws in this cursory analysis are numerous. Most critically, in its rush to declare that the jury could not have done its job, the majority fails to do its own job—*i.e.*, to consider whether the court is able to find beyond a reasonable doubt that the error *viewed in the light of the record as a whole*, had little, if any likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. 300 Kan. at 281 (citing standard of review).

Before considering the record as a whole and the impact it should have had on the majority's analysis, I will first remark upon the "especially damning subset of evidence" referred to by the majority. 300 Kan. at 281. This evidence has two components. One component is the statement of the defendants' sister, Tamika, that Reginald Carr admitted to her during a jail visit that he was the shooter. When asked about this statement on cross-examination, Tamika said: "I believe I heard him tell me something like that. I don't remember . . . when he asked me who he shot and all that, I don't remember who was, you know, shot by who[m]." The second component is Jonathan's general mitigating evidence suggesting his brother was a negative influence in his life.

The majority refers to this evidence as "moral culpability" evidence and suggests that it was impossible for the jury, after hearing this evidence, to declare mercy for Reginald Carr. 300 Kan. at 278. In my view, even considering this evidence in isolation, as the majority considers it, the evidence can hardly be characterized as "especially damning." Rather, these evidentiary components were minor in comparison to the substantial and more compelling mitigating evidence both brothers presented about the childhood abuse they suffered at the hands of others, including parental neglect and being forced to participate in each other's beatings.

But more importantly, this "moral culpability" evidence hardly compelled the jury to overlook everything else they heard about the defendants and their joint 3-hour crime spree, for which the

jury had already found them equally legally culpable. Moreover, the negligible impact of Jonathan Carr's mitigating evidence suggesting his brother had been a negative influence in his life is obvious from the jury's refusal to declare mercy and spare Jonathan Carr instead of dealing him the same punishment as his brother. See *People v. Letner*, 50 Cal. 4th 99, 197, 235 P.3d 62 (Cal. 2010) ("Moreover, in light of the circumstance that the jury reached a death verdict as to both defendants, we discern even less of a possibility that the jury improperly assigned culpability based upon one defendant's attempt to mitigate the seriousness of his own actions by shifting accountability to his codefendant.").

In any event, even accepting the majority's characterization of this evidence as "especially damning," I have no hesitation whatsoever in concluding that when viewed in light of the record as a whole it had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances.

Simply put, 12 of Reginald Carr's peers—jurors sworn to uphold the law and impose the death penalty if warranted—heard overwhelming and convincing evidence of heinous and atrocious acts committed by Reginald Carr. And they heard that evidence from Holly, the unintended survivor of this savage attack. It is nearly impossible to convey in a few short paragraphs the overwhelming nature of that evidence. But in order to demonstrate the severe shortcoming in the majority's harmless error analysis, a summary is necessary.

For more than 3 hours, Reginald and Jonathan Carr inflicted their perverse form of torture on the five victims in this case, forcing their often naked captives to commit sexual acts on one another as the two intruders watched. Holly recounted that over those 3 hours she was raped once by Reginald Carr, who after raping her, grabbed her by the back, turned her around, ejaculated into her mouth, and directed her to swallow. The jury also heard Holly describe how she was twice raped by Jonathan Carr, forced to digitally penetrate herself, and forced into sexual intercourse with Heather, Brad, Aaron, and Jason.

When she was not being violated herself, Holly sat naked in a closet with her fellow captives, so terrified she wet herself, listening to Heather moaning in pain as she repeatedly was raped in the same fashion. Heather's moans caused her boyfriend, Aaron, to break down, sobbing and crying, "[T]his shouldn't happen this way." Holly performed oral sex on Jason while in the closet because one of the two defendants threatened additional violence if the men could not get an erection.

Each victim also was forced to leave the Birchwood residence and travel alone with Reginald Carr to withdraw money from his or her bank accounts. Holly recounted her experience, explaining she was clothed only in a sweatshirt, and that Reginald Carr groped her vagina while they were in the car. Holly asked Reginald if he was going to kill them, and he said "no."

But any slight hope Holly might have had that her life and the lives of her friends would be spared was dashed when they returned to the house and Reginald Carr told Holly, "[D]on't worry. I'm not going to shoot you *yet*." Carr's threat proved true when the five victims were taken at gunpoint into the garage, and Jason, Brad, and Aaron were forced into the trunk of Aaron's car. Jonathan Carr then drove Aaron's car, with Heather seated on the passenger side, while Reginald Carr drove Jason's truck with Holly seated on the passenger side.

The defendants then took their victims to a soccer field in a remote location. They ordered the men out of the trunk and ordered Heather and Holly out of the car. Eventually, Reginald Carr and Jonathan Carr forced each of their five victims, who were naked or partially clothed, to kneel next to each other, single file, on the snow-covered ground in below freezing temperatures. As these victims did so, surely each suspected his or her fate.

Holly testified she heard one shot, then heard Aaron pleading, and then "another shot and another one and another one" as each victim was shot, execution style, in the back of the head. Then everything went briefly gray for Holly. But even after being shot in the back of the head, Holly remained kneeling. One of the defendants kicked her in the back, causing her to fall face forward in the snow. She heard the defendants having a conversation before

they drove off in Jason's truck. She felt an impact as the truck ran over her.

After the two men drove off, Holly got up and checked on the others, wrapping her only remaining piece of clothing around Jason's head in a futile attempt to save his life. And then she ran— terrified, naked, bleeding, and freezing—for over a mile to get help. Meanwhile, Reginald and Jonathan Carr, unaware that Holly had survived, returned to the home at Birchwood to steal belongings from the victims and beat Holly's dog to death.

Unquestionably, the State proved by overwhelming and convincing evidence the aggravating circumstance that Reginald Carr committed the murders in a heinous, atrocious, or cruel manner. See K.S.A. 2013 Supp. 21-6624(f). See *State v. Kleypas*, 282 Kan. 560, 569, 147 P.3d 1058 (2006) (murder is committed in an especially heinous, atrocious, or cruel manner for purposes of the death penalty aggravating factor when the victim suffers serious physical abuse or mental anguish before death, and mental anguish includes a victim's uncertainty as to his or her ultimate fate).

Nor can there be any question the State overwhelmingly proved the other three aggravating circumstances found by the jury: (1) Reginald Carr "knowingly or purposely killed or created great risk of death to more than one person." K.S.A. 2013 Supp. 21-6624(b); (2) Reginald Carr committed capital murder so he or another could receive money or items of value. K.S.A. 2013 Supp. 21-6624(c); and (3) Reginald Carr committed capital murder to avoid arrest or prosecution. See K.S.A. 2013 Supp. 21-6624(e).

The majority gives lip service to the standard of review—*i.e.*, to consider whether beyond a reasonable doubt the error *viewed in the light of the record as a whole*, had little, if any likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. But it entirely fails to conduct the analysis. Had it done so, I do not believe it could arrive at any conclusion other than that the severance error, if any, had little, if any, likelihood of changing the jury's ultimate conclusion. Instead, the court should hold that this jury, which demonstrated its willingness to independently assess the respective culpability of each defendant, appropriately conducted the required weighing of

aggravating and mitigating circumstances and concluded Reginald Carr deserved the penalty of death.

The people of Kansas, through the legislature, enacted a death-penalty scheme that comports with the Eighth Amendment and demonstrates the people's collective belief that death is the appropriate punishment for murder in certain circumstances. I am convinced Reginald Carr received a fair trial and that the jury imposed a sentence of death because it understood that his horrendous crime called for that sentence. Because I would affirm Reginald Carr's death sentence, I dissent.